1

2 **THOMAS C. GOLDSTEIN, ESQ.**
*Pro Hac Vice*
3 Goldstein & Russell, P.C.
7475 Wisconsin Avenue, Suite 850
4 Bethesda, MD 20814
Telephone: (202)362-0636
5 Attorney for Defendant *Darren Wai Kit Phua*

6 **DAVID Z. CHESNOFF, ESQ.**
Nevada Bar No. 2292
7 520 South Fourth Street
Las Vegas, Nevada 89101
8 Telephone: (702) 384-5563
Attorney for Defendant *Wei Seng Phua*
9

10 **RICHARD A. SCHONFELD, ESQ.**
Nevada Bar No. 6815
11 520 South Fourth Street
Las Vegas, Nevada 89101
12 Telephone: (702) 384-5563
Attorney for Defendant *Darren Wai Kit Phua*
13

14 **MICHAEL PANCER, ESQ.**
*Pro Hac Vice*
15 105 W F St # 4San Diego, CA 92101
**DAVID BROWN, ESQ.**
16 520 South Fourth St.
Las Vegas, NV 89101
17 Telephone: (702) 384-5563
Attorneys for *Seng Chen Yong and*
18 *Wai Kin Yong*

19

20                 **UNITED STATES DISTRICT COURT**
                        **DISTRICT OF NEVADA**
21

22 **UNITED STATES OF AMERICA**              )
                                            )
23 v.                                        )        **2:14-CR-00249-APG-PAL**
                                            )
24 **WEI SENG PHUA et al.,**                 )        **DEFENDANTS' JOINT MOTION TO**
                                            )        **SUPPRESS FRUITS OF**
25            **Defendants**                 )        **WARRANTLESS SEARCHES**
                                            )
26 ─────────────────────────────           )

27

28

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

1

## DEFENDANTS' JOINT MOTION TO SUPPRESS FRUITS OF WARRANTLESS SEARCHES

2

3          COMES NOW, WEI SENG PHUA, by and through his attorney, DAVID Z.

4   CHESNOFF, ESQ., DARREN WAI KIT PHUA, by and through his attorneys THOMAS C.

5   GOLDSTEIN, ESQ. and RICHARD A. SCHONFELD, ESQ., and SENG CHEN YONG and

6

7   WAI KIN YONG, by and through their attorneys MICHAEL PANCER, ESQ. and DAVID

8   BROWN, ESQ. and hereby file their Joint Motion to Suppress Fruits of Warrantless Searches.

9          This Motion is made and based upon the papers and pleadings on file herein, the

10  attached Memorandum of Points and Authorities, the attached exhibits, and any oral

11  argument/evidence that is heard.

12         Dated this 27th day of October, 2014.

13

**CHESNOFF & SCHONFELD**          **GOLDSTEIN & RUSSELL**

14

15   /s/ David Z. Chesnoff                         /s/ Thomas C. Goldstein
**DAVID Z. CHESNOFF, ESQ.**          **THOMAS C. GOLDSTEIN, ESQ.**

16  Nevada Bar No. 2292                       *Pro Hac Vice*
520 South Fourth Street                     7475 Wisconsin Ave.

17  Las Vegas, Nevada 89101                  Bethesda, MD 20814
Attorney for Wei Seng Phua             Attorney for Darren Wai Kit Phua

18

19

**CHESNOFF & SCHONFELD**          **LAW OFFICES OF MICHAEL**

20                                                            **PANCER**

21   /s/ Richard A. Schonfeld                    /s/ Michael Pancer
**RICHARD A. SCHONFELD, ESQ.**    **MICHAEL PANCER, ESQ.**

22  Nevada Bar No. 6815                       105 W. F. Street
520 South Fourth Street                     San Diego, CA 92101

23  Las Vegas, Nevada 89101                  **DAVID T. BROWN, ESQ.**

24  Attorney for Darren Wai Kit Phua       520 South Fourth Street
Las Vegas, NV 89101

25                                                            Attorneys for Seng Chen Yong and
Wai Kin Yong

26

27                                              ii

28

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

## TABLE OF CONTENTS

I.   INTRODUCTION................................................................... 1

II.  THE FACTS...................................................................... 4

A. The initial investigation into Villa 8888.......................................4

B. The available evidence regarding Villa 8881 and Villa 8882.............................. 6

C. The plan to conduct warrantless searches of the villas.......................... 8

D. The first warrantless search of Villa 8882....................................9

E. The first warrantless search of Villa 8881....................................12

F. Another warrantless search of Villa 8882 (and intrusion into Villa 8881)................. 15

G. The search warrant................................................... 20

III.  ARGUMENT...................................................................21

A.   The Villas' Residents Maintained A Constitutionally Protected Reasonable Expectation Of Privacy...................................................26

B.   The Government Violated The Fourth Amendment Because They Deceived The Residents Into Giving Up Their Privacy Without Any Reasonable Basis That They Would Find Evidence Of Illegality In The Villas...................... 28

C.   The Residents Made No Voluntary Choice To Admit The Agents Into The Villas... 31

  1.  The Government Violated The Fourth Amendment By Inducing The Residents To Give Up Their Privacy By Reporting The Internet Outage............................34

  2.  The Government Violated The Fourth Amendment By Inducing The Residents To Give Up Their Privacy When Wood And The Agents Appeared As Technicians With The Apparent Authority To Enter The Villas......................35

iii

D. The Residents Did Not Consent To The Searches But Instead At Most Granted Caesars A Limited License To Repair The Internet Connection…………………………………...37

    1.  The Agents Exceeded The Scope Of The Residents' Consent By Unnecessarily Entering The Villas………………………………………………………..38

    2.  The Agents Exceeded The Scope Of The Residents' Consent By Unnecessarily Remaining Within The Villas To Conduct A Search……… …………………….40

IV.      CONCLUSION……………………………………………………….….... 42

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

# TABLE OF AUTHORITIES

**<u>Citation</u>**                                                                  **<u>Page Number:</u>**

<u>***United States Supreme Court***</u>

*Bumper v. North Carolina,*
391 U.S. 543 (1968)……………………………………………………...22, 23, 32

*Florida v. Jardines,*
133 S. Ct. 1409 (2013)…………………………………………………...35, 40

*Georgia v. Randolph,*
547 U.S. 103, (2006)……………………………………………………..22, 26

*Gouled v. United States,*
255 U.S. 298 (1921)……………………………………………………..37

*Hoffa v. United States,*
 385 U.S. 293 (1966)……………………………………………………..32

*Lewis v. United States,*
385 U.S. 206 (1966)……………………………………………………..22, 41

*Moran v. Burbine,*
 475 U.S. 412 (1986)……………………………………………………..33

*Schneckloth v. Bustamonte,*
412 U.S. 218 (1973)……………………………………………………...23

*Stoner v. California,*
376 U.S. 483 (1964)……………………………………………………...21

*United States v. Davis,*
482 U.S. 893 (1973)……………………………………………………...23

*United States v. Jeffers,*
342 U.S. 48 (1951)……………………………………………………….26

*United States v. Jones,*
132 S. Ct. 945 (2012)…………………………………………………….35

*Wong Sun v. United States,*
371 U.S. 471 (1963)……………………………………………………...21

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

***Ninth Circuit Court of Appeals***

*Dietemann v. Time, Inc.,*
449 F.2d 245 (9th Cir.1971)................................................................... 40

*La Duke v. Nelson,*
762 F.2d 1318 (9th Cir. 1985).............................................................. 23

*United States v Chan-Jimenez,*
125 F.3d 1324 (9th Cir. 1997)............................................................. 22

*United States v. Bosse,*
898 F.2d 113 (9th Cir. 1990)............................................................... 41

United States v. Bramble,
103 F.3d 1475 (9th Cir. 1996).......................................................... 22, 41

*United States v. Cleveland,*
38 F.3d 1092 (9th Cir. 1994)............................................................... 21

*United States v. Cormier,*
220 F.3d 1103 (9th Cir. 2000)............................................................. 21

*United States v. Crawford,*
323 F.3d 700 (9th Cir. 2003)............................................................... 23

*United States v. Garcia,*
997 F.2d 1273 (9th Cir. 1993)..............................................................26

*United States v. Glassel,*
488 U.S. 143 (9th Cir. 1973)............................................................... 22

*United States v. Nerber,*
222 F.3d 597 (9th Cir. 2000)........................................................ 26, 40

*United States v. Patacchia,*
602 F.2d 218 (9th Cir. 1979)............................................................... 23

*United States v. Phillips,*
497 F.2d 1131 (9th Cir. 1974)............................................................. 32

*United States v. Reed,*
15 F.3d 928 (9th Cir. 1994)................................................................ 21

*United States v. Rothman,*
492 F.2d 1260 (9th Cir. 1973)............................................................. 32

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

*United States v. Shaibu,*
920 F.2d 1423 (9th Cir. 1990)…………………………………………... 23

*United States v. Vasey,*
534 F.2d 872 (9th Cir. 1987)…………………………………………… 24

*United States v. Wanless,*
882 F.2d 1459 (9th Cir. 1989)………………………………………….. 24

*United States v. Young,*
573 F.3d 711 (9th Cir. 2009)……………………………………… 21, 23

**_Seventh Circuit Court of Appeals_**

*Desnick v. Am. Broad. Cos., Inc.,*
44 F. 3d 1345 (7th Cir. 1995)……………………………………….....40

*United States v. Schuster,*
467 F.3d 614 (7th Cir. 2006)………………………………….…. 27-28

**_Sixth Circuit Court of Appeals_**

*United States v. Lord,*
230 F. App'x 511 (6th Cir. 2007)……………………………………… 22

**_Federal District Court_**

*United States v. Benezario,*
339 F. Supp. 2d 361 (D.P.R. 2004)…………………………………….28

*United States v.Boyd,*
910 F. Supp. 2d 995 (W.D. Mich. 2011)…………………….………... 36

*United States v. Broadhurst,*
2012 WL 5985615 (D. Or. Nov. 28, 2012)……………………………25

*United States v. Montes-Reyes,*
547 F. Supp.2d 281 (S.D.N.Y. 2008)………………………………… 32

*United States v. Montoya,*
760 F. Supp. 37 (E.D.N.Y 1991)……………………………………... 29

*United States v. Parson,*
599 F. Supp.2d 592 (W.D. Pa. 2009)……………………………….32, 33

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

vii

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

**State Courts**

*Arizona*

*State v. Poland,*
645 P.2d 784 (Ariz. 1982)……………………………………………………..37

*California*

*People v. Hodson,*
37 Cal. Rptr 575 (Cal. Ct. App. 1964) ……………………………………..36

*People v. Lathrop,*
160 Cal.Rptr. 654 (Cal. Ct. App. 1979)…………………………………..   33

*People v. Miller,*
56 Cal. Rptr. 865 (Cal. Ct. App. 1967)……………………………………36

*People v. Reeves,*
391 P.2d 393 (Cal. 1964)…………………………………………………...28

*People v. Reyes,*
98 Cal. Rptr. 898 (Cal. Ct. App. 2000)……………………………………34

*Illinois*

*Sotelo v. DirectRevenue, LLC,*
384 F. Supp. 2d 1219 (N.D. Ill. 2005)……………………………………..35

*Iowa*

*State v. Ahart,*
324 N.W.2d 317 (Iowa 1982)……………………………………………. 28

*Kentucky*

*Krause v. Commonwealth,*
206 S.W.3d 922, 925 (Ky. 2008)…………………………………….. 33

*Maryland*

*Brown v. State,*
835 A.2d 1208, 1211 (Md. 2003)…………………………………….. 32-33

*Nevada*

*State v. Hardin,*
90 Nev. 10, 518 P.2d 151 (1974)……………………………………………...26, 36

***Ohio***

*State v. Pi Kappa Alpha Fraternity,*
491 N.E.2d 1129 (Ohio 1986)……………………………………………………32-33

***Pennsylvania***

*Commonwealth v. Morrison,*
418 A.2d 1378, (Pa. Super. 1980)……………………………………………  44

<u>**United States Constitution**</u>

U.S. Const. amend. IV…………………………………………………………2, 21

<u>**Federal Statutes**</u>

18 U.S.C. § 1030……………………………………………………………………3, 27

<u>**Nevada Statutes**</u>

Nev. Rev. Stat. 205.477…………………………………………………………3, 27

<u>*Additional Authorities*</u>

Restatement (Second) of Torts…………………………………………...35, 39-42

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The next time you call for assistance because the internet service in your home is not working, the "technician" who comes to your door may actually be an undercover government agent. He will have secretly disconnected the service, knowing that you will naturally call for help and—when he shows up at your door, impersonating a technician—let him in. He will walk through each room of your home, claiming to diagnose the problem. Actually, he will be videotaping everything (and everyone) inside. He will have no reason to suspect you have broken the law, much less probable cause to obtain a search warrant. But that makes no difference, because by letting him in, you will have "consented" to an intensive search of your home.

The next time your telephone service goes out, the "repairman" who responds may actually be an FBI agent who cut the line himself. The next time your cable television service goes fuzzy, your plumbing backs up, or your lights go dark, *caveat emptor*: the source of the problem may actually be the government agent lurking in his car down the street, waiting for you to call for help—thereby unknowingly "consenting" to him using a secret camera to record you and the most private spaces in your home.

Even if you think that the next service outage in your home is real, so that an *actual* technician has responded, don't be so be sure. Your consent is just as valid when the undercover agent lies to your face to falsely reassure you—even when he misleads you by holding realistic-sounding telephone calls with made-up colleagues about what is actually a non-existent problem. So, every time any technician or service provider comes to your door,

1

you will feel the palpable dread that by opening it you are "consenting" to the government secretly spying on you and your family—with no basis whatsoever.

Or at least that is inevitably the government's astonishing position before this Court, because those are the appalling facts of this case.

Government agents disconnected the internet access of two hotel rooms occupied by fathers and their sons. Just the day before, the residents had refused the agents—who were impersonating technicians employed by the hotel—permission to enter. But this time the agents timed the outages to create an urgent problem, to ensure that they would be let in.

The residents reported the outages to the hotel—as every innocent person who wanted to preserve his privacy would do. The agents then dressed up as technicians again and—without even asking the residents for permission—were let in by employees of the hotel, which was cooperating in the investigation. In fact, it was impossible for the agents to fix the problem from inside the rooms. They were doing only one thing: searching for evidence.

Those searches were unconstitutional. This is not a close case. The residents had a reasonable expectation of privacy in their hotel rooms. The Fourth Amendment establishes a process before agents may enter and search our homes (and hotel rooms): a neutral and detached magistrate must find facts establishing probable cause. U.S. Const. amend. IV. Contrary to the government's novel and deeply troubling position—taken for the first time ever in this case—the Constitution does not permit agents to make that judgment themselves. The Fourth Amendment violation is considerably worse when, as here, the agents lack any reasonable basis for the warrantless intrusions.

2

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

Movants have been unable to find a single time in which any law enforcement agency in the country has ever resorted to using a scheme like this one—terminating a service to a residence in order to deceive the occupants into calling for assistance. Unsurprisingly, every court to consider anything *remotely* similar has found it flagrantly unconstitutional.

Indeed, it is apparent that the agents themselves harbored grave doubts about the constitutionality and legality of what they were doing, because they engaged in an extraordinary cover up. At least six people actively participated in the deception—three federal agents, a state agent, a hotel investigator, and a private contractor. They were in constant contact. The agents created numerous FBI Form 302s. They took hidden-camera videos. They used the fruits of the intrusions to submit an application for a search warrant. They filed a criminal complaint.

The Court naturally expects—and the law requires—that those voluminous records would be accurate: in this case, that they would acknowledge that the agents disconnected the internet service, then entered the rooms despite the fact that they could not actually restore the service from inside. Without those facts, no person reviewing the facts would know what actually happened. As a consequence, they could not recognize the serious questions about whether the residents consented to the searches and whether the participants in the searches broke the law by intentionally disrupting the residents' computers. *See* 18 U.S.C. § 1030; Nev. Rev. Stat. 205.477.

But everyone involved in the scheme omitted all of those facts from all of the records—their email communications, the 302s, the videotapes, the warrant application, and the criminal complaint. The agents even cautioned each other during the recordings that

3

1  "these still things are still on just so you guys know," so that no one would inadvertently

2  disclose the scheme. *See* Ex. F, Trans. Disc 3, p. 23, lines 12-15; Trans. Disc 2, p. 19 at lines

3  17-20.  Movants discovered the truth only because, on just one tape, the private technician and

4  the state agent slipped up and briefly discussed the deception in highly technical terms.  There

5  were two other recording devices, but the agents now say that both failed to record anything.

6  Ex. A, at 004213.

7        The motion to suppress should be—must be—granted.

## II.   THE FACTS[1]

### A.  *The initial investigation into Villa 8888*

      In June 2014, Caesars Palace Hotel & Casino ("Caesars") informed the Nevada Gaming Control Board ("Board") that residents of one villa in the hotel—Villa 8888, which is one of six located in a single building that Caesars provides free of charge to high-rollers (Ex. A, at 000236)—might be operating an unlicensed sports book taking bets on the 2014 FIFA Soccer World Cup. Ex. A, at 003616.

      A hotel worker had taken a picture of computers in Villa 8888—not because he thought the guests were engaging in illegal gambling, but to ensure the hotel returned their computer equipment at the end of their stay. Ex. A, at 000012, 000235-36.  The picture apparently raised no particular suspicions, given that Caesars did nothing with it for more than

LAW OFFICES
CHESNOFF & SCHONOFF
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

---

[1]  Several Exhibits accompany this motion.  Exhibit A contains documents produced by the government in discovery, in Bates stamp order.  Exhibit B contains documents submitted by movants, in Bates stamp order.  Exhibit C contains the search warrant application.  Exhibit D contains the search warrants for Villas 8881 and 8882.  Exhibit E contains the criminal complaint.  Exhibit F contains excerpts from transcripts of video recordings produced in discovery.  Exhibit G contains expert reports.  Exhibit H is a compact disc with the video recordings.

4

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

a week. Ex. A, at 000012, 000235, 003616.  Multiple residents of Villa 8888 departed in the meantime. Ex. A, at 002026, 002032, 003785.

A Caesars investigator later looked into the picture. Ex. A, at 003616-19.  He "did not find any criminal or other negative information" about the person who had booked Villa 8888 (defendant Hui Tang). Ex. A, at 003617.  But the investigator interviewed an electrician who had been inside the villa, and who—although he had no relevant expertise—thought the equipment resembled a sports book. Ex. A, at 003618.

Particularly relevant here, the investigator learned nothing that created any concerns about the residents of any *other* villa, including particularly Villas 8881 and 8882, which were occupied by two sets of fathers and sons.  Although "another room was tied to [Villa] 8888," Villas 8881 and 8882 were not. Ex. A, at 003617.  It was moreover the computers and accompanying "monitors and chairs" in Villa 8888 that led to suspicions that the residents of that villa were running "a boiler room operation (bookie operation)." *Id.*  But the investigator knew that a "tour of the villas" by Caesars' staff had revealed just a single "computer installed in Villa 8882" and none at all in Villa 8881. Ex. A, at 000012, 000235.

Caesars sent the results of its investigation to the Board on June 23, raising concerns regarding Villa 8888 alone. Ex. A, at 003616.  The Board began an investigation, together with the FBI. Ex. A, at 003894-95.  Caesars fully cooperated—for example, by providing extensive records about the villas' residents. Ex. A, at 000011, 000050, 000237, 000275, 003593.  These included the logs of every entry into and exit from the villas, as well as detailed logs regarding the residents' whereabouts and their requests to Caesars' staff.  The agents had access to Caesars' extensive network of cameras (which recorded every entry and

5

exit), including tapes spanning most or all of the residents' stay at the hotel. Caesars also authorized the private contractor responsible for maintaining the villas' high-speed internet connections (Mike Wood) to participate in the investigation, including by using the hotel's equipment and facilities. Ex. A, at 000179.

### B. *The available evidence regarding Villa 8881 and Villa 8882*

The agents began their investigation by trying to intercept the contents of the residents' internet communications without a warrant. They asked Caesars' outside internet service provider—Century Link—to provide information on those connections to Caesars, which would then turn it directly over to the government. Ex. A, at 003943. As the lead Board Agent—Rick Lopez—explained to a Caesars' employee, "you are a representative of the company that owns the lines why would you need any legal process. I can try calling the [law enforcement officer] line but they will say I need a warrant I think." Ex. A, at 003944. Once Caesars persuaded Century Link to cooperate, the inquiries were made by Caesars' outside technician, Mike Wood—who as noted was directly participating in the investigation. Among other things, Wood asked Century Link how he could access the internet modems located in the individual villas to view the history of the residents' internet activity. Ex. A, at 004077-78.

Through that effort and the rest of the investigation, the agents found no further evidence suggesting that anything illegal was happening in Villa 8888. Wood reported, for example, that his staff had installed DSL internet service in Villa 8888, but had not seen any computer equipment installed inside. Ex. B, at 000043.

Nor—importantly—was there any evidence of illegality in Villas 8881 or 8882. There was evidence, but it pointed in the opposite direction. The villas were staffed by nearly

6

round-the-clock butlers, and other staff entered as well—housekeepers, for example. Also, the agents knew that technicians had recently been present in each of the villas to install DSL internet service and DirecTV satellite television. But no one had reported anything suspicious about Villa 8881 or 8882.

Caesars' records also provided the government compelling evidence that the residents of the three villas were *not* operating a sports book together. If they were, the residents would have been together prior to and during World Cup matches. Otherwise the book could not operate, because so many bets would be made at that time. Ex. G, Sports Wagering Expert Report. The participants in a sports book would regularly meet at other times as well to discuss the daily matches—for example, the lines on upcoming games and the book's prior results. *Id.*

But Caesars' records showed exactly the *opposite*. The residents watched the World Cup in their own separate villas; and the residents of Villas 8881 and 8882 rarely interacted with those in Villa 8888. Indeed, the videotapes would have shown that the occupants of Villas 8881 and 8882 *never* visited Villa 8888. (The government has apparently reached the same conclusion, having advised Movants that it finds no "evidentiary value" in the tapes of the entries and exits from the villas.)

The villas' logs for June 16, 28, 29, and 30 are illustrative. They specify that the residents of each of the three villas *separately* "[d]ined in Villa and watched soccer." Ex. A, at 000057, 000060, 000066-67, 000142. The logs also include numerous other notations when different villas' residents were together, *e.g.*, Ex. A, at 000060, 000066, 000086, 000134, and are remarkably detailed, *e.g.*, Ex. A, at 000062, 000066. But there is no record of any resident

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

of Villa 8881 or Villa 8882 watching a single one of the dozens of soccer matches with a resident of Villa 8888.

### C. *The plan to conduct warrantless searches of the villas*

Ignoring all that, the agents decided to investigate not just Villa 8888, but also Villas 8881 and 8882. They did not have anything remotely approaching probable cause for a search warrant. The agents did know that one resident of Villa 8882 had been arrested in Macau—and released—on charges of engaging in sports betting in violation of Macau law. Ex. C, ¶ 6. But that fact did not remotely provide a basis to search the villas. There was, for example, no evidence that those activities involved either a violation of U.S. law or any activity in the villas at Caesars. Indeed, there was no evidence that the even Macau charges had any merit.

Apparently without taking any time to study the extensive records provided by Caesars, the agents nonetheless developed an extraordinary plan to conduct warrantless searches of all three villas. They would cut off the villas' high-speed internet service. The agents knew that the residents would be powerless to restore their computer access except through the technicians authorized by the hotel. Any guest using her computer online—including for perfectly innocent reasons—would of course report the outage and ask that it be repaired. Wood explained to Agent Lopez that, when they received the call for assistance, "I can tell them we've been having trouble with the DSLs this morning, but we may have to reset the modem. *Then you'd have to go to the room*." Ex. F, at Trans. Disc 2, p. 17, lines 5-8. The agents would then enter and search the villas under the guise of fixing the problem.

Wood and the agents implemented their plan starting on the morning of July 4. Wood disconnected the service during the World Cup matches, which was when the government

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

thought that the residents would be using their computers to watch the matches and (it also suspected) take bets.

Wood first cut the DSL internet service for Villa 8888. Because there are no records, Movants do not know whether the residents reported the outage to Caesars. But the plan went awry in any event, because if the residents did report it, Caesars did not tell Wood. Ex. F, at Trans. Disc 3, p. 17, lines 8-9. (Wood later explained that in his view the Caesars employees were not merely "dumb," but "[i]diots." Ex. F, Trans. Disc 3, p. 26, lines 20-25, p. 27, line 1.). The absence of any report from the villa would have suggested to Wood and the agents that their deception might fail, because the villas' residents might not be using the DSL internet service they were manipulating.

The agents then proposed disconnecting the other internet service in the same villa and, when the residents reported the outage, enter while impersonating a Caesars engineer. At this point, they consulted with the Assistant United States Attorney (AUSA) responsible for the case, Kimberly Frayn. No document produced by the government acknowledges the discussion. But a Caesars investigator recorded the discussion in a memorandum to the file. The AUSA directed the agents not to cut off the service because "it was a consent issue," so "they could not continue with the engineer plan." Ex. B, at 000044.

**D.** *The first warrantless search of Villa 8882*

The agents nonetheless decided to resolve their uncertainty about what internet service the residents were using by conducting yet another warrantless search. Later that morning, the residents of Villa 8882 coincidentally requested that the hotel provide them with a laptop computer. Ex. A, at 004138. Wood and Lopez delivered the laptop. Ex. A, at 000036. Lopez was dressed as a technician, instructed by Wood that he had to "look the part" and "go

9

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

all the way." Ex. F, Trans. Disc 2, p. 2, lines 7-11. Lopez played no genuine role, however; he came along only to gather evidence.

The butler for Villa 8882 met Wood and Lopez at the entry pantry, where they could have dropped off the laptop and left. Ex. A, at 000036. But Wood falsely stated that he was setting up the laptop. Ex. F, at Trans. Disc 3, at p. 8, lines 15-19. He was actually secretly using the villa's WiFi service to confirm that the residents were using the DSL connection. Ex. F, at Trans. Disc 2, at p. 9, lines 19-24.

Then Wood and Lopez tried to conduct a warrantless search of the villa. Lying, they told the butler that they needed to go past the pantry to check the internet connection. But that failed; the butler explained that the residents had instructed him to keep the villa private. Ex. F, at Trans. Disc 2, p. 7, line 8. In Lopez's words, the butler "reminded [Wood and Lopez] several times that [they] could not go any further into the Villa" and "was effectively blocking [their] way from coming further into the Villa." Ex. A, at 000036.

When the butler walked away—trusting that Wood and Lopez were actually technicians doing their job—they defied the residents' instructions and went in anyway. Anxiously whispering, *"let's go, before he gets back,"* Lopez hurriedly led Wood in. Ex. F, at Trans. Disc 2, p. 10, line 17.

They saw nothing suspicious. Ex. H, "First Villa 8882 Intrusion," at 18:20-19:00. Lopez heard a soccer game playing in the media room—no surprise, because that room exists to watch television—but he did not see inside, because the butler stopped them, again. Ex. F, at Trans. Disc 2, p. 10, line 19. Lying—again—Wood and Lopez tried to trick the butler—again—into disobeying the residents' instructions to keep the villa private from outsiders.

10

They told the butler that they needed to check the internet connection. Ex. F, at Trans. Disc 2, p. 10, lines 24-25. The butler patiently explained that the residents were in the media room, which they wanted to keep private. Ex. F, at Trans. Disc 2, p. 11, lines 2-25, p. 12, lines 1-4.

No real technician would have done that, knowing (as Wood and Lopez did) that it was working fine. Ex. G, Technical Expert Report. The butler declined to let them into the media room, explaining that the residents did not want to admit any person they did not know personally. *See id.* He then politely escorted Wood and Lopez out. Ex. F, at Trans. Disc 2, p. 14 Ex. H, "First Villa 8882 Intrusion," at 22:45-23:10.

Wood and Lopez recorded the search on hidden cameras. But they scripted their conversations so that anyone who later saw the recordings would believe that they were genuinely acting as technicians would. For example, when the two were entirely alone, they had a completely contrived conversation about whether the internet signal in the villa was strong enough, knowing that there was no actual problem. Ex. F, at Trans. Disc 2, p. 10, lines 2-6.

Lopez later told Wood that he was convinced the residents were operating a sports book out of Villa 8882. Ex. F, at Trans. Disc 2, p. 15, lines 1-21. He reasoned that the residents of Villa 8888—which had the computer installation—had not called for assistance when the agents cut their DSL internet connection, suggesting they were not using it. Also, Lopez could hear the World Cup match playing in Villa 8882's media room. *Id.* But he had no answer when Wood expressed doubts—contrasting the completely innocuous contents of Villa 8882 with the computers in Villa 8888. *Id.*

LAW OFFICES
CHESNOFF & SCHONOFF
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

11

Lopez created a formal Form 302 to record the results of the search. But he wrote it to misrepresent what occurred. According to his Form 302, when the butler let in Wood and Lopez, he "immediately" said that the residents "did not want anyone in there because they did not want anyone seeing their 'business,'" Ex. A, 000036, a phrase that the agents would later suggest in the warrant application was suspicious, Ex. C, ¶ 12. That is false. In fact, when the butler left the pantry, Wood and Lopez defied his instruction—and thus any supposed consent to their intrusion—and went into the villa anyway. It was *only then* that the butler, having located them inside, made the comment about the residents' "business." Ex. F, at Trans. Disc 2, p. 13.

### E. *The first warrantless search of Villa 8881*

The agents now knew through their entry in to Villa 8882 that the villas' residents were using the DSL connection. So, Wood and Lopez agreed that, in an hour, they would start disconnecting that service again, as the villas' residents continued to watch World Cup games. Because the government avoided creating any records acknowledging the disconnection, Movants do not know how the agents decided to continue with the disconnections despite having been told by the Assistant United States Attorney not to do so.

Wood went to the equipment that provided the DSL connections, restored access for Villa 8888, Ex. F, Trans. Disc 3, pp. 17-18, and—after a break to eat—cut it for Villa 8881. The residents apparently reported the outage to Caesars, which passed the information on to Wood. Ex. F, at Trans. Disc 3, p. 26, lines 20-21.

When Caesars relayed the report of the outage in Villa 8881, Wood could have restored the connection immediately. An actual technician would have done just that. Indeed, Wood knew for a fact that he *could not* do so from inside the villa. Ex. G, Technical Expert

12

Report. Nonetheless, Wood went to the villa, presenting himself as a technician working for the hotel. Ex. C, ¶ 13.

The butler apparently let him in and took him to the internet router, which was located in the villa's hallway. Ex. H, "Villa 8881 Intrusion," at 0:04. Just as in the visit to Villa 8882 earlier the same day, Wood saw nothing at all remotely suspicious. No one was making or taking bets. Also, in contrast to Villa 8888, there was no computer installation. Ex. H, "Villa 8881 Intrusion," at 0:07 to 0:27. After some time, Wood apparently made a cell phone call to tell a colleague to restore the connection.

Wood knew that the only problem that justified his presence in the villa was now fixed. Ex. G, Technical Expert Report. He had seen the signal restored on the router. Moreover, he was holding a laptop in *his own hands* that showed that the WiFi connection had been restored. But he was not done searching. He walked away from the router, through a second room, and to the entry to yet a third: the media room. There, he saw a single laptop, which was being used by defendant Seng Chen Yong. Ex. H, "Villa 8881 Intrusion," at 0:35 to 0:37. No other person—including any resident of Villa 8882 or Villa 8888—was there. *Id.*

From the doorway, Wood was too far away to read the words on the laptop screen. *Id.* He had no reason to get any closer. He knew without any doubt that the internet connection was restored. Even if he hadn't, he easily could have asked Yong from there to confirm that the connection was restored. But Wood instead walked closer, so that he could read the screen, under the guise of asking Yong if the connection was working. *Id.* at 0:37 to 0:50. He later told the agents that he believed that the screen showed odds for sports betting. (The basis for Wood's convenient statement that the betting was "illegal" is a mystery:  there is nothing

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

13

unlawful—and in Las Vegas, uncommon—about looking at sports betting odds on online sports betting sites. Indeed, it is perfectly legal not only to review odds but to place bets through licensed online sports books in the state. Ex. G, Sports Wagering Expert Report.) Wood then left.

Wood could have used another hidden camera to record the entire intrusion into Villa 8881, beginning with him cutting off the internet access. But he and the agents decided against that. Instead, Wood made a severely misleading cell phone video inside the villa. He started the video precisely moments *after* he instructed his colleague to restore the internet access. Ex. H, "Villa 8881 Intrusion," at 0:01 to 0:07. So the tape omits both the termination of the access and its restoration. Then, Wood conducted a fake conversation on the recording so that anyone who later watched the tape would think the intrusion was legitimate. Standing *entirely alone* in the villa, he said on the tape that he was "just going to test the signal" and "make sure I have a good connection everywhere," when he knew the connection had been purposefully disconnected and then restored. Ex. H, "Villa 8881 Intrusion," at 0:09 to 0:22.

Wood and the agents then crafted the only written records of the search to reinforce the *faux* legitimacy of the entry. Several agents were involved in the process, but *none* created the standard FBI Form 302 documenting what had occurred. So far as discovery has revealed, no one created any other record—no emails, text messages, or any other documents. In fact, the agents later affirmatively represented—falsely—that "[t]here were no other ops conducted than the ones listed in the 302s." Ex. B, at 000039. The very fact that Wood went alone to the villa in response to this first outage also leaves the false impression that the government was not involved. The upshot is that the government crafted both Wood's intrusion and the

14

records of it to create the false impression that the intrusion was not instigated by the government *at all*.

The agents may have thought that they could attribute the intrusion to Caesars and its contractor, concealing their responsibility under the Fourth Amendment. The agents went to considerable length to keep Wood's direct role in their investigation a secret. Lopez's 302 of the agents' interview with Wood vaguely states that Wood "agreed to aid us in the ongoing investigation." Ex. A, at 000179. That is seriously misleading because it omits Wood's agreement to the government's scheme. In reality, Wood expressly agreed to participate in the termination of the internet access, and he discussed with the agents how they could "pull the [DSL] line itself." Ex. A, at 003812, 004411.

The government later filed a criminal complaint stating that Wood "entered Villa 8881" after he "received a request to provide technical support assistance." Ex. D, at 6-7. That too is of course entirely misleading: it omits that Wood terminated the internet connection as an excuse to enter the villa as part of the government's investigation; that he initially saw nothing suspicious; and that he only entered the separate media room after the connection was restored.

**F.   *The second warrantless search of Villa 8882 (and intrusion into Villa 8881)***

The next morning, Wood cut the DSL connection to Villa 8882. The residents reported the outage to Caesars, which sent its own engineer to the villa. When that engineer saw that the router had no internet connection, he called Wood. Ex. F, at Trans. Disc 3, p. 28, lines 4-13. The government would have known that the connection could not be restored inside even if Wood *hadn't* disconnected it: when the same outage happened the day before in Villa 8881, it was fixed from outside. Ex. G, Technical Expert Report.

15

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

Wood nonetheless escorted Lopez and FBI Agent Michael Kung—both now impersonating technicians—to the villa, then went back to where he had disconnected the internet service. Ex. A, at 000038. Wood apparently had consulted with a lawyer since his first entry into the villa, Ex. B, at 000044, and determined not to return. The entry by Lopez and Kung was a farce. Neither had the skills to fix the connection, even if—contrary to the reality—the problem *had been* inside the villa. And the only reason to send a second person was to gather evidence; Wood had previously gone to Villa 8881 by himself. *See supra* at 6. Indeed, Kung went only because he spoke Chinese, and the agents hoped to overhear conversations in the villa that he would understand. Ex. A, at 3618. The circumstances were so suspicious that Wood and the agents carefully avoided encountering the Caesars engineer on the way to the villa. Ex. F, at Trans. Disc 3, p. 27, lines 22-25.

The agents also knew that, once inside, they would be acting differently from actual technicians. So, Lopez told Wood to have an explanation for why they "might do something weird," such as a false story that they were new employees. Ex. F, at Trans. Disc 3, p. 27, lines 12-16. Wood responded that he "already ha[d] that lined up." *Id.* at line 17.

When Lopez and Kung arrived at Villa 8882, they presented themselves as technicians to the female Caesars butler on duty—a different staff member than had been present the day before. "She asked if they were there to fix the DSL and they responded in the affirmative . . . ." Ex. A, at 000038. The butler admitted them and took them to the media room, where the router was located. Ex. A, at 000038, 000048. Lopez of course specifically knew from his previous visit that the residents regarded this room as very private and refused to permit an entry by any person they did not know. *See* Ex. F, at Trans. Disc 2, p. 7, line 8.

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

16

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

Nothing about what the agents saw in the villa—including when they entered the media room—was consistent with the operation of a sports book. Ex. G, Sports Wagering Expert Report. At various points during their time in the media room, there were five occupants. All of them were "transfixed on the soccer game on the television"; none were working or communicating by phone with anyone outside the room. Ex. A, at 000039. Only two—the father and son who were the residents—had computers; both were laptops; neither had an attached phone. Ex. A, at 000038. No one was on a phone of any kind—for example, making or taking bets. Ex. H, "Second Villa 8882 Intrusion – Part I," at 9:20-end.

A red light on the router showed that it was not receiving an internet connection—*i.e.*, that the source of the problem was outside the villa. Ex. F, Trans. Disc 3, pp. 33-35; Ex. G, Technical Expert Report. But unlike actual technicians, the agents did not have Wood promptly restore it. Instead, they did essentially the opposite: they conducted a speakerphone call in which Wood falsely claimed to be examining the external equipment to diagnose the (manufactured) problem. Ex. F, at Trans. Disc 3, pp. 36-37. Actually, he was stalling to give agents more time to examine the media room. *Id.* at p. 37, line 4. Lying, "Lopez assured [Phua] that they would get [the DSL] working." Ex. A, at 000038. When the agents had seen everything possible from their location in the room, Lopez used a secret code word to tell Wood to restore the connection. Ex. F, Trans. Disc 3, p. 25, lines 1-8, p. 36, lines 1-5.

The justification for the agents' presence had ended: just as with Wood's intrusion into Villa 8881, they not only knew that the connection had been restored, but they had their own laptop that showed that the WiFi connection was now working. But again like Wood, they were far from done searching. From the router, they "could not read what was being typed"

17

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

on the laptops. Ex. A, at 000038.  Maneuvering behind them, the agents asked the residents whether the connection was working.  Ex. F, at Trans. Disc 3, p. 39; Ex. H, "Second Villa 8882 Intrusion-Part II," at 1:00-4:00.  On the laptop of the father (defendant Wei Seng Phua), an agent saw what appeared to be betting odds and the message "Good luck with the hedge bet."  Ex. A, at 000048.  The son (defendant Darren Phua) tried to keep contents of his screen private, but the agent moved too quickly and caught a glimpse of the login page of a sports betting site.  Ex. A, at 000039.  (In sum, the agents saw evidence that could prove—at most—that Wei Seng Phua, at some time and in some place, had placed a single "hedge bet" and that Darren Phua had looked at sports betting odds.  But, of course, it is perfectly lawful and common to look at odds online and to place sports bets in licensed sports books—both online and in casinos like Caesars. Ex. G, Sports Wagering Expert Report.)

The government also used this opportunity to conduct *another* warrantless search of Villa 8881.  A guest in Villa 8882's media room—believing the lie that there was a problem with the internet router—took Agent Kung next door to retrieve the router from Villa 8881 as a replacement.  Ex. H, "Second Villa 8882 Intrusion-Part II," at 3:30-3:50.  Kung knew that entering Villa 8881 could not help restore the connection, but he went anyway.  He apparently did not see anything that would be consistent with the operation of a sports book; the government has never suggested otherwise.

Once they left the villas, the first comment of Lopez and Kung was to agree that the female butler was "pretty hot."  Ex. F, Trans. Disc 3, p. 39, lines 24-25.  Turning back to the case, Lopez subsequently explained that in Villa 8882, "We saw what we needed to see.  Very much."  Ex. F, Trans. Disc 3, p. 42, line 17.

18

Again, the government made sure that every record left the false impression that the agents had been invited into the villa to respond to a genuine outage and acted as actual technicians would have.    FBI Agent Kung's Form 302 starts: "Woods [sic] Telecommunications employees were contacted because the DSL in Caesars Palace villa 8882 was not functioning properly," so he and Agent Lopez "responded to the DSL inquiry."  Ex. A, at 000048.  Agent Lopez's Form 302 starts:  "the occupants of Caesar's [sic] Villa # 8882 called because they were having trouble with their DSL connection."  Ex. A, at 000038. Lopez then represents that from within the media room he "connected to the modem and went into the router configuration page to check the default settings."  *Id.*

Even as late as October 1, the agents were preparing Form 302s "to supplement and to clarify" the record they had previously created.  But these new records continued to maintain that Wood "responded to a technical request at Villa 8881 and conducted a consensual recording," as well as that "Agent Lopez and SA Mike Kung responded as technicians for the DSL in Villa 8882."  Ex. A, at 004213.  In fact, the residents merely reported the outages to Caesars (never making any request to Wood); they did so only because the government had (unbeknownst to them) caused the outages; Lopez had no ability to "check the default settings" for any genuine purpose; and the agents saw the evidence in question only after their manufactured justification for being in the villas had ended.

Immediately after leaving Villa 8882, Lopez had recognized that the sports-betting sites the residents were viewing were used to "wager"—*i.e.*, to *place*, not take, bets. Ex. F, Trans. Disc 3, p. 40, lines 13-16.  But in the Form 302 he created weeks later to document the search, he stated that in his opinion the residents were operating a "wire room" taking bets.

19

Given that there were only two laptops and no land telephones, and given that no person took or received a call the entire time, that is objectively implausible.  Ex. G, Sports Wagering Expert Report.

Lopez also took a hidden-camera video of the entry.  Ex. H, "Second Villa 8882 Intrusion-Part I"; *id.*, "Second Villa 8882 Intrusion-Part II."  But he started the recording only *after* Wood had disabled the internet connection, and no one took video—or created any other record—of Wood restoring it.  Because the agents conducted the fictitious call with Wood while they were in Villa 8882's media room, and then discussed between themselves how they had fixed the outage when *no one else was present*, Lopez's recording is tailored to create the false impression that the agents genuinely fixed a real outage.

## G. *The search warrant*

The agents subsequently applied for a warrant to search not just Villa 8888, but also Villas 8881 and 8882.  The application cites the facts gathered in the course of the warrantless intrusions—*i.e.*, that sports betting websites were being visited in Villas 8881 and 8882—as the only supposed basis to believe that evidence of illegality would be found in Villas 8881 and 8882.  Ex. C, ¶¶ 13, 14.  The application then attempts to link the residents of all three villas together.  Those supposed links are the subject of Movants' parallel Motion To Suppress under *Franks v. Delaware*.

Like the other records created by the agents, the application falsely characterizes the warrantless searches—this time for the magistrate judge—as if the agents had responded to a genuine internet outage.  It represents that Wood "entered Villa 8881" after he "received a request to provide technical support assistance," while Lopez and Wood "entered Villa 8882" after the residents "made an urgent request to [Wood] for technical assistance with the DSL in

20

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

Villa 8882." Ex. C, ¶¶ 13, 14.  The application conceals from the magistrate that the agents caused the outages; that the residents did not contact Wood; that the agents could not repair the outages from within the villas; or that they saw the evidence in question only by remaining in the villas after the connection had been restored.

The magistrate judge—unaware of any Fourth Amendment issue created by the warrantless intrusions—granted the application to search all three villas.  The agents subsequently executed the warrant, seizing a variety of electronic devices and various documents. (Among these was the laptop delivered to Villa 8882; when subsequently seized by the government, it did not contain any evidence of illegality by the villa's residents.)  The agents also individuals who were in the villas at the time of the search.

This Motion seeks to suppress all the fruits of the warrantless intrusions, including the evidence secured in the execution of the resulting search warrant.

### III.    ARGUMENT

The Fourth Amendment protected the privacy of the occupants of Villas 8881 and 8882.[2]  The agents and Wood—who was for present purposes a government agent because he was actively participating in the investigation[3]—intruded on that constitutionally protected zone of privacy by entering and searching the villas.  Absent some applicable exception to the warrant requirement, the fruits of the searches must be suppressed.[4]

---

[2] U.S. Const. amend. IV; *see Stoner v. California*, 376 U.S. 483 (1964) (Fourth Amendment applies fully to hotel rooms); *see also United States v. Cormier*, 220 F.3d 1103, 1108-09 (9th Cir. 2000); *United States v. Young*, 573 F.3d 711, 716 (9th Cir. 2009).

[3] *See United States v. Cleveland*, 38 F.3d 1092, 1093 (9th Cir. 1994); *United States v. Reed*, 15 F.3d 928, 931-33 (9th Cir. 1994).

[4] *E.g., Wong Sun v. United States*, 371 U.S. 471, 448 (1963).

21

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

The government presumably intends to defend the warrantless searches on the ground that the residents "consented." The government is not required to secure a warrant if a resident "freely and voluntarily" consents to the intrusion—*i.e.*, she makes a conscious, uncoerced choice to give up her privacy.[5]

Applying that principle, courts have held that an agent may deceive residents about his identity if invited in to commit a crime such as buying illegal drugs—an invitation that creates a reasonable suspicion of illegality.[6] Or the agent may go into a home without creating a false identity if it is open to the public—for example, because it is offered for sale[7] or if it is essentially being run as a business and the owner knows the invitee.[8]

But contrary to the apparent view of the government in this case, those decisions do not announce a general rule that the Fourth Amendment's protections evaporate every time a government agent is admitted into a home—no matter what the circumstances. The AUSA at least initially ordered the agents not to engage in these intrusions precisely because there was "a consent issue." Ex. B, at 000044.

The Constitution specifies that a search requires a warrant. The Supreme Court has therefore limited "consent" to the narrow role of a "jealously and carefully drawn exception" to that requirement.[9] Accordingly, in asserting in this case that the villas' residents' consent vitiated the obligation to secure a warrant, the government bears a "heavy burden" of proof[10]

---

[5] *Bumper*, 391 U.S. at 548.

[6] *See, e.g.*, *United States v. Bramble*, 103 F.3d 1475 (9th Cir. 1996); *United States v. Glassel*, 488 U.S. 143 (9th Cir. 1973).

[7] *United States v. Lord*, 230 F. App'x 511 (6th Cir. 2007).

[8] *Lewis v. United States*, 385 U.S. 206 (1966).

[9] *Georgia v. Randolph*, 547 U.S. 103, 109 (2006).

[10] *United States v Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997).

22

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

that is subject to "the most careful scrutiny."[11]  Because the Fourth Amendment protects our residences in particular, the government's burden "is heaviest" when—as in this case—it claims that it received consent to search a home or hotel.[12]

In this case, the warrantless searches provided the only evidence suggesting that evidence of illegality would be found in Villa 8881 and 8882.  Without that evidence, the magistrate judge would not have issued a search warrant.  It was only through the warrantless intrusions that, as Lopez acknowledged, he was able to get "what we needed.  Very much." *See* App. F, Trans. Disc 3, p. 42, line 17.  The agents also consistently exploited the unconstitutional warrantless intrusions to further their investigation, the fruits of which were themselves used in the application.  For example, they used the initial intrusion into Villa 8882—which was ostensibly to drop off a laptop—to determine that the residents were using the DSL connection and that they were in the media room where the router was located.  App. F, at Trans. Disc 3, at p. 8, lines 15-19.  Both those facts were essential to their subsequent ability to gain entry to see the residents' laptops.  The agents then used the videos from the unconstitutional intrusions to develop information about individuals they wanted to pursue in the investigation, an opportunity they described as "Exciting stuff!"  App. A, at 003810.

Because the unconstitutional warrantless searches were the principal basis for the magistrate's subsequent decision issue to search warrant, it is "fundamental that" the fruits of

---

[11] *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973).

[12] *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009); *see also United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990). *See generally United States v. Davis*, 482 U.S. 893, 914 (1973); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979); *United States v. Crawford*, 323 F.3d 700, 718 (9th Cir. 2003); *La Duke v. Nelson*, 762 F.2d 1318, 1329 (9th Cir. 1985).

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384.5563

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

that warrant must be suppressed as well.[13]   The Ninth Circuit has thus not hesitated to order suppression when unlawfully obtained evidence was itself the principal link leading the government to conduct further searches.  In *United States v. Wanless*, an unlawful traffic stop led officers to conduct a further search of the vehicle.  The court held that the fruits of the vehicle search must be suppressed because the only evidence validly available to the officer who made the stop—*viz.*, that the driver was a drug user—did not establish probable cause to search the car.  The court found particularly compelling what that evidence did *not* show: "The troopers did not detect any drug or drug-related odors; nor did they see any items that they could reasonably believe were controlled substances."[14]

Similarly, in *United States v. Vasey*, officers used the fruits of an unconstitutional warrantless search of a vehicle to obtain a warrant.  There was untainted evidence.  It showed that the suspect had acted evasively, had an outstanding arrest warrant on a drug-related charge, was carrying over $1000 in cash, and had a sealed container of an unknown type of pills.[15]   Moreover, the officer had five years of police experience.  Nonetheless, the Ninth Circuit did not hesitate to suppress the fruits of the warrant because that untainted evidence did not establish probable cause, given that there was "little or no evidence indicating that Vasey's car contained contraband."[16]

---

[13] *See United States v. Wanless*, 882 F.2d 1459, 1465 (9th Cir. 1989); *United States v. Vasey*, 534 F.2d 872, 789 (9th Cir. 1987) (explaining that the "good faith exception is not applicable" when an officer "conducted an illegal warrantless search and presented tainted evidence obtained in this search to a magistrate in an effort to obtain a search warrant" because "[t]he constitutional error was made by the officer . . . not by the magistrate").
[14] *Id.*
[15] *Id.*
[16] *Id.*

24

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

More recently, the court in *United States v. Broadhurst*[17] suppressed the fruits of a search warrant when the warrant application contained important evidence that the agents had obtained illegally.   Officers had determined that ten Internet Protocol (IP) addresses potentially tied to any of six different residences were involved in sharing child pornography.[18]   The police believed that the multiple addresses arose from the fact that a single suspect was hijacking his neighbors' unsecured wireless routers.  *Id.*  While attempting to pinpoint the suspect's location, the police trespassed onto the defendant's property, then used that evidence in support of its application for a warrant.[19]  The court suppressed the fruits of the warrant, recognizing that the untainted evidence underlying the warrant application provided "no reason to single out defendant's home" as opposed to the other residents (or vehicles) in the area.[20]

Because the initial warrantless intrusions in this case violated the Fourth Amendment, all the fruits of those searches—including the results of the search warrant—must be suppressed.  Well-settled law provides three independent reasons that the government cannot come *close* to satisfying its heavy burden of proving that the residents "consented" to the warrantless searches:

> *First*, when the government used a false identity and created the fictitious service outage to deceive the residents into giving up their privacy, it had no reasonable basis to suspect that the villas contained evidence of illegality. *See* Part III-B, *infra*.

///

---

[17] No. 3:11-cr-00121-MO-1, 2012 WL 5985615 (D. Or. Nov. 28, 2012).
[18] *Id.* at *9.
[19] *Id.* at *6.
[20] *Id.* at *9.

25

*Second*, the villas' residents did not "consent" to the searches in the sense required by the Fourth Amendment, because the government used the outages and their own appearance as technicians employed by Caesars to thwart the residents' desire to maintain their privacy. *See* Part III-C, *infra*.

*Third*, at most, the residents granted a limited license to repair the internet connection, which the agents violated twice—first by unnecessarily entering the villas and then by engaging in searches after they had restored the connection. *See* Part III-D, *infra*.

## A. The Villas' Residents Maintained A Constitutionally Protected Reasonable Expectation Of Privacy.

In cases of mistaken consent, "general Fourth Amendment principles apply: the ruse becomes a search if it intrudes on the person's reasonable, subjective expectation of privacy." *United States v. Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993). "To establish a 'legitimate' expectation of privacy, [an individual] must demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was 'one that society is prepared to recognize as reasonable.'" *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000) (citation omitted).

Here, the residents' "reasonable expectation of privacy" is plain. They did not invite in strangers; to the contrary, they sought to exclude them. The hotel had no authority to admit anyone.[21] Nevada recognizes—in the Fourth Amendment context itself—the right of a hotel guest to exclude third parties.[22]

With respect to Villa 8882 in particular, the residents' refusal to consent could not be more stark. When they delivered the laptop, Wood and Lopez sought to enter the villa—including its media room in particular—using the *identical* deception of pretending to check

---

[21] *See, e.g., Georgia v. Randolph*, 547 U.S. 103, 112 (2006); *United States v. Jeffers*, 342 U.S. 48, 51-52 (1951).

[22] *See State v. Hardin*, 90 Nev. 10, 12, 518 P.2d 151, 152 (1974).

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

the internet connection.   They were refused; the butler relayed the residents' express instructions to keep that room private from strangers.   What more could be done to maintain the residents' privacy than that, in Lopez's words, the butler—acting at the residents' direction—"was effectively blocking [their] way from coming further into the Villa"? *See s* Ex. A, at 00003610.

The residents' expectation of privacy is not diminished by the wildly hypothetical possibility that someone was purposefully disconnecting their internet access in order to create an excuse to come in.   Who expects that a hotel will permit someone to interfere with the basic services it provides?   When the power goes out or the water stops running or the internet connection stops working, the guest of course calls the front desk and, if a hotel engineer comes to the door, lets them in.

That expectation of privacy is greatest with respect to internet services.   The federal government recently fined a hotel hundreds of thousands of dollars for interfering with its guests' WiFi access. *See* Press Release, Federal Communications Commission, *Marriott to Pay $600,000 to Resolve Wifi-Blocking Investigation* (Oct. 3, 2014), http://www.fcc.gov/document/marriott-pay-600k-resolve-wifi-blocking-investigation.

Interfering with individuals' use of their computers is also a federal and state crime.[23] Here, Wood and the agents blocked the residents' internet access specifically to prevent their

---

[23] *See* Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030(a)(2)(C) (making it a crime to "access without authorization" or "exceed authorized access" any computer used in interstate commerce), 1030(a)(5)(A)-(C) (making it a crime to knowingly, recklessly, or intentionally damage a protected computer) ); Nev. Rev. Stat. 205.477(1) (making it a crime to "den[y] or cause[] the denial of access to or use of a computer, system or network"). *See also United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012) (CFAA applies to computers with internet connections). *See, e.g., United States v. Schuster*, 467 F.3d 614 (7th Cir. 2006)

27

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

computers from functioning as intended.  An individual cannot be deemed to have anticipated that a third party terminated her internet connection, when doing so—including perhaps on the facts of this very case—could be a federal felony.

**B. The Government Violated The Fourth Amendment Because They Deceived The Residents Into Giving Up Their Privacy Without Any Reasonable Basis To Believe That They Would Find Evidence Of Illegality In The Villas.**

The Fourth Amendment does not give the government free license to engage in deception in order to secure entry into private spaces despite the residents' reasonable expectation of privacy.  Undercover agents may enter a space into which the public has been invited—as when a house is open to prospective buyers.  But when the agents instead engage in affirmative deception about their identities to trick a person into giving up her privacy, the resulting intrusion is *per se* unconstitutional absent reasonable suspicion of illegality.  That condition is satisfied, for example, when the resident invites the agent in to purchase drugs.

Thus, a search is "clearly invalid" and "patently unreasonable as an arbitrary intrusion when it is based upon consent obtained by deception unless there is a justifiable and reasonable basis for the deception."[24]  That prerequisite is essential to protecting innocent individuals from gross intrusions on their privacy.  If the agents were instead permitted to

_____

(defendant who knowingly accessed wireless network, disrupting the connections of paying customers).

[24] *State v. Ahart*, 324 N.W.2d 317, 319 (Iowa 1982); *see also United States v. Benezario*, 339 F. Supp. 2d 361, 364, 368 (D.P.R. 2004) (finding that the agents' ruse to obtain consent to search the property of an individual, whom the agents did not know and were not even sure committed a crime, was not permissible); *Maldonado Garcia*, 655 F. Supp. at 1367 ("[O]fficers cannot use a ruse to gain access unless they have more than mere conjecture that criminal activity is underway."); *People v. Reeves*, 391 P.2d 393, 396 (Cal. 1964) ("Unless the officers had reasonable cause to enter Reeves' room before the door was opened they cannot lawfully rely on any information secured by inducing the opening of that door by ruse or subterfuge.  It is well settled by both federal and state decisions that 'an entry obtained by trickery, stealth or subterfuge renders a search and seizure invalid.'" (citation omitted)).

engage in deception when they "do not have at least reasonable suspicion that the occupants are engaged in crime," then could target literally anyone to intrude on their privacy.[25]   Such wholly suspicionless searches are by definition "unreasonable."

Applying those principles, the warrantless intrusions in this case violated the Fourth Amendment from the outset.   The dispositive question is whether the agents had any reasonable basis to believe that there would be evidence of illegality in specific physical spaces:   Villa 8881 or 8882.   There was not.   No person—including any of the Caesars employees who entered those villas—reported anything suspicious.   Nor had any witness reported engaging in any illegal activity with the residents of those villas, including sports betting, in the United States.

Further, as discussed, all of the available evidence—which was substantial— contradicted the hypothesis that the residents of the three villas were operating a sports book together; they were apart not only generally, but during the World Cup matches in particular. That fact was demonstrated by the records provided by Caesars, as well as by the fact that Wood and the agents *themselves* went to Villa 8881 and 8882 during World Cup matches. The villas' residents were there, but the residents of Villa 8888 were not.   This would have to be the surreal, mythical sports book that supposedly takes "hundreds of millions of dollars in illegal bets," Ex. C, ¶ 6, yet—although the principals are all located in the same building— they have little to do with each other.

There were still other records available to the government through Caesars—the butlers logs for each villa—which made the identical point.   Inexplicably, the agents did not ask for them.   The butler's logs for Villa 8888 thus note when a resident of another villa

---

[25] *United States v. Montoya*, 760 F. Supp. 37, 39 (E.D.N.Y 1991).

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

visited. Ex. A, at 002017. The only such entry for residents of Villa 8881 or 8882 is that on June 28 "[f]our ladies went to night club at 12:30 with 8881 guests." Ex. A, at 002025.

This case also perfectly illustrates *why* the courts have insisted on reasonable suspicion as a prerequisite to engaging in deception to gain entry into a residence. Barely after starting their investigation, and without studying available records or asking for other available materials, they settled on a plan to enter the villas without a warrant. The searches were addictive: the agents tried the deception on all three villas, and ultimately entered two of them twice. They were expressly told in the clearest possible terms that they could not enter the premises, yet defied that instruction and showed no regard for the residents' privacy.

Indeed, the agents repeatedly sought to use essentially the same scheme to enter Villa 8888 other times. When the effort to disrupt the DSL service in that villa failed, they asked the AUSA's permission to cut the other internet service. *See* Ex. B, at 000044. Then, on July 8, residents of Villa 8888 requested that Caesars provide them with a printer toner cartridge. But the hotel did not comply with that straightforward request. Rather, Wood prepared to deliver the cartridge as an excuse to look around inside that villa, into which they had previously been unable to gain warrantless access. Ex. A, at 004167-71. But the plan failed when the residents decided to use a cartridge from another printer instead. Ex. A, at 004173. The effort to keep these intrusions secret was so pervasive that the Caesars investigator wrote Agent Lopez a cryptic, one-sentence email: "Rick, 8888 needs a printer cartridge for the fax machine." Ex. A, at 004167. No person who did not already know of the government's scheme could decipher that communication.

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

The government's systematic and sustained efforts to evade the warrant requirement also easily distinguish this case from any other ever approved by any court. The cases in which courts have held that the Fourth Amendment permits an undercover agent to enter a residence on the basis of "mistaken consent" are essentially one-off isolated intrusions—*e.g.*, a single drug sale. This case, in stark contrast, involves an extensive, multi-day scheme. The government employed sophisticated equipment and multiple layers of participants—the agents, Wood and his employees, and employees of Caesars.

In contrast to an offer to buy drugs, here the government carefully timed each of the outages. It then sent into the private residences agents who were only searching, not engaging in a transaction; indeed, were completely incapable of fulfilling the only supposed basis for their presence inside. If this Court authorizes this duplicity, the government will be free to employ similar schemes in virtually every context to enter the homes of perfectly innocent people. Agents will frequently have no incentive to follow the warrant procedure required by the Constitution. Agent Lopez was perfectly candid that his investigative efforts were designed to avoid a finding that "I need a warrant." *See* Ex. A, at 003944.

Because the agents had no reasonable basis for targeting the villas' residents for deception, the warrantless intrusions violated the Fourth Amendment.

## C. The Residents Made No Voluntary Choice To Admit The Agents Into The Villas.

Even if the agents had possessed reasonable suspicion, the warrantless intrusions would have violated the Fourth Amendment because this is not a case of "mistaken consent." There was no actual "consent" at all.

The mere fact that agents are admitted into a residence does not signify "consent" in the Fourth Amendment sense. For example, a police officer does not have valid "consent" to

31

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

search if he nominally asks permission but indicates that he has the right to enter a residence anyway.[26] Nor may a police officer come to the door of a residence, falsely claim that he saw a burglar enter a back door, and enter based on the supposed "consent" of the occupants.[27]

"Consent" in the sense that excuses the government from securing a warrant instead refers to an independent choice to surrender one's privacy, uninfluenced by government coercion. When the resident makes that choice, he no longer exhibits a reasonable expectation of privacy. By contrast, any amount of coercion renders the search unconstitutional because "no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."[28]

When as in this case an individual *does* seek to maintain her privacy, the government engages in coercion by tricking her into giving it up. The Supreme Court has thus explained, "The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area."[29] For that reason, the government's deception is "an important" factor undermining a finding that the residents consented to an intrusion.[30]

---

[26] *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).
[27] *United States v. Phillips*, 497 F.2d 1131, 1135 (9th Cir. 1974).
[28] *Schneckloth*, 412 U.S. at 228; *see also Parson*, 599 F. Supp.2d at 602 ("Courts carefully consider the circumstances under which consent is obtained. . . . Consent is voluntary if it's the product of an essentially free and unconstrained choice by its maker.'").
[29] *Hoffa v. United States*, 385 U.S. 293, 301 (1966); *see also United States v. Montes-Reyes*, 547 F. Supp.2d 281, 286 (S.D.N.Y. 2008) ("[T]he fundamental question—was the defendant's consent voluntary in light of all of the facts and circumstances?—does not change simply because one of those 'circumstances' is the use of a deceptive tactic by law enforcement."); *cf. United States v. Rothman*, 492 F.2d 1260 (9th Cir. 1973) ("Where the consent is obtained through a misrepresentation by the government . . . such consent is not voluntary.").
[30] *Brown v. State*, 835 A.2d 1208, 1211 (Md. 2003); *see also, e.g., State v. Pi Kappa Alpha Fraternity*, 491 N.E.2d 1129 (Ohio 1986) (evidence suppressed where undercover officers

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

1   The legal question is "whether this particular ruse frustrated the purpose of the

2   constitutional requirement that consent to make a warrantless entry into and search of a home

3

4   must be voluntary, and thus, free of implied or express coercion."[31]   In this case, the residents

5   did not voluntarily abandon their privacy by "consenting" to the intrusions.   Instead, in the

6   words of the leading treatise, the government deprived the villas' residents "of the ability to

7   make a fair assessment of the need to surrender [their] privacy."[32]

8       A hypothetical illustrates the point.   The government could not seriously argue that the

9

10  villas' residents "consented" to the searches if the agents—posing as technicians—had simply

11  shown up at the villas' doors, told the residents the lie that there was an internet outage that

12  they needed to come in and fix immediately, and been admitted.   The result cannot be

13  different in this case—because the residents' expectation of privacy remains the same—just

14  because the agents deceived the residents even *more*, making the identical lie more believable,

15  by doubling down and creating a fictitious outage before they arrived.

16

17      As discussed below, in two respects, the government's scheme violated the Fourth

18  Amendment because it "served to overcome the [residents'] reticence or resistance to the

19  search."[33]   First, Wood and the agents terminated the internet connections precisely in order to

20  leave the residents with essentially no choice but to report the outage.   Second, they then

21  presented themselves as technicians with the apparent authority to enter the villas.

22

23  entered fraternity house based on false claim of interest in joining); *People v. Lathrop*, 160
    Cal.Rptr. 654, 655 (Cal. Ct. App. 1979) (evidence suppressed where officers entered based on
24  false claim to be a new neighbor needing to use the phone).
    [31] *Krause v. Commonwealth*, 206 S.W.3d 922, 925 (Ky. 2008).   *Cf. Moran v. Burbine*, 475
25  U.S. 412, 421 (1986) (waiver is voluntary if "it was the product of a free and deliberate choice
    rather than intimidation, coercion, *or deception*" (emphasis added)).
26  [32] LaFave et al., Criminal Procedure § 3.10(c).
    [33] *United States v. Parson,* 599 F. Supp.2d 592, 603 (W.D. Pa. 2009).
27
                                              33
28

### 1. The Government Violated The Fourth Amendment By Inducing The Residents To Give Up Their Privacy By Reporting The Internet Outage.

The government overcame the residents' efforts to maintain their privacy only by secretly terminating the internet connection of Villas 8881 and 8882 in order to interfere with the residents' computers in a way that would create a mirage: that the residents could continue with their private online activities only if they invited a third-party onto the premises. When there was no outage, the agents had been refused entry into Villa 8882. The agents specifically triggered the outage when the residents were most likely to be using their computers through the internet, precisely in order to produce an "urgent" request to restore the connection. As Wood and Lopez expressly agreed, the plan was designed to make the residents believe the technicians "have to go to the room." *See* Ex. F, at Trans. Disc 2, p. 17, lines 5-8.

The dispositive fact is that any innocent person would have done just as the villas' residents did: report the outage. Thus, in *People v. Reyes*,[34] the court suppressed evidence that the government acquired when a resident emerged from his apartment in response to the undercover officer's false claim to have hit the resident's truck.

The court reasoned:

> [B]ecause the police lure was one that *almost no one, crooked or not, would refuse*, we think the police went too far and that defendant's cooperation was involuntary from the outset. We would not find that to have been the case, however, had the undercover officer invited Reyes to step outside to engage in some sort of criminal activity. The law tolerates that type of deception, so long as it is not accompanied by inappropriate inducements or pressure, because it poses *no threat to the honest citizen*, only to those predisposed to criminal behavior.[35]

---

[34] 98 Cal. Rptr. 898 (Cal. Ct. Ex. 2000).
[35] *Id.* at 900 (emphasis added).

34

LAW OFFICES
CHESNOFF & SCHONOFF
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

Moreover, it was only by disconnecting the internet service that Wood and the agents saw the residents' *laptop screens*, which were the only source of the evidence secured in the warrantless searches. Any other deception—for example, a claimed need to repair the electricity or plumbing—would have given them no reason to enter the private media rooms. If they had not engaged in the further deception of claiming the need to check whether the laptops were connected to the internet, the residents likely would have closed their lids, shielding them from view. Darren Phua tried to do just that. *See* Ex. A, at 000039.

Government agents specifically violate the Fourth Amendment when they trespass on private spaces without a warrant—a "property-rights baseline" that the Supreme Court has applied because it "keeps easy cases easy."[36] The agents' intentional interference with the villas' internet connection was a classic "trespass to chattels"—Wood and the agents no doubt intentionally "intermeddled" with the occupants' ability to use their property.[37]

**2. The Government Violated The Fourth Amendment By Inducing The Residents To Give Up Their Privacy When Wood And The Agents Appeared As Technicians With The Apparent Authority To Enter The Villas.**

An individual cannot be said to have voluntarily "consented" to a search by a person who presents himself as someone employed by the property owner. At the very least, that suggestion of authority to enter the premises materially influences the individual's decision, an element of coercion that renders the supposed "consent" invalid for Fourth Amendment purposes.

[36] *Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013); *see also United States v. Jones*, 132 S. Ct. 945, 952 (2012) (reasonable expectations of privacy have been "*added to*, not *substituted for*, the common-law trespassory test").
[37] *See* Restatement (Second) of Torts § 217; *see Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1230 (N.D. Ill. 2005) (collecting cases).

35

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

It appears that every court to consider the question has held that there is no valid "consent" when the investigation has been conducted by someone who is—or poses as someone who is—acting at the direction of the property owner. The court in *United States v. Hardin*,[38] found no consent when an apartment manager sought to enter the premises while falsely claiming to investigate a water leak. Similarly, the court in *United States v. Boyd*,[39] found no consent when the undercover officer presented himself as a maintenance employee, reasoning that "the false identity in this case is especially troubling":

> Investigator Millard's statement that he was "Tim from maintenance" escalated the pressure on the occupants of the apartment in a way that other false identities would not. Investigator Millard . . . did not represent himself and Investigator Ghiringhelli as *strangers, social guests, or door-to-door salespersons, none of whom have any right to enter a dwelling*. The false identity used here, however, creates *an entirely different expectation in the mind of a reasonable person*. Landlords normally have the right to enter rental units *for maintenance purposes*, at least if they can do so without breach of the covenant of quiet enjoyment, or any express limits in a rental contract. Thus, a knock from 'maintenance' carries more force than a knock by someone who does not have a lawful right to enter.[40]

In this case, the residents did not consent to *any* person entering the villas. They merely told Caesars that the internet was not functioning and indicated that it should be fixed. Nothing about that report intrinsically authorized a third party to enter the villas. The very nature of internet service is that it originates from outside through the use of a wide array of external equipment. Ex. G, Technical Expert Report.

---

[38] 539 F.3d 404 (6th Cir. 2008).

[39] 910 F. Supp. 2d 995 (W.D. Mich. 2011).

[40] *Id.* at 1003 (emphasis added). *See also, e.g., In re Robert T.*, 88 Cal. Rptr. 37 (Cal. Ct. Ex. 1970) (manager claimed to want to inspect premises); *People v. Miller*, 56 Cal. Rptr. 865 (Cal. Ct. App. 1967) (manager knocked on an apartment door so that the officers could look inside); *People v. Hodson*, 37 Cal. Rptr 575 (Cal. Ct. Ex. 1964) (officer claimed to be apartment manager).

36

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

Wood and the agents got in only by presenting themselves at the villas as technicians operating at Caesars' direction. They knew that they had to "look the part." *See* Ex. F, Trans. Disc 2, p. 2, lines 7-11.

When Wood and the agents encountered the residents in the villas' media rooms, they *again* did not request permission to enter. A reasonable hotel guest would not believe—or at least would doubt—that he had the authority to refuse to permit the technicians acting at Caesars' direction to enter to repair Caesars' telecommunications equipment. In fact, the deception was designed to produce exactly that reaction.

In sum, by first terminating the villas' internet access, and then entering the villas while posing as technicians with the authority to be on the premises, the government deprived the residents of the opportunity to make a genuine choice whether to consent to the agents' entries and searches. The searches accordingly violated the Fourth Amendment.

**D. The Residents Did Not Consent To The Searches But Instead At Most Granted Caesars A Limited License To Repair The Internet Connection.**

There is a third, independent reason that the government cannot carry its "heavy burden" of showing that the villas' residents consented to the searches. Even if an individual mistakenly consents to an intrusion by a government agent, he retains the expectation of privacy that the invitee will act as a private person would in the same circumstances. The scope of the resident's consent is "limited to conduct which would be normal for one adopting the disguise used in seeking entry."[41]

---

[41] *State v. Poland*, 645 P.2d 784, 792 (Ariz. 1982). *See also Gouled v. United States*, 255 U.S. 298 (1921) (Where defendant's business acquaintance, acting under orders of federal officers, obtained entry into defendant's office by falsely representing that he intended only to pay a social visit but then secretly ransacked the office and seized certain private papers, the

37

In this case, the residents merely informed Caesars of the internet outage, and perhaps requested that it be repaired. Their expectation of privacy was that a technician would enter the villas only if necessary to complete that task, then would leave as soon as the connection was restored. The agents violated that expectation in both respects.

### 1. The Agents Exceeded The Scope Of The Residents' Consent By Unnecessarily Entering The Villas.

The most that the government can hope to establish is that the residents conditionally consented to the technicians entering the villas *to the extent necessary* to restore the internet connection. The conduct reasonably expected of an internet technician in the actual circumstances—in which the technician terminated the connection outside the villas—would obviously have been to repair the connection there, without ever entering the villas. Ex. G, Technical Expert Report.

The same is true even if the Court—counterfactually—ignores that the government itself *caused* the outages. Wood received the reports of the problems while at a desk that was located near the external connection. An actual technician in the circumstances would have taken the simple and easy step of checking it. Why would he go to the trouble of traveling to the villas first, when the solution might be right at hand? Finding the problem each time, he would have repaired it then and there without ever entering the villas. If he did go to the villas, he would not have taken an additional colleague with him. Ex. G, Technical Expert Report.

Supreme Court had no difficulty concluding that the Fourth Amendment had been violated by the secret and general ransacking, notwithstanding that the initial intrusion was occasioned by a fraudulently obtained invitation rather than by force or stealth).

38

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

Lopez made that point himself.  He explained to the butler in Villa 8882 that Wood had stayed with the equipment "just in case this was going to maybe be an issue. . . . [I]t's something to do with maybe the hardware downstairs." Ex. F, Disc 3, p. 36, lines 15-22.  In reality, a technician in Wood's position would have checked that equipment before bothering to send anyone to the villa. Ex. G, Technical Expert Report.

That is doubly true with respect to the outage in Villa 8882, because the technician would know that the identical problem happened just the day before in Villa 8881 and that it was repaired from outside. Ex. G, Technical Expert Report.  The agents thus explained that the outage in Villa 8882 was "the same thing" that happened in the other Villa, and that Wood was able to fix that one too. Ex. F, Disc 3, p. 32, lines 7-13.  But Wood actually did the opposite:  he ignored the obvious source of the problem in order to pave the way for the government to enter Villa 8882.

The agents' false claim that they were there to repair the internet connection was itself a trespass, confirming the Fourth Amendment violation.  It is hornbook law that third parties violate the residents' right to exclude—and commit a trespass—when they misrepresent material facts in order to gain admission.[42]  To be sure, it is not trespass to withhold an *ulterior* motive that would lead a homeowner to exclude a person he is otherwise willing to admit—for example, an undercover officer engaging in a drug buy.  But it is trespass to gain entry to an otherwise private space by misrepresenting that the entrant will provide an

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

---

[42] *See* Restatement (Second) of Torts §§173, 892B.

"authorized service function."[43]   Indeed, that is the very first example of a trespass by deception in the Restatement of Torts.[44]

Moreover, the residents never authorized any video recording of their private spaces. Nor could that authorization be inferred: an actual technician would not have engaged in such behavior. Ex. G, Technical Expert Report. The government therefore separately breached the scope of the residents' consent by recording the items and people in the rooms.[45]

**2.     The Agents Exceeded The Scope Of The Residents' Consent By Unnecessarily Remaining Within The Villas To Conduct A Search.**

The government independently violated the Fourth Amendment by conducting searches *after* the internet connection had been restored. Before that point, everything Wood had seen in Villa 8881 and that the agents had seen in Villa 8882 directly contradicted the hypothesis that the residents were operating a sports book. Ex. G, Sports Wagering Expert Report. Their subsequent observations in the media rooms exceeded the residents' consent.

Even if the Court assumes that Wood and the agents were authorized to be in the villas to restore the internet connections, once that was accomplished, the residents' consent was terminated. Any further search violated the Fourth Amendment. "The scope of a license— express or implied—is limited not only to a particular area but also to a specific purpose."[46] Accordingly, "[t]he undercover entry must be limited to the purposes contemplated by the

---

[43] *See Desnick v. Am. Broad. Cos., Inc.*, 44 F. 3d 1345, 1352-53 (7th Cir. 1995) (citing *Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir.1971)).

[44] *See* Restatement (Second) of Torts § 173 (1965) (discussing trespasser pretending to be a doctor to enter a home).

[45] *See United States v. Nerber*, 222 F.3d 597, 600 (9th Cir. 2000) (holding that people visiting an informant's hotel room "had a legitimate expectation to be free from secret video surveillance").

[46] *Jardines*, 133 S. Ct. at 1416 n.4.

40

suspect.  Once inside the suspect's home, the agent may not 'conduct a general search for incriminating materials.'"[47]

Relatedly, the intrusions also violated the Fourth Amendment because Wood and the agents acted very differently than ordinary technicians would have in the circumstances.  "A government agent, *in the same manner* as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant."[48]  Here, the difference was so great that Lopez made sure that Wood had a plan to explain why the agents would "do something weird." *See supra* at p. 16.

Because they knew that the internet connections had already been restored, and they moreover their own laptops could confirm the functioning of the villas' WiFi connections, Wood had no reason to enter the media room in Villa 8881, and Lopez and Kung had no reason to maneuver behind the laptop screens of the residents of Villa 8882.  An actual technician, knowing that the internet outage had been corrected, would simply have left. Ex. G, Technical Expert Report.  But Wood, Lopez, and Kung instead engaged in unconstitutional, warrantless hunts for evidence.  The agents' failure to leave promptly was yet another trespass.  A person trespasses by exceeding the scope of the license given for the

---

[47] *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) (quoting *Lewis*, 385 U.S. at 211); *see also, e.g., United States v. Bramble*, 103 F.3d 1475, 1478 (9th Cir. 1996) ("Until Bramble showed them the incriminating bird parts, the federal undercover agents remained in the area where Bramble had invited them and acted only for the purpose for which they had been invited, *i.e.,* to conduct an illegal transaction."); Wayne R. Lafave et al., 2 Crim. Proc. § 3.10(c) (3d ed.) ("If the officer posing as a meter reader were admitted to defendant's basement and then did more looking about than would be necessary to read the meter, this quite obviously would not be a case in which defendant had voluntarily revealed his criminality.").

[48] *Lewis*, 385 U.S. at 211 (emphasis added).

41

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

entry—whether by prying into unnecessary spaces, engaging in unauthorized conduct, or straying outside the purposes for which they were admitted.[49]

## IV.   CONCLUSION

The government's position in this case—and the legal rule it inevitably asks this Court to adopt—would shock the very core of the conscience of ordinary Americans.  It is an assault on our deepest constitutional values that cannot be taken seriously.   The government's breathtaking conception of "mistaken consent" is that it can disconnect the basic services of any residence or hotel room in the nation- to gain entry.  Its agents can then roam from room to room, ostensibly checking bedrooms for "broken" cable connections, bathrooms for "leaky" pipes, and home offices for electrical "shorts," all the while surreptitiously searching and recording the occupants' most intimate spaces.

The victims of this scheming will have done everything within their reasonable power to maintain the privacy of their homes.  They will not have created suspicion by inviting in others to buy drugs; they will not have thrown open the doors to the public.   But the government now says that it can send in undercover agents to lie and deceive the residents—entering and unnecessarily extending the scope of that entry—all the while searching the premises with hidden video cameras.

///

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

[49] Restatement (Second) of Torts §§ 168, 173 (illustration 2), 892A (comment).

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

The notion that an individual "consents" to such searches—so that the government is free to ignore the Fourth Amendment's explicit warrant requirement—is, in a word, absurd. Our lives cannot be private—and our personal relationships intimate—if each physical connection that links our homes to the outside world doubles as a ready-made excuse for the government to conduct a secret, suspicionless, warrantless search.  Only a few remote log cabins lack any internet, electric, gas, water, cable, or telephone service.  But the Constitution does not require us to sever all those connections—and live as hermitic luddites—to protect ourselves from the government's prying eyes and secret cameras.

A ruling upholding these intrusions would cause innocent Americans to live their daily lives burdened with the palpable fear that their government is regularly scheming to spy on them in their homes.

///

43

As one astute jurist has observed:

> If we are to be able to enjoy liberty and pursue happiness, we must know what part of our world is real and what part is illusion—that our home is our castle, and not a broadcasting center for hidden police transmission devices; that a repairman is a repairman, . . . and not a police agent. Permit the police to make our world illusion, and no one, neither criminal nor honest citizen, will be free.[50]

The motion to suppress should be—must be—granted.

Dated this 28th day of October, 2014.

**CHESNOFF & SCHONFELD**

 /s/ David Z. Chesnoff
**DAVID Z. CHESNOFF, ESQ.**
Nevada Bar No. 2292
520 South Fourth Street
Las Vegas, Nevada 89101
Attorney for Wei Seng Phua

**CHESNOFF & SCHONFELD**

 /s/ Richard A. Schonfeld
**RICHARD A. SCHONFELD, ESQ.**
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Attorney for Darren Wai Kit Phua

**GOLDSTEIN & RUSSELL**

 /s/ Thomas C. Goldstein
**THOMAS C. GOLDSTEIN, ESQ.**
*Pro Hac Vice*
7475 Wisconsin Ave.
Bethesda, MD 20814
Attorney for Darren Wai Kit Phua

**LAW OFFICES OF MICHAEL PANCER**

 /s/ Michael Pancer
**MICHAEL PANCER, ESQ.**
105 W. F. Street
San Diego, CA 92101
**DAVID T. BROWN, ESQ.**
520 South Fourth Street
Las Vegas, NV 89101
Attorneys for Seng Chen Yong and Wai Kin Yong

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

---

[50] *Commonwealth v. Morrison*, 418 A.2d 1378, 1386 (Pa. Super. 1980) (Spaeth, J., concurring).

44

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that service of the foregoing was served on the 28th day of October, 2014, via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

/s/ Camie Linnell
An employee of Chesnoff & Schonfeld

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563