1  **DAVID Z. CHESNOFF, ESQ.**
   **Nevada Bar No. 2292**
2  **520 South Fourth Street**
   **Las Vegas, Nevada 89101**
3  **Telephone: (702) 384-5563**
   **Attorney for Defendant *WEI SENG PHUA***
4

5  **RICHARD A. SCHONFELD, ESQ.**
   **Nevada Bar No. 6815**
6  **520 South Fourth Street**
   **Las Vegas, Nevada 89101**
7  **Telephone: (702) 384-5563**
   **Attorney for Defendant *DARREN WAI KIT PHUA***
8

9  **THOMAS C. GOLDSTEIN, ESQ.**
   ***Pro Hac Vice***
10 **Goldstein & Russell, P.C.**
   **7475 Wisconsin Avenue, Suite 850**
11 **Bethesda, MD 20814**
   **Telephone: (202)362-0636**
12 **Attorney for Defendant *DARREN WAI KIT PHUA***

13

14

15                    **UNITED STATES DISTRICT COURT**
16                        **DISTRICT OF NEVADA**

17 **UNITED STATES OF AMERICA**          )
                                          )
18 **v.**                                 )          **2:14-CR-00249-APG-PAL**
                                          )
19 **WEI SENG PHUA and**                  )
20 **DARREN WAI KIT PHUA,**               )
                                          )
21          **Defendants**                )
                                          )
22

23 <u>**JOINT MOTION OF DEFENDANTS WEI SENG PHUA AND DARREN WAI KIT**</u>
24          <u>**PHUA TO SUPPRESS STATEMENTS**</u>

25

26

27

28

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Defendants Wei Seng Phua and Darren Wai Kit Phua move for an order suppressing their statements made to law enforcement.  This Motion is based upon this Notice of Motion, the attached Memorandum of Points and Authorities, and the exhibits filed herewith.

Dated this 28th day of October, 2014.

CHESNOFF & SCHONFELD

 /s/ David Z. Chesnoff
**DAVID Z. CHESNOFF, ESQ.**
Nevada Bar No. 2292
520 South Fourth Street
Las Vegas, Nevada 89101
Attorney for Wei Seng Phua


CHESNOFF & SCHONFELD

 /s/ Richard A. Schonfeld
**RICHARD A. SCHONFELD, ESQ.**
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Attorney for Darren Wai Kit Phua

GOLDSTEIN & RUSSELL

 /s/ Thomas C. Goldstein
**THOMAS C. GOLDSTEIN, ESQ.**
*Pro Hac Vice*
7475 Wisconsin Ave.
Bethesda, MD 20814
Attorney for Darren Wai Kit Phua

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

1  DAVID Z. CHESNOFF, ESQ.
   Nevada Bar No. 2292
2  520 South Fourth Street
   Las Vegas, Nevada 89101
3  Telephone: (702) 384-5563
4  Attorney for Defendant *WEI SENG PHUA*

5  RICHARD A. SCHONFELD, ESQ.
   Nevada Bar No. 6815
6  520 South Fourth Street
   Las Vegas, Nevada 89101
7  Telephone: (702) 384-5563
8  Attorney for Defendant *DARREN WAI KIT PHUA*

9  THOMAS C. GOLDSTEIN, ESQ.
   *Pro Hac Vice*
10 Goldstein & Russell, P.C.
   7475 Wisconsin Avenue, Suite 850
11 Bethesda, MD 20814
12 Telephone: (202)362-0636
   Attorney for Defendant *DARREN WAI KIT PHUA*

13

14

15                    UNITED STATES DISTRICT COURT
16                         DISTRICT OF NEVADA

17 UNITED STATES OF AMERICA        )
                                   )
18 v.                             )      2:14-CR-00249-PAL
                                   )
19 WEI SENG PHUA and              )      MEMORANDUM OF POINTS AND
20 DARREN WAI KIT PHUA,           )      AUTHORITIES IN SUPPORT OF
                                   )      MOTION OF WEI SENG PHUA AND
21       Defendants              )      DARREN WAI KIT PHUA TO
                                   )      SUPPRESS STATEMENTS
22 _____)

23 ///

24

25

26

27

28

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

On July 9, 2014, a horde of agents from three law enforcement agencies – the FBI, Homeland Security, and the Nevada Gaming Control Board (NVGCB) – stormed into Villa 8882 at Caesars Palace with guns drawn and bearing assault weapons. As they raced into the villa, the agents screamed obscenity-laced commands at the terrified hotel guests, Wei Seng Phua (known as Paul) and his son, Darren Wai Kit Phua.  Two agents handcuffed the father and son, then forced them to kneel facing against a wall. As both guests remained in handcuffs for all (Paul) or most (Darren) of the next 5 1/2 hours, the agents conducted a search pursuant to a warrant. Under such extreme circumstances, in which no reasonable person would have been free to leave, it is evident on its face that Paul and Darren Phua were placed in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966). Yet, agents proceeded to isolate father from son and son from father and to interrogate them – Paul for three long hours while he remained handcuffed – without providing the required *Miranda* warnings in violation of the Fifth Amendment to the United States Constitution. Accordingly, all statements made by Paul and Darren Phua on July 9, 2014, must be suppressed.

## I.    FACTUAL BACKGROUND.

### A.    Paul Phua.

On July 9, 2014, at 2:50 p.m., at least 10 law enforcement agents and officers (perhaps as many as 15 or more) entered Villa 8882 at Caesar's Palace. All of them were armed. At least two carried assault rifles and two had handguns drawn. Residing in the unit were Paul and his son, Darren, both of whom are Malaysian citizens.  One agent pointed a machine gun at Paul and shouted, "Put your f***ing hands up." (Affidavit of Wei Seng Phua, submitted herewith as Exhibit 1.) All occupants of the villa were handcuffed and taken to the dining room, where they were ordered to get on their knees and face the wall. *Id.* After about 30 minutes, Darren requested that he be able to sit on a chair because of knee pain. Thereafter, a Homeland Security agent grabbed

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

1  Paul by the arm and took him into a bedroom, where he remained alone in handcuffs isolated from

2  the other guests in the room,, including his son. *Id.*

3       Paul later was taken to the living room. He saw his handcuffed son on the way, but could

4  not speak with him. *Id.* At 3:30 p.m., according to the FBI 302 report of the search and

5  interrogation, Paul was advised "that agents were executing a search warrant, he was not under

6  arrest, the interview was voluntary, he could refuse to answer questions, and he could stop the

7  interview at any time." Exhibit 2, submitted herewith. At no time was Paul advised that he had a

8  right to consult with an attorney or have counsel present during the interrogation. Nor was he

9  advised at any time that he was free to leave. He remained in handcuffs throughout the

10 interrogation. Ex. 1. Paul proceeded to answer most, but not all, of the agents' questions. He was

11 interviewed primarily by FBI Special Agent Pham Minh. In addition, Agent Lopez of the NVGCB

12 and Agent Conlin of HSI were present for portions of the interview.

13      After Agent Minh had questioned Paul Phua for about 10 minutes, the NVGCB agent

14 asked him specifically whether he was engaged in sports betting, telling him that it was illegal to

15 bet outside a licensed sports book. Agent Minh left the room briefly and, when he returned, told

16 Paul that his Skype account showed betting. *Id.* The interrogation continued for three hours, until

17 6:30 p.m.. The searching agents did not leave the premises until 8:15 p.m.. Ex. 2. Paul remained

18 handcuffed for the entire duration of the search and interrogation, a total of almost 5 ½ hours. Paul

19 was allowed to use the bathroom upon request; but remained handcuffed and was escorted by an

20 agent who stood at the door. Ex. 1. At no time did Paul feel that he was free to stop answering the

21 agents' questions and to terminate the interview. Nor did Paul ever feel that he was free to leave.

22 *Id.* At 5:20 p.m., while Paul was being interrogated, attorney Richard Schonfeld—acting upon the

23 request of his partner David Z. Chesnoff who had been contacted to represent Paul--arrived at the

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 • 384-5563

villa. Mr. Schonfeld advised Agents Beasley, Jones and Meador that he was there on behalf of Paul and wished to speak with him. The agents went back inside the hotel room, telling Mr. Schonfeld to wait. At this time, Mr. Schonfeld asked Agent Beasley if interviews were being conducted. Agent Beasley responded that he was not the case agent and that he did not know whether interviews were taking place. Mr. Schonfeld then asked to speak with the case agent. At 5:45 p.m., without having had the requested opportunity to speak with the case agent or with his client, Mr. Schonfeld was approached by the head of security at Caesars. With Agent Meador standing behind him, the Caesars security chief instructed Mr. Schonfeld to leave the Villa area. Mr. Schonfeld reiterated that he wished to speak with Paul and was again told to leave, which he then did. *See* Exhibit 3, submitted herewith. At 5:47 p.m., Mr. Schonfeld sent an email to attorney David Z. Chesnoff outlining the agents' refusal to permit him to speak with Paul and his ultimate ejection from the premises. *See* Ex. 3.

It was not until sometime shortly before 6:30 p.m. – after three hours of interrogation and well after Mr. Schonfeld had been ordered to leave the area – that Agent Minh asked Paul whether he had an attorney. According to the FBI 302 report, Paul initially responded that he did not. Upon being informed that "someone claimed to be his attorney," Paul said that one of the people who had been in his hotel room may have contacted an attorney for him, and, if that were the case, he wished to speak with the attorney. *See* Ex. 1, Ex. 2 at 3. The agents continued to question Paul for about 15 minutes, until another agent entered and advised the agents to stop questioning him. Ex. 1. Paul remained handcuffed for about another two hours after the interrogation ceased.

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

**B.    Darren Phua.**

Darren Phua is the 22-year-old son of Paul Phua. He is a Malaysian citizen and resides in Singapore. When the law enforcement agents, visibly armed with handguns and assault weapons and two of them with handguns drawn, entered the room and shouted, "Put your f***ing hands up" and "Don't f***ing move." Darren was terrified. He initially thought a robbery was taking place. Affidavit of Darren Phua, submitted herewith as Exhibit 4. The agents proceeded to handcuff everyone in the room, including Darren. The hotel guests were then taken to the dining room, where they were ordered to "face the wall and get on your f***ing knees," which they did. *Id.* After about 15 minutes, a female agent asked Darren for his particulars. After another 15 minutes, Darren explained to the agents that he had knee problems and asked to sit on a chair, which they permitted. Shortly thereafter, Darren was taken to a couch area by the pool. *Id.* According to the FBI 302 report of the interrogation, Darren "was advised that he was not under arrest and did not have to speak with law enforcement." *See* Exhibit 5, submitted herewith.

The 302 recites that Darren was told that he was free to leave but that, if he did so, he would not be permitted to return until the search was completed. *id.*, But Darren's memory of the event is far different. Darren recalls that agents *never* told him that he was free to leave or that he did not have to answer their questions, While Darren *was* told that he was not under arrest, the fact that he remained handcuffed for several hours thereafter supports Darren's recollection that he was never advised that he could leave. Agent Galvin told Darren that he must tell her the truth and that he could go to prison for five years if he lied to her. Ex. 4. Under these circumstances, particularly after remaining in handcuffs and being informed that he could go to prison for lying to the agent, Darren felt obligated to speak to Agent Galvin. Thus, Darren proceeded to answer questions for 15-20 minutes. *Id.*

5

Thereafter, Darren remained alone, frightened and isolated for more than an hour while still handcuffed. At that point, he was taken to the hallway near the dining room, where he was interviewed by Agent Minh for about 15-20 minutes without being advised of his Miranda rights. Minh is the same agent who had interviewed his father and who Darren remembered as one of the agents who had pointed a gun at them when they first entered the room.

About 15 minutes after Agent Minh left Darren, he returned and accused Darren of lying to him when he said that his father did not own the IBC website. Agent Minh told Darren that his father had acknowledged owning IBC. *Id.* It was at this point that Darren was told, for the first time, that he had the right to remain silent. Tellingly, Darren was not told that also he had a right to counsel or that he was free to leave. *Id.* Agent Minh then notified Darren that another agent would return to interview him. Darren was taken to his father's bedroom, where he waited alone and handcuffed. However, no one appeared to question him further. He remained handcuffed until about 30 minutes before the agents left the hotel room. He was allowed to use the bathroom, but he was escorted by an agent who took off the handcuffs at the bathroom door, left the door open, watched while Darren used the facilities and then re-handcuffed him. *Id.*

According to Agent Minh's 302 report of his interview with Darren, Darren was "advised that he was not under arrest and did not have to speak with the agents, the interview was voluntary, he could refuse to answer questions, and he could have an attorney present during the interview." *See* Exhibit 6, submitted herewith. However, only a portion of that advisement was given <u>after</u> Agents Galvin and Minh had separately interviewed Darren.

LAW OFFICES

CHESNOFF & SCHONFELD

AN ASSOCIATION OF PROFESSIONAL CORPORATIONS

520 SOUTH FOURTH STREET

LAS VEGAS, NEVADA 89101-6593

TELEPHONE 702 · 384-5563

6

**II.   BECAUSE BOTH PAUL PHUA AND DARREN PHUA WERE "IN CUSTODY" WHEN THEY WERE INTERROGATED BY LAW ENFORCEMENT AGENTS WITHOUT BEING PROVIDED *MIRANDA* WARNINGS, THE STATEMENTS MADE BY THEM MUST BE SUPPRESSED.**

"Any police interview of an individual suspected of a crime has coercive aspects to it," *United States v. IMM*, 747 F.3d 754, 764 (9th Cir. 2014), *quoting J.D.B. v. North Carolina*, ___ U.S. ___, 131 S.Ct. 2394, 2401 (2011), and when that police interview takes place when the individual being questioned is in custody, "the substantial coercion inherent in his situation 'blurs the line between voluntary and involuntary statements, and thus heightens the risk that [the person being interrogated] will not be accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Id., quoting Dickerson v. United States*, 530 U.S. 428, 435 (2000). "Recognizing that the inherently coercive nature of custodial interrogation calls into doubt the voluntariness of inculpatory statements, the Court in *Miranda* 'adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination.'" *Id., quoting J.D.B.*, 131 S.Ct. at 2401.

Statements made by a defendant in response to custodial interrogation are admissible *only* if, prior to police questioning, he was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," *Miranda*, 384 U.S. at 444, *and* he "voluntarily, knowingly, and intelligently" waived those rights. *J.D.B.*, 131 S.Ct. at 2401. *See Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010)("In order for an accused's statement to be admissible at trial, police must have given the accused a *Miranda* warning").

Neither Paul nor Darren was administered *Miranda* warnings prior to being questioned by the interrogating agents. That being the case, the critical inquiry becomes whether they were "in custody" while being questioned. As the ensuing discussion will demonstrate, the answer to that

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 • 384-5563

7

question is unequivocally yes. To determine whether an individual is in custody when questioned, courts "examine the totality of the circumstances surrounding the interrogation," *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008), and then ask "whether a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.*

The inquiry is an objective one: It "focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). *See Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012). The Ninth Circuit has outlined five factors likely to be relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Kim*, 292 F.3d at 974. Other factors, many of which overlap the *Kim* factors, are relevant where the individual is interrogated in his home. As the Ninth Circuit has explained:

> If a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. *To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home.*

*Craighead*, 539 F.3d at 1083 (emphasis added).

When evaluating the circumstances of an interrogation conducted in the individual's home, courts are to look to "the extent to which the circumstances of the interrogation turned the otherwise comfortable surroundings of the home into a 'police-dominated atmosphere.'" *Id.* Whether a "police-dominated atmosphere" exists rests on an analysis of four factors: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated

8

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *Id.* at 1084.

For all intents and purposes, Villa 8882 was Paul and Darren's residence. They are foreign visitors to this country, thousands of miles from their own homes, and the hotel room where they had been staying for 28 days, was their "home away from home." It should be treated as such for purposes of the *Miranda* custody inquiry.[1] But, whichever standard is applied – *Kim* or *Craighead* – the conclusion must be the same: that Paul and Darren were in custody when they were interrogated. Because the circumstances of the interrogation were somewhat different for each of them, the next sections of this memorandum will address their individual situations.

### A.    Paul Phua.

#### 1.    The *Kim* factors.

##### a.    the language used to "summon" Paul.

The language used to "summon" Paul was physical, rather than verbal. Numerous visibly armed agents, two of whom pointed their guns at Paul and the other occupants of the villa, invaded the hotel villa where he was residing and quickly fanned out throughout the villa. Paul was immediately handcuffed and forced to his knees. There was nothing remotely voluntary about this encounter. *See United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009)("where we have found an interrogation non-custodial, we have emphasized that the defendant agreed to accompany

---

[1] It is well established in the Fourth Amendment context that a hotel room is analogous to a person's home. *See, e.g., Stoner v. California*, 376 U.S. 483, 489 (1964)(guest in hotel room is entitled to the same protection against unreasonable searches and seizures as is the tenant of a house); *United States v. Young*, 573 F.3d 711, 715-716, 721 (9th Cir. 2009)("Until a hotel guest's lease of the room expires or he checks out, the room is like a home;" "[p]art of what a person purchases when he leases a hotel room is privacy for one's person and one's things"); *United States v. Brooks*, 367 F.3d 1128, 1133 n.4 (9th Cir. 2004)("An individual in his or her hotel room has the same Fourth Amendment protections as he or she has in a home").

9

officers to the police station or to the interrogation room"). Like the defendant in *Kim*, Paul "did not willingly agree to submit to an encounter with the police." *Kim*, 292 F.3d at 974.

While, according to the 302 report of the interrogation, Paul was told that he was not under arrest and that he could refuse to answer questions or terminate the interrogation at any time, he was not given the option of departing the premises while the search proceeded. This option is of limited utility when the encounter takes place in the defendant's home. The Ninth Circuit has made it clear that "'[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*, and such statements must be considered 'within the context of the scene as a whole.'" *United States v. Clymer*, 524 Fed. Appx. 354, 356 n.1 (9th Cir. 2013), *quoting Craighead*, 539 F.3d at 1088. A reasonable person in Paul's position – a foreign national, handcuffed and surrounded by armed law enforcement agents – would at no point feel that he was free to leave.

> **b.      the extent to which Paul was confronted with evidence of guilt.**

Paul was interrogated for three hours – itself an indicator, along with the entry of the agents with a search warrant for his room, that the interrogating agents believed him guilty of a crime. Paul also was repeatedly "confronted with evidence of guilt," as is readily apparent from the 302 report of the interrogation. Agents questioned Paul about his recent gambling arrest in Macau and about the purchase of his jet. When Paul told them that he had been in Las Vegas since June 23, 2014, agents confronted him with their knowledge that he had traveled to London since his arrival in Las Vegas. They also asked him about the purpose of his travel and with whom he had met in London. This served to reinforce Paul's understanding that he was under criminal investigation. They asked Paul about his sports betting and told him that betting outside of a licensed sports book was illegal.

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

10

Agents confronted Paul about why he had a betting website open on his laptop and asked him about a bag containing cash and casino chips that was found in his room. They also confronted him regarding his ownership of the IBC website, which the agents believed to be "an illegal sport betting website." Criminal Complaint, ¶21.   At times, after Paul declined to answer certain questions, the agents persisted in seeking the information, and Paul ultimately responded. *See* Ex. 2 (Paul "initially refused to talk about his meeting in London. However, he later said his meeting was about getting a license for a casino in Barcelona, Spain"); *id.* (Paul "refused to answer how he made bets because he was concerned about the legal problems," but later answered). The presence of a search warrant and the agents' probing questioning about betting, gambling, and sports betting websites would have left no doubt in Paul's mind that he was a criminal suspect, particularly once the agents told him that his sports betting was illegal. *See Kim*, 292 F.3d at 977 (agents searching defendant's store and asking questions about her drug sales could have led defendant to assume that she was a criminal suspect).

### c. the physical surroundings of the interrogation.

While the interrogation took place in the familiar setting of Paul's villa, any comfort which that setting may have otherwise provided was completely destroyed by the domination of the residence by armed law enforcement agents and the fact that Paul was handcuffed for the entire duration of his detention and was not even allowed to go to the bathroom unescorted. *See, e.g., United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007)(concluding that the suspect's home had become a "police-dominated environment" because "the facts belie any conclusion that [the suspect's] home, on the morning of the questioning at issue, was the traditional comfortable environment that we normally would consider a neutral location for questioning"); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)("While an interrogation in a defendant's residence,

11

without more, certainly weighs against a finding of custody, . . . the level of physical control the agents exercised over [the defendant] weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home"); *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996)("More important than the familiarity of the surroundings where [defendant] was being held is the degree to which the police dominated the scene"); *United States v. Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990)("Questioning which occurs in the suspect's own home may provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting"); *see also United States v. Brobst*, 558 F.3d 982, 995-96 (9th Cir. 2009)(finding that fact that interrogation took place while officers were searching defendant's home pursuant to a search warrant weighed in favor of finding that defendant was in custody, but ultimately concluding that defendant was not in custody because he was detained for only 15 minutes before he was arrested, the interview lasted only about two minutes, and defendant was not handcuffed).

Moreover, Paul was isolated from others, including his son, for the duration of his five and a half hour detention and his three-hour interrogation. He also was not told that an attorney was waiting outside wishing to speak with him. As the Ninth Circuit has recognized, "isolating the defendant from the outside world . . . largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion." *Kim*, 292 F.3d at 977. *See, e.g., United States v. Beraun-Panez*, 830 F.2d 127 (9th Cir. 1987)("By keeping [defendant] isolated from other people, the officers contributed to the custodial nature of the interrogation").

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

#### d.    the duration of the detention.

As previously stated, Paul's detention lasted five and a half hours and his interrogation lasted three hours. This factor, too, weighs heavily in favor of a finding that Paul was in custody for purposes of *Miranda*. *See, e.g., IMM*, 747 F.3d at 768 (duration of detention "strengthened the conclusion that [defendant] was in custody" where defendant "spent 30 to 40 minutes in an unmarked police car and then nearly an hour being questioned"); *Clymer*, 524 Fed. Appx. at 355-56 (finding defendant in custody where, *inter alia*, defendant was interviewed, unhandcuffed, for 1 ½ hours); *Kim*, 292 F.3d at 977 (custody found where, *inter alia*, defendant was detained for "some time" before she was questioned and then was questioned for 50 minutes); *see also United States v. Wright*, 625 F.3d 583, 602 (9th Cir. 2010)(remanding to the district court for findings on the custody issue where, *inter alia*, the defendant testified that he was handcuffed and questioned for 45-60 minutes); *Bassignani*, 575 F.3d at 886 (terming a 2 ½ hour interrogation as "at the high end").

#### e.    the degree of pressure used to detain Paul.

The degree of pressure used to detain Paul was absolute: He was handcuffed, was not permitted to leave the premises (or even offered the option of doing so), was not allowed to go to the bathroom unescorted, and was surrounded by numerous armed officers who were searching his hotel residence. "[A] reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." *Craighead*, 539 F.3d at 1083. A reasonable person in Paul's position "would have felt deprived of his freedom of action in [a] significant way,

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

such that he would not have felt free to terminate the interrogation." *Clymer*, 524 Fed. Appx. at 356, *quoting Craighead*, 539 F.3d at 1082.

In sum, any reasonable assessment of the five *Kim* factors demonstrates that Paul was in custody for *Miranda* purposes and that the statements he made while being interrogated on July 9, 2014, must be suppressed. If more is needed, an analysis of the *Craighead* factors serves only to reaffirm that Paul was in custody throughout the interrogation.

### 2.     The *Craighead* factors.

Paul is a Malaysian national who lives in Malaysia; at the time of the interrogation, he was thousands of miles away from his permanent home and making his temporary home in the United States in Villa 8882. *See* Exhibit 2. Under such circumstances, it is reasonable to treat Villa 8882 as Paul's home for purposes of the in-custody analysis and examine whether law enforcement agents created a "police-dominated atmosphere" within Villa 8882. *Craighead*, 539 F.3d at 1083. An assessment of the *Craighead* factors compels the conclusion that they did and that this was a custodial interrogation requiring the administration of *Miranda* warnings.

First, there were a large number of armed agents on the scene, *see Craighead*, 539 F.3d at 1085 ("the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere"), who entered the premises shouting commands and handcuffing everyone present.

Second, Paul was physically restrained for the entire five and a half hour detention. *See id.* ("When law enforcement agents restrain the ability of the suspect to move – particularly through physical restraints . . . – a suspect may reasonably feel he is subject to police domination in his own home and thus not free to leave or terminate the interrogation").

14

1    Third, he was isolated from all others, including his son and an attorney who wished to
2  speak with him.

3    Fourth, he was not told that he was free to leave. According to the 302, agents told Paul
4  that he was free not to speak and to terminate the interview. However, the context of the encounter
5
6  would have left any reasonable person believing that he was not free to leave. Thus, an analysis of
7  the *Craighead* factors amply reaffirms the conclusion that Paul was subjected to custodial
8  interrogation without having been given *Miranda* warnings. His statements must, accordingly, be
9  suppressed.

10    **B.    Darren Phua – First Interview.**

11    Much of the discussion in the preceding section pertaining to Paul is equally applicable to
12  Darren. The circumstances of their interrogations may have differed somewhat, but the end result
13  is the same: Darren was in custody for purposes of *Miranda*.
14

15    **1.    The *Kim* factors.**

16    **a.    the language used to "summon" Darren.**

17    Like his father, Darren was not responding voluntarily to a "summons." Instead, numerous
18  visibly armed agents invaded the hotel residence where this young 22-year old foreign national
19  was living with his father. He was immediately handcuffed "for officer safety." Ex. 5. *See Wright*,
20  625 F.3d at 602 ("while 'handcuffing a suspect does not necessarily dictate a finding of custody[,]'
21  it is a factor that the district court should consider," *quoting United States v. Booth*, 669 F.2d 1231,
22  1236 (9th Cir. 1981)). That officers may have viewed handcuffing as necessary for their own
23  protection does not lessen the coercive aspects. *See  Craighead*, 539 F.3d at 1086 ("We understand
24  that in many cases, when law enforcement agents conduct an in-home interrogation while
25  conducting a lawful search of the home, physical control of the suspect will be necessary to
26
27

28    15

LAW OFFICES
CHESNOFF & SCHONOFF
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

1  preserve evidence and protect the safety of the agents. The fact that these precautions may be

2  necessary to the success of the lawful search does not lessen their tendency to make a reasonable

3  person believe he is in custody").

> If the government is correct that the agents' actions were necessary for evidence
> preservation and officer safety, then it could have chosen to postpone the
> interrogation until a non-custodial moment or to Mirandize [the suspect]. Either
> step would have protected both the defendant's constitutional rights and the
> officers' legitimate law enforcement needs.

8  *Craighead*, 539 F.3d at 1086, *quoting Mittel-Carey*, 493 F.3d at 40. Darren also was threatened

9  with prison if he lied to the interrogating agent.

10  While the 302 states Darren was told that he was free to leave, Darren's maintains he was

11  not. This renders all but inescapable the conclusion that Darren was in custody for *Miranda*

12  purposes. Even if, however, Darren was told that he was free to leave without answering questions,

13  the custody conclusion would remain the same. The 302 also states that Darren was told that, if he

14  left, he could not return until after the search was completed. *See* Ex. 5. Thus, Darren was faced

15  with an indefinite exclusion from his home, separated from his father, if he left the premises. "The

16  mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does

17  not render an interrogation non-custodial *per se*, and such statements must be considered 'within

18  the context of the scene as a whole.'" *United States v. Clymer*, 524 Fed. Appx. at 356 n.1, *quoting*

19  *Craighead*, 539 F.3d at 1088.

22  The circumstances of this encounter were such that a reasonable person in Darren's

23  position, handcuffed, surrounded by armed law enforcement in the only home he had in this

24  country, would not have felt free to leave, regardless of what the agents may have said. "It is . . .

25  significant that whether or not [Darren] was told he was free to leave, he could not simply return to

26  his home, since it was being searched." *Wright*, 625 F.3d at 602. "[A]n agent's statement that the

27

28  16

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

suspect is free to leave may have more or less resonance with the suspect depending on whether he can leave the interrogation site and retreat to the safety of his home or whether his home is in fact the locus of police activity." *Clymer*, 524 Fed. Appx. at 356 n.1, *quoting Craighead*, 539 F.3d at 1088.

> [A] reasonable person interrogated inside his own home may have a different understanding of whether he is truly free "to terminate the interrogation" if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.

*Craighead*, 539 F.3d at 1083. *See, e.g., id.* at 1088 (concluding that despite being told he was free to leave, the defendant would not have reasonably believed that he was free to go because the agents were searching his home); *United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir. 1982)(holding that defendant would not have felt free to leave where he was "questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house"). Critically, "[t]he *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test asks whether 'a reasonable person [would] have *felt* he or she was not at liberty to terminate the interrogation and leave." *Craighead*, 539 F.3d at 1088 (first emphasis in original; second emphasis added by Court), *quoting Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

A reasonable person in Darren's circumstances – a frightened young man far from home, isolated from his father and faced with indefinite exclusion from the only residence he had – would not have felt free to leave.

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

17

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

**b.    the extent to which Darren was confronted with evidence of guilt.**

Like his father, Darren was confronted with evidence of guilt. He was asked to identify his cell phone and his laptop, which the agents could see was open to the IBC website, which the agents believed to be "an illegal sport betting website." Criminal Complaint, ¶21. The agents asked Darren numerous questions about his gambling activities and whether anything on his computer pertained to gambling. He was asked specifically about his use of the IBC website and whether he or his father took bets from others. *See* Ex. 5. As was the case with his father, the presence of a search warrant and the agents' probing questioning about betting, gambling and sports betting websites would have left little doubt in Darren's mind that law enforcement agents had reason to believe that those present in Room 8882 were guilty of criminal conduct and that he himself was a criminal suspect. *See Kim*, 292 F.3d at 977 (agents searching defendant's store and asking questions about her drug sales could have led defendant to assume that she was a criminal suspect).

**c.    the physical surroundings of the interrogation.**

While the interrogation took place in the familiar surroundings of the hotel room where Darren was residing with his father, any comfort which that setting may have otherwise provided was completely destroyed by the domination of the residence by visibly armed and verbally hostile law enforcement agents. Moreover, Darren, a young man of 22 years old, was isolated from all others, including his father, for the duration of the interrogation (and, indeed, until about 30 minutes before the agents left).

As the Ninth Circuit has recognized, "isolating the defendant from the outside world . . . largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion." *Kim*, 292 F.3d at 977. *See, e.g., United States v. Beraun-Panez*, 830 F.2d 127 (9th Cir.

18

1   1987)(" By keeping [defendant] isolated from other people, the officers contributed to the

2   custodial nature of the interrogation")."[T]he police in this case temporarily took over complete

3   control of [Darren's residence,] creating 'police-dominated atmosphere,' in which the police kept

4   [Darren] physically isolated from [a] family member[] who could have provided both moral

5   support and . . . a more complete understanding of the overall situation." *Kim*, 292 F.3d at 977.

6

7                    **d.    the duration of the detention.**

8        Darren was detained, in handcuffs, for nearly the entire five hours the agents remained in

9   the room. He had been detained for about 30 minutes before Agent Galvin sought to question him,

10  which she did for 15-20 minutes, and then remained detained, in handcuffs, thereafter.

11

12                   **e.    the degree of pressure used to detain Darren.**

13       The degree of pressure used to detain Darren was substantial – he was handcuffed and

14  surrounded by law enforcement agents who had invaded and taken complete control of his

15  residence. Darren was not even able to go to the bathroom without being escorted and watched. A

16  reasonable person in Darren's position "would have felt deprived of his freedom of action in [a]

17  significant way, such that he would not have felt free to terminate the interrogation." *Clymer*, 524

18  Fed. Appx. at 356, *quoting Craighead*, 539 F.3d at 1082.

19       In sum, an assessment of the five *Kim* factors demonstrates that Darren was in custody for

20  *Miranda* purposes and that the statements he made while being interrogated on July 9, 2014, must

21

22  be suppressed. If more is needed, an analysis of the *Craighead* factors serves only to reaffirm that

23  Darren was in custody throughout the interrogation.

24

25

26

27

28                                              19

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

### 2. The *Craighead* factors.

Darren is a Malaysian national who lives in Malaysia. At the time of the interrogation, Darren was thousands of miles away from his permanent home and making his temporary residence in the United States in Room 8882. *See* Ex. 5. Under such circumstances, it is reasonable to treat Room 8882 as Darren's home for purposes of the in-custody analysis and to examine whether law enforcement agents created a "police-dominated atmosphere" within his residence. *Craighead*, 539 F.3d at 1083. An assessment of the *Craighead* factors compels the conclusion that they did and that this was a custodial interrogation requiring the administration of *Miranda* warnings.

First, there were a large number of visibly armed agents on the scene, who were verbally hostile and aggressive in taking control of the residence and its occupants. *See Craighead*, 539 F.3d at 1085 ("the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere").

Second, Darren was physically restrained. *See id.* ("When law enforcement agents restrain the ability of the suspect to move – particularly through physical restraints . . . – a suspect may reasonably feel he is subject to police domination in his own home and thus not free to leave or terminate the interrogation").

Third, Darren was isolated from all others, most particularly his father. Even had he been told that he was free to leave, as the 302 states, the context of the encounter would have left any reasonable person believing that he was not free to do so. Thus, an analysis of the *Craighead* factors amply reaffirms the conclusion that Darren was subjected to custodial interrogation without having been given *Miranda* warnings. His statements must, accordingly, be suppressed.

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

## C.   Darren Phua – Second Interview.

The 302 states that Darren "was advised that he was not under arrest and did not have to speak with the agents, the interview was voluntary, he could refuse to answer questions, and he could have an attorney present during the interview," Exhibit 6, submitted herewith. However, it is Darren's contention that he was not provided such advice until *after* Agent Minh already had interviewed him for 15-20 minutes while he was handcuffed and standing in the hallway. Agent Minh's interview took place more than an hour after Agent Galvin's questioning of Darren had ended. Agent Minh then returned and accused Darren of lying to him about his father's ownership of the IBC betting website.[2]

Darren was plainly in custody during the second interview as well, for all the reasons addressed in the preceding section with respect to his first interview. He had been in handcuffs for about two hours at the time of the second interview, isolated from his father, and surrounded by armed agents who were searching the only residence he had in this country. Notably, even the 302 does not state that Darren was told that he was free to leave at this juncture. No reasonable person in Darren's position would have felt free to terminate the interview and leave.

## III.   PAUL AND DARREN PHUA'S STATEMENTS WERE INVOLUNTARY AND MUST BE SUPPRESSED.

The discussion in the preceding sections of this memorandum should be dispositive of the question of the admissibility the statements made by Paul and Darren on July 9, 2014. However, to ensure that all aspects of the issue are before the Court, defendants also address the question of voluntariness. For all the reasons addressed in this section (and many of those addressed in the

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

---

[2] In any event, the 302 stops short of saying that full and complete *Miranda* warnings were given. It does not, for example, state that Darren was told that "any statement he [made] may be used as evidence against him." *See IMM*, 747 F.3d at 764, *quoting Miranda*, 384 U.S. at 444. Nor is there any indication that Darren executed a waiver of his *Miranda* rights.

preceding sections), the statements made by Paul and Darren on July 9, 2014, were involuntary and must be suppressed.

The Fifth Amendment right against self-incrimination is "the mainstay of our adversary system of criminal justice, and . . . one of the great landmarks in man's struggle to make himself civilized." *United States v. Preston*, 751 F.3d 1008, 1015 (9th Cir. 2014). In implementing this "bedrock constitutional value," courts focus on "whether [the] defendant's will was overborne by the circumstances surrounding the giving of [the] confession," an inquiry that "takes into consideration the totality of all the surrounding circumstances— *both* the characteristics of the accused *and* the details of the interrogation." *Id.* at 1016, *quoting Dickerson v. United States*, 530 U.S. 428, 434 (2000)(emphasis added by Court). Relevant factors to be considered along with all the surrounding circumstances include "the duration and conditions of detention . . . , the manifest attitude of the police toward [the defendant], his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control. *Id.*, *quoting Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

Where the subject of the interrogation was a foreign national, the Ninth Circuit has added further considerations to be evaluated: "(1) whether the defendant signed a written waiver; (2) whether he was read his rights in his native language; (3) whether he appeared to understand those rights; (4) whether he had the assistance of a translator; (5) whether his rights were explained painstakingly; and, (6) whether he had experience with the American criminal justice system." *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002), *quoting United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000). *See United States v. Labrada-Bustamente*, 428 F.3d 1252, 1259 (9th Cir. 2005)(fact that defendant "might not be familiar with the United States' form of justice" is a factor to be considered).

22

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 - 384-5563

Thus, the voluntariness inquiry "is not limited to instances in which the claim is that the police conduct was 'inherently coercive, but applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will[.] . . . Ultimately, the voluntariness determination depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Id.* (internal quotation marks and citations omitted). *See Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011)("Coercive police activity can be the result of either physical intimidation or psychological pressure" (internal quotation marks omitted)). "The application of these principles involves *close scrutiny* of the facts of individual cases." *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011), *quoting Gallegos v. California*, 370 U.S. 49, 52 (1962)(emphasis added by Court). The burden is on the government to prove voluntariness by a preponderance of the evidence. *See, e.g., United States v. Williams*, 435 F.3d 1148, 1153 n.5 (9th Cir. 2006).

All of the surrounding circumstances here, which have been discussed in detail in the preceding sections, include the invasion of Paul's and Darren's residence by a large force of visibly armed law enforcement agents, two of whom were carrying assault weapons and two of whom pointed guns at the father and son. In addition, the circumstances include, the hostile and aggressive commands of the agents upon entry; the immediate handcuffing of Paul and Darren; the demand to kneel on the floor facing the wall, their isolation from others – father from son and son from father; the lack of *Miranda* warnings, and the complete and utter domination of the scene by armed law enforcement agents.

23

1   Combined, all of these circumstances left both Paul and Darren  feeling compelled to

2   respond to the agents' questions. Moreover, Paul and Darren are citizens of Malaysia, where the

3   rights of those who encounter the police are very different than they are in this country and where

4   human  rights  abuses  are  pervasive. *See  generally*  Human  Rights  in  Malaysia,

5   http://en.wikipedia.org/wiki/Human_rights_in_Malaysia  (last visited September 22, 2014); World

6
7   Report 2014, Malaysia, http://www.hrw.org/world-report/2014/country-chapters/malaysia (last

8   visited September 22, 2014).

9   A Malaysian citizen confronted by police interrogation would feel compelled, as Paul and

10  Darren did, to submit to the show of authority and respond to interrogation. Courts have

11  recognized that cultural factors are relevant to the voluntariness inquiry. *See, e.g., Al-Yousif v.*

12  *Trani*, ___ F.Supp.2d ___, 2014 WL 252512 at *13 (D.Colo. Jan. 22, 2014)(state court

13  unreasonably applied totality of  circumstances test when it failed to "credit the importance of the

14  numerous historical findings of fact made by the trial court, including the fact that the defendant

15  had substantial language and cultural barriers that impeded his ability to understand, and therefore

16  to waive, his *Miranda* rights"); *United States v. Ramirez*, 991 F.Supp.2d 1258, 1270 (S.D.Fla.

17
18  2014)(fact that defendant was a Peruvian national who worked on cruise ships and spent most of

19  his time outside the United States was relevant factor in evaluating voluntariness of statement).

20  ///

21

22

23

24

25

26

27

28

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

24

1    This factor, too, supports the conclusion that the statements made by Paul and Darren on

2  July 9, 2014, were not voluntary and must be suppressed.

3    Dated this 28th day of October, 2014.

4
   **CHESNOFF & SCHONFELD**                     **GOLDSTEIN & RUSSELL**
5    /s/ David Z. Chesnoff                       /s/ Thomas C. Goldstein
   **DAVID Z. CHESNOFF, ESQ.**                   **THOMAS C. GOLDSTEIN, ESQ.**
6  Nevada Bar No. 2292                           *Pro Hac Vice*
   520 South Fourth Street                       7475 Wisconsin Ave.
7  Las Vegas, Nevada 89101                       Bethesda, MD 20814
   Attorney for Wei Seng Phua                    Attorney for Darren Wai Kit Phua
8

9  **CHESNOFF & SCHONFELD**

10   /s/ Richard A. Schonfeld

11 **RICHARD A. SCHONFELD, ESQ.**
   Nevada Bar No. 6815
12 520 South Fourth Street
   Las Vegas, Nevada 89101
13 Attorney for Darren Wai Kit Phua

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                25

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that service of the foregoing was served on the 28th day of October, 2014, via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

/s/ Camie Linnell
An employee of Chesnoff & Schonfeld

LAW OFFICES
CHESNOFF & SCHONFELD
AN ASSOCIATION OF PROFESSIONAL CORPORATIONS
520 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101-6593
TELEPHONE 702 · 384-5563