DANIEL G. BOGDEN
United States Attorney
PHILLIP N. SMITH, JR.
KIMBERLY M. FRAYN
Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada  89101
PHONE: (702) 388-6336
FAX:  (702) 388-6418

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**-oOo-**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:14-cr-00249-APG-PAL |
| Plaintiff, | GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO SUPPRESS STATEMENTS [231] |
| vs. | |
| WEI SENG PHUA, and DARREN WAI KIT PHUA, | |
| Defendants. | |

COMES NOW the United States of America, by and through DANIEL G. BOGDEN, United States Attorney, and PHILLIP N. SMITH, JR. and KIMBERLY M. FRAYN, Assistant United States Attorneys, and responds in OPPOSITION to the Motion to Suppress Statements (hereinafter, "the Defendants' Motion") filed on October 28, 2014 by WEI SENG PHUA and DARREN WAI KIT PHUA (hereinafter, "the Defendants").  *See* Docket #231.

**I.      RELEVANT PROCEDURAL HISTORY**

On July 14, 2014, a Criminal Complaint was filed against the Defendants, charging them with one (1) count of Transmission of Wagering Information in violation of 18 U.S.C. §§ 1084(a) and 2, and one (1) count of Operating an Illegal Gambling Business in violation of 18 U.S.C. §§ 1955 and 2.  *See* Docket #1.  The Defendants made an initial appearance on the Complaint on the same day.  After detention hearings, both Defendants were granted pre-trial release pending the

1

posting of bonds. On July 29, 2014, the Federal grand jury returned a Criminal Indictment against the Defendants charging them with the same offenses alleged in the Complaint; it also contained forfeiture allegations. *See* Docket #86. The Defendants were arraigned on the Indictment on August 7, 2014, whereupon they pleaded not guilty and the matter was set for trial.

The Defendants filed the instant Motion on October 28, 2014. *See* Docket #231. The Court set the Government's response deadline for November 7, 2014. The Government respectfully submits the following in OPPOSITION to the Defendants' Motion.

## II.   FACTUAL BACKGROUND

On July 9, 2014, at approximately 2:45 p.m., pursuant to an investigation into illegal online gambling, a team of Government agents led by Special Agents from the Federal Bureau of Investigation ("FBI") executed a search warrant at three luxury villas (including Villa 8882, which was occupied by the Defendants) in Caesar's Palace Hotel and Casino. After securing the premises (and the Villa's occupants) in order to safely conduct the court-approved search, agents conducted interviews of the Defendants. At the outset, the Government would note that the Defendants' characterization of the circumstances in which the interviews were conducted contains several factual misrepresentations of what actually occurred. The Defendants' Motion is based largely upon said misrepresentations.

The Government does not contest that the agents were armed when they entered all three villas, and does not contest that the occupants were initially handcuffed to properly secure the scene prior to commencing the searches. Neither action is uncommon (nor improper) for agents to partake when executing a search warrant.[1] Upon entry into Villa 8882, the agents saw approximately seven (7) individuals, including both Defendants. All seven were told to put their hands up and get on their knees. They were then frisked, handcuffed, and escorted to a hallway for officer safety

---

[1] Specifically, the agents had information that the occupants of an adjoining villa had recently been to a gun range, so the agents had (reasonably) heightened safety concerns. *See, e.g.*, Muehler v. Mena, 544 U.S. 93, 99-100 (2005).

1   purposes. The Defendants were on their knees for a few minutes, not for the extended length of time
2   alleged in the Defendants' Motion.
3       **A. Paul Phua.**
4       Paul Phua's ("Paul") interview began at approximately 3:30 p.m., 40 minutes after the agents
5   entered the villa. The delay was due to the fact that the search warrant encompassed the search of
6   multiple villas (8881, 8882 and 8888), some of which were connected to each other. In order to not
7   exceed the scope of the search warrant, agents wanted to verify where each villa began and ended;
8   consequently, they had to wait for confirmation from Caesar's staff as to the dimensions of each
9   villa. Prior to being interviewed, Paul was informed that the agents were executing a search warrant
10  and that he was not under arrest. *See* Exhibit 1 (FBI report documenting interview of Paul). He was
11  also informed of the nature of the interview, but he was not given Miranda warnings.
12      Prior to being interviewed, Paul asked if he could answer some questions and refuse to
13  answer others. He was advised that the interview was voluntary and that he could refuse to answer
14  questions and/or terminate the interview at any time. *Id.* Paul was also informed that if he wished to
15  answer questions, he would have to do so while handcuffed in the front for officer safety purposes
16  because there were agents present with firearms in plain view. Paul agreed to voluntarily answer
17  questions. During the course of the interview, Paul indeed declined to answer some of the questions
18  that were posed to him. Approximately 30-45 minutes into the interview, Paul asked to use the
19  restroom. He was allowed to do so, and an agent escorted him to the bathroom merely to preserve
20  the integrity of the scene due to the fact that agents were still searching of the villa. Prior to going to
21  the restroom, Paul was asked if he wished to have his handcuffs removed. He declined.[2]
22      Paul was also asked whether or not he had an attorney; he said he did not. When Paul was
23  informed that an individual present at the scene had claimed to be his attorney, he first reiterated that

---

[2] Paul remained in handcuffs for approximately five and a half (5½) hours, during the entirety of the search.

3

1  he did not have one, but then indicated that if someone else had secured counsel for him, he wished
2  to talk to counsel.  The interview was then immediately terminated.  Paul was then advised that he
3  had to wait while agents completed the search and conducted an inventory of the items that were to
4  be seized.  After the conclusion of the search, Paul was provided with an inventory of the seized
5  items.  Paul also informed the agents that the FBI was "very nice" compared to law enforcement in
6  Macau, which had apparently "roughed him up."[3]

**B.  Darren Phua.**

8  Darren Phua ("Darren") was interviewed twice.  His first interview began at approximately
9  3:30 p.m.  Before this interview, Darren was informed that he was not under arrest and was not
10 provided with Miranda warnings.  He was told he could leave but that, if he did so, he could not
11 return to the villa until the search had been completed.  *See* Exhibit 2 (FBI report documenting first
12 interview of Darren).  Darren was informed that he did not have to answer any questions, and he was
13 told the nature of the interview.  Darren stated that he was willing to voluntarily answer questions.
14 During the ensuing interview, Darren was handcuffed in the front.  He was informed that he was
15 being handcuffed for officer safety purposes.

16 Darren's second interview began at approximately 5:00 p.m.  Prior to the second interview,
17 he was provided with Miranda warnings.  He was again advised that he was not under arrest and that
18 the interview was voluntary and that he could refuse to answer questions.  *See* Exhibit 3 (FBI report
19 documenting second interview of Darren).  He was also informed that he could leave, and told the
20 nature of the interview.  Darren responded that he wanted to remain at the scene, and he
21 subsequently voluntarily gave a second interview.

22 . . .

23 . . .

---

[3] Paul was apparently arrested in Macau for conducting the same type of illegal activity with which he is alleged to have engaged in in the instant case.

4

## III.     ARGUMENT

**A. Analytical Framework.**

The procedural protections afforded by Miranda are designed to secure an accused's privilege against self-incrimination. They are triggered only in the event of a custodial interrogation. Oregon v. Mathiason, 429 U.S. 492 (1977) (per curiam). "Custody" is the deprivation of "freedom of action in any significant way." Miranda, 384 U.S. at 444. "Interrogation" refers to "express questioning" or its "functional equivalent," which includes "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In United States v. Gonzalez-Mares, 752 F.2d 1485 (9th Cir. 1985), the Court explained that "not every question posed in a custodial setting is equivalent to 'interrogation' requiring *Miranda* warnings." 752 F.2d at 1489.

The Government concedes that the foregoing interviews constituted "interrogations" for Miranda purposes. To be clear, however, the obligation to give a suspect Miranda warnings before interrogation extends only to those instances where the individual is actually "in custody." Oregon v. Mathiason, *supra*. To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). The Defendant bears the burden of proving that he was in custodial status. *See, e.g.*, United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds by* United States v. Bengivenga, 845 F.2d 593 (5th Cir. 1988) (en banc).

The inquiry into whether or not a person was in custody, therefore, focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being

questioned. Stansbury, 511 U.S. at 323. That is, the Court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." United States v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir. 1987); *see also* United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). Whether a defendant was the focus of a custodial interrogation is a factual determination that must be made on a case by case basis. United States v. Crisco, 725 F.2d 1228, 1230 (9th Cir. 1984) (citing United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981)).

The Ninth Circuit has held that the following factors are among those likely to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066 (citing Beraun-Panez, 812 F.2d at 580). However, "[h]andcuffing a suspect does not [alone] necessarily dictate a finding of custody.... Strong but reasonable measures to insure the safety of the officer or the public can be taken without necessarily compelling a finding that the suspect was in custody." Booth, 669 F.2d at 1236 (citation omitted).

Finally, a "Mirandized" statement given after a prior, unwarned statement is admissible so long as there are no "… deliberately coercive or improper tactics in obtaining the initial statement." Oregon v. Elstad, 470 U.S. 298, 314 (1985). Thus, "if the prewarning statement was voluntary (or if involuntary, the change in time and circumstances dissipated the taint), then the postwarning confession is admissible unless it was involuntarily made despite the Miranda warning." *See* United States v. Williams, 435 F.3d 1148, 1153 (9th Cir. 2006).

**B. The Defendants' Motion should be denied as moot as it pertains to Paul Phua.**

Given the nature of Paul's statement, the Government does not intend on introducing it during its case-in-chief, thereby rendering the Defendants' Motion moot as to that Defendant. The

1  Government is not conceding that the statement was taken in violation of *Miranda*, but rather is not
2  seeking to use the statement during its case-in-chief.  However, even presuming that Paul's
3  interview was conducted in violation of Miranda, the Government respectfully reserves the right to
4  introduce his statement as rebuttal or impeachment evidence if he testifies at trial and his testimony
5  is inconsistent with said statement.  *See, e.g.,* Michigan v. Harvey, 494 U.S. 344, 350 (1990)
6  (holding that statements taken in violation of Miranda may not be used in the prosecution's case in
7  chief, but they are admissible to impeach conflicting testimony by the defendant).

   **C. The Defendants' Motion should be denied on its merits as it pertains to Darren Phua.**

   **a. Darren's first interview.**

   Defendants' Motion as it pertains to Darren is flawed for several reasons.  First, it begins with the premise that "… Villa 8882 was Paul and Darren's residence."  *See* Defendants' Motion, at 9.  Second, it ignores the totality of the objective circumstances of the situation (which necessarily must include consideration of the particularities surrounding the Defendants).  And third, it does not consider that Darren was, in fact, provided with Miranda warnings prior to being interviewed a second time.[4]  According to the Motion, the Phuas were "foreign visitors to this country, thousands of miles from their own homes, and the hotel room where they had been staying for 28 days, was their 'home away from home.'"  *Id*.  Of course, one's "home away from home" is markedly different from one's "home."

   The Defendants primarily rely upon United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008) to support the propositions that the villa was analogous to their home; that Darren was not free to leave; and that he was, therefore, in custody.  This reliance is misplaced.  As previously indicated, prior to the first, un-Mirandized interview, Darren was told that he was not under arrest, that he

---

[4] The Government acknowledges that the report documenting Darren's second interview does not specifically indicate that he was provided with Miranda warnings.

7

could leave if he desired, and that he did not have to speak with law enforcement. "If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody." United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

Darren, however, maintains that because he was "… a frightened young man far from home, isolated from his father and faced with indefinite exclusion from the only residence he had," he was in fact *not* free to leave. *See* Defendants' Motion, at 17. The Government disagrees. This Court must consider the fact that Darren was told that he could leave and that he did not have to answer any questions "within the context of the scene as a whole." *See* United States v. Lee, 699 F.2d 466, 467-68 (9th Cir. 1982) (per curiam). Darren's reliance on Craighead is misplaced because Craighead is distinguishable from the facts of the instant case.

The Defendants' Motion appears to attempt to extract, from Craighead, a bright-line rule that a suspect must always be Mirandized if he is interviewed during the execution of a search warrant at his home (because the execution of a search warrant is a necessarily police-dominated atmosphere). The Craighead Court itself, however, limited its holding to "certain circumstances," 539 F.3d at 1083, and indicated that the opinion "should not be interpreted as an exhaustive pronouncement." *Id.* at 1084. Rather, "[t]he determination of whether an in-home interrogation was custodial 'is necessarily fact intensive.'" United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993).

Here, while there were indeed numerous armed agents present during the execution of the search warrant, Darren was specifically told that he could leave and that he was not under arrest. He was also told that he did not have to answer any questions. The only reason why he was handcuffed was because *he* chose to remain in the villa during the execution of the search, and he was told as much. And to be clear, Darren was inside a hotel villa that (while itself spacious) formed just a small part of an exceedingly large hotel and casino complex. Within close proximity to the villa, for

8

instance, there was a large swimming pool and the main gaming floor of the hotel, along with various restaurants and bars. Consequently, a reasonable person in Darren's position would have, at a minimum, thought he could temporarily vacate the villa and retreat to another part of the complex while the agents were present inside of the villa—this is especially true given that Darren was specifically told as much and the agents did not communicate anything to him either through words or actions that would have indicated the contrary.

Several of the concerns addressed in Craighead appear nowhere in the present record. For instance:

> Craighead was not handcuffed or physically restrained. However, he was escorted to a back storage room and the door was closed behind him. Craighead testified that Detective Englander appeared to him to be leaning with his back to the door in such a way as to block Craighead's exit from the room. Detective Englander wore a flack jacket or "raid vest," and was visibly armed. Detective Englander did not participate in the interrogation by asking questions; he stood silent with his back to the door facing the suspect. Craighead testified that he did not feel he had the freedom to leave the storage room because, in order to get to the room's only door, he "would have either had to have moved the police detective or asked him to move."

539 F.3d at 1086. Here, there is no indication that Darren was under armed guard in a closed room, or that an agent was positioned in such a way as to require Darren to take extra steps if he wished to leave. In fact, the contrary was true.

After choosing to remain inside the villa, Darren was allowed to rest comfortably in one of villa's the main hallways. While inside of the villa, Darren actually walked around the hallway area next to the dining and media rooms, observing as the agents executed the search warrant. Furthermore, it was apparent to one of the agents that Darren was observing out of mere curiosity, not anxiety. One of the agents also observed Darren smiling during the search—another signal that he wasn't under any form of duress. Perhaps, most importantly, several of the villa's seven occupants who were present at the commencement of the search in fact left the scene after they, like Darren, were advised that they were not under arrest and were free to leave. Darren saw these

1  individuals vacate the villa. The Government submits that this renders unreasonable any belief by
2  Darren that *he* was not free to leave.

3  In further support of his claim that he was helpless and incapable of making a voluntary
4  decision to remain at the villa, the Defendants' Motion cites the fact that the adult Darren was
5  "…isolated from all others, most particularly his father." *See* Defendants' Motion, at 20. It should
6  be noted, however, that at no point did Darren express any concern about the whereabouts of Paul
7  (or anyone else, for that matter). When Darren was told (twice) that he could leave, he said nothing
8  about whether or not his father could leave as well. When Darren was interviewed, Paul was present
9  in the villa, approximately 20-30 feet away in his (Paul's) bedroom.

10  For all of these reasons, the Government submits that Darren was not in custody for Miranda
11  purposes during his first interview, and, consequently, his first statement should not be suppressed.

12  **b. Darren's second statement.**

13  In Elstad, *supra*, the suspect gave an incriminating statement to a police officer at his home
14  without first receiving Miranda warnings. Officers then took Elstad to a police station, placed him
15  in an interrogation room, read him his Miranda rights and questioned him at length. During this
16  interrogation, and approximately 30 minutes after giving his original unwarned incriminatory
17  statement, Elstad expanded significantly on his earlier statements and gave a full confession. Elstad,
18  470 U.S. at 301-02. Elstad later asserted that his confession should be suppressed as "fruit of the
19  poisonous tree" because, although he confessed after being given Miranda warnings, his subsequent
20  confession was tainted by the earlier unwarned comments. *Id.* at 303.

21  Elstad also claimed that the coercive impact of his unwarned statement required suppression
22  because the unwarned statement compromised the voluntariness of his post-warning statement. *Id.*
23  at 302-04. The Supreme Court rejected both arguments, first concluding that the first statement
24  Elstad gave was voluntary. *Id*. at 306-14. The Elstad Court held that "absent deliberately coercive

or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the postwarning (and presumably admissible) confession. *Id.* at 314. Rather, the Court held, "[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Id.* at 308. The Court thus held that a "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." *Id.* at 318.

In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court expanded on Elstad. Seibert held that "if the prewarning statement was voluntary (or if involuntary, the change in time and circumstances dissipated the taint), then the postwarning confession is admissible unless it was involuntarily made despite the Miranda warning." *See* United States v. Williams, 435 F.3d 1148, 1153 (9th Cir. 2006). In Williams, the Ninth Circuit held that Seibert required a postwarning confession to be suppressed if it was obtained during a "deliberate two-step interrogation where the midstream Miranda warning–in light of the objective facts and circumstances–did not effectively apprise the suspect of his rights." *Id.* at 1157 (emphasis added).

Williams also held:

> ...where law enforcement officers deliberately employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a reasonable person in the suspect's shoes of his rights, the trial court should suppress the confession. This narrower test–that excludes confessions made after a deliberate, objectively ineffective mid-stream warning–represents Seibert's holding. In situations where the two-step strategy was not deliberately employed, Elstad continues to govern the admissibility of postwarning statements.

*Id.* at 1158. In sum, it is the deliberateness of the initial failure to provide Miranda warnings–meaning the police officer in question deliberately attempted to circumvent the suspect's constitutional rights–which triggers the Seibert analysis. The initial inquiry in the instant case, then,

11

1  assuming that warnings were required in the first place, begins with whether or not the agents
2  deliberately employed a two-step interrogation.

3  The Government submits that they did not. <u>Williams</u> held that "in determining whether the
4  interrogator deliberately withheld the <u>Miranda</u> warning, courts should consider whether objective
5  evidence and any available subjective evidence, such as an officer's testimony, support an inference
6  that the two-step interrogation procedure was used to undermine the <u>Miranda</u> warning." *Id.*
7  Similarly, in the instant case, it is reasonably in dispute as to whether or not the initial inquiry was a
8  custodial interrogation to begin with, and consequently, it stands to reason that the first interviewing
9  agent did not deliberately withhold <u>Miranda</u> warnings.

10  Even if the first interviewing agent conducted a non-custodial interview, the Government
11  would note here that she subjectively would not have believed that she was required to provide
12  <u>Miranda</u> warnings and therefore could not have *deliberately* withheld them. Assuming *arguendo* 1)
13  that <u>Miranda</u> warnings should have been provided before the first interview, and were not, but 2)
14  that they were not deliberately withheld, then "[t]he admissibility of postwarning statements should
15  continue to be governed by the principles of Elstad." <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J.,
16  concurring). In the instant case, assuming that 1) Darren was in custody at the inception of the
17  search; and 2) the first interview constituted a custodial interrogation and that consequently <u>Miranda</u>
18  warnings should have been given, there is nothing to suggest that the agent's questioning during the
19  first interview was coercive and thereby rendered Darren's answers involuntary; consequently, under
20  the <u>Elstad</u> factors, the second Mirandized statement is still admissible.

21  Moreover, even if Darren's statements during the first interview was given involuntarily (a
22  point the Government does not concede), the change in time and circumstances–*i.e.*, two (2)
23  statements given approximately an hour apart–amply dissipated any taint. Additionally, there is
24  nothing to suggest that Darren did not then subsequently knowingly and intelligently waive his

Miranda rights prior to giving the second statement. Even if this Court determines that the first agent deliberately withheld providing Darren with the required Miranda warnings prior to the first interview, suppression is not automatic, as the analysis does not end there. The Ninth Circuit instructed in Williams:

> When an interrogator has deliberately employed the two-step strategy, Seibert requires the court then to evaluate the effectiveness of the midstream Miranda warning to determine whether the postwarning statement is admissible. The court must determine, based on objective evidence, whether the midstream warning adequately and effectively apprised the suspect that he had a "genuine choice whether to follow up on [his] earlier admission." In its analysis, the court should look both to the objective circumstances the plurality cited as "bear[ing] on whether Miranda warnings delivered midstream could be effective enough to accomplish their object," and to the curative measures characterized by Justice Kennedy as "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning."

Williams, 435 F.3d at 1160 (internal citations omitted); *see also* United States v. Stewart, 388 F.3d 1079 (7th Cir. 2004)(explaining that if the two-step interrogation was deliberately used, then the inquiry shifts into the sufficiency of the break in time and circumstances between the unwarned and warned confessions).

Williams promulgated a five-part test to determine whether or not Seibert requires the suppression of a postwarning confession: "(1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken." Williams, 435 F.3d at 1160. Of particular importance in the instant case is Seibert's holding that a "substantial break in time and circumstances" between pre- and postwarning questioning, would "in most circumstances, ... allow[] the accused to distinguish the two contexts and appreciate that the interrogation ha[d] taken a new turn." Seibert, 542 U.S. at 622.

1   Here, a significant lapse of time separated the initial statement and the postwarning
2   statement, and the two interviews were conducted by two different agents. During the interim,
3   Darren remained comfortably in the hallway of the villa. Additionally, the second interview was
4   about a completely different subject than the first interview, and the second agent did not confront
5   Darren with information gleaned from the first agent. This is important because it illustrates that
6   there was not a "two-step" interview conducted here, as where the first interview secures
7   incriminating information and then the second Mirandized interview is nothing more than the means
8   to get the suspect to adopt and/or expand upon the first interview post-Miranda.

### c. Voluntariness.

The Defendants' Motion asserts that any statement given by Darren was not voluntary. The second statement, however, was the product of Darren's knowing, voluntary, and intelligent waiver of his Miranda rights. There is a presumption against waiver, of which the Government bears the burden of overcoming by a preponderance of the evidence. *See* United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998). To meet this burden, generally, the Government must prove that, under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of such abandonment. *Id.*

Several factors to consider are (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system. *Id.* at 537-39. In the instant case, citing United States v. Gamez, 301 F.3d 1138 (9th Cir. 2002), Darren attempts to additionally rely on his status as a foreign national in urging this Court to find that he was coerced into answering questions. *See* Defendants' Motion, at 22-24.

Here, however, at no point did Darren exhibit any difficulties comprehending the English language. There is no indication that he did not understand his rights as they were given to him. The Government maintains that Darren knowingly and voluntarily waived his Miranda rights during the second interview. Consequently, the second statement should not be suppressed.

Based on the foregoing, the Defendants' Motion should be denied.

### III.   CONCLUSION

WHEREFORE, after consideration of the included facts, points, authorities, and arguments, the United States respectfully requests that this court DENY the Defendants' Motion.

DATED this 7th day of November, 2014.

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney

//s//
PHILLIP N. SMITH, JR.
KIMBERLY R. FRAYN
Assistant United States Attorneys

Case 2:14-cr-00249-APG-PAL   Document 254   Filed 11/07/14   Page 16 of 16

**CERTIFICATE OF SERVICE**

I, Phillip N. Smith, Jr., certify that the following individual was served with a copy of the GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO SUPPRESS STATEMENTS on this date by the below identified method of service:

Electronic Case Filing

David Z. Chesnoff, Esq.
Richard A. Schonfeld, Esq.
Thomas C. Goldstein, Esq.
Counsel for Defendants WEI SENG PHUA and DARREN WAI KIT PHUA

DATED: November 7, 2014.

                                              //s//                      
                                              PHILLIP N. SMITH, JR.
                                              Assistant United States Attorney