1  DANIEL G. BOGDEN
United States Attorney
2  KIMBERLY M. FRAYN
PHILLIP N. SMITH, JR.
3  Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
4  Las Vegas, Nevada  89101
PHONE: (702) 388-6336
5  FAX:  (702) 388-6418

6          **UNITED STATES DISTRICT COURT**
          **DISTRICT OF NEVADA**
7                    **-oOo-**

8  UNITED STATES OF AMERICA,          2:14-cr-00249-APG-PAL

9                    Plaintiff,          GOVERNMENT'S RESPONSE IN
                                        OPPOSITION TO DEFENDANTS'
10          vs.                          JOINT MOTION TO SUPPRESS
                                        FRUITS OF WARRANTLESS
11  WEI SENG PHUA et al.,                SEARCH [229]

12                    Defendants.

13          The United States of America, by and through undersigned counsel, responds to and

14  opposes Defendants' "Joint Motion to Suppress Fruits of Warrantless Search," which was filed

15  on October 28, 2014. Doc. No. 229.  The Response was due on November 7, 2014, however, we

16  were unable to file the Response due to the CM/ECF system being down the evening of

17  November 7, 2014.  Unfiled copies of this Response was emailed to Defense Counsel on

18  November 7, 2014 and and they have no opposition to the late filing.  Government's Omnibus

19  Redacted Exhibits for this response and the Government's companion response in opposition to

20

21

22

23

24

1   the *Franks* suppression motion are filed under separate docket numbers due to the Exhibits'

2   voluminous nature.

3        DATED this 10th day of November, 2014.

4                                        Respectfully submitted,

5                                        DANIEL G. BOGDEN
                                         United States Attorney

6
                                         _____
7                                        //s//
                                         KIMBERLY M. FRAYN
                                         PHILLIP N. SMITH, JR.
8                                        Assistant United States Attorneys

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

I.   Introduction ............................................................................................................. 1

II.  Statement of the Facts ............................................................................................. 3

    A.  *Even before arriving in Las Vegas, Paul Phua and his associates request that Caesars supply their villas with unusual quantities of electronics equipment and technical support; while installing this equipment, Caesars' employees see numerous indicators of a betting operation.* ........................................................................... 3

    B.  *Background: Undaunted by his arrest in Macau for operating an illegal sports gambling business, Phua—a high-ranking member of an international criminal organization—continues his illegal operation in Las Vegas.* ...................................................... 6

    C.  *Wood TMS installs the special DSL lines requested by Phua and his associates.* ............. 7

    D.  *On July 3, 2014, DSL contractor tells the FBI what he has seen inside the Villas and agrees to help surreptitiously gain access to the Villas.* .................................................. 10

    E.  *On July 4, 2014, SA Lopez, in an undercover capacity, accompanies DSL contractor into Villa 8882, under the guise of delivering the requested laptop computer, and DSL contractor, acting alone, thereafter enters and tapes the inside of Villa 8881.* ............... 12

    F.  *On July 5, 2014, SAs Lopez and Kung, in undercover capacities, enter Villa 8882, under the guise of serving the DSL outage the government induced as part of its ruse.* ............. 16

III. Argument ............................................................................................................... 19

    A.  *Only Defendants Seng Chen Yong and Wai Kin Yong may challenge any warrantless entries into Villa 8881, and only Defendants Wei Seng Phua and Darren Wai Kit Phua may challenge any warrantless entries into Villa 8882.* ................................................ 20

    B.  *Analytical Framework for Consent Entry Based on Ruse* ................................. 21

    C.  *Law Enforcement's Use of a Ruse Does Not Require Any Level of Suspicion and, in Any Event, the Present Agents Had a Reasonable, Pre-Ruse Suspicion of Illegal Book-Making.* ........................................................................................................... 25

    D.  *No Fourth Amendment Violation Occurred When SA Lopez Accompanied DSL contractor to Villa 8882 to Deliver the Laptop the Occupants had Requested.* ................................. 28

    E.  *No Fourth Amendment Violation Occurred When DSL Contractor Entered Villa 8881 Contractor Engaged In A Private Frolic Outside Of Any Agency Relation With The Agents.* ............................................................................................................ 29

i

*F. No Fourth Amendment Violation Occurred When DSL Service Was Disrupted and the Agents Entered the Villas Purporting to Correct the Problem Because Agents Created No Emergency, and Defendants Retained the Choice Whether and When to Permit Outsiders to Enter to Repair a Nonessential Service.* ........................................................................32

*G. The Agents Did Not Exceed the Scope of the Consent.* ........................................................36

CONCLUSION ........................................................................................................................39

1

## TABLE OF AUTHORITIES

2

<u>**Cases**</u>

3

Brown v. State,
   378 Md. 355, 835 A.2d 1208 (Md. 2003) ................................................................ 26

4

Coolidge v. New Hampshire,
   403 U.S. 443, 91 S. Ct. 2022 , 29 L.Ed.2d 564 (1971) ...................................... 30, 36

5

Copeland,
   1996 WL 306556.......................................................................................................... 25

6

7

Hoffa v. United States,
   385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ............................................... 35

8

9

Kentucky v. King,
   131 S. Ct. 1849 (2011) ............................................................................................... 39

10

11

Lewis v. United States,
   385 U.S. 206 (1966) ................................................................. 22, 23, 24, 36

12

Miller,
   688 F.2d at 657 ............................................................................................................ 31

13

14

Minnesota v. Carter,
   525 U.S. 83 (1998) ............................................................................................. 20, 21

15

Parson,
   599 F.Supp.2d at 603................................................................................................... 34

16

17

People v. Jefferson,
   43 A.D.2d 112, 350 N.Y.S.2d 3 (1973) ................................................................. 33

18

People v. Minervini,
   20 Cal. App.3d 832 (Cal. App. 1971) ...................................................................... 37

19

20

People v. Reeves,
   391 P.2d 393 (Ca. 1964)............................................................................................. 26

21

Rakas v. Illinois,
   439 U.S. 128 (1978) ..................................................................................................... 20

22

23

Roberts v. Casey,
   93 P.2d 654 (1939)...................................................................................................... 38

24

Schneckloth v. Bustamonte,
  412 U.S. 218 (1973) ........................................................................... 22, 26

Smith v. Maryland,
  442 U.S. 735 (1979) ............................................................................... 19

State v. Ahart,
  324 N.W.2d 317 (Iowa 1982) ................................................................. 26

State v. Hastings,
  119 Wash.2d 229, 830 P.2d 658 (Wash. 1992) ...................................... 26

State v. Stevens,
  123 Wis.2d 303, 367 N.W.2d 788 (1985) ............................................... 24

United States v. Baldwin,
  621 F.2d 251 (6th Cir. 1980) .................................................................. 23

United States v. Benezario,,
  39 F. Supp. 2d 361 (D.P.R. 2004) .......................................................... 26

United States v. Giraldo,
  743 F.Supp. 152 (E.D.N.Y. 1990) ............................................... 24, 25, 33

United States v. Gumerlock,
  590 F.2d 794 (9th Cir. 1979) .................................................................. 31

United States v. Haden,
  397 F.2d 460 (7th Cir. 1968) .................................................................. 23

United States v. Hardin,
  539 F. 3d 404 (6th Cir. 2008) ....................................... 24, 25, 33, 36

United States v. Harrison,
  639 F.3d 1273 (10th Cir. 2011) .............................................................. 33

United States v. Jacobsen,
  466 U.S. 109 (1984) ............................................................................... 19

United States v. Lord,
  230 Fed. Appx. 511 (6th Cir. 2007) ........................................................ 24

United States v. Maldonado Garcia,
  655 F. Supp. 1363 (D. P.R. 1987) .......................................................... 26

United States v. Miller,
  688 F.2d 652 (9th Cir. 1982) ........................................................... 30, 31

iv

United States v. Nerber,
  222 F.3d 597 (9th Cir. 2000)................................................................. 20

United States v. Parson,
  599 F.Supp.2d 592 (W.D. Pa. 2009) ...................................................... 34

United States v. Reed,
  15 F.3d 928 (9th Cir. 1994)................................................................... 30

United States v. Scherer,
  673 F.2d 176 (7th Cir. 1982)........................................................... 24, 29

United States v. Sherwin,
  539 F.2d 1(9th Cir. 1976)..................................................................... 30

United States v. Shigemura,
  682 F.2d 699 (8th Cir. 1982),......................................................... 23, 29

United States v. Snype,
  441 F.3d 119 (2d Cir. 2006) ........................................................... 21, 22

United States v. Taketa,
  923 F.2d 665 (9th Cir. 1991)................................................................. 20

United States v. Wagner,
  884 F.2d 1090 (8th Cir. 1989)................................................... 23, 28, 29

United States v. Walther,
  652 F.2d 788 (9th Cir. 1981)........................................................... 31, 32

United States v. Wright,
  641 F.2d 602 (8th Cir. 1981)................................................................. 24

Walter v. United States,
  447 U.S. 649, 100 S. Ct. 2395, 65 L.Ed.2d 410 (1980) ............................ 30

2 Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (3d ed.2007) ...........................24, 25, 33

# I.  Introduction

Defendants are high rollers permitted by Caesars Palace to occupy several villas free of charge during the 2014 World Cup.  This case involves the use of a ruse by law enforcement officers to obtain Defendants' consent to enter Villas 8881 and 8882 after Caesars reported to the authorities substantial evidence that Defendants, who had asked Caesars to supplement its complementary WI-FI with the installation of DSL lines, were using those DSL lines to conduct an illegal internet sports betting operation. Under Caesars' "Internet Access Terms of Use," Caesars retained the right to terminate internet service if used for "illegal activity."[1]

In brief, after Caesars contacted the authorities, agents, working with Caesars and a DSL contractor, (hereafter "DSL contractor"), entered Villa 8882 on July 4, 2014, to deliver a laptop requested by the occupants.  That same day, the contractor also temporarily disconnected the DSL service to Villa 8881, leaving WI-FI and other digital and electronic services in place. When Defendants asked Caesars to restore the DSL connection in Villa 8881, the DSL contractor entered alone and on his own initiative (without law enforcement direction),used his cell phone to make a video of the Villa's interior, which he delivered to the authorities.  The following day, the contractor disconnected the DSL service to Villa 8882 at the direction of law enforcement. When a Defendant called Caesars requesting restoration of service, agents posed as DSL technicians to gain admittance to 8882 and stayed long enough to confirm with Defendants that the DSL connection had been restored. Four days later, on July 9, agents executed a warrant authorizing the search of Villas 8881, 8882, and 8888.

Defendants move to suppress evidence seized during the warrant search as the fruit of the warrantless entries into Villas 8881 and 8882, arguing: (1) that the agents coerced consent by using a ruse to gain entry; (2) that agents may not use a ruse unless they have reason to suspect

---

[1] *See* Exhibit 39.

illegal activity, and that they lacked reasonable suspicion here; and (3) that even if the agents had consent to enter the villas to fix the DSL connections, they exceeded the scope of consent. The motion should be denied.

First, only the defendants occupying a villa may seek suppression based on an alleged illegal entry into that specific villa. Thus only Defendants Wei Seng Phua (a.k.a. Paul Phua) and Darren Wai Kit Phua can establish a reasonable expectation of privacy in Villa 8882, and only Defendants Seng Chen Yong (a.k.a. Richard Yong) and Wai Kin Yong can establish a reasonable expectation of privacy in Villa 8881.[2]

With respect to those defendants who can establish standing, the question whether the use of a ruse to enter Villas 8881 and 8882 violated the Fourth Amendment turns on the unique facts of this case, in which the government briefly disconnected a DSL line, which Caesars had installed for Defendants to supplement the Wi-Fi already provided. At no time did the government disrupt Wi-Fi or any other service—essential or otherwise—to either villa. The ruse therefore was not coercive, and Defendants' consent was valid.

Defendants' argument that the use of a ruse must be supported by reasonable suspicion is not supported by precedent. Neither the Supreme Court nor any circuit court has imposed such a requirement. But even if reasonable suspicion was required to proceed by ruse, the agents had ample suspicion here. Finally, notwithstanding Defendants' claim to the contrary, the agents did not exceed the scope of consent when they entered the villas.[3]

---

[2] *See* Exhibit 38.

[3] In a separate pleading also filed today, the government explains that even if the warrantless entries were illegal, and all information obtained from those entries is stricken from the affidavit, the warrant is still valid under *Franks*, and thus evidence obtained as a result of the execution of the search warrant should not be suppressed. That pleading also addresses the omission of the circumstances surrounding the warrantless entries from the warrant affidavit.

## II.   Statement of the Facts

> *A.   Even before arriving in Las Vegas, Paul Phua and his associates request that Caesars supply their villas with unusual quantities of electronics equipment and technical support; while installing this equipment, Caesars' employees see numerous indicators of a betting operation.*

A Caesars' VIP Services employee, working at Caesars Hotel and Casino, reserved several Villas, (including Villas 8881, 8882 and 8888)[4] at the behest of Paul Phua, Richard Yong, or one of their associates in anticipation of their arrival in Las Vegas in June 2014.[5] Defendants were high rollers[6] permitted by Caesars Palace to occupy several villas free of charge during the 2014 World Cup.  Thus, on June 6, 2014, Phua's associate Richard Yong, (whom law enforcement knows to be associated with the 14K Triad),[7] checked into Villa 8881.[8] On June 7, 2014, Phua's associate Hui Tang checked in to Villa 8888.[9]  On June 11, 2014, Paul Phua himself, (whom law enforcement knows to be a high-ranking member of the 14K Triad),[10]

---

[4] Also reserved were Villas 8883, and 8887, the occupants of which law enforcement does not allege were involved in illegal gaming.

[5] *See* Exhibit 3.

[6] *See* Exhibits 2F, 3, and 21.

[7] *See*  Exhibit 48, 302 Yong Triad

[8] *See* Exhibits 4, showing check in on June 6, 2014 at approximately 9:19, and 38.

[9] See Exhibits 5, showing check in on June 7, 2014 at approximately 12:29, and 38. At the time the search warrant affidavits were executed, it was unclear if Hui Tang or others in villa 8888 were associated with the Triads.  However, *see* Exhibit 44, passport photograph recovered from defendant Herman Yeung's computer seized from Villa 8888 titled "Boss HKSAR Passport 2011." This was a copy of the passport of an individual confirmed by a Hong Kong court, and the United States Permanent Subcommittee on Investigations, to be one of nine leaders of the Wo Hop To Triad.

[10] *See* Exhibit 49, 302 Phua Triad.

checked into Villa 8882.[11] The villas' occupants associated with one another during their stay.[12]

Prior to their arrivals and check-ins, Paul Phua and his associates requested that Caesars provide them with an unusual amount of electronics equipment and technical support, which they requested be installed in the Villas.[13]  In response to these requests, Caesars (on June 22, 2014) sent several electrical engineer employees (including employees J.A. and J.S.) to Villa 8888 to assist with setting up the equipment.  Engineer J.A. later told Caesars' investigator that the equipment[14] in Villa 8888 appeared to be a set-up for an illegal gambling operation, adding that he saw several computer work stations with extra monitors attached.[15]  J.A. also told law enforcement that on one of the computer screens were words he believed to be in the Chinese language; that the screen also included several columns of numbers; and that these looked like

---

[11] *See* Exhibits 6 and 38. Paul Phua checked in and out periodically. In June 2014, he traveled to Macau, where he got arrested. Later in early July he traveled to London for approximately 48 hours. The records show Paul Phua initially checked into Caesars Las Vegas on June 11, 2014.

[12] *See, e.g.,* Exhibits 2F, 2M, 37, butler's notes residents of 8881, 8882 and 8888 planning to go to Wet Republic together, and 43, butler's notes residence of 8881 and 8882 scheduled to go to firearms range together.

[13] *See* Exhibit 2I. On July 3, 2014, Caesars' lead investigator P.U. (hereafter "Caesars' investigator") informed Nevada Gaming SA Rick Lopez that eight computers, five work stations, twenty plus monitors, three additional TV sets, and additional Wi-Fi and DSL lines, were put in Villa 8888 at the request of Hui Tang, who wanted them to "keep up on the world cup." Nineteen keys for Villa 8888 were issued. The TVs were hooked up to Cox, Dish TV, and Direct TV. Monitors were hooked up to Century Link DSL lines. One of the chief complaints from the guests was the time delay between the video signals of each service. In addition, Villas 8881 and 8882 requested additional DSL lines and fax machines. *See* Exhibits 8A-B; 13A-B; and 12, DSL contractor's affidavit; and 47.

[14] The equipment referred to by J.A. was purchased by defendant Herman Yeung on June 8, 2014. *See* Exhibit 30.

[15] *See* Exhibit 2A, e-mail contains photographs, including but not limited to, the computer bank in Villa 8888, which was shown to J.A., J.S., and the FBI and Nevada Gaming agents prior to the search warrant affidavits' execution. *See also* Exhibit 9A, 302 documenting a subsequent interview conducted on August 20, 2014, which confirmed the information in Exhibits 2A and 2I.

betting odds, similar to what J.A. has seen in sports betting in the casinos. *Id.*

Electrical Engineer J.S. saw much the same inside Villa 8888 on June 22, 2014, namely, computer screens that looked just like the ones in the casino's sports book.[16] J.S. said there were five stations set up in the room, with three monitors attached to each station, and that each station's computer tower was hooked up to a Century Link DSL line with voice-over internet protocol phones. *Id.*  Near the computer stations, J.S. also saw three large-screen televisions with service from Cox, Dish, and Direct TV, each of which was tuned to the World Cup.[17]  J.S. said that one of the chief complaints of the Villa's occupants was a time delay between the video signals of each service (Cox, Dish, and Direct TV).[18] J.S. said he believed that illegal sports book betting was being conducted in Villa 8888. *Id.*

Caesars did not consent to this illegal activity.  Accordingly, on June 30, 2014, Caesars' investigator provided the FBI and Nevada Gaming agents with photographs of the equipment set up in Villa 8888.[19]  Based on his training and experience, Nevada Gaming Special Agent (SA) Ricardo Lopez believed, upon review of these photographs, that the set-up is similar to a "wire room" where illegal wagers are made and monitored.  Additionally, the search warrant affiant, FBI SA Minh Pham, told United States Magistrate Judge Nancy J. Koppe that, based on his training and experience, Paul Phua, Richard Yong, Hui Tang, and others acting under their direction and control, were monitoring the World Cup and betting odds associated with World

---

[16] *See* Exhibits 2A, 2I, and 10, 302 documenting a subsequent interview conducted on August 20, 2014, which confirmed the information in 2A and 2I.

[17] *See* Exhibit 2A.

[18] *See* Exhibits 2I and 10.  SAs Lopez and Pham note that, based on their training and experience, eliminating time delay is critical for illegal gambling operations engaged in "in-game" wagering.

[19] *See* Exhibit 2A. Some of these photographs, *see* Exhibit 11, were attached as Attachment C to the search warrant affidavits.

Cup soccer games in furtherance of their illegal gambling business.

> B.     Background: Undaunted by his arrest in Macau for operating an illegal sports
> gambling business, Phua—a high-ranking member of an international criminal
> organization—continues his illegal operation in Las Vegas.

On or about June 18, 2014, Defendant Paul Phua traveled from Las Vegas to Macau.  On or about June 19, 2014, Phua was arrested in Macau,[20] along with more than twenty other individuals, for: 1) engaging in organized crime; and 2) operating an illegal sport book gambling business.[21]  The 14K Triad is known by law enforcement to be a criminal organization engaged in an ongoing illegal criminal enterprise.  Prior to their arrests, Paul Phua and his associates[22] transacted hundreds of millions of dollars in illegal bets on the World Cup soccer tournament that was held in Brazil in June and July of 2014. Most of their bets were made through use of the wires, that is, online or over the phone.[23]  After his arrest in Macau, Phua was freed under then-unknown conditions of release.[24]  In any event, on June 23, 2014,[25]  Paul Phua

---

[20] *See* Exhibits 31A, copy of arrest warrant seized from Paul Phua at his arrest on July13, 2014, and 31B, translation of warrant into English. *See also,* Exhibit 40 i-message chat from Darren Phua's i-phone talking about the arrest and forwarding photographs of Paul Phua under arrest in Macau.

[21] *See* Exhibits 1, media reports of arrest, and 2B.

[22] *See* Exhibit 41, p.5, i-messages and text messages from Darren Phua's i-phone indicating that four of the people arrested in Macau were Phua employees.

[23] *See* Exhibit 1 and 2I. *See also* Exhibits 28A-C information from Paul Phua's laptop, tablet cell phone; 29 302 confirming skype chats are wagers; and 32 customers' list and how bets were placed for World Cup Brazil 2014 which was recovered from a computer (1B106) in Villa 8888; 42 information from Richard Yong's laptop recovered from Villa 8881.

[24] Indeed, the conditions of his release remained unknown to FBI and Nevada Gaming agents even up to the time the three search warrant affidavits for Villas 8881, 8882, and 8888 (hereafter, "the search warrant affidavits") were executed. However, as shown in Exhibit 7, messages subsequently recovered from Darren Phua's iPhone (evidence item number 1B35) acknowledge that his father, Paul Phua, had been arrested in Macau by the Macau police which is "a friend of Paul's and they are negotiating now. Hopefully they want only money." The messages further mention paying 4-5 million Hong Kong dollars under the table to free Phua from custody, and

landed at McCarran International Airport in Las Vegas, Nevada, on a privately owned

Gulfstream G-550 business jet with tail number N888XS.  Upon arrival, Phua and his

associates[26] continued their illegal gambling business, which they had commenced on or about

June 6, 2014, at the Caesars in Las Vegas, Nevada ("Caesars").

    *C.*  *Wood TMS installs the special DSL lines requested by Phua and his associates.*

   The mechanics of the requested installation required the assistance of the DSL

contractor who owns Wood Telemanagement Solutions (or "Wood TMS"), and who has been in

the telecom business since 1975. Wood TMS provides on-site telecom service and support to

numerous businesses in Nevada, and it began providing these services to Caesars in 2010.[27]  As

part of this service, Wood TMS installs DSL lines to rooms inside Caesars' properties.

Installation of a DSL line includes running a wire from a demarcation point (for example, a

closet housing the appropriate wires) within the property to the specific room requesting DSL

service. After running the wire, Wood TMS enters the specific room and installs a DSL modem

in order for the service to work properly.[28]  Wood TMS also installs fax machines into rooms or

---

note that, as of mid-June, it appeared (from Interpol records checked by a Phua associate) there
were no outstanding arrest warrants for Paul Phua in Asia or Europe. *See also* Exhibit 41.

[25] *See* Exhibit 6.

[26] *See* Exhibit 2I, email disclosing status of Caesars' internal investigation to Nevada Gaming
agents on June 23, 2014 and July 3, 2014. *See also* Exhibit 2I, 2F, 2M, information documenting
the interrelationship of the three Villas' occupants. Caesars' investigator indicated that Caesars
had derived these links, in part, from Caesars' surveillance of Salon 7, a privately reserved
gaming room used in June and July 2014 by Paul Phua and his associates, some of whom were
occupants of Villas 8881, 8882, and 8888.

[27] *See* Exhibit 12, DSL contractor's affidavit, at p.1, para. 1

[28] *See* Exhibit 47.

1    conference rooms at the request of Caesars.[29]

2         In early June 2014, Wood TMS was contacted by Caesars' VIP Services Group to install

3    additional fax machines[30] into Villas 8881, 8882, and 8883, and to install DSL lines into those

4    same villas and in Villa 8888.  Wood TMS was informed that the guests of the luxury villas

5    specifically requested the DSL lines because they were dissatisfied with the available, in-house

6    WI-FI provided to all Caesars Palace guests.[31]  Wood TMS installed a DSL line into Villa 8888

7    on or about June 8, 2014. That installation allowed for hard connection of four computers.

8    Subsequently, in response to a request from Villa occupants, Caesars requested that Wood TMS

9    install a DSL connection that would allow for connection of five computers.  Because Wood

10   TMS does not have that ability, Caesars was informed that they should contact another company

11   or IT to meet that request.[32]  Wood TMS also installed DSL lines in Villas 8881 and 8882 on or

12   about June 10, 2014, and into Villa 8883 on or about June 25, 2014.[33]

13        Sometime after June 13, 2014, Wood TMS was contacted via email by Caesars' VIP

14   Services to respond to the Villas 8881 and 8882 regarding complaints that the DSL line was

---

[29] *See* Exhibit 12, at p. 1-2, para. 2-3.

[30] *See* Exhibit 8A, for information obtained by law enforcement about the added equipment, added services and occupants' dissatisfaction thereof, which was known to them prior to the execution of the search warrant affidavits. *See also* Exhibit 8B, for further information corroborating those same facts, but which were obtained after executing the search warrant affidavits; and Exhibit 12 p. 2. para. 3-5.

[31] *See* Exhibit 8A. *See also* Exhibit 12, at p. 2, para. 3-5 and Exhibits 13A-B, email chains documenting Villa occupants' dissatisfaction and the subsequent installation of DSL, which were obtained after executing the search warrant affidavits, but which corroborate information passed to FBI and Nevada gaming agents prior to the search warrant that which were obtained.

[32] *See* Exhibit 8A. *See also* Exhibit 12, at p. 2 para. 6.

[33] *See* Exhibit 8A. *See also* Exhibits 12, at p. 2 para. 6-7, 13A-B, and 47.

either not working or was performing unsatisfactorily.[34]  A DSL contractor personally

responded to at least one of those emails for service.  Continuing during the month of June,

Wood TMS employees (including A.P.) responded to other requests for service in the Villas

regarding DSL problems.  To correct the service issues, Wood TMS entered Villas 8881, 8882,

and 8888 on at least two occasions including on June 27, 2014, when Wood TMS employees

entered Villa 8881 to respond to yet another call for service. *Id.*

On June 30, 2014, Caesars' investigator emailed the DSL contractor because he had

important questions to ask him.[35]  They spoke on the telephone that same day, and during this

initial call DSL contractor learned that law enforcement was interested in what Wood TMS had

installed or worked on in certain Villas, later confirmed as Villas 8881, 8882, 8883 and 8888.[36]

DSL contractor informed Caesars' investigator of the work Wood TMS had performed in the

aforementioned Villas. They spoke on the phone several more times regarding these issues

through July 4, 2014. *Id.*

As previously noted, Caesars' investigator sent emails disclosing the status of Caesars'

internal investigation to Nevada Gaming agents the week of June 23, 2014. Nevada Gaming SA

Ricardo Lopez was on vacation for part of the week of June 23, and was assigned responsibility

for the investigation on or about June 30, 2014.[37]  SA Lopez then contacted the FBI. FBI SA

Minh Pham advised that the FBI opened their case on or about July 1.[38]  One of the first pieces

of information Caesars' investigator conveyed to law enforcement was photographs taken by a

---

[34] *See* Exhibit 8A. *See also* Exhibit 12, at p. 2 para 8-9 and Exhibits 13A-B.

[35] *See* Exhibit 14.

[36] *See* Exhibit 12 at p. 3 para. 10.

[37] *See* Exhibits 2A-M for information provided to Nevada Gaming from June 25 to July 5, 2014.

[38] *See* Exhibit 2G.

Caesars' VIP Services employee of Villa 8888.[39]

No actions taken by Caesars' employees or Wood TMS' employees inside Villas 8881, 8882, 8883, or 8888 prior to July 4, 2014, were made at the direction of law enforcement.

    D.    *On July 3, 2014, DSL contractor tells the FBI what he has seen inside the Villas and agrees to help surreptitiously gain access to the Villas.*

On July 3, 2014, Caesars' investigator arranged for DSL contractor to be interviewed by SA Lopez and FBI SAs Justin Nwadiashi and Minh Pham.[40]  During the interview, DSL contractor answered numerous questions regarding the work Wood TMS performed in Villas 8881, 8882, 8883, and 8888, and what had been seen while completing that work. He informed agents how, when, and why Wood TMS performed work on the DSL lines. *Id.* Prior to executing the search warrant affidavits, SA Lopez reported that DSL contractor said he had been providing technical support for four or five years and had never previously received any requests for such a large amount of equipment and technical support as that which had been requested by the three Villa occupants.[41]

After Caesars' investigator and DSL contractor agreed to assist law enforcement in the ongoing investigation,[42] the agents asked him how they could surreptitiously gain entry to the

---

[39] *See* Exhibits 2A, 2I and 11.

[40] *See* Exhibit 12 at p. 3 para. 11.

[41] *But see* Exhibit 12 at p. 3 para. 11, noting that DSL contractor's statement given on or about October 27, 2014, clarified that what he had actually meant by his statement to law enforcement on July 3 was that it was unusual for "the request for additional fax machines into Villas 8881, 8882, and 8883. Based on my training and experience, that request was unusual because all of the aforementioned Villas already had exact make and model fax machines installed.  Further, I noted to agents that the numerous requests for various technology-related items to all of the villas were unusual."

[42] *See* Exhibit 12 at p. 3-4 para. 12.

Villas.[43] Various ideas were discussed, including the intentional disruption of services, such as cable or DSL. DSL contractor told the agents of the locations of the DSL modems inside each of the Villas, adding that the modem for Villa 8882 was installed in the Villa's media room. DSL contractor advised the agents that if the DSL was important to the Villas' occupants, then disconnecting the DSL would prompt an immediate call for service. *Id.* He also told the agents that the standard protocol for service calls was for Wood TMS to respond and enter the specific unit to address the problem.[44] At the conclusion of the interview, agents briefed Caesars' investigator about the plan to disrupt DSL services with the help of DSL contractor the next morning.

On July 4, 2014, one of Phua's associates—acting solely on their own volition without any actions taken by law enforcement to prompt the request—requested that Caesars' VIP Services deliver a laptop computer to Villa 8882.[45] At approximately 5:38 a.m., the VIP Services employee conveyed the request, via email, to Wood TMS. DHL contractor then conveyed the request to Caesars' investigator, commenting on the perfect timing of the request, [meaning that it fortuitously allowed law enforcement the opportunity to surreptitiously enter the Villa].[46] Caesars' investigator conveyed the information to SA Lopez, with the understanding that law enforcement would use the laptop request as a means to get an undercover agent inside villa 8882. *Id.*

---

[43] *See* Exhibit 12 at p. 4 para. 13. *See also*, Exhibit 47.

[44] *See* Exhibit 12 at p. 4 para. 13.

[45] *See* Exhibit 15A. *See also* Exhibit 12 p.4 para.14.

[46] *See* Exhibit 15B.

E.    *On July 4, 2014, SA Lopez, in an undercover capacity, accompanies DSL contractor into Villa 8882, under the guise of delivering the requested laptop computer, and DSL contractor, acting alone, thereafter enters and tapes the inside of Villa 8881.*

On the morning of July 4, 2014, DSL contractor helped law enforcement[47] disrupt what he believed to be the DSL in Villas 8882 and 8888. At his instruction, a Wood TMS employee (A.P.) helped law enforcement disconnect the DSL wires from a closet[48] located in the main Caesars telephone room.[49] The DSL was disconnected to what was believed to be Villas 8882 and 8888. Wood TMS did not receive any calls for service for quite some time after disconnecting what was believed to be Villas 8882.

Later that same morning, but before the start of the World Cup soccer game, DSL contractor agreed to accompany SA Lopez, who, acting in an undercover capacity, was posing as the contractor's support technician, into Villa 8882 to deliver and set up the requested laptop computer. Both SA Lopez and the contractor were equipped with concealed audio and visual recording devices, which they kept on while they were inside Villa 8882.[50] They entered through the butler's service entrance, which Wood TMS usually uses if the Villa is occupied.[51]

Upon entering, they did not inform the butler who answered the door of SA Lopez's actual identity. Rather, they said simply that they were there to deliver the laptop the occupants

_____

[47] Nevada Gaming SA Lopez, and FBI SAs Nwadiashi, Pham, and Thayne Larson.

[48] *See* Exhibit 18, photographs of wire closet.

[49] *See* Exhibit 12 p. 5 para. 16.

[50] *See* Exhibit 16A, noting that both SA Lopez's and the contractor's recording devices recorded properly, but the time stamp on the contractor's video is incorrect. *See also* 16B further explaining the handling of the recordings after they were completed.

[51] *See* Exhibit 12, p. 4-5 para 14.

had requested. *Id.* The butler (later determined to be Caesars' employee O.C., who was assigned to assist the occupants in Villa 8882), restricted SA Lopez's and DSL contractor's access to the pantry area, and adamantly blocked their path to the other parts of the villa.[52] The butler stated the guests were in the media room, but did not want anyone to see their "business."[53]

While in the butler's pantry, DSL contractor and SA Lopez set up a new Windows 8 laptop for use by Villa 8882's occupants, as requested. At some point during this process, the butler left the pantry. *Id.* DSL contractor could hear a lot of noises coming from within the Villa, including noises consistent with the World Cup game that was then being broadcast. He suggested that they head towards the media room with the laptop.[54] They exited the pantry and walked further into Villa 8882 towards the media room. The butler re-appeared and again assertively informed them to go back to the pantry. *Id.* The butler told DSL contractor and SA Lopez to leave the laptop in the pantry, and then escorted them off the premises. DSL contractor informed the Butler to call if additional service on the laptop was needed.[55] DSL contractor and agent then left the Villa.

Prior to executing the search warrant affidavits, SA Lopez reported that DSL contractor had stated the butler's aggressive actions were so intimidating that DSL contractor later stated that he was fearful for his safety and would not go back into Villa 8882.[56]

---

[52] *See* Exhibit 12, p. 4-5 para 14.

[53] *See* Exhibit 17, 302 documenting a subsequent interview of O.C. conducted after entry was made via the search warrants on July 9, which confirmed this information.

[54] *See* Exhibit 12, p. 4-5 para 14.

[55] *See* Exhibit 12, p. 4-5 para 14.

[56] *But see*, Exhibit 12 at p. 4-5 para. 14 and 15, noting that DSL contractor's statement given on or about October 27, 2014 clarified that what he had actually meant by his/her statement to law enforcement on July 3 was that: a) "the Butler's behavior was unusual in that it appeared

Later that day, the agents left the Caesars property when no service calls had come in from Villas 8888 or 8882. The agents directed DSL contractor to call them if Wood TMS received a service call. *Id.* None of the law enforcement agents instructed DSL contractor, or any other Wood TMS employee, to take any additional action, apart from contacting the agents if any service call came in after the agents left the property.

While Wood TMS never received a call from Villa 8888, it did, later that afternoon, receive a call that the DSL in Villa 8881 was not working.[57] It was at that time that DSL contractor learned that Wood TMS's own logs—documenting which wires had been installed into which Villa—were incorrect. It was also at that time that DSL contractor learned that Wood TMS had failed to disconnect DSL service to Villa 8882, as planned. Rather, Wood TMS had accidentally disconnected DSL service to Villa 8881. *Id.* Upon learning of this, DSL contractor reconnected the DSL lines to 8881 and 8888.[58]

After reconnecting the DSL lines, DSL contractor, acting on his own volition and without any direction from or contact with law enforcement, responded to a service call from Villa 8881. In doing so, DSL contractor disregarded the prior plan to the effect that he was

---

aggressive and demanding. That was unusual to me because we have a long-term, good working relationship with Caesars, to include working with many of the butlers and have never previously had that reception;" and b) following that encounter, "I informed the agents that based on the Butler's reaction during the laptop drop off, together with the noises I heard from Villa 8882, I informed the agents that from that point on, neither myself or any of my employees were go into Villa 8882."

[57] *See* Exhibit 12 p. 5 para. 17.

[58] *See* Exhibit 12 p. 5 para. 18. Defendants' motion to suppress makes numerous misrepresentations regarding this sequence of events. *See*, e.g., Motion at 12 (asserting that DSL contractor cut service to 8881 after the reconnected service to 8888; Motion at 13 (asserting that while he was in 8881, DSL contractor "apparently made a cell phone call to tell a colleague to restore the connection");  Motion at 14 (accusing DSL contractor of making a "severely misleading cell phone video" by starting the recording "precisely moments after he instructed his colleague to restore the internet access").

supposed to call the agents in response to any service call he received. In any event, DSL contractor, alone, entered Villa 8881.[59] While inside, he used a work cellphone to take a short video of the inside of the Villa, specifically, the area where the DSL was located, the bar, and the media room. *Id.* Where the DSL was located, DSL contractor's video captured a phone list setting forth the names and respective Villa numbers of the Villas' occupants.[60] In the media room, the video captured an individual on a computer, which displayed a sports betting odds-related website. *Id.* After capturing the video and confirming that the DSL was functioning properly, DSL contractor left.[61]

Later on July 4, 2014, DSL contractor called SA Lopez and told him that he had mistakenly disconnected the wrong Villa's DSL; that he had reconnected the DSL; and that he had shot a video of the inside of Villa 8881.[62] Shortly thereafter, law enforcement met DSL contractor at his office in Caesars, where he turned over a copy of the video. *Id.* Reviewing it, FBI SA Pham saw that the person whom DSL contractor had taped sitting at the computer in Villa 8881 matched the description of Seng Chen (Richard) Yong. The agents and DSL contractor agreed to come back the next day and disconnect the DSL for Villa 8882, as originally planned. *Id.*

---

[59] *See* Exhibit 12 p. 5 para. 18.

[60] *See* Exhibit 19A for a photograph of the master "go" phone list linking the occupants of Villas 8881, 8882, and 8888 together which was captured in the video. *See also,* Exhibit 19B which is a clearer photograph which was taken July 9, 2014 during the search of the call list, a copy of which was found present in each of the Villas on the day of the search.

[61] *See* Exhibit 12 p. 5-6 para. 18.

[62] *See* Exhibit 12 p. 6 para. 19.

F.     *On July 5, 2014, SAs Lopez and Kung, in undercover capacities, enter Villa 8882, under the guise of serving the DSL outage the government induced as part of its ruse.*

The next morning (July 5, 2014), Caesars' investigator, SA Lopez and FBI SAs Nwadiashi, Pham, Larson, and Mike Kung met DSL contractor at his office.[63] Around 9:00 a.m., at law enforcement's direction, Wood TMS disconnected the DSL line to Villa 8882 and, possibly, Villa 8888 (a fact that neither the agents nor DSL contractor precisely recall). *Id.* At this point, the plan was that, if there was a service call from Villa 8882, SAs Lopez and Kung would pose as technicians dispatched to "fix" the DSL and, in that capacity, attempt to gain consent to enter the Villa. While waiting for a possible service call, DSL contractor instructed SAs Lopez and Kung on how to hold themselves out as legitimate technicians,[64] providing the agents with specific instructions so that if any of the Villa's occupants looked over the agents' shoulders, it would appear they were legitimately repairing the problem. *Id.*

Approximately 30 minutes after the DSL was disconnected (but before the Argentina v. Belgium game started), Paul Phua directed the butler to make an urgent request for technical assistance to the DSL in Villa 8882.[65] DSL contractor learned of this when (while waiting for a possible service call with Caesars' investigator and agents) the building engineers advising him that the DSL in Villa 8882 was not working.[66] The engineers told DSL contractor that they had entered Villa 8882 to respond to the call for service but once discovering that the issue was DSL-related, they called DSL contractor. *Id.* He instructed the engineers that the problem

---

[63] *See* Exhibit 12 p. 6 para. 20.

[64] *See* Exhibit 12 p.6 para. 20.

[65] *See* Exhibit 45.

[66] *See* Exhibit 12 p.6 para. 21.

would be taken care of. Once they learned of the service call, SAs Lopez and Kung, posing as technical support assistants, went to Villa 8882. Both of the agents were equipped with concealed audio and video recording devices, which they kept on while in villa 8882.[67]  Upon entry, the agents were greeted by a female butler who led them to the media room.[68] The butler said the occupants of the villa were doing "business" in the media room. *Id.* In the media room, SAs Lopez and Kung saw Paul Phua, Richard Yong, Darren Phua, and two of their associates. SA Kung saw Paul Phua sitting at a laptop computer which was displaying both the website "SBOBET" and an active instant messaging window. The agents saw Paul Phua clicking on numbers, which SA Lopez believes, based on his training and experience, were sports wagering odds on SBOBET website. SA Kung observed an incoming message to Paul Phua stating "good luck on the hedge bet" or similar wording.[69] SA Kung later accessed SBOBET and confirmed that it was an illegal Asian online sports wagering website. *Id.*

SA Lopez observed Darren Phua using another laptop computer, which depicted the login screen for an illegal sport wagering site; Darren Phua, however, switched to a Google search page when he saw SA Lopez was approaching his computer. To act like a legitimate technician, SA Lopez connected the DSL modem to a laptop that DSL contractor had given SA Lopez to use as part of the ruse. SA Lopez brought up a browser, went to the configuration pages on the modem, and pretended he was reviewing them. SA Lopez started talking to the

---

[67] *See*  Exhibit 16A-B, SA Lopez' device recorded but SA Kung's devices did not. SA Kung also had his cell phone in his pocket set on mute. He called SA Nwadiashi, leaving the call connected so that the agents waiting near villa 8882 could hear what was happening inside the villa for officer safety purposes so that the waiting agents could respond to a distress call, if necessary. SA Kung's cell phone did not record the call.

[68] *See* Exhibit 20, 302 of FBI SA Kung regarding the undercover activities on July 5, 2014 in Villa 8882.

[69] *See* Exhibit 20.

occupants of the room, apologizing for the bad connection and asking if they were able to

connect to it. In asking these questions, SA Lopez knew that the DSL was disconnected and not

working. Darren Phua advised SA Lopez that the DSL was not working, and indicated the red

light on the modem. At some point during these events, one of the unidentified Phua associates,

a middle-aged man who seemed concerned with the connectivity issues, took SA Kung to look

at a modem in another room,[70] possibly in Villa 8881, which is connected to Villa 8882 by an

internal hallway. Shortly thereafter, SA Lopez called DSL contractor and feigned a conversation

that appeared to be about correcting the service outage, but which was, in actuality, a

prearranged signal for DSL contractor to reconnect Villa 8882's DSL. The DSL connection was

reestablished. The agents confirmed with the occupants that it was working, and then the agents

left Villa 8882.

Based on all of the information the agents had obtained, from Caesars and from their

own investigation, SA Pham sought and received a warrant from United States Magistrate Judge

Nancy J. Koppe to search Villas 8881, 8882, and 8888. The warrant was executed on July 9,

2014. Law enforcement agents came to Caesars in street clothes and "staged" in three rooms in

the Octavius tower.[71]  Once the operation was "a go," a Caesars' employee led the agents, now

dressed in raid gear, into the Villas via internal service elevators. After the agents gained entry

to the Villas, they executed the warrants and took photographs that plainly confirm the accuracy

of the search warrant affidavits.[72] Various items were then seized as a result of the search.[73]

---

[70] *See* Exhibit 20.

[71] *See* Exhibit 22.

[72] *See* Exhibit 23A-C. 23A which contains photographs showing Villa 8888 on July 9, 2014; 23B which contains photographs showing Villa 8881 on July 9, 2014; and 23C which contains photographs showing Villa 8882 on July 9, 2014.

1

### III.   Argument

2      Defendants' motion hints at broad constitutional issues and dramatically warns (*see*

3   Motion at 43) that upholding the present agents' actions "would cause innocent Americans to

4   live their daily lives burdened with the palpable fear that their government is regularly scheming

5   to spy on them in their homes." These warnings are misguided and, as shown below, the narrow

6   issues raised by their motion hinge on the specific and unusual facts of this case.

7      Defendants do not contend (nor can they) that the entries into the villas by Caesars'

8   employees and contractors prior to July 4, 2014, implicated the Fourth Amendment. *See*, *e.g.*,

9   *United States* v. *Jacobsen*, 466 U.S. 109, 115 (1984) (initial intrusions into defendant's package

10   by Federal Express employees "[w]hether [they] were accidental or deliberate, and whether they

11   were reasonable or unreasonable, * * * did not violate the Fourth Amendment because of their

12   private character") (footnote omitted). Nor do Defendants claim that the Fourth Amendment was

13   implicated when Caesars provided information in its possession about Defendants and their use

14   of the villas to the government; Caesars was not acting as an agent for the government when it

15   gathered that information. Further, Defendants do not claim that the government agents violated

16   the Fourth Amendment when they instructed the contractor to remotely interrupt DSL service to

17   the villas, as that action involved no entry, trespass, or seizure.  *Cf. Smith* v. *Maryland*, 442 U.S.

18   735 (1979) (use of pen register does not implicate the Fourth Amendment).  Accordingly, the

19   only issues to be resolved are: 1) whether the agents violated the Fourth Amendment when they

20   responded to Defendants' call for technical assistance and entered Villas 8881(DSL contractor

21   only) and 8882 on July 4 and July 5 without a warrant; and 2) whether Defendants' consent was

22   vitiated because the government provoked Defendants' call by interrupting DSL service that was

23   only essential for the illegal gambling operation, but nothing else.

24

---

[73] *See* Exhibit 24 for a list of items seized and where they were seized from.

As explained below, the answer to both questions is no. Law enforcement has long been permitted to obtain consent by posing as a confederate, business associate, or service provider. In fact, the government uses ruses every day in its undercover operations, and consent obtained by such ruses is valid unless the deceit leaves the occupant with no choice but to consent to an entry. In this case, the ruse—which involved a brief interruption of DSL service for which no Fourth Amendment intrusion was necessary, and which did not interfere with the occupants' other means of internet access—was not coercive. Defendants' motion should be denied.

A.   *Only Defendants Seng Chen Yong and Wai Kin Yong may challenge any warrantless entries into Villa 8881, and only Defendants Wei Seng Phua and Darren Wai Kit Phua may challenge any warrantless entries into Villa 8882.*

The Fourth Amendment protects the right of the people "to be secure in *their* persons, houses, papers, and effects" (emphasis added). It is a "personal right," that must be invoked by an individual. *See, e.g.*, *United States* v. *Taketa*, 923 F.2d 665 (9th Cir. 1991) (noting that the Supreme Court has "explicitly rejected concepts of 'vicarious' or 'target' standing to assert fourth amendment rights").[74]

"[T]o claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Minnesota* v. *Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas* v. *Illinois*, 439 U.S. 128, 143-144 & n.12 (1978)). In *Carter*, the Supreme Court explained that "an overnight guest in

---

[74] "Although this issue is often discussed in terms of 'standing' to invoke the Fourth Amendment, the Supreme Court has repeatedly cautioned against invoking this concept." *United States* v. *Nerber*, 222 F.3d 597, 599 (9th Cir. 2000) (quoting *Carter*, 525 U.S. at 88 ("[I]n determining whether a defendant is able to show the violation of his * * * Fourth Amendment rights, the definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.") (quotation marks and citation omitted).

a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Carter*, 525 U.S. at 90. Thus the Court in *Carter* found that the constitutional rights of the respondents, who had been in an apartment bagging cocaine with the apartment's lessee, were not violated by a warrantless search of the apartment.

Defendants' "Joint Motion to Suppress Fruits of Warrantless Search" challenges 1) SA Lopez's entry into Villa 8882 on July 4, 2014; 2) DSL contractor's entry into Villa 8881 on July 4, 2014; and 3) SAs Lopez's and Kung's entry into Villa 8882 on July 5, 2014 (which, they contend, also involved one of those agents entering 8881). *See* Doc. 229.[75] Each Defendant bears the burden of establishing that he had a reasonable expectation of privacy in the place searched in order to challenge the search of that place. Most of the Defendants cannot meet those burdens.

Specifically, only Wei Seng Phua and Darren Wai Kit Phua can establish a reasonable expectation of privacy in Villa 8882, and only Seng Chen Yong and Wai Kin Yong can establish a reasonable expectation of privacy in Villa 8881. Defendants' motion should be rejected with respect to the other Defendants; to the extent that Wei Seng Phua and Darren Wai Kit Phua (and the other Defendant joinders) seek to challenge the entries into Villa 8881; and to the extent that Seng Chen Yong and Wai Kin Yong (and the other joinders) seek to challenge the entries into Villa 8882.

### B. Analytical Framework for Consent Entry Based on Ruse

"Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person." *United States* v. *Snype*, 441 F.3d 119 (2d Cir.

---

[75] Defendants Wei Seng Phua, Darren Wai Kit Phua, Seng Chen Yong, and Wai Kin Yong filed the instant motion. *See* Doc. 229. Motions for joinder were filed by defendants Yung Keung Fan, Yan Zhang, Herman Chun Sang Yeung, and Hui Tang. *See* Docs. 233, 237, 239, 240.

2006) (citing *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219 (1973)). This consent exception balances the "values reflecting the concern of our society for the right of each individual to be let alone," with the reality that "[i]n situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." *Schneckloth*, 412 U.S. at 228, 242 (citation omitted).

When seeking to admit evidence obtained as a result of a consent search, "the government * * * bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *Snype*, 441 F.3d at 131. To determine whether the Government has carried its burden on this issue, a court must consider "the totality of all the circumstances" in which the consent was given. *Ibid*. (citation omitted).

Courts have frequently upheld searches where law enforcement officers (or individuals working with law enforcement) gained consent to enter through the use of trickery or deception. In the seminal case of *Lewis* v. *United States*, 385 U.S. 206 (1966), for example, an agent gained entry to the defendant's home by pretending to be a drug buyer. *Id*. at 207. In denying suppression, the Supreme Court stressed that the defendant "invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics," *id*. at 210, and that the agent acted within the scope of the license he was granted:

> During neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business. Were we to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional *per se*. Such a rule would, for example, severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest.

*Id*. at 210. Although in *Lewis* the defendant invited the agent to his home to engage in illegal

activity, lower courts have applied that decision more broadly, interpreting *Lewis* as supporting the broader proposition that "the Fourth Amendment affords no protection to the person who voluntarily reveals incriminating evidence to one who is a government agent in the mistaken belief that the latter will not disclose it." *United States* v. *Haden*, 397 F.2d 460, 464 (7th Cir. 1968).

So, for example, in *United States* v. *Wagner*, 884 F.2d 1090 (8th Cir. 1989), a UPS delivery man and an undercover officer posing as a UPS employee delivered a package to the defendant, who agreed to accept the C.O.D. delivery. *Id.* at 1094. When the defendant entered the house to write a check, the two men followed, and the officer "detected a strong chemical odor that he associated with the manufacture of methamphetamine." *Ibid*. The court of appeals rejected the defendant's argument that evidence obtained in a subsequent warrant search should be suppressed because the warrant was issued based on "information gleaned from [the officer's] warrantless entry into the house, gained by his deception in posing as a UPS employee." *Ibid*. Relying on *Lewis*, the Eighth Circuit explained:

> [T]he Supreme Court held that the Fourth Amendment does not categorically prohibit a law enforcement agent from gaining entry into private homes by misrepresenting his identity. As we explained in *United States* v. *Shigemura*, 682 F.2d 699 (8th Cir. 1982), cert. denied, 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983), one who consents to an undercover agent's entry into his house "has no legally enforceable expectation that [the agent] is not an undercover police officer." *Id.* at 706.
>
> After reviewing the relevant law with regard to warrantless entries gained by ruse, the District Court concluded that Officer McAllister's entry did not violate the Fourth Amendment. * * * That conclusion was based on an implicit finding, which on this record we cannot say is clearly erroneous, that Michael Wagner, believing Officer McAllister to be a delivery person, consented to his entry. * * * Accordingly, we conclude that the warrants were not tainted by any illegality and that the District Court therefore properly declined to suppress the evidence seized in the May 6, 1988 searches.

*Id.* at 1094-1095 (footnote omitted); *see also United States* v. *Baldwin*, 621 F.2d 251 (6th Cir.

1980) (seizure of drugs by undercover agent who worked as defendant's chauffeur and

handyman did not violate Fourth Amendment, because "The Fourth Amendment * * * does not

protect wrongdoers from misplaced confidence in their associates"); *State* v. *Stevens*, 123 Wis.2d

303, 367 N.W.2d 788 (1985) (applying *Lewis* to find no violation where garbage collector did

not disclose that he had agreed to deliver defendant's garbage to the police); *United States* v.

*Scherer*, 673 F.2d 176 (7th Cir. 1982) (agent came onto defendant's property posing as a cousin

of the informer defendant had invited build duck blinds and defendant's wife gave broad

permission to look around for wood to build the duck blinds; a government agent may obtain an

invitation onto property by misrepresenting his identity, and if invited, does not need probable

cause nor warrant to enter so long as he does not exceed the scope of his invitation) ; *United*

*States* v. *Wright*, 641 F.2d 602 (8th Cir. 1981) (agent pretended to have car trouble and wanted to

borrow tools); *United States* v. *Lord*, 230 Fed. Appx. 511, 514 (6th Cir. 2007) (consent voluntary

where government agents posing as real estate investors gained access to an individual's

bedroom and bedroom closet).

In certain extreme circumstances, however, a ruse or trick can undermine an otherwise

consensual encounter. The Sixth Circuit has thus observed that "where . . . the effect of the ruse

is to convince the resident that he or she has no choice but to invite the undercover officer in, the

ruse may not pass constitutional muster.'" *United States* v. *Hardin*, 539 F. 3d 404, 424-425 (6th

Cir. 2008). Stated slightly differently, ruse-obtained consent may not be voluntary (and may,

therefore, violate the Fourth Amendment) where undercover or uniformed agents make

misrepresentations "so extreme" that the subject is "depriv[d] . . . of the ability to make a fair

assessment of the need to surrender his privacy," and therefore the resulting "consent should not

be considered valid." Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (3d ed. 2007).

Thus, for example, in *United States* v. *Giraldo*, 743 F.Supp. 152 (E.D.N.Y. 1990), agents

24

disguised as gas company workers asked permission to enter to check for a gas leak. *Id.* at 153. The resulting consent was deemed involuntary because, under those circumstances, the "defendant was led to believe there was a life-threatening emergency," and that his consent to search was required to prevent a dangerous situation from occurring. *Id.* at 154. As the court explained, "Defendant's only 'free choice'" given the scenario presented to him "was to have refused entry to the 'gas company' and risk blowing up himself and his neighbors." *Id.*

Similarly in *Hardin*, the Sixth Circuit held a search unconstitutional because the defendant was tricked by his apartment manager, acting with police officers, who falsely told the defendant that he (the manager) had to enter the apartment because of a water leak. *Id.* at 425. The *Hardin* court concluded that "the ruse regarding the water leak presented a situation in which an individual would feel 'no choice but to invite the undercover officer in' and any consent was invalid." *Id.* (quoting *Copeland*, 1996 WL 306556 at *3 n.3). The court in *Hardin* astutely noted that in assessing whether law enforcement have coerced a subject into giving consent to search, the question is not whether the subject may have declined the officer's request had he known the officer's true motivation. Rather, the question under the Fourth Amendment is whether the "'police misrepresentation of purpose [was] so extreme that it deprive[d] the individual of the ability to make a fair assessment of the need to surrender his privacy.'" *Hardin*, 539 F. 3d at 425 (quoting 2 Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (3d ed.2007)).

> C. *Law Enforcement's Use of a Ruse Does Not Require Any Level of Suspicion and, in Any Event, the Present Agents Had a Reasonable, Pre-Ruse Suspicion of Illegal Book-Making.*

Defendants assert that when agents engage in affirmative deception about their identities to trick a person into giving up his or her privacy, the resulting intrusion is "*per se* unconstitutional absent reasonable suspicion of illegality." *See* Motion at 28. Defendants' assertion is misplaced and, in making it, they rely primarily on decades-old state court and

district court decisions. *See* Motion at 28 & n.24 (citing, inter alia, *State* v. *Ahart*, 324 N.W.2d 317, 319 (Iowa 1982); *United States* v. *Benezario*, 39 F. Supp. 2d 361 (D.P.R. 2004); *United States* v. *Maldonado Garcia*, 655 F. Supp. 1363 (D. P.R. 1987); *People v. Reeves*, 391 P.2d 393 (Ca. 1964). Although those non-binding cases suggested such a legal principle, other courts have rejected it. *See, e.g.*, *Brown* v. *State*, 378 Md. 355, 364, 835 A.2d 1208, 1213 (Md. 2003) ("Placing that kind of generic limitation or pre-condition on the use of deception may or may not be good public policy, but it is inconsistent with the holding in *Schneckloth* that the validity, under the Fourth Amendment, of a search or seizure based on consent is to be determined by looking at all of the circumstances bearing on the consent."); *State* v. *Hastings*, 119 Wash.2d 229, 830 P.2d 658 (Wash. 1992) (noting that a "threshold requirement" that must have a "justifiable and reasonable basis to suspect criminal activity" before they may effect a ruse entry "is an unnecessary limitation on undercover police investigations" and "serves no valid purpose").

Notwithstanding that Defendants' assertion lacks support in the binding precedent, this Court need not reach that issue in this case. As explained below, even if the agents had needed a reasonable basis to suspect criminal activity to use a ruse to seek consent to enter the villas, they plainly had it. Indeed, the record makes clear that law enforcement had ample reason to suspect Defendants of illegal book-making *before* initiating any ruse in this matter.

Law enforcement began to investigate Defendants after Caesars' personnel saw things inside Defendants' villas that caused them to be concerned with the possibility of criminal activity, and to alert Caesars' management, which in turn alerted law enforcement.[76] By the time law enforcement became involved in this investigation, Caesars' personnel had witnessed and

---

[76] *See* Exhibits 2A, 9A-B, and 10.

photographed equipment in Villa 8888 that established reasonable cause to believe that Defendants were operating an illegal gambling business using the DSL internet line Caesars had agreed to connect.  (See footnote 76).  Caesars' employees had also already informed law enforcement that the set up in Villa 8888 was consistent with an illegal bookmaking operation.[77] At the same time Defendants began to stay in Villa 8888, they also occupied Villas 8881 and 8882. On occupying these villas, they asked Caesars to install the same DSL lines and other technology-related items consistent with the equipment that Defendants had requested for the bookmaking operation in Villa 8888. Below is a chart of the various items regarding Villas 8881, 8882, and 8888 that were known to Caesars, its contractors and employees, or law enforcement agents knew before the agents engaged in any ruse:

| Villa | Request for Complimentary high-speed DSL | Request for Additional Televisions | Request for Additional Fax Machines | Availability of WI-FI |
|-------|------------------------------------------|------------------------------------|-------------------------------------|-----------------------|
| 8881  | X                                        | X                                  | X                                   | X                     |
| 8882  | X                                        | X                                  | X                                   | X                     |
| 8883  |                                          |                                    |                                     | X                     |
| 8887  |                                          |                                    |                                     | X                     |
| 8888  | X                                        | X                                  |                                     | X                     |

Agents were also aware that Paul Phua, an occupant of 8882, had originally checked into Caesars Palace on June 11, 2014.[78]  Phua was then involved in a raid and arrest at the Wynn Macau casino resort property for his involvement in running a large scale bookmaking operation, and had soon thereafter returned to Caesars Las Vegas. *See* Exhibit 1. After fleeing Macau, Phua returned to Las Vegas and the Caesars Villas.[79] In view of the existence of Caesars' regular WI-FI internet service, the connecting of the DSL lines in 8888, 8882, and 8881, Phua's immediate

[77] *See* Exhibits 2A, 9A and 10.
[78] *See* Exhibits 6 and 27.

[79] *See* Exhibits 6 and 27.

criminal history and the conduct observed in Villa 8888, law enforcement had reasonable suspicion that Defendants were using the DSL internet lines in 8882 and 8881 to conduct illegal gaming in those two villas. Defendants' contention that law enforcement had no evidence of frequent interaction between occupants of 8881 and 8882 and occupants of 8888 is completely misleading.

Law enforcement reasonably believed that Defendants in all three villas were actively communicating with each other as necessary given their known associations.[80] Although surveillance cameras at Caesars were not positioned to show who and when anyone may have moved from 8881 and 8882 to 8888, numerous avenues existed for communication between all Defendants through cellular telephones, texting, Skype and email. Indeed, the agents' subsequent investigation confirmed that Defendants did communicate during the operation of their illegal gambling business using all of those methods. Thus, even if reasonable suspicion were required for law enforcement officers to use a ruse in their continuing investigation, that threshold was clearly met, and Defendants' claim fails.

### D. No Fourth Amendment Violation Occurred When SA Lopez Accompanied DSL contractor to Villa 8882 to Deliver the Laptop the Occupants had Requested.

Defendants imply that SA Lopez violated the Fourth Amendment when, posing as a tech services employee, he accompanied DSL contractor to deliver and set up the laptop computer[81] that an occupant of Villa 8882 had requested. *See* Motion at 9-12, 25. For the very reasons the Eighth Circuit affirmed the "intrusion" in *Wagner*, SA Lopez's accompanying DSL contractor to deliver the laptop to Villa 8882 does not implicate the Fourth Amendment.

---

[80] *See* Exhibits 19A-B, 35, and 36

[81] Defendant's motion at p.21 states that this laptop when recovered did not contain any evidence of criminal conduct.  This statement is patently false. *See* Exhibit 46 for a ledger containing World Cup 2014 wagers, which was forensically recovered from this computer after it was seized from 8882.

Like the defendant in *Wagner* (who ordered a product to be delivered to his home through U.P.S.), an occupant of Villa 8882 ordered a laptop for delivery to that villa by a Caesars' employee or contractor. Neither the defendant in Wagner nor the occupants of Villa 8882 had any basis to complain that the individual allowed into their protected place was in fact an undercover law enforcement officer. *See Wagner*, 884 F.2d at 1095 ("[O]ne who consents to an undercover agent's entry into his house 'has no legally enforceable expectation that [the agent] is not an undercover police officer.'") (quoting *United States* v. *Shigemura*, 682 F.2d 699 (8th Cir. 1982)).[82]

Defendants' make passing accusations that DSL contractor "falsely" said he was setting up the laptop, but that "[n]o real technician would have" tried to check the internet connection. The record belies these conclusory assertions. *See*, *e.g*., Exhibit 12 at para. 14 (discussing how it would be standard protocol to go to the media room with laptop).[83] Caesars and its employees provided luxury services to meet Defendants' many demands. Asserting that the DSL technicians would not check the connection is contrary to the very service Defendants were expecting.

  E.  *No Fourth Amendment Violation Occurred When DSL Contractor Entered Villa 8881 Contractor Engaged In A Private Frolic Outside Of Any Agency Relation With The Agents.*

---

[82] *See also United States v. Scherer,* 673 F.2d 176, 181 (7th Cir. 1982). In *Scherer*, the agent came onto defendant's property posing as a cousin of an informer defendant had invited to build duck blinds. The agent was represented as the informer's cousin who was going to assist in the building process. The agent's real intent was to look for firearms on the property. Defendant's wife gave the informer and agent broad permission to look around for wood to build the duck blinds. The court upheld the search and firearms seized finding a government agent may obtain an invitation onto property by misrepresenting his identity, and if invited, does not need probable cause nor warrant to enter so long as he does not exceed the scope of his invitation. The fact that law enforcement in the instant case engaged in misrepresentation to come into the villa in hopes of observing evidence does not undermine the voluntary consent defendants had given for both the technician and officer. *Id.* ("The fact that the agents were aware before the visit that the two Thompson submachine guns were lying in Scherer's barn does not take this case out of the consent exception to the Fourth Amendment's warrant requirement.").

[83] *See* Exhibit 47.

29

DSL contractor's conduct in entering Villa 8881 on July 4, 2014, does not implicate the Fourth Amendment because he was, at that point, acting as a private party, not as a government agent or instrument. *See, e. g., Walter v. United States*, 447 U.S. 649, 100 S. Ct. 2395, 65 L.Ed.2d 410, 417 (1980) (wrongful search by private party does not violate Fourth Amendment). Only where a private party acts as an "instrument or agent" of the government in entering a private area do constitutional protections come into play. *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 2048, 29 L.Ed.2d 564 (1971). The Ninth Circuit has recognized that there exists a "gray area" between the extremes of overt governmental participation in a search and the complete absence of government involvement. *See United States v. Sherwin*, 539 F.2d 1, 6, n.5 (9th Cir. 1976) (en banc). Cases falling within this "gray area" are best resolved on their own particular facts, and against the backdrop of two general principles: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994)(citing *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982).

Here, DLS contractor entered Villa 8881 on July 4, 2014 with the intent to assist law enforcement. The issue, therefore, is whether the government agents "knew of and acquiesced in" DSL contractor's conduct when he entered Villa 8881. The evidence will show they did not. The agents had, earlier in the day, worked with DSL contractor to participate in the delivery of a computer to Villa 8882. They had also participated with contractor to disconnect what they thought was the D.S.L. line to Villa 8882: had the agents received a service call, the plan was for them to go into Villa 8882 in an undercover capacity as service technicians. The agents had no plans, however, to use DSL contractor to make such entry, because he had told the agents that, based on the butler's reaction during the laptop drop off, neither he, nor any of his TMS

employees would go into Villa 8882.

After waiting for a period of time (during which no one in Villa 8882 called for service), the agents decided to leave the Caesars Palace property for the day. When they did so, they specifically instructed DSL contractor that if a call for service came in, he was to call the agents. None of the law enforcement agents instructed DSL contractor, or any other Wood TMS employee, to take any additional action, apart from contacting the agents if any service call came in after the agents left the property. None of the agents anticipated DSL contractor or any Wood TMS employee would do anything other than call them in view of contractor's specific assertion that he would not participate in subsequent entries into Villa 8882.

Subsequently, a call for service came in from Villa 8881 and, at that point, DSL contractor realized that the DSL lines were mismarked and that he had disconnected the line for Villa 8881, not Villa 8882. He reconnected Villa 8881. At this point, DSL contractor did not make a call to agents as instructed and decided on his own, contrary to the agents' instruction, to act alone to enter Villa 8881 on the premise of a service call. Consequently, DSL contractor acted beyond the authority he was given and beyond the expectations of the agents. Agents did not have knowledge of his search of Villa 8881 and did not acquiesce to it. While DSL contractor had previously acted for the Government, in this instance he engaged in a private frolic outside of any agency relation with the agents and the fourth amendment does not apply. *See Miller*, 688 F.2d at 657.

While government agents had previously worked with DSL contractor, for him to be their *de facto* agent in entering Villa 8881, the "government must [have been] involved either directly as a participant or indirectly as an encourager of the private citizen's actions." *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981); *United States v. Gumerlock*, 590 F.2d 794, 800 (9th Cir. 1979) (en banc). In analyzing whether the government knew of and encouraged a private

citizen's act, the Ninth Circuit scrutinizes the facts surrounding the relation between law enforcement and the private citizen and what government agents should have known or expected based on that relationship.  In *Walther*, for example, the Court found a private citizen's search of a package at the airport was done as an agent for the DEA: the Court focused on the citizen's extensive relation with DEA, in which he provided the DEA with information in hopes of a reward.  The Court found DEA had previously encouraged the citizen to engage in the type of search at issue and had rewarded the citizen for information.  The Court noted that at no time did the DEA discourage the citizens' from opening packages.  Consequently, the DEA either knew or should have known that the citizen had made it his practice (one that law enforcement had endorsed) to inspect and open certain packages.

Here, by contrast, the agents had never allowed or encouraged DSL contractor to act alone.  Nor could they have expected he would do so. Indeed, DSL contractor had previously expressed a refusal to further enter Villa 8882.  Finally, the agents specifically instructed him to call them if he received a service call on the DSL lines after they left the Caesars Palace property.  While DSL contractor had previously worked with the agents, in this instance he acted on his own outside the agents' knowledge and without the agents' encouragement.

> F.   *No Fourth Amendment Violation Occurred When DSL Service Was Disrupted and the Agents Entered the Villas Purporting to Correct the Problem Because Agents Created No Emergency, and Defendants Retained the Choice Whether and When to Permit Outsiders to Enter to Repair a Nonessential Service.*

"[W]hen an individual gives consent to another to intrude into an area or activity otherwise protected by the Fourth Amendment, aware that he will thereby reveal to this other person either criminal conduct or evidence of such conduct, the consent is not vitiated merely because it would not have been given but for the nondisclosure or affirmative misrepresentation which made the consenting party unaware of the other person's identity as a police officer or

police agent." 2 Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (3d ed. 2007)). Use of a ruse by law enforcement to gain entry into a protected space will vitiate the subject's consent, however, where "the effect of the ruse is to convince the resident that he or she has no choice but to invite the undercover officer in." *Hardin*, 539 F. 3d at 424-25. This can occur, for example, when the ruse leads the subject to believe that entry is required to respond to an emergency situation or repair an essential service.  *See, e.g., United States* v. *Harrison*, 639 F.3d 1273 (10th Cir. 2011) (bomb threat); *Hardin*, 539 F. 3d F.3d 404 (6th Cir. 2008) (water leak); *United States* v. *Giraldo*, 743 F.Supp. 152 (E.D.N.Y. 1990) (gas leak);  *People* v. *Jefferson*, 43 A.D.2d 112, 350 N.Y.S.2d 3 (1973) (gas leak).

This case is easily distinguishable from those in which courts have held that a ruse effectively took away the defendant's choice to refuse entry. Defendants here simply cannot argue that they believed they had no choice but to allow Caesars' technicians to enter their villas: no essential service was disrupted, and no emergency was presented.

Access to the Internet from the villas was *never* discontinued, blocked, or interrupted. The hotel's WI-FI system provided continuous, uninterrupted access to the Internet.[84] Defendants' assertion of what occurred in this case, *see* Motion at 27 ("agents blocked the residents' internet access"); *id*. at 33 ("agents terminated the internet connections precisely in order to leave the residents with essentially no choice but to report the outage."), is incorrect. Moreover, Defendants do not identify a single *legitimate* service or application that could not be adequately supported through the hotel's WI-FI system, their personal hotspots, or personal cellphones, nor could they. In fact, the DSL service disruption affected only their ability to operate their illegal book-making operation. As revealed by the Defendants' requests for DSL

---

[84] If there was any disruption to the WI-FI, it was not at the behest of law enforcement. At no time did law enforcement disrupt the WI-FI service at Caesars Palace, which is operated by Cox Communications.

installation in the Villas, they were familiar with the Wi-Fi capabilities and were dissatisfied with it.[85] The DSL service was faster[86] and allowed for Defendants to better run their multi-million dollar operation. Stated otherwise, Defendants knew that the WI-FI was too slow for them to successfully accept the number of bets they were taking during the various World Cup Games. The DSL disruption did not deprive Defendants of any essential service, and thus cases in which claimed disruption of essential services vitiates consent are inapposite.

While Defendants strain to portray it as having forced a fast, life-or-death decision, the present ruse did not induce a request to fix the lights, or the plumbing, or the air conditioner in the midst of a Las Vegas summer. Rather, the ruse induced a request to fix only the specially-installed DSL equipment that Defendants needed not for internet access, but to run their illegal gambling operation.

At bottom, then, the ruse did not strip Defendants of their ability to make a "fair assessment" of whether or not to "surrender their consent." Def. Mot at 33, n.32. Indeed, in making that claim, Defendants omit from their citation to LaFave's treatise the author's conclusion that "consent is not vitiated merely because" the consenter is later surprised that the person to whom he voluntarily revealed his unlawful conduct turned out to be a police officer. Accordingly, Defendants' selective reliance on LaFave—like their reliance on *United States* v. *Parson*, 599 F.Supp.2d 592 (W.D. Pa. 2009)—rests on an exigent-consent scenario that simply does not exist here. *Compare Parson*, 599 F.Supp.2d at 603-604 & n.6 (unlike present case, the agents in *Parson* falsely "present[ed] themselves as being focused upon an identity theft problem . . . [T]he agents' statements about identity theft were constantly on the mind of Parson, and this fear played an integral role in obtaining his consent . . . . The government did not present any

---

[85] *See* Exhibits 8A-B and 13A-B.
[86] *See* Exhibit 47.

legitimate evidence that identity theft had occurred, or was a concern; it was simply not a plausible scenario.").

Nor did disruption of the DSL create an emergency situation that would vitiate consent. First, as noted above, the villas retained uninterrupted access to the Internet. Second, unlike a gas leak or bomb scare, disruption of the DSL did not—in any legitimate sense—require *immediate* attention.[87] Thus even if Defendants believed that admission of technicians to the Villa was required to reestablish the DSL service, and *chose* to invite the technicians in for that purpose, they certainly could have taken the time to put evidence of their illegal activity away and out of the view of whoever might show up.

Defendants complain throughout their argument that they never consented to the presence of law enforcement in their Villas. But the Fourth Amendment, however, does not protect wrongdoers from misplaced confidence in the fact that their activities would not be detected, or reported by Caesars' employees. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

Defendants retained the choice of whether—and when—to permit SAs Lopez and Kung to enter Villa 8882.[88] The agents' ruse therefore did not present "a situation in which an

---

[87] Defendants suggest the government timed the internet outage to cause an "urgent problem" requiring immediate assistance. *See* Motion at 2. Defendants do not identify this "urgent problem," presumably because the DSL lines were being used to operate their illegal gambling operation. Law enforcement's decision to terminate the DSL lines did not create any legal urgent consequences, but only interfered with Defendants' conduct of their illegal activities. Moreover, when agents disrupted DSL service to Villas 8881 and 8888 on July 4, 2014, no call for service was ever placed by the occupants of Villa 8888, *see* Exhibit 12 at p. 5 para. 16, and a call for service to Villa 8881 was placed at least one hour *after* service was disrupted, *see* Exhibit 12 at p. 5 para. 17. While disruption of the complimentary DSL service prompted an "urgent call" on July 5, that does not mean disruption of the service is comparable to cutting off gas or–as relevant to an investigation taking place in Las Vegas during the month of July–air conditioning.

[88] Thus Defendants' attempt to analogize to the "hypothetical" in which the agents showed up at the villas and "told the residents the lie that there was an internet outage that they needed to

35

individual would feel 'no choice but to invite the undercover officer in.'" *United States v. Hardin*, 539 F.3d at 424–25. Despite the ruse, Defendants maintained "the ability to make a fair assessment of the need to surrender his privacy." *Id*. at 425. Defendants were not faced with the Hobson choice of no internet access or calling for service. Defendants were faced with the choice of running their multi-million dollar international illegal gambling business or not running their business. They quite simply chose the convenience of the DSL lines to run their illegal operation.

G. *The Agents Did Not Exceed the Scope of the Consent.*

Under *Lewis*, an officer may legitimately obtain an invitation into a house by misrepresenting his identity, as the agents did in this case posing as Caesars' technicians. Once invited inside, the agents did not need probable cause to enter and they did not need a warrant. Once inside the Villa, the agents may observe anything in plain view as long as they don't exceed the scope of their invitation. *Lewis, supra*, at 210; *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971).

In the instant case, Caesars was well within its rights in cooperating with law enforcement and in terminating the DSL internet lines it had provided as a *complimentary* service after having learned it was being used to conduct an illegal gambling business on its premises. Defendants contend that law enforcement exceeded the scope of their consent, claiming that "real technicians" would not act as DSL contractor did in this case. Defendants' assertions are based purely on the opinion and affidavit of another individual who has not been an employee of Caesars. *See* Def. Ex. G. This is key in the instant case given that Defendants were occupying high-end luxury villas. Moreover, Defendants' "Technical Expert" has no knowledge of how the DSL is connected in Caesars, nor the type of service Caesars provides its guests (especially those guests occupying high end villas). Thus his opinion regarding how he

come in and fix immediately," s*ee* Motion at 33, fails. Defendants, not the hotel, decided both whether and when to invite Lopez and Kung into the villa.

1   would act is not relevant.

2          Common sense dictates that Caesars and its employees would strive to give the highest

3   possible customer service. As noted by DSL contractor, it was usual protocol to ensure that the

4   call for service was completed. *See* Exhibits 12 at para. 14 (discussing standard protocol to

5   ensure laptop was working before dropping it off) and 47. The actions of DSL contractor on July

6   4, 2014, in entering Villa 8881 after Defendants called for service due to the DSL being

7   mistakenly disconnected was standard protocol. Likewise, the actions of DSL contractor and SA

8   Lopez of delivering the laptop and asking to drop it off to ensure it was working properly was

9   consistent with Caesars' customer service procedure and did not exceed the scope of consent.

10  The occupants of 8882 requested the laptop. Consequently, DSL contractor was invited in. His

11  attempt to enter further into the Villa, per standard protocol—did not exceed the consent,

12  especially given that his attempts to provide his standard service were thwarted by the butler.

13         Finally, SAs Lopez and Kung did not exceed the scope of their consent when they

14  entered Villa 8882 on July 5, 2014. In their undercover capacity, they responded to the call for

15  service. Defendants' contention that they did not act within the scope of their consent and that

16  they acted in a manner contrary to typical DSL service is without merit.  As evidenced by DSL

17  contractor's affidavit, the Agents were instructed on how to act so they *would not* exceed the

18  normal behavior. *See generally* Exhibit 12 at para. 26-29.

19         Defendants' contention that the agents' actions were akin to a trespass is incorrect.

20  Further, despite Defendants' many demands of Caesars (and, their clear expectation that their

21  demands would be met), a person who checks into a hotel is a licensee; he acquires only a

22  limited right to use the premises. Unlike a tenant, who holds a possessory interest in the property

23  he occupies, a hotel guest has only the right to use hotel property for a certain period of time, and

24  for a certain purpose. *See People v. Minervini*, 20 Cal. App.3d 832, 840 (Cal. App. 1971) (hotel

management retains control over all premises included rooms occupied by guests); *Roberts v. Casey*, 93 P.2d 654, 659 (1939) (following general rule that lodgers, boarders and hotel guests are mere licensees and not tenants); N.R.S. §651.020 (granting hotel owners right to evict anyone who "acts in a disorderly manner . . . or causes a public disturbance…"). The relationship is contractual and the rights and duties of the parties are guided by that contract. Caesars' "Internet Access Terms of Use," ("Terms of Use") applicable to its customers, demonstrates that it had the right to terminate the DSL connections at its discretion.[89]  It provides:

> 2. Access to Customer's Hotel Room.   Customer authorizes Caesars Entertainment and Hospitality, and their respective employees, agents, contractors, and representatives to enter Customer's hotel room or any other room from which Customer is accessing the Service (the "Premises") as necessary to install, maintain, inspect, repair and remove the Equipment and/or the Service. All such services will be conducted at a time as reasonably agreed to by Customer and Caesars Entertainment. *Id.*

The terms of use further allow Caesars to immediately terminate internet access if, in its sole discretion, its patron: (1) uses internet service for "financial gain, commercial activity or illegal activity"; and (2) infringes "on the rights of Caesars Entertainment, Hospitality or a third party or that has otherwise violated any intellectual property laws or regulations." Significantly, the Terms of Use warn the patron that Caesars intends to monitor and collect its patron's internet traffic and by such use, the patron agrees that Caesars "has the right . . . to protect itself or its subscribers, and to disclose any information as necessary to satisfy any law, regulation or other governmental request."[90]  Not only does Caesars' Terms of Use diminish Phua's and his associates' privacy expectation in the complimentary internet service they received, it emphasizes Caesars right to terminate that service once it identifies illegal activity on its premises.

---

[89] *See* Exhibit 39.
[90] *See* Exhibit 39.

Based on the foregoing, the Defendants' Motion should be denied.

## CONCLUSION

WHEREFORE, after consideration of the included facts, points, authorities, and arguments, the United States respectfully requests that this court DENY Defendants' Motion (Doc. No. 229).  The facts of this case are unique.  Far from attempting to create a broad change in legal precedent, the government agrees that in different situations, disconnecting utilities or internet access to prompt a request for assistance may be found coercive.  But nothing of the sort happened here.  The disruption here is more analogous to drug cases where law enforcement is invited onto the premises because they have offered to provide something the trafficker needs to run his business, *i.e.*, the drugs, better baggies, a more precise scale, etc.  The DSL connection here enhanced Defendants' ability to operate their illegal sports betting operation, but it was otherwise redundant of the internet, phone, and television service that Caesars was already providing.  It is of no moment that the government caused the DSL disruption.  *See, e.g., Kentucky v. King*, 131 S. Ct. 1849 (2011)(holding that the exigent circumstances exception to the warrant requirement applies even if law enforcement creates the exigency, as long as agents did not violate the Fourth Amendment in creating the exigency).  If the police knock on the front door, which they are permitted to do, and they suddenly hear toilets flushing, they can burst in to preserve evidence that the occupants are trying to destroy.  That entry is not unreasonable simply because the officer's knock triggered the need to destroy evidence.  Similarly here, the agents did not violate the Fourth Amendment by disconnecting the DSL line, and although that act spurred Phua's desire to have that service restored so that he could maximize his illicit profits, that does not render his consent involuntary.  Accordingly, the

///

///

39

Court should find that Defendants' rights and protections under the Fourth Amendment were not violated and should deny Defendants' Motion.

DATED this 10th day of November, 2014.

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney

_____
//s//
KIMBERLY M. FRAYN
PHILLIP N. SMITH, JR.
Assistant United States Attorneys

1

## CERTIFICATE OF SERVICE

2

I, Kimberly M. Frayn, certify that the following individuals were served with a copy of
the GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION

3

TO SUPPRESS FRUITS OF WARRANTLESS SEARCH on this date by the below identified
method of service:

4

5

Electronic Case Filing to:

6

Thomas C. Goldstein, Esq.
David Z. Chesnoff, Esq.

7

Richard A. Schonfeld, Esq.
Michael Pander, Esq.

8

Richard A. Wright, Esq.
Russ Marsh, Esq.

9

John V. Spilotro, Esq.
Thomas F. Pitaro, Esq.
Chris T. Rasmussen, Esq.

10

The sealed unredacted exhibits will be delivered to defense counsel on a cd.

11

DATED:  November 10, 2014.

12

13

_____
//s//

14

KIMBERLY M. FRAYN
Assistant United States Attorney

15

16

17

18

19

20

21

22

23

24

41