1
2
3
4
5

DANIEL G. BOGDEN
United States Attorney
KIMBERLY M. FRAYN
PHILLIP N. SMITH, JR.
Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada  89101
PHONE: (702) 388-6336
FAX:  (702) 388-6418

6
7

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
-oOo-

8

UNITED STATES OF AMERICA,

2:14-cr-00249-APG-PAL

9

Plaintiff,

10

vs.

11

12

WEI SENG PHUA et al.,

13

Defendants.

GOVERNMENT'S RESPONSE IN
OPPOSITION TO DEFENDANTS'
JOINT MOTION TO SUPPRESS
PURSUANT TO *FRANKS* V.
*DELAWARE*

14

The United States of America, by and through undersigned counsel, responds to and opposes

15

Defendants' "Joint Motion to Suppress Fruits of Search Warrant Pursuant to Franks v. Delaware"

16

(hereinafter, "Defendants' Motion"), which was filed on October 28, 2014.  Doc. No. 232.  The

17

Response was due on November 7, 2014, however, we were unable to file the Response due to the

18

CM/ECF system being down the evening of November 7, 2014.  Unfiled copies of this Response

19

was emailed to Defense Counsel on November 7, 2014 and they have no opposition to the late filing.

20

Government's Omnibus Redacted Exhibits for this Franks response and for the Government's

21

22

23

24

1

1   companion response in opposition to the 4th Amendment Fruits of Warrantless Search suppression

2   motion are filed under separate docket numbers due to the Exhibits voluminous nature.

3        DATED this 10th day of November, 2014.

4                                    Respectfully submitted,

5                                    DANIEL G. BOGDEN
                                     United States Attorney

6                                            //s//
                                     _____
                                     KIMBERLY M. FRAYN

7                                    PHILLIP N. SMITH, JR.
                                     Assistant United States Attorneys

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACT .....................................................................................2

    A.   *Even before arriving in Las Vegas, Paul Phua and his associates request that Caesars supply their villas with unusual quantities of electronics equipment and technical support; while installing this equipment, Caesars' employees see numerous indicators of a betting operation.* ...........................................................................................................3

    B.   *Background: Undaunted by his arrest in Macau for operating an illegal sports gambling business, Phua—a high-ranking member of an international criminal organization— continues his illegal operation in Las Vegas.* ...........................................................6

    C.   *Wood TMS installs the special DSL lines requested by Phua and his associates* ...................7

    D.   *On July 3, 2014, DSL contractor tells the FBI what he has seen inside the Villas and agrees to help surreptitiously gain access to the Villas.* .................................................10

    E.   *On July 4, 2014, SA Lopez, in an undercover capacity, accompanies DSL contractor into Villa 8882, under the guise of delivering the requested laptop computer, and DSL contractor, acting alone, thereafter enters and tapes the inside of Villa 8881.* ........................................12

    F.   *On July 5, 2014, SAs Lopez and Kung, in undercover capacities, enter Villa 8882, under the guise of serving the DSL outage the government induced as part of its ruse* ........................15

III. ARGUMENT .......................................................................................................18

    A.   The Applicable Legal Standard .........................................................................18

    B.   The Affidavit Accurately Characterized the Relationships Between the Occupants of the Villas. ...............................................................................................................21

    C.   With the Exception of One Inadvertent and Immaterial Factual Error, the Affidavit Accurately Characterized the Installation of Equipment in the Villas. ..................................25

    D.   With the Exception of Two Inadvertent and Immaterial Factual Errors, the Affidavit Accurately Characterized Significant Financial Transactions among the Residents of the Three Villas.......................................................................................................27

i

1

2

E.  No Constitutional Violation Occurred when Nevada Gaming Control Board Special Agent Ricardo Lopez Accompanied M.L.W. to Deliver and Set Up a Laptop Computer at the Request of the Occupants of Villa 8882 ...................................................................................31

3

4

5

F.  The Affidavit, Purged of Information Gleaned from the Entries into Villas 8881 And 8882 that Were Prompted by Law Enforcement's Disruption of the DSL Service to Those Villas, Would Still Have Justified the Issuance of the Warrant, and thus Suppression is Unwarranted..............................................................................................................................35

6

i.   Undercover Agents were Provided Detailed Training in Order to Appear Like Legitimate DSL Service Technicians. ........................................................................42

7

8

G.  Even if this Court Determines the Inclusion of Information About the Ruse Would Impact the Magistrate Judge's Probable Cause Determination, the Evidence Should Not Be Suppressed Because the Evidence Would Have Been Inevitably Discovered. ..........................................43

9

CONCLUSION..................................................................................................................................44

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# TABLE OF AUTHORITIES

Cases

Bravo v. City of Santa Maria,
    665 F.3d 1076 (9th Cir. 2011) ................................................................................... 20, 35

Ewing v. City of Stockton,
    588 F.3d 1218 (9th Cir. 2009) ........................................................................... 19, 20, 35, 41

Franks v. Delaware,
    438 U.S. 154 (1978) ........................................................... 19, 20, 21, 26, 38, 42, 43, 44

Illinois v. Gates,
    462 U.S. 213 ............................................................................................. 19, 26, 32, 33, 41

Lewis v. United States,
    385 U.S. 206 (1966) ............................................................................................................ 32

Liston v. County of Riverside,
    120 F.3d 965 (9th Cir. 1997) ............................................................................................. 41

McDonald v. United States,
    335 U.S. 451 (1948) ............................................................................................................ 30

Nix v. Williams,
    467 U.S. 431 (1984) ............................................................................................................ 43

Ornelas v. United States,
    517 U.S. 690 (1996) ............................................................................................................ 29

Payton v. New York,
    445 U.S. 573 (1980) ............................................................................................................ 19

Schneckloth v. Bustamonte,
    412 U.S. 218 (1973) ..................................................................................................... 31, 32

State v. Stevens,
    123 Wis.2d 303, 367 N.W.2d 788 (1985) ....................................................................... 33

Texas v. Brown,
    460 U.S. 730 (1983) ............................................................................................................ 31

United States v. Baldwin,
    621 F.2d 251 (6th Cir. 1980) ............................................................................................. 33

United States v. Bishop,
    264 F.3d 919 (9th Cir. 2001).................................................................................... 26, 41

United States v. Botero,
    589 F.2d 430 (9th Cir. 1978)......................................................................................... 20

United States v. Burnes,
    816 F.2d 1354 (9th Cir. 1987)................................................................................. 42, 43

United States v. Capers,,
    708 F.3d. 588 (D.C. Cir. 2010) ..................................................................................... 21

United States v. Chavez-Miranda,
    306 F.3d 973 (9th Cir. 2002).............................................................................. 21, 42, 43

United States v. Dicesare,
    765 F.2d 890 (9th Cir. 1985)......................................................................................... 20

United States v. Ewing,
    638 F.3d. 1226 (9th Cir. 2011)...................................................................................... 31

United States v. Garcia-Cruz,
    978 F.2d 537 (9th Cir. 1992)......................................................................................... 42

United States v. Haden,
    397 F.2d 460 (7th Cir. 1968)......................................................................................... 32

United States v. Hole,
    564 F.2d 298 (9th Cir. 1977)......................................................................................... 20

United States v. Jawara,
    462 F.3d 1173 (9th Cir. 2006)....................................................................................... 20

United States v. Kiser,
    716 F.2d 1268 (9th Cir. 1983).................................................................................. 42, 43

United States v. Kyllo,
    37 F.3d 526 (9th Cir. 1994)...................................................................................... 42, 43

United States v. Lord,
    230 Fed. Appx. 511 (6th Cir. 2007) .............................................................................. 34

United Sates v. Martin,
    426 F.3d 68............................................................................................................... 21

United States v. Pavulak,
    700 F.3d 651 (3rd Cir. 2012)......................................................................................... 21

United States v. Perdomo,
    800 F.2d 916 (9th Cir. 1986)......................................................................... 20

United States v. Pulliam,
    405 F.3d 782 (9th Cir. 2005)......................................................................... 43

United States v. Ramirez-Sandoval,
    872 F.2d 1392 (9th Cir. 1989)....................................................................... 43

United States v. Reilly,
    224 F.3d 986 (9th Cir. 2000).......................................................................... 43

United States v. Scherer,
    673 F.2d 176 (7th Cir. 1982).................................................................... 33, 34

United States v. Shigemura,
    682 F.2d 699 (8th Cir. 1982),................................................................... 33, 34

United States v. Snype,
    441 F.3d 119 (2d Cir. 2006)........................................................................... 31

United States v. Stanert,
    762 F.2d 775 (9th Cir. 1985)......................................................................... 20

United States v. Stewart,
    337 F.3d 103 (1st Cir. 2003) ......................................................................... 41

United States v. Ventresca,
    380 U.S. 102 (1965) ...................................................................................... 19

United States v. Wagner,
    884 F.2d 1090 (8th Cir. 1989)............................................................. 32, 33, 34

United States v. Watson,
    423 U.S. 411 (1976) ...................................................................................... 29

United States v. Whitworth,
    856 F.2d 1268 (9th Cir. 1988)................................................................. 20, 41

United States v. Wright,
    641 F.2d 602 (8th Cir. 1981).......................................................................... 34

Statutes

U.S. Const. Amend. IV .................................................................................... 18

## I.    INTRODUCTION

Defendants' Motion makes four challenges to the affidavit that was submitted to the Magistrate Judge in support of a search warrant on July 9, 2014. To support their claim that the affidavit contained either deliberate falsehoods or material omissions which, if corrected, would defeat probable cause to search villas 8881 and 8882,[1] the Defendants first contend (*see* Motion at 8-13) that the affiant omitted facts that would have shown the Magistrate Judge that the warrantless entries into villas 8881 and 8882 on July 4, and 5, 2014 were unconstitutional, and argue that if those facts had been included, the Magistrate Judge would have "denied the application because it was not supported by lawfully acquired probable cause."  Second, the Defendants contend (*see* Motion at 15-17) that the affidavit "falsely characterized" the relationship between the residents of the three villas. Third, the Defendants contend (*see* Motion at 17-22) that the affidavit "seriously mischaracterized" the installation of computer equipment in the villas.  Fourth, the Defendants contend (*see* Motion at 22-27) that the affidavit "falsely described supposed financial transactions" among the residents of the three villas.

As explained below, the second, third, and fourth challenges lack merit.  With the exception of two inadvertent, immaterial errors of fact regarding two financial transactions, and one inadvertent, immaterial error of fact regarding the number of DSL lines installed in the villas, the information in the affidavit is correct and amply supported by the evidence.  In addition, with respect to the Defendants' first challenge, their claim that a law enforcement agent violated their Fourth Amendment rights when he posed as a service technician and accompanied a technician to deliver and set up a laptop at the request of the occupants of villa 8882 is contrary to established law and

---

[1] The Defendants have not challenged the probable cause determination as it relates to villa 8888. The Defendants therefore concede that there was sufficient probable cause set forth in the search warrant application as it relates to villa 8888.

without merit. Defendant's contention that agents' disruption of DSL service and subsequent entry

into villa 8882 in an undercover capacity as service technicians was unconstitutional is likewise

wrong under the specific facts of this case and is dealt with by separate response. [2]    Consequently,

the information from the warrantless entries into villas 8881 and 8882 on July 4, and 5, 2014, was

properly included in the affidavit.

Even if the Court were to conclude the Magistrate Judge should not have been asked to

consider information gleaned from the entries into villas 8881 and 8882 that were prompted by law

enforcement's disruption of the DSL service to those villas, the exclusion of that information from

consideration would not have undermined the Court's finding of probable cause to search villas 8881

and 8882. Because the affidavit, purged of that information, would still have justified the issuance

of the search warrant, suppression is unwarranted and the Defendants' Motion should be denied.

## II.        STATEMENT OF FACT

 Defendants are high rollers permitted by Caesars Palace to occupy several villas free of

charge during the 2014 World Cup. This case involves the use of a ruse by law enforcement officers

to obtain defendants' consent to enter Villas 8881 and 8882 after Caesars reported to the authorities

substantial evidence that defendants, who had asked Caesars to supplement its complementary WI-

FI with the installation of DSL lines, were using those DSL lines to conduct an illegal internet sports

betting operation. Under Caesars' "Internet Access Terms of Use," Caesars retained the right to

terminate internet service if used for "illegal activity."[3]

In brief, after Caesars contacted the authorities, agents, working with Caesars and a DSL

contractor, (hereafter "DSL contractor"), entered Villa 8882 on July 4, 2014, to deliver a laptop

requested by the occupants. That same day, the contractor also temporarily disconnected the DSL

---

[2] The Government has filed a separate response to Defendant's Motion to Suppress Warrantless Searches
relating to villas 8881 and 8882.
[3] *See* Exhibit 39.

service to Villa 8881, leaving WI-FI and other digital and electronic services in place. When

defendants asked Caesars to restore the DSL connection in Villa 8881, the DSL contractor entered

alone and on his own initiative (without law enforcement direction),used his cell phone to make a

video of the Villa's interior, which he delivered to the authorities. The following day, the contractor

disconnected the DSL service to Villa 8882 at the direction of law enforcement. When a defendant

called Caesars requesting restoration of service, agents posed as DSL technicians to gain admittance

to 8882 and stayed long enough to confirm with defendants that the DSL connection had been

restored. Four days later, on July 9, 2014, agents executed a warrant authorizing the search of Villas

8881, 8882, and 8888.

> A.   *Even before arriving in Las Vegas, Paul Phua and his associates request that Caesars supply their villas with unusual quantities of electronics equipment and technical support; while installing this equipment, Caesars' employees see numerous indicators of a betting operation.*

A Caesars' VIP Services employee, working at Caesars Hotel and Casino, reserved several

Villas, (including Villas 8881, 8882 and 8888)[4] at the behest of Paul Phua, Richard Yong, or one of

their associates in anticipation of their arrival in Las Vegas in June 2014.[5]  Defendants are high

rollers[6] permitted by Caesars Palace to occupy several villas free of charge during the 2014 World

Cup. Thus, on June 6, 2014, Phua's associate Richard Yong, (whom law enforcement knows to be

associated with the 14K Triad),[7] checked into Villa 8881.[8]  On June 7, 2014, Phua's associate Hui

---

[4] Also villas 8883, and 8887, the occupants of which law enforcement does not allege were involved in illegal gaming.

[5] *See* Exhibit 3.

[6] *See* Exhibits 2F, 3, and 21.

[7] *See*  Exhibit 48, 302 Yong Triad

[8] *See* Exhibits 4, showing check in on June 6, 2014 at approximately 9:19, and 38.

Tang checked in to Villa 8888.[9]   On June 11, 2014, Paul Phua himself, (whom law enforcement knows to be a high-ranking member of the 14K Triad),[10] checked into Villa 8882.[11] The villas' occupants associated with one another during their stay.[12]

Prior to their arrivals and check-ins, Paul Phua and his associates requested that Caesars provide them with an unusual amount of electronics equipment and technical support, which they requested be installed in the Villas.[13] In response to these requests, Caesars (on June 22, 2014) sent several electrical engineer employees (including employees J.A. and J.S.) to Villa 8888 to assist with setting up the equipment. Engineer J.A. later told Caesars' investigator that the equipment[14] in Villa 8888 appeared to be a set-up for an illegal gambling operation, adding that he saw several

[9] See Exhibits 5, showing check in on June 7, 2014 at approximately 12:29, and 38. At the time the search warrant affidavits were executed, it was unclear if Hui Tang or others in villa 8888 were associated with the Triads.  However, see Exhibit 44, passport photograph recovered from defendant Herman Yeung's computer seized from villa 8888 titled "Boss HKSAR Passport 2011" was a copy of the passport of an individual confirmed by a Hong Kong court, and the United States Permanent Subcommittee on Investigations, to be one of nine leaders of the Wo Hop To Triad.

[10] See Exhibit 49, 302 Phua Triad.

[11] See Exhibits 6 and 38. Paul Phua checked in and out periodically. In June, he traveled to Macau, where he got arrested. Later in early July he traveled to London for approximately 48 hours. The records show Paul Phua initially checked into Caesars Las Vegas June 11, 2014.

[12] See, e.g., Exhibits 2F, 2M, 37 butler's notes residents of 8881, 8882 and 8888 planning to go to Wet Republic together, and 43 butler's notes residence of 8881 and 8882 scheduled to go to firearms range together.

[13] See Exhibit 2I. On July 3, 2014, Caesars' lead investigator P.U. (hereafter "Caesars' investigator") informed Nevada Gaming SA Rick Lopez that eight computers, five work stations, twenty plus monitors, three additional TV sets, and additional Wi-Fi and DSL lines, were put in Villa 8888 at the request of Hui Tang, who wanted them to "keep up on the world cup." Nineteen keys for Villa 8888 were issued. The TVs were hooked up to Cox, Dish TV, and Direct TV. Monitors were hooked up to Century Link DSL lines. One of the chief complaints from the guests was the time delay between the video signals of each service. In addition, Villas 8881 and 8882 requested additional DSL lines and fax machines. See Exhibits 8A-B; 13A-B; and 12, DSL contractor's affidavit; and 47.

[14] The equipment referred to by J.A. was purchased by defendant Herman Yeung on June 8, 2014. See Exhibit 30.

computer work stations with extra monitors attached.[15] J.A. also told law enforcement that on one of the computer screens were words he believed to be in the Chinese language; that the screen also included several columns of numbers; and that these looked like betting odds, similar to what J.A. has seen in sports betting in the casinos. *Id.*

Electrical Engineer J.S. saw much the same inside Villa 8888 on June 22, 2014, namely, computer screens that looked just like the ones in the casino's sports book.[16] J.S. said there were five stations set up in the room, with three monitors attached to each station, and that each station's computer tower was hooked up to a Century Link DSL line with voice-over internet protocol phones. *Id.* Near the computer stations, J.S. also saw three large-screen televisions with service from Cox, Dish, and Direct TV, each of which was tuned to the World Cup.[17] J.S. said that one of the chief complaints of the Villa's occupants was a time delay between the video signals of each service (Cox, Dish, and Direct TV).[18] J.S. said he believed that illegal sports book betting was being conducted in Villa 8888. *Id.*

Caesars did not consent to this illegal activity. Accordingly, on June 30, 2014, Caesars' investigator provided the FBI and Nevada Gaming agents with photographs of the equipment set up in Villa 8888.[19] Based on his training and experience, Nevada Gaming Special Agent (SA) Ricardo

---

[15] *See* Exhibit 2A, e-mail contains photographs, including but not limited to, the computer bank in Villa 8888, which was shown to J.A., J.S., and the FBI and Nevada Gaming agents prior to the search warrant affidavits' execution. *See also* Exhibit 9A, 302 documenting a subsequent interview conducted on August 20, 2014, which confirmed the information in Exhibits 2A and 2I.

[16] *See* Exhibits 2A, 2I, and 10, 302 documenting a subsequent interview conducted on August 20, 2014, which confirmed the information in 2A and 2I.
[17] *See* Exhibit 2A.

[18] *See* Exhibits 2I and 10. SAs Lopez and Pham note that, based on their training and experience, eliminating time delay is critical for illegal gambling operations engaged in "in-game" wagering.

[19] *See* Exhibit 2A. Some of these photographs, *see* Exhibit 11, were attached as Attachment C to the search warrant affidavits.

Lopez believed, upon review of these photographs, that the set-up is similar to a "wire room" where illegal wagers are made and monitored. Additionally, the search warrant affiant, FBI SA Minh Pham, told United States Magistrate Judge Nancy J. Koppe that, based on his training and experience, Paul Phua, Richard Yong, Hui Tang, and others acting under their direction and control, were monitoring the World Cup and betting odds associated with World Cup soccer games in furtherance of their illegal gambling business.

> B.    Background: Undaunted by his arrest in Macau for operating an illegal sports gambling business, Phua—a high-ranking member of an international criminal organization—continues his illegal operation in Las Vegas.

On or about June 18, 2014, defendant Paul Phua traveled from Las Vegas to Macau.  On or about June 19, 2014, Phua was arrested in Macau, [20] along with more than twenty other individuals, for: 1) engaging in organized crime; and 2) operating an illegal sport book gambling business.[21] The 14K Triad is known by law enforcement to be a criminal organization engaged in an ongoing illegal criminal enterprise. Prior to their arrests, Paul Phua and his associates[22] transacted hundreds of millions of dollars in illegal bets on the World Cup soccer tournament that was held in Brazil in June and July of 2014. Most of their bets were made through use of the wires, that is, online or over the phone.[23] After his arrest in Macau, Phua was freed under then-unknown conditions of release.[24]

---

[20] See Exhibits 31A, copy of arrest warrant seized from Paul Phua at his arrest on July13, 2014, and 31B, translation of warrant into English. See also, Exhibit 40 i-message chat from Darren Phua's i-phone talking about the arrest and forwarding photographs of Paul Phua under arrest in Macau.

[21] See Exhibits 1, media reports of arrest, and 2B.

[22] See Exhibit 41, p.5, i-messages and text messages from Darren Phua's i-phone indicating that four of the people arrested in Macau were Phua employees.

[23] See Exhibit 1 and 2I. See also Exhibits 28A-C information from Paul Phua's laptop, tablet cell phone; 29 302 confirming skype chats are wagers; and 32 customers' list and how bets were placed for World Cup Brazil 2014 which was recovered from a computer (1B106) in Villa 8888; 42 information from Richard Yong's laptop recovered from Villa 8881.

In any event, on June 23, 2014,[25]  Paul Phua landed at McCarran International Airport in Las Vegas, Nevada, on a privately owned Gulfstream G-550 business jet with tail number N888XS. Upon arrival, Phua and his associates[26] continued their illegal gambling business, which they had commenced on or about June 6, 2014, at the Caesars in Las Vegas, Nevada ("Caesars").

       *C.*     *Wood TMS installs the special DSL lines requested by Phua and his associates.*

The mechanics of the requested installation required the assistance of the DSL contractor who owns Wood Telemanagement Solutions (or "Wood TMS"), and who has been in the telecom business since 1975. Wood TMS provides on-site telecom service and support to numerous businesses in Nevada, and it began providing these services to Caesars in 2010.[27] As part of this service, Wood TMS installs DSL lines to rooms inside Caesars' properties. Installation of a DSL line includes running a wire from a demarcation point (for example, a closet housing the appropriate wires) within the property to the specific room requesting DSL service. After running

---

[24] Indeed, the conditions of his release remained unknown to FBI and Nevada Gaming agents even up to the time the three search warrant affidavits for Villas 8881, 8882, and 8888 (hereafter, "the search warrant affidavits") were executed. However, as shown in Exhibit 7, messages subsequently recovered from Darren Phua's iPhone (evidence item number 1B35) acknowledge that his father, Paul Phua, had been arrested in Macau by the Macau police which is "a friend of Paul's and they are negotiating now. Hopefully they want only money." The messages further mention paying 4-5 million Hong Kong dollars under the table to free Phua from custody, and note that, as of mid-June, it appeared (from Interpol records checked by a Phua associate) there were no outstanding arrest warrants for Paul Phua in Asia or Europe. *See also* Exhibit 41.

[25] *See* Exhibit 6.

[26] *See* Exhibit 2I, email disclosing status of Caesars' internal investigation to Nevada Gaming agents on June 23, 2014 and July 3, 2014. *See also* Exhibit 2I, 2F, 2M, information documenting the interrelationship of the three Villas' occupants. Caesars' investigator indicated that Caesars had derived these links, in part, from Caesars' surveillance of Salon 7, a privately reserved gaming room used in June and July 2014 by Paul Phua and his associates, some of whom were occupants of Villas 8881, 8882, and 8888.

[27] *See* Exhibit 12, DSL contractor's affidavit, at p.1, para. 1

the wire, Wood TMS enters the specific room and installs a DSL modem in order for the service to work properly.[28] Wood TMS also installs fax machines into rooms or conference rooms at the request of Caesars.[29]

In early June 2014, Wood TMS was contacted by Caesars' VIP Services Group to install additional fax machines[30] into Villas 8881, 8882, and 8883, and to install DSL lines into those same villas and in Villa 8888. Wood TMS was informed that the guests of the luxury villas specifically requested the DSL lines because they were dissatisfied with the available, in-house WI-FI provided to all Caesars Palace guests.[31] Wood TMS installed a DSL line into Villa 8888 on or about June 8, 2014. That installation allowed for hard connection of four computers. Subsequently, in response to a request from Villa occupants, Caesars requested that Wood TMS install a DSL connection that would allow for connection of five computers. Because Wood TMS does not have that ability, Caesars was informed that they should contact another company or IT to meet that request.[32] Wood TMS also installed DSL lines in Villas 8881 and 8882 on or about June 10, 2014, and into Villa 8883 on or about June 25, 2014.[33]

---

[28] *See* Exhibit 47.

[29] *See* Exhibit 12, at p. 1-2, para. 2-3.

[30] *See* Exhibit 8A, for information obtained by law enforcement about the added equipment, added services and occupants' dissatisfaction thereof, which was known to them prior to the execution of the search warrant affidavits. *See also* Exhibit 8B, for further information corroborating those same facts, but which were obtained after executing the search warrant affidavits; and Exhibit 12 p. 2. para. 3-5.

[31] *See* Exhibit 8A. *See also* Exhibit 12, at p. 2, para. 3-5 and Exhibits 13A-B, email chains documenting Villa occupants' dissatisfaction and the subsequent installation of DSL, which were obtained after executing the search warrant affidavits, but which corroborate information passed to FBI and Nevada gaming agents prior to the search warrant that which were obtained.

[32] *See* Exhibit 8A. *See also* Exhibit 12, at p. 2 para. 6.

[33] *See* Exhibit 8A. *See also* Exhibits 12, at p. 2 para. 6-7, 13A-B, and 47.

Sometime after June 13, 2014, Wood TMS was contacted via email by Caesars' VIP Services to respond to the Villas 8881 and 8882 regarding complaints that the DSL line was either not working or was performing unsatisfactorily.[34] DSL contractor personally responded to at least one of those emails for service. Continuing during the month of June, Wood TMS employees (including A.P.) responded to other requests for service in the Villas regarding DSL problems. To correct the service issues, Wood TMS entered Villas 8881, 8882, and 8888 on at least two occasions including on June 27, 2014, when Wood TMS employees entered Villa 8881 to respond to yet another call for service. *Id.*

On June 30, 2014, Caesars' investigator emailed DSL contractor because he had important questions to ask him.[35] They spoke on the telephone that same day, and during this initial call DSL contractor learned that law enforcement was interested in what Wood TMS had installed or worked on in certain Villas, later confirmed as Villas 8881, 8882, 8883 and 8888.[36] DSL contractor informed Caesars' investigator of the work Wood TMS had performed in the aforementioned Villas. They spoke on the phone several more times regarding these issues through July 4, 2014. *Id.*

As previously noted, Caesars' investigator sent emails disclosing the status of Caesars' internal investigation to Nevada Gaming agents the week of June 23, 2014. Nevada Gaming SA Ricardo Lopez was on vacation for part of the week of June 23, and was assigned responsibility for the investigation on or about June 30, 2014.[37]  SA Lopez then contacted the FBI. FBI SA Minh

---

[34] *See* Exhibit 8A. *See also* Exhibit 12, at p. 2 para 8-9 and Exhibits 13A-B.

[35] *See* Exhibit 14.

[36] *See* Exhibit 12 at p. 3 para. 10.

[37] *See* Exhibits 2A-M for information provided to Nevada Gaming from June 25 to July 5, 2014.

Pham advised that the FBI opened their case on or about July 1.[38] One of the first pieces of information Caesars' investigator conveyed to law enforcement was photographs taken by a Caesars' VIP Services employee of Villa 8888.[39]

No actions taken by Caesars' employees or Wood TMS' employees inside Villas 8881, 8882, 8883, or 8888 prior to July 4, 2014, were made at the direction of law enforcement.

D.     *On July 3, 2014, DSL contractor tells the FBI what he has seen inside the Villas and agrees to help surreptitiously gain access to the Villas.*

On July 3, 2014, Caesars' investigator arranged for DSL contractor to be interviewed by SA Lopez and FBI SAs Justin Nwadiashi and Minh Pham.[40] During the interview, DSL contractor answered numerous questions regarding the work Wood TMS performed in Villas 8881, 8882, 8883, and 8888, and what had been seen while completing that work. He informed agents how, when, and why Wood TMS performed work on the DSL lines. *Id.* Prior to executing the search warrant affidavits, SA Lopez reported that DSL contractor said he had been providing technical support for four or five years and had never previously received any requests for such a large amount of equipment and technical support as that which had been requested by the three Villa occupants.[41]

After Caesars' investigator and DSL contractor agreed to assist law enforcement in the

---

[38] *See* Exhibit 2G.

[39] *See* Exhibits 2A, 2I and 11.

[40] *See* Exhibit 12 at p. 3 para. 11.

[41] *But see* Exhibit 12 at p. 3 para. 11, noting that DSL contractor's statement given on or about October 27, 2014, clarified that what he had actually meant by his statement to law enforcement on July 3 was that it was unusual for "the request for additional fax machines into Villas 8881, 8882, and 8883. Based on my training and experience, that request was unusual because all of the aforementioned Villas already had exact make and model fax machines installed.  Further, I noted to agents that the numerous requests for various technology-related items to all of the villas were unusual."

ongoing investigation,[42] the agents asked him how they could surreptitiously gain entry to the Villas.[43] Various ideas were discussed, including the intentional disruption of services, such as cable or DSL. DSL contractor told the agents of the locations of the DSL modems inside each of the Villas, adding that the modem for Villa 8882 was installed in the Villa's media room. DSL contractor advised the agents that if the DSL was important to the Villas' occupants, then disconnecting the DSL would prompt an immediate call for service. *Id.* He also told the agents that the standard protocol for service calls was for Wood TMS to respond and enter the specific unit to address the problem.[44] At the conclusion of the interview, agents briefed Caesars' investigator about the plan to disrupt DSL services with the help of DSL contractor the next morning.

On July 4, 2014, one of Phua's associates—acting solely on their own volition without any actions taken by law enforcement to prompt the request—requested that Caesars' VIP Services deliver a laptop computer to Villa 8882.[45] At approximately 5:38 a.m., the VIP Services employee conveyed the request, via email, to Wood TMS. DHL contractor then conveyed the request to Caesars' investigator, commenting on the perfect timing of the request, [meaning that it fortuitously allowed law enforcement the opportunity to surreptitiously enter the Villa].[46] Caesars' investigator conveyed the information to SA Lopez, with the understanding that law enforcement would use the laptop request as a means to get an undercover agent inside villa 8882. *Id.*

---

[42] *See* Exhibit 12 at p. 3-4 para. 12.

[43] *See* Exhibit 12 at p. 4 para. 13. *See also*, Exhibit 47.

[44] *See* Exhibit 12 at p. 4 para. 13.

[45] *See* Exhibit 15A. *See also* Exhibit 12 p.4 para.14.

[46] *See* Exhibit 15B.

11

1
2

      E.      *On July 4, 2014, SA Lopez, in an undercover capacity, accompanies DSL contractor into Villa 8882, under the guise of delivering the requested laptop computer, and DSL contractor, acting alone, thereafter enters and tapes the inside of Villa 8881.*

3

      On the morning of July 4, 2014, DSL contractor helped law enforcement[47] disrupt what he

4

believed to be the DSL in Villas 8882 and 8888. At his instruction, a Wood TMS employee (A.P.)

5

helped law enforcement disconnect the DSL wires from a closet[48] located in the main Caesars

6

telephone room.[49] The DSL was disconnected to what was believed to be Villas 8882 and 8888.

7

Wood TMS did not receive any calls for service for quite some time after disconnecting what was

8

believed to be Villas 8882.

9

      Later that same morning, but before the start of the World Cup soccer game, DSL contractor

10

agreed to accompany SA Lopez, who, acting in an undercover capacity, was posing as the

11

contractor's support technician, into Villa 8882 to deliver and set up the requested laptop computer.

12

Both SA Lopez and the contractor were equipped with concealed audio and visual recording

13

devices, which they kept on while they were inside Villa 8882.[50] They entered through the butler's

14

service entrance, which Wood TMS usually uses if the Villa is occupied.[51]

15

      Upon entering, they did not inform the butler who answered the door of SA Lopez's actual

16

identity. Rather, they said simply that they were there to deliver the laptop the occupants had

17

requested. *Id.* The butler (later determined to be Caesars' employee O.C., who was assigned to

18

---

19

[47] Nevada Gaming SA Lopez, and FBI SAs Nwadiashi, Pham, and Thayne Larson.

20

[48] *See* Exhibit 18, photographs of wire closet.

21

[49] *See* Exhibit 12 p. 5 para. 16.

22
23

[50] *See* Exhibit 16A, noting that both SA Lopez's and the contractor's recording devices recorded properly, but the time stamp on the contractor's video is incorrect. *See also* 16B further explaining the handling of the recordings after they were completed.

24

[51] *See* Exhibit 12, p. 4-5 para 14.

assist the occupants in Villa 8882), restricted SA Lopez's and DSL contractor's access to the pantry area, and adamantly blocked their path to the other parts of the villa.[52] The butler stated the guests were in the media room, but did not want anyone to see their "business."[53]

       While in the butler's pantry, DSL contractor and SA Lopez set up a new Windows 8 laptop for use by Villa 8882's occupants, as requested. At some point during this process, the butler left the pantry. *Id.* DSL contractor could hear a lot of noises coming from within the Villa, including noises consistent with the World Cup game that was then being broadcast. He suggested that they head towards the media room with the laptop.[54] They exited the pantry and walked further into Villa 8882 towards the media room. The butler re-appeared and again assertively informed them to go back to the pantry. *Id.* The butler told DSL contractor and SA Lopez to leave the laptop in the pantry, and then escorted them off the premises. DSL contractor informed the Butler to call if additional service on the laptop was needed.[55] DSL contractor and agent then left the Villa.

       Prior to executing the search warrant affidavits, SA Lopez reported that DSL contractor had stated the butler's aggressive actions were so intimidating that DSL contractor later stated that he was fearful for his safety and would not go back into Villa 8882.[56]

---

[52] *See* Exhibit 12, p. 4-5 para 14.

[53] *See* Exhibit 17, 302 documenting a subsequent interview of O.C. conducted after entry was made via the search warrants on July 9, which confirmed this information.

[54] *See* Exhibit 12, p. 4-5 para 14.

[55] *See* Exhibit 12, p. 4-5 para 14.

[56] *But see*, Exhibit 12 at p. 4-5 para. 14 and 15, noting that DSL contractor's statement given on or about October 27, 2014 clarified that what he had actually meant by his/her statement to law enforcement on July 3 was that: a) "the Butler's behavior was unusual in that it appeared aggressive and demanding. That was unusual to me because we have a long-term, good working relationship with Caesars, to include working with many of the butlers and have never previously had that reception;" and b) following that encounter, "I informed the agents that based on the Butler's reaction during the laptop drop off, together with the noises I heard from Villa 8882, I informed the

Later that day, the agents left the Caesars property when no service calls had come in from Villas 8888 or 8882. The agents directed DSL contractor to call them if Wood TMS received a service call. *Id.* None of the law enforcement agents instructed DSL contractor, or any other Wood TMS employee, to take any additional action, apart from contacting the agents if any service call came in after the agents left the property.

While Wood TMS never received a call from Villa 8888, it did, later that afternoon, receive a call that the DSL in Villa 8881 was not working.[57] It was at that time that DSL contractor learned that Wood TMS's own logs—documenting which wires had been installed into which Villa—were incorrect. It was also at that time that DSL contractor learned that Wood TMS had failed to disconnect DSL service to Villa 8882, as planned. Rather, Wood TMS had accidentally disconnected DSL service to Villa 8881. *Id.* Upon learning of this, DSL contractor reconnected the DSL lines to 8881 and 8888.[58]

After reconnecting the DSL lines, DSL contractor, acting on his own volition and without any direction from or contact with law enforcement, responded to a service call from Villa 8881. In doing so, DSL contractor disregarded the prior plan to the effect that he was supposed to call the agents in response to any service call he received. In any event, DSL contractor, alone, entered

---

agents that from that point on, neither myself or any of my employees were go into Villa 8882."

[57] *See* Exhibit 12 p. 5 para. 17.

[58] *See* Exhibit 12 p. 5 para. 18. Defendants' motion to suppress makes numerous misrepresentations regarding this sequence of events. *See*, e.g., Motion at 12 (asserting that DSL contractor cut service to 8881 after the reconnected service to 8888; Motion at 13 (asserting that while he was in 8881, DSL contractor "apparently made a cell phone call to tell a colleague to restore the connection"); Motion at 14 (accusing DSL contractor of making a "severely misleading cell phone video" by starting the recording "precisely moments after he instructed his colleague to restore the internet access").

Villa 8881.[59] While inside, he used a work cellphone to take a short video of the inside of the Villa, specifically, the area where the DSL was located, the bar, and the media room. *Id.* Where the DSL was located, DSL contractor's video captured a phone list setting forth the names and respective Villa numbers of the Villas' occupants.[60] In the media room, the video captured an individual on a computer, which displayed a sports betting odds-related website. *Id.* After capturing the video and confirming that the DSL was functioning properly, DSL contractor left.[61]

Later on July 4, 2014, DSL contractor called SA Lopez and told him that he had mistakenly disconnected the wrong Villa's DSL; that he had reconnected the DSL; and that he had shot a video of the inside of Villa 8881.[62] Shortly thereafter, law enforcement met DSL contractor at his office in Caesars, where he turned over a copy of the video. *Id.* Reviewing it, FBI SA Pham saw that the person whom DSL contractor had taped sitting at the computer in Villa 8881 matched the description of Seng Chen (Richard) Yong. The agents and DSL contractor agreed to come back the next day and disconnect the DSL for Villa 8882, as originally planned. *Id.*

> F.   *On July 5, 2014, SAs Lopez and Kung, in undercover capacities, enter Villa 8882, under the guise of serving the DSL outage the government induced as part of its ruse.*

The next morning (July 5, 2014), Caesars' investigator, SA Lopez and FBI SAs Nwadiashi, Pham, Larson, and Mike Kung met DSL contractor at his office.[63] Around 9:00 a.m., at law

---

[59] *See* Exhibit 12 p. 5 para. 18.

[60] *See* Exhibit 19A for a photograph of the master "go" phone list linking the occupants of Villas 8881, 8882, and 8888 together which was captured in the video. *See also,* Exhibit 19B which is a clearer photograph which was taken July 9, 2014 during the search of the call list, a copy of which was found present in each of the Villas on the day of the search.

[61] *See* Exhibit 12 p. 5-6 para. 18.

[62] *See* Exhibit 12 p. 6 para. 19.

[63] *See* Exhibit 12 p. 6 para. 20.

15

enforcement's direction, Wood TMS disconnected the DSL line to Villa 8882 and, possibly, Villa 8888 (a fact that neither the agents nor DSL contractor precisely recall). *Id.* At this point, the plan was that, if there was a service call from Villa 8882, SAs Lopez and Kung would pose as technicians dispatched to "fix" the DSL and, in that capacity, attempt to gain consent to enter the Villa. While waiting for a possible service call, DSL contractor instructed SAs Lopez and Kung on how to hold themselves out as legitimate technicians,[64] providing the agents with specific instructions so that if any of the Villa's occupants looked over the agents' shoulders, it would appear they were legitimately repairing the problem. *Id.*

Approximately 30 minutes after the DSL was disconnected (but before the Argentina v. Belgium game started), Paul Phua directed the butler to make an urgent request for technical assistance to the DSL in Villa 8882.[65] DSL contractor learned of this when (while waiting for a possible service call with Caesars' investigator and agents) the building engineers advising him that the DSL in Villa 8882 was not working.[66] The engineers told DSL contractor that they had entered Villa 8882 to respond to the call for service but once discovering that the issue was DSL-related, they called DSL contractor.  *Id.*  He instructed the engineers that the problem would be taken care of. Once they learned of the service call, SAs Lopez and Kung, posing as technical support assistants, went to Villa 8882. Both of the agents were equipped with concealed audio and video recording devices, which they kept on while in villa 8882.[67]  Upon entry, the agents were greeted by

---

[64] *See* Exhibit 12 p.6 para. 20.

[65] *See* Exhibit 45.

[66] *See* Exhibit 12 p.6 para. 21.

[67] *See*  Exhibit 16A-B, SA Lopez' device recorded but SA Kung's devices did not. SA Kung also had his cell phone in his pocket set on mute. He called SA Nwadiashi, leaving the call connected so that the agents waiting near villa 8882 could hear what was happening inside the villa for officer safety

a female butler who led them to the media room.[68] The butler said the occupants of the villa were

doing "business" in the media room. *Id.* In the media room, SAs Lopez and Kung saw Paul Phua,

Richard Yong, Darren Phua, and two of their associates. SA Kung saw Paul Phua sitting at a laptop

computer which was displaying both the website "SBOBET" and an active instant messaging

window. The agents saw Paul Phua clicking on numbers, which SA Lopez believes, based on his

training and experience, were sports wagering odds on SBOBET website. SA Kung observed an

incoming message to Paul Phua stating "good luck on the hedge bet" or similar wording.[69] SA

Kung later accessed SBOBET and confirmed that it was an illegal Asian online sports wagering

website. *Id.*

SA Lopez observed Darren Phua using another laptop computer, which depicted the login

screen for an illegal sport wagering site; Darren Phua, however, switched to a Google search page

when he saw SA Lopez was approaching his computer. To act like a legitimate technician, SA

Lopez connected the DSL modem to a laptop that DSL contractor had given SA Lopez to use as

part of the ruse. SA Lopez brought up a browser, went to the configuration pages on the modem,

and pretended he was reviewing them. SA Lopez started talking to the occupants of the room,

apologizing for the bad connection and asking if they were able to connect to it. In asking these

questions, SA Lopez knew that the DSL was disconnected and not working. Darren Phua advised

SA Lopez that the DSL was not working, and indicated the red light on the modem. At some point

during these events, one of the unidentified Phua associates, a middle-aged man who seemed

---

purposes so that the waiting agents could respond to a distress call, if necessary. The SA Kung's cell
phone did not record the call.

[68] *See* Exhibit 20, 302 of FBI SA Kung regarding the undercover activities on July 5, 2014 in Villa
8882.

[69] *See* Exhibit 20.

concerned with the connectivity issues, took SA Kung to look at a modem in another room,[70] possibly in Villa 8881, which is connected to Villa 8882 by an internal hallway. Shortly thereafter, SA Lopez called DSL contractor and feigned a conversation that appeared to be about correcting the service outage, but which was, in actuality, a prearranged signal for DSL contractor to reconnect Villa 8882's DSL. The DSL connection was reestablished. The agents confirmed with the occupants that it was working, and then agents left Villa 8882.

Based on all of the information the agents had obtained, from Caesars and from their own investigation, SA Pham sought and received a warrant from United States Magistrate Judge Nancy J. Koppe to search Villas 8881, 8882, and 8888. The warrant was executed on July 9, 2014. Law enforcement agents came to Caesars in street clothes and "staged" in three rooms in the Octavius tower.[71]  Once the operation was "a go," a Caesars' employee led the agents, now dressed in raid gear, into the Villas via internal service elevators. After the agents gained entry to the Villas, they executed the warrants and took photographs that plainly confirm the accuracy of the search warrant affidavits.[72] Various items were then seized as a result of the search.[73]

### III.    ARGUMENT

#### A.    The Applicable Legal Standard

The Fourth Amendment provides that "No warrant shall issue but upon probable cause, supported by oath or affirmation …."  U.S. Const. Amend. IV. The text expressly imposes two requirements in regards to searches and seizures.  First, all searches and seizures must be reasonable.

---

[70] *See* Exhibit 20.

[71] *See* Exhibit 22.

[72] *See* Exhibit 23A-C. 23A which contains photographs showing Villa 8888 on July 9, 2014; 23B which contains photographs showing Villa 8881 on July 9, 2014; and 23C which contains photographs showing Villa 8882 on July 9, 2014.

[73]  *See* Exhibit 24 for a list of items seized and where they were seized from.

1    Second, a search warrant may not be issued unless probable cause is properly established and the

2    scope of the authorized search is set out with particularity.  *See Payton* v. *New York*, 445 U.S. 573,

3    584 (1980).

4            Probable cause is a fluid concept and exists when "there is a fair probability that contraband

5    or evidence of a crime will be found in a particular place."  *See Illinois* v. *Gates*, 462 U.S. 213.  The

6    *Gates* Court set the applicable standards for issuing and reviewing a search warrant:

7           "The task of the issuing [judge] is simply to make a practical, common-sense
            decision whether, given all the circumstances set forth in the affidavit before him,

8           ... there is a fair probability that contraband or evidence of a crime will be found
            in a particular place.  And the duty of a reviewing court is simply to ensure that

9           the [judge] had a 'substantial basis for ... conclud[ing]' that probable cause
            existed."  *Id.* at 238–39 (some alterations in original).

10           The Supreme Court has held that affidavits in support of a search warrant should be tested in

11    a commonsense and realistic fashion, and need only recite sufficient underlying circumstances to

12    enable a judge to perform his detached function and not serve as a mere rubber stamp.  *United States*

13    *v. Ventresca*, 380 U.S. 102 (1965).  Moreover, there is a presumption of validity with respect to the

14    affidavit supporting the search warrant. *Franks v. Delaware,* 438 U.S. 154, 171 (1978).

15           The standard for challenging the validity of a search warrant was established in *Franks*.

16    Under *Franks*, a defendant overcomes the "presumption of validity" that attaches to a search warrant

17    affidavit, 438 U.S. at 171-172, by making a substantial preliminary showing that (1) the affidavit

18    contains intentionally or recklessly false statements or misleading omissions, and (2) the allegedly

19    false information was material to the magistrate's issuance of the warrant.  *Id*. at 155-56.  The

20    Court's evaluation of materiality requires that it consider the effect of any false statements or

21    omissions.  "If an officer submitted false statements, the court purges those statements and

22    determines whether what is left justifies issuance of the warrant."  *See Ewing* v. *City of Stockton*, 588

23    F.3d 1218, 1224 (9th Cir. 2009).  "If the officer omitted facts required to prevent technically true

24

19

statements in the affidavit from being misleading, the court determines whether the affidavit, once

corrected and supplemented, establishes probable cause." *Ibid.* "If probable cause remains after

amendment, then no constitutional error has occurred." *Bravo* v. *City of Santa Maria*, 665 F.3d

1076, 1084 (9th Cir. 2011).

The Ninth Circuit has articulated five requirements a defendant must meet to satisfy the

"substantial preliminary showing" to be entitled to a *Franks* hearing:

> (1) alleging with specificity the portions of the warrant affidavit that are claimed to be
> false; (2) contending that the false statements or omissions were deliberately or
> recklessly made; (3) accompanying the allegations with a detailed offer of proof,
> including affidavits; (4) a challenge to the veracity of the affiant; and (5) establishing
> that the challenged statements are necessary to a finding of probable cause.

*United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (citing *United States v. Dicesare*, 765

F.2d 890, 895 (9th Cir. 1985)).  Under very narrow circumstances, a defendant may be entitled to a

hearing to challenge, in the first instance, the truthfulness of facts set forth in a presumptively valid

affidavit supporting a search warrant.  *Franks,* 438 U.S. at 171-172.  A defendant's attack on an

affidavit, however, must be more than conclusory and supported by more than a mere desire to

cross-examine the officer.  *See id.*  Further, mere allegations of negligence or innocent mistake are

insufficient.  *Id.*

Omissions are not fatal unless they are made with the intent to deceive the court, and they

will not invalidate an affidavit that, on its face, establishes probable cause.  *See United States v.

Botero*, 589 F.2d 430, 433 (9th Cir. 1978); *see also United States v. Hole*, 564 F.2d 298 (9th Cir.

1977).  The burden lies with the defendant to demonstrate that "the affidavit, purged of those

falsities and supplemented by the omissions, would not be sufficient to support a finding of probable

cause." *United States v. Whitworth*, 856 F.2d 1268, 1281 (9th Cir. 1988) (quoting *United States v.

Stanert*, 762 F.2d 775, 782 (9th Cir. 1985); *see also United States v. Jawara*, 462 F.3d 1173, 1188

(9th Cir. 2006), *opinion amended and superseded on denial of reh'g*, 474 F.3d 565 (9th Cir. 2007).

If a challenged statement is necessary for the probable cause determination, then the court must hold an evidentiary hearing.  *Franks,* 438 U.S. at 155-56.  A defendant is not entitled to a *Franks* hearing if allegations of falsities or omissions have no bearing on probable cause.  *United States v. Chavez-Miranda,* 306 F.3d 973, 979 (9th Cir. 2002) (no hearing required because the defendant had offered no evidence to support his claim that omission from an affidavit were reckless or intentionally misleading); *United States v. Capers,* 708 F.3d. 588, 597 (D.C. Cir. 2010) (no hearing required because defendant could not demonstrate that rectified misstatements or omissions allegedly contained in affidavit would negate the finding of probable cause); *accord United Sates v. Martin,* 426 F.3d 68, 74 (2d Cir. 2005 (no hearing required because even after correcting the affidavit for erroneous statement, remaining facts supported probable cause); *United States v. Pavulak,* 700 F.3d 651, 666 (3rd Cir. 2012) (no hearing required because defendant failed to show that omitted information would negate finding of probable cause).

These principles foreclose the Defendants' claims.  Because the affidavit—once corrected and supplemented—would be sufficient to support a finding of probable cause, the Defendants cannot show that any errors or omissions in the affidavit were material to the Magistrate Judge's probable cause determination.  The Defendants do not meet their burden to show entitlement to a *Franks* hearing, and, consequently, their Motion to Suppress should be denied.

## B.  The Affidavit Accurately Characterized the Relationships Between the Occupants of the Villas.

During the course of the investigation, and prior to obtaining the search warrant, agents received a great deal of information about the Defendants and their associates.  This information included, but was not limited to, still photographs from the video surveillance of the Defendants gambling at Caesars Palace (hereinafter "Caesars," *see* Govt.'s Exhibit 2M; hotel registration information showing that all three reservations for the three subject premises were made together,

through the same casino host, *see* Gov't.'s Exhibit 27; financial transaction information; and information about the Defendants and their associates obtained by interviewing Caesars employees. Some of the aforementioned information was included in the search warrant affidavit. *See generally* Def.'s Exhibit C. For example, the affidavit recited that Wei Seng Phua reserved a gambling room, "Salon 7," at Caesars for exclusive use by him and his associates.[74] Based on the information provided by Caesars, Phua and several associates provided casino credit to open the gambling salon.

The agents also knew that the Defendants and their associates had stayed at Caesars in the past. Caesars provided still photographs from the video surveillance depicting some of the Defendants and their known associates gambling at Caesars dating back to 2012, and additional information about the individuals staying in the subject premises. *See* Gov't.'s Exhibits 2F, 2I, and 2M. The information illustrates that Phua and his associates had gambled at Caesars in the past. *Id.* Thus, the video surveillance stills provided by Caesars helped identify the Defendants and assisted in establishing a connection between many of the occupants of three villas.

For example, a surveillance still[75] from June 12, 2014 shows Gyoye Huang, an occupant of villa 8882, gambling at Caesars. Likewise, a still from June 26, 2012 shows Wei San Phua (aka Paul Phua—an occupant of villa 8882 in July 2014) gambling at Caesars, and a still (also from June 26, 2012) shows Boonchai Kasamvillas—an occupant of villa 8882 in July of 2014—gambling at Caesars. A still of Sen Chen Yong (aka Richard Yong—an occupant of villa 8881 in July 2014) shows him gambling at Caesars on June 24, 2013; a still of Wai Kin Yong (an occupant of villa 8881 in July 2014) shows him gambling at Caesars on December 25, 2012. Wen Cui Wang (an occupant of villa 8881 in July 2014) also is captured on one of the stills, gambling at Caesars on June 29, 2012. Similarly, Yung Keung Fan (an occupant of villa 8888 in July 2014) is captured gambling at

---

[74] "Front money" of at least $300,000 is required to reserve any salon at any casino in the State of Nevada. *See* Nevada Gaming Regulation 5.200(2)(d).

[75] Photographs referenced in this paragraph are in Exhibit 2M.

Caesars on December 29, 2013.  A co-occupant of villa 8888, Hui Tang, is also captured on a still gambling at Caesars on December 29, 2013.  Hotel registration information provided by Caesars also showed Phua and his associates checking in and out of Caesars during the relevant period.  *See generally* Govt.'s Exhibit 27.  Law enforcement confirmed that Phua and his associates were residing at the various villas associated to them, including villas 8881, 8882, and 8888, by speaking with Caesars employees and obtaining limited hotel guest registration records. [76]

The Defendants challenge the well-documented relationship between them and their associates by suggesting law enforcement should have taken a closer look at butler's logs from the various villas, or alternatively, that they should have examined video surveillance.  The Defendants contend a review of the logs would have shown whether occupants of villas 8881 dined with the occupants of 8888, or vice versa.  *See* Motion at 17.  This suggestion is speculative and unproductive, as review of the Defendants' Exhibit A at Bates numbers 57, 60, 66-67 and 142 (which was apparently included in an attempt to support the Defendants' assertion regarding the failure of the agents to conduct further investigation) does not include information regarding the exact individuals who were dining or visiting the specific villas.  Rather, it generally identifies individuals as "Main Guest" or "Guest."   *See generally*  Govt.'s Exhibits  37 and 43 (identifying individuals in the logs as "Guest"). Contrary to the Defendants' attempts to argue that the butler logs did not demonstrate an association between the three villas, the logs actually solidify the connection between the villas' occupants.  For example, one log, dated June 28, 2014, revealed that the occupants of villa 8888 were supposed to go to the nightclub Wet Republic with the occupants of "81" and "82."  *See* Government's Exhibit 37 at Bates number 00067.  A second log, dated July 3, 2014, includes notes requesting delivery of "blk ck soup and congee to 81, 82, 83, and 88 at 5:30 p.m.  *Id.* at Bates number 51.  Yet another log, dated June 16, 2014, includes notes that Villas 8881

---

[76] *See e.g.,* Exhibits 2A-M, 3, 9A, and 10.

and 8882 attended a firearms shooting range together. *See* Government's Exhibit 43.

The Defendants' representation that the occupants would need to regularly visit each other in order to run a bookmaking operation is incorrect.  The Defendants were fully aware that while there was a main room where they were running their illegal sports betting business (villa 8888), they could also operate the business remotely–*i.e.*, wherever they had access to the internet.  This is supported, for example, by instant messaging applications and Skype chats recovered from Phua's computer and phone, as well as Darren Phua's phone in villa 8882.  *See generally* Govenrment's Exhibit 33 at Bates numbers 1990-1991 (FBI report discussing Skype chats recovered from Darren Phua's phone showing bets on 2014 FIFA World Cup) and at 1993-2000 (WhatsApp chats discussing betting on 2014 FIFA World Cup); 34 (FBI report discussing Skype chats and messaging about betting World Cup Games from Paul Phua's phone); *see also* Government's Exhibit 32 (draft translation of Customer List[77] identifying contact information, type of currency, and method of betting [web v. phone, etc.]).  Skype and other instant messaging applications are available on computers, as well as tablets, cellphones, or any other mobile internet device.  Moreover, in the case of Skype messaging, individuals can join Skype chats from anywhere they have internet access.  They would merely need to "join" the Skype chat–which can be accomplished from anywhere in the world.

Phua's communication via Skype was also confirmed during an interview of M.D.K., who confirmed he was making wagers with Phua via Skype during the 2014 FIFA World Cup.  *See* Government's Exhibit 29.  Similarly, cellphones recovered from the villas revealed the occupants were in regular communication.  For example, a phone belonging to Paul Phua, who occupied villa 8882, showed that he regularly called Hui Tang, who was an occupant of villa 8888.  *See*

---

[77] The Government notes that the top left-hand corner of the customer list specifically identifies the list as part of "Brazil 2014," which corresponds with the location of the 2014 FIFA World Cup.

Government's Exhibit 35 (showing calls from Paul Phua to Hui Tang at phone number 702-215-1006).  Richard Yong, occupant of villa 8881, was also in regular contact with Hui Tang during several of the World Cup games, to include games on July 4 and 5, 2014.  *See* Government's Exhibit 36 (call logs showing calls from Yong to Hui Tang at 702-215-1006).

The Defendants contend that video surveillance would reveal that the occupants of villas 8881 and 8882 "never" visited villa 8888.  This is incorrect.  Cameras inside Caesars do not capture the front entrance to every villa.  Rather, one angle captures a hallway where various people can be seen entering and exiting the villas, but it appears from a top-down angle, which would not have captured individual faces.  Another angle of the surveillance appears to capture only a carpeted area in the main hallway to the villas.  This, too, would not show who was going in and out of the various villas.  In any event, the footage would not undermine the probable cause determination that an illegal sports betting operation was taking place within the villas.

The Government had ample evidence of the relationships between the occupants of villas 8881, 8882, and 8888.  Consequently, the characterization of those relationships in the affidavit was neither misleading nor inaccurate, and the Defendants' claim fails on that ground.

### C.  With the Exception of One Inadvertent and Immaterial Factual Error, the Affidavit Accurately Characterized the Installation of Equipment in the Villas.

Law enforcement began to investigate the Defendants after Caesars personnel made observations in the Defendants' villas that caused them to be concerned with the possibility of criminal activity and to subsequently alert Caesars management, which in turn alerted law enforcement.[78]  By the time law enforcement became involved in this investigation, Caesars personnel had witnessed and photographed equipment in villa 8888 that established reasonable cause to believe that the Defendants were indeed operating an illegal gambling business using the DSL

---

[78] *See* Exhibits 2A, 2I, 9A, and 10.

1   internet line Caesars had agreed to connect.  *Id.*  Caesars' employees had also already informed law

2   enforcement that the setup in villa 8888 was consistent with an illegal bookmaking operation.[79]

3   Moreover, at the same time the Defendants began to stay in villa 8888, they also occupied villas

4   8881 and 8882.

5          Upon occupying these villas, they asked Caesars to install the same DSL lines and other

6   technology-related items consistent with the equipment that the Defendants had requested for the

7   illegal bookmaking operation in villa 8888.[80]  The Defendants, however, attempt to attack the

8   veracity of the search warrant affidavit by asserting that it seriously mischaracterized the installation

9   of computer equipment.  *See generally* Defendants' Motion at 17-22.  Their Motion, however, fails

10  to demonstrate that the information included in the affidavit was either false or misleading—the

11  central requirement of *Franks*.  They take issue with the representation that eight DSL lines were

12  installed in the villas.  Defendants' Motion at 17-18.  While the affidavit would have been more

13  accurate by reflecting that there was a request made for five (instead of eight) DSL lines for villa

14  8888, that omission or incorrect DSL number is insufficient to warrant a *Franks* hearing because the

15  difference is immaterial.  Further, the Defendants summarily assert that the information regarding

16  the electronics and other requests for technical support is not probative.  Defendants' Motion at

17  18:12.  Such information, however, forms part of the totality of the suspicion-arousing circumstances

18  known to the agents and it is therefore probative.  *See, e.g.*, *United States v. Bishop*, 264 F.3d 919,

19  924 (9th Cir. 2001) (citing *Gates*, 462 U.S. at 238) ("It is well settled that the determination of

20  probable cause is based upon the totality of the circumstances known to the officers at the time of the

21  search.").  Given the subject offenses set forth in the affidavit (*see* Defendants' Exhibit C at para. 2),

22

23

24  [79] *See* Exhibits 2I, 9A and 10.
    [80] *See e.g., Exhibits 8A-B, 13A-B, 12, 47.*

the Defendants' requests for electronics and technical support is certainly something the agents and the Magistrate Judge should have considered in making a determination that probable cause existed.

Below is a chart of the various items regarding villas 8881, 8882, and 8888 that were known to Caesars, its contractors and employees, and/or law enforcement agents knew before the agents engaged the plan to disrupt the Defendants' DSL connection:

| Villa | Request for Complimentary high-speed DSL | Request for Additional Televisions | Request for Additional Fax Machines | Availability of WiFi |
|-------|------------------------------------------|------------------------------------|-------------------------------------|----------------------|
| 8881 | X | X | X | X |
| 8882 | X | X | X | X |
| 8883 | | | | X |
| 8887 | | | | X |
| 8888 | X | X | | X |

Thus, the Defendants' assertion that "the only unusual computer equipment was installed *only* in [v]illa 8888 at the request of *only* that single villa's occupants" (Defendants' Motion at 18) is incorrect.

**D. With the Exception of Two Inadvertent and Immaterial Factual Errors, the Affidavit Accurately Characterized Significant Financial Transactions among the Residents of the Three Villas.**

As detailed in the search warrant affidavit, the agents were aware of the numerous and suspicious financial transactions between several of the Defendants and their associates. *See generally* Defendants' Exhibit C, at para. 15-17. Prior to drafting the affidavit, agents reviewed casino records and spoke with casino personnel to gather information about the financial activities of the Defendants and their associates.[81] The records, in part, formed the basis for the information

---

[81] *See,* Exhibit 2F. *But see,* Exhibit 21 for updated financial information received after the affidavits were executed.

included in the search warrant affidavit.  Most importantly, at the time the search warrant was submitted, the agent believed in good faith that it was true and accurate; consequently, any inaccuracy was not the result of an intentional falsehood or reckless disregard for the truth.

After execution of the search warrant, the affiant learned of two misstatements in the affidavit.  First, paragraph 15 of the affidavit states "Phua also recently deposited four certified checks totaling $4 million from an originating account at the Bank of China, located in Macau, with the casino to secure a casino marker."  The sentence should have read: "**Seng Chen Yong** also recently deposited four certified checks totaling $4 million from an originating account at the Bank of China, located in Macau, with the casino to secure a casino marker."  Second, subsection (ii)(f) of paragraph 16 states that Boonchai Kasamvillas transferred "$3 million to Herman Chun Sang Yeung."  It should have read: Boonchai Kasamvillas transferred "$3 million to **Chuchai Waraporn**."

While incorrect, those two later-discovered errors were not intentional, reckless, or misleading.  More importantly, the errors were not material to the Magistrate Judge's issuance of the warrant.  The remaining transactions in the affidavit were accurate.  They include the following transactions, which took place between May 9, 2014 and June 27, 2014:

    i.    Wei Seng Phua (occupant of villa 8882) transferred $3 million to Gyouye Huang (occupant of villa 8882);

    ii.    Boonchai Kasamvillas (occupant of villa 8882) transferred (a) $300,000 to Tawee Aroonpornwong; (b) $300,000 to Thongchai Awvutmangkil; (c) $300,000 to Suwit Kamonwaranon; (d) $300,000 to Yut Sonthildphon; and (e) $3 million to Thanarath Thanavutwatthana;

    iii.    Hui Tang, (occupant of villa 8888) transferred $3 million to Yung Keung Fan (occupant of same);

28

iv. Sen Chen Yong (occupant of villa 8881) transferred: (a) $3 million to Cho Ieng Chan; (b) $1 million to Ping San Chan; (c) $3 million to Tsz Man Lee; (d) $3 million to Hui Tang (occupant of villa 8888); (e) $3 million to Wen Cui Wang (occupant of Villa 8881); and (f) $3 million to Keung Fan Yung (occupant of villa 8888);

v. Sen Chen Yong (occupant of villa 8881) wire transferred approximately $4 million from an originating account at the Bank of China into Yong's Caesars account located in the United States;

vi. Wei Seng Phua or one of his associates wired an additional $985,561 from the Seminole Casino in Fort Lauderdale, Florida, into Yong's Caesars account; and

vii. Seng Chen Yong also recently deposited four certified checks totaling $4 million from an originating account at the Bank of China, located in Macau, with the casino to secure a casino marker.

The Defendants assert (Defendants' Motion at 23) that there is "nothing suspicious" about the money transfers between the Defendants and their associates. They attempt to bolster that assertion with a "Sports Wagering Expert's Report" (*see* Defendants' Exhibit G at 8-14), and suggest that this Court take that "report" and evaluate it in a vacuum—without considering all the other factors that established probable cause that illegal bookmaking was occurring. Evaluating the report in such a manner would be contrary to the well-established law that the probable cause determination must be two-fold. *Ornelas v. United States*, 517 U.S. 690 (1996). First, judges must determine the "historical facts," including the events leading up to the search. *Id.* at 690; second, judges must decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," amount to probable cause. *Id.* at 690; *United States v. Watson,* 423 U.S. 411, 423 (1976) (explaining that law enforcement should seek warrants where practicable to do so

29

and their judgments about probable cause are more likely to be accepted when backed by a magistrate).

The Defendants' "expert" report cannot be considered as part of the historical facts known to the agents at the time they were seeking the search warrant, for the simple reason that it did not exist. Even if this Court were to consider the report, however, it would not defeat the Magistrate Judge's probable cause determination. The information included in the report is precisely why the agents were seeking a search warrant, that is, based on a probable cause determination to search the three villas, agents sought evidence of an illegal sports betting operation. Further, the expert's report does not provide any reliable information regarding the financial transactions the agents deemed suspicious. First, the "expert" is *not* an expert on financial transactions or junkets. *See* Defendants' Exhibit G at 8-14. He is also not an expert regarding what law enforcement would deem to be suspicious transactions. Nonetheless, the expert provides information to this Court about junkets (s*ee generally* Doc. No. 229-7 at para. 22-24), but he fails to include key information, such as the fact that an individual *cannot* use credit to place sports bets in lawful sports books. That is not the case when it comes to an illegal sports betting operation like the one present in the instant case; junkets were used in the Defendants' unlawful sports book operation. *See* Government's Exhibit 50 (junket/settlement sheet); *see also* Government's Exhibit 51 (Betting Strategy spreadsheet discussing settlement channels). The Government can only assume that the expert was paid to include information in his affidavit about junkets in an attempt to lend legitimacy to the very transactions that law enforcement reasonably deemed were suspicious.

Contrary to the Defendants' suggestion otherwise, law enforcement may use their experience, training, and expertise to draw limited inferences of criminal activity from behavior that is not facially criminal, or, that can be alternatively explained away in an innocent fashion. *See McDonald v. United States*, 335 U.S. 451, 454-455 (1948) (probable cause for search warrant

because sounds of adding machine corroborated suspicious behavior of suspects under surveillance for running an illegal "numbers" game); *Texas v. Brown*, 460 U.S. 730, 742-43 (1983) (plurality opinion) (probable cause to arrest when experienced police officer, who knew that drugs are frequently transported in party balloons, inferred that party balloon observed in plain view contained narcotics); *United States v. Ewing*, 638 F.3d. 1226, 1233 (9th Cir. 2011) (probable cause to search vehicle when officer observed money stuffed into padding of door because circumstances presented fair likelihood that money was involved in money laundering).  In this instance, given the totality of information known about Phua and his associates to law enforcement, the financial transactions were reasonably believed to be suspicious by the agents.

Finally, the Defendants attempt to attack the import of the financial transactions and how they give rise to probable cause, as well as the association between the Defendants and the three subject premises, by claiming that omitting nine of the fourteen transactions detailed in the search warrant affidavit from the criminal complaint shows that the Government "harbor[ed] grave doubts" about them.  *See* Defendants' Motion at 27.  This is not so. In fact, the Government simply deleted transactions involving individuals who were *not charged* in the criminal complaint.  Contrary to the suggestion that the Government deleted the transactions based on doubts, the facts show that the deleted transactions were not relevant to the Magistrate Judge's probable cause determination for purposes of the complaint.

### E.       No Constitutional Violation Occurred when Nevada Gaming Control Board Special Agent Ricardo Lopez Accompanied M.L.W. to Deliver and Set Up a Laptop Computer at the Request of the Occupants of Villa 8882.

"Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person."  *United States* v. *Snype*, 441 F.3d 119 (2d Cir. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  This consent exception

balances the "values reflecting the concern of our society for the right of each individual to be let alone," with the reality that "[i]n situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." *Schneckloth*, 412 U.S. at 228, 242 (citation omitted).

Courts routinely uphold searches where law enforcement officers (or individuals working with law enforcement) gained consent to enter through the use of trickery or deception. In the seminal case of *Lewis v. United States*, 385 U.S. 206 (1966), for example, an agent gained entry to the defendant's home by pretending to be a drug buyer. *Id.* at 207. In denying suppression, the Supreme Court stressed that the defendant "invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics," *id.* at 210, and that the agent acted within the scope of the license he was granted:

> During neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business. Were we to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional *per se*. Such a rule would, for example, severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest.

*Id.* at 210. Although in *Lewis* the defendant invited the agent into his home to engage in illegal activity, lower courts have applied that decision more broadly, interpreting *Lewis* as supporting the broader proposition that "the Fourth Amendment affords no protection to the person who voluntarily reveals incriminating evidence to one who is a government agent in the mistaken belief that the latter will not disclose it." *United States* v. *Haden*, 397 F.2d 460, 464 (7th Cir. 1968).

So, for example, in *United States v. Wagner*, 884 F.2d 1090 (8th Cir. 1989), a UPS delivery man and an undercover officer posing as a UPS employee delivered a package to the defendant, who

32

agreed to accept the C.O.D. delivery.  *Id*. at 1094.  When the defendant entered the house to write a

check, the two men followed, and the officer "detected a strong chemical odor that he associated

with the manufacture of methamphetamine."  *Ibid*.  The court of appeals rejected the defendant's

argument that evidence obtained during the execution of a subsequent search warrant should be

suppressed because the warrant was issued based on "information gleaned from [the officer's]

warrantless entry into the house, gained by his deception in posing as a UPS employee."  *Ibid*.

Relying on *Lewis*, the Eighth Circuit explained:

> [T]he Supreme Court held that the Fourth Amendment does not categorically prohibit
> a law enforcement agent from gaining entry into private homes by misrepresenting
> his identity.  As we explained in *United States v. Shigemura*, 682 F.2d 699 (8th Cir.
> 1982), cert. denied, 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983), one who
> consents to an undercover agent's entry into his house "has no legally enforceable
> expectation that [the agent] is not an undercover police officer."  *Id*. at 706.

> After reviewing the relevant law with regard to warrantless entries gained by ruse, the
> District Court concluded that Officer McAllister's entry did not violate the Fourth
> Amendment.  * * *  That conclusion was based on an implicit finding, which on this
> record we cannot say is clearly erroneous, that Michael Wagner, believing Officer
> McAllister to be a delivery person, consented to his entry.  * * *  Accordingly, we
> conclude that the warrants were not tainted by any illegality and that the District
> Court therefore properly declined to suppress the evidence seized in the May 6, 1988
> searches.

*Id*. at 1094-1095 (footnote omitted); *see also United States v. Baldwin*, 621 F.2d 251 (6th Cir. 1980)

(seizure of drugs by undercover agent who worked as defendant's chauffeur and handyman did not

violate Fourth Amendment, because "The Fourth Amendment * * * does not protect wrongdoers

from misplaced confidence in their associates"); *State* v. *Stevens*, 123 Wis.2d 303, 367 N.W.2d 788

(1985) (applying *Lewis* to find no violation where garbage collector did not disclose that he had

agreed to deliver defendant's garbage to the police); *United States* v. *Scherer*, 673 F.2d 176 (7th Cir.

1982) (agent came onto defendant's property posing as a cousin of the informer defendant had

invited to build duck blinds and defendant's wife gave broad permission to look around for wood to

build the duck blinds; a government agent may obtain an invitation onto property by misrepresenting

his identity, and if invited, does not need probable cause nor warrant to enter so long as he does not

exceed the scope of his invitation) ; *United States v. Wright*, 641 F.2d 602 (8th Cir. 1981) (agent

pretended to have car trouble and wanted to borrow tools); *United States v. Lord*, 230 Fed. Appx.

511, 514 (6th Cir. 2007) (consent voluntary where government agents posing as real estate investors

gained access to an individual's bedroom and bedroom closet).

       This precedent forecloses the Defendants' claim that Special Agent Lopez violated their

Fourth Amendment rights when he posed as a service technician and accompanied M.L.W. to villa

8882 to deliver and set up the laptop computer that an occupant of villa 8882 had specifically

requested.  Like the defendant in *Wagner* who ordered a product to be delivered to his home through

UPS, an occupant of villa 8882 ordered a laptop to be delivered to the villa by a Caesars employee or

contractor.  Neither Wagner nor the occupants of villa 8882 had any basis to complain that the

individual they invited into their protected place was in fact an undercover law enforcement officer.

*See Wagner*, 884 F.2d at 1095 ("[O]ne who consents to an undercover agent's entry into his house

'has no legally enforceable expectation that [the agent] is not an undercover police officer'")

(quoting *United States v. Shigemura*, 682 F.2d 699 (8th Cir. 1982)).[82]

---

[82] *See also United States v. Scherer,* 673 F.2d 176, 181 (7th Cir. 1982).  In *Scherer*, the law
enforcement agent came onto defendant's property posing as a cousin of an informer that the
defendant had invited to build duck blinds.  The agent was represented as the informer's cousin who
was going to assist in the building process.  The agent's real intent was to look for firearms on the
property.  The defendant's wife gave the informer and the agent broad permission to look around for
wood to build the duck blinds.  The court upheld the search and firearms seized, finding that a
government agent may obtain an invitation onto property by misrepresenting his identity, and if
invited, does not need probable cause nor a warrant to enter so long as he does not exceed the scope
of his invitation.  The fact that law enforcement in the instant case engaged in misrepresentation to
come into the villa in hopes of observing evidence does not undermine the voluntary consent the
Defendants had given for both the technician and officer.  *Id.*  ("The fact that the agents were aware
before the visit that the two Thompson submachine guns were lying in Scherer's barn does not take
this case out of the consent exception to the Fourth Amendment's warrant requirement.").

34

**F.    The Affidavit, Purged of Information Gleaned from the Entries into Villas 8881 And 8882 that Were Prompted by Law Enforcement's Disruption of the DSL Service to Those Villas, Would Still Have Justified the Issuance of the Warrant, and thus Suppression is Unwarranted.**

As noted above, while information gleaned from the entries into villas 8881 and 8882 that were prompted by law enforcement's disruption of the DSL service was lawfully obtained under the specific facts of this case and properly included in the affidavit,[83] even assuming the Magistrate Judge should not have been asked to consider the information, such a conclusion does not mean that the evidence obtained during the execution of the search warrant should be suppressed.[84]  To prevail on a claim that law enforcement procured a warrant through deception, the party challenging the warrant must show that the affiant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009).  The Court's evaluation of materiality requires that it consider the effect of any false statements or omissions.  "If an officer submitted false statements, the court purges those statements and determines whether what is left justifies issuance of the warrant." *Id*. at 1224.  "If the officer omitted facts required to prevent technically true statements in the affidavit from being misleading, the court determines whether the affidavit, once corrected and supplemented, establishes probable cause." *Id*.  "If probable cause remains after amendment, then no constitutional error has occurred." *Bravo* v. *City of Santa Maria*, 665 F.3d 1076, 1084 (9th Cir. 2011).

Here, the question is whether the affidavit—purged of paragraphs 13 and 14, and corrected with respect to the five DSL lines requested for villa 8888, wherein resided the depositor of $4

---

[83] *See* Government's Response in Opposition to Defendant's Motion to Suppress Warrantless Searches.

[84] This assumption should also not be interpreted as supporting the Defendants' implied accusations that the agents withheld information about the ruse from the affidavit because they knew, or had been told, that their conduct was unlawful.

million with the casino and the recipient of the $3 million transfer from Boonchai Kasamvillas—would establish probable cause to justify the Magistrate Judge's issuance of the search warrants for villas 8881 and 8882.  This Court should answer that question in the affirmative, and deny the Defendants' Motion.

At a minimum, before seeking a federal search warrant for the three subject premises, agents from the Nevada Gaming Control Board ("NGCB") and the FBI already knew that Defendant Phua had recently left Macau after being arrested for operating an illegal gambling ring.[85]  They also knew that Phua (a known member of the 14k Triad criminal enterprise) and his associates had arrived in Las Vegas on his personal Lear jet,[86] and that they were occupying several luxury villas at Caesars Palace.  Further, law enforcement knew that, prior to their arrival, the Defendants had made numerous "special" requests for their complimentary luxury villas, including the addition of numerous television screens, DSL internet connections, and extra fax machines.  *See* Government's Exhibit 12 (affidavit from DSL contractor, M.L.W.).  The request for the DSL internet connection was made despite the fact that Caesars already provides 24/7 Wi-Fi internet to all guests.[87]  Moreover, the request for extra fax machines was made despite the fact that each luxury villa comes equipped with fax machines.  *See* Government's Exhibit 12 at para. 11.

Additionally, law enforcement had already been informed that Caesars employees themselves were suspicious of illegal activity inside the villas occupied by Phua and his associates.  Indeed, two Caesars engineers told the casino's security personnel that the equipment in villa 8888

---

[85] *See* Government's Exhibits 1 and 2B, Public Source Information Regarding Arrests in Macau.

[86] It is now known that Phua and his associates bribed their way out of Macau.  Evidence collected from Darren Phua's cellphone reveals that $4-5 million Hong Kong dollars was paid for Phua to get out of the country.  *See* Government's Exhibit 7.

[87] The Government notes that Defendant Phua was paying for the 24-hour access to Wi-Fi in villa 8882 from June 28, 2014 through July 18, 2014.  *See* Government's Exhibit 25A.

appeared to be a setup for an illegal gambling operation.[88]

Further, in response to the defendants and their requests, Caesars employees who entered villa 8888 to assist with the numerous requests for additional equipment, took photographs of the inside of the villa for quality control purposes. *See* Government's Exhibits 2A, 2I, and 11 (photographs). The photographs were initially provided to Caesars Luxury VIP services; however, they were eventually provided to the security for Caesars Palace. *Id*. Security personnel looked at the photographs and felt that the equipment in villa 8888 appeared to be a setup for an illegal gambling operation. *Id.*

Moreover, law enforcement was informed that the occupants of villas 8881 and 8882 had made requests for the similar equipment and technology that led Caesars employees to believe villa 8888 was setup as an illegal bookmaking operation; the only exception being that villa 8888 never requested an additional fax machine.[89]

Supplied with the foregoing facts, and other information, agents from the FBI and the NGCB commenced a more thorough investigation into Phua and his associates. Agents from the FBI and the NGCB did not initiate their investigation into the Defendants and their associates until, at the earliest, June 25, 2014. One part of that more extensive investigation included utilizing a ruse. The ruse entailed disrupting the specially-installed DSL connections to villas 8881, 8882 and 8888.[90] The ruse, which was created in part by the suggestion of a civilian Caesars DSL contractor, M.L.W.,

---

[88] *See* Government's Exhibit 2A and 2I; *see also* Government's Exhibits 9A and 10 (FBI report documenting a subsequent interviews which confirmed the information in 2A and 2I, including confirming identification of photographs).

[89] *See e.g.,* Exhibits 8A-B, 13A-B, 12 p. 2 para. 4, and 47.

[90] The Defendants challenge the legality of the ruse in their Motion to Suppress (Doc. #229). While the Defendants allege that the ruse is illegal in the instant Motion, the Government will not address that allegation herein. Rather, the Government adopts and incorporates the arguments demonstrating the legality of the ruse from its response to the Motion to Suppress.

37

was designed to have the Defendants call for internet assistance.  The ruse was created in part as a result of the Defendants' previous actions of calling for internet service.  *See generally* Government's Exhibits 8A-B; 13A-B.  Based on those requests, in the days and weeks before law enforcement entered the villas, the Defendants had repeatedly allowed Caesars employees and other individuals into the same private areas.  *Id.*

The Defendants complain that the information regarding the details of the ruse were not included in the search warrant affidavit, *see generally* Doc. No. 232 at 8-10, contending that the information was omitted because it was unlawful.[91]  The Government concedes that the information regarding the ruse was not, and should have been, included.  But that does not, under *Franks*, equate to an attempt to recklessly or deliberately mislead the Magistrate Judge.  The Defendants fail to adduce any evidence to support this point and there has been not, nor will there be, any concession that the ruse itself under the specific factual circumstances of this case was unlawful.

While erroneously omitted from the search warrant affidavit, the omission was the result of at least several factors: at the time the agents applied for the search warrant, they believed the technique was protected; the search warrant was obtained during a live, time-sensitive operation;[92]

---

[91] The Defendants misinform this Court that one of the Assistant United States Attorneys assigned to the case knew the ruse was unlawful and advised Caesars accordingly.  *See* Doc. No. 232 at 13 (citing to Defendants' Exhibit A at Bates number 3829).  Their misguided argument is based solely on an email, which was not composed by said Assistant United States Attorney ("AUSA"), and which contains hearsay regarding an unrelated issue.  In fact, that email referenced a request from Caesars Entertainment to the U.S. Attorney's Office to grant permission to disconnect *Cox Cable* services.  The AUSA informed the agents, and Caesars Entertainment, that the decision to disconnect the cable was up to Caesars and its employees.  The AUSA further correctly advised that the U.S. Attorney's Office could not grant such authority.  The email that purportedly captures that conversation is based on double hearsay.  *See* Defendants' Exhibit A at Bates number 3829.  The representation that the AUSA expressly informed the agents and Caesars that this ruse was unlawful is thus false.

[92] The time-sensitive nature of the operation was exacerbated when NGCB Special Agent Lopez received a phone call from Caesars Entertainment advising that a senior executive knew details about the FBI and "Gaming" seeking search warrants for the villas at issue.  This was a significant

and the agents needed to protect the ongoing assistance of a civilian.  The second factor was demonstratively reasonable given that one of the Defendants had just fled Macau after being arrested for similar offenses and had access to a personal Lear jet.[93]  Finally, while not confirmed until after the fact, law enforcement believed that Phua and his associates had bribed their way out of Macau.  *See* Government's Exhibit 7.  The Defendants' access to remarkable sums of money was a grave concern to law enforcement.

As revealed from the statement of facts, as well as the information contained herein, once corrected and supplemented with information about the ruse, probable cause still exists in abundance.  Prior to any law enforcement involvement, Caesars had amassed ample evidence of possible criminal activity to warrant further investigation, notably Phua's arrest in Macau, the computer/electronic set-up in villa 8888, the requests for similar equipment in villas 8881 and 8882, and the known association between the occupants of all three villas.  That information was known to law enforcement *before* putting the ruse into action.  The omitted information about the ruse would have revealed that the ruse was first put into action on the morning of July 4, 2014.  *See* Government's Exhibit 12 at para.16.  Agents, with the assistance of DSL contractor attempted to disrupt service to villas 8882 and 8888 by disconnecting the DSL.  The attempt was made prior to the DSL contractor and Special Agent Lopez going into villa 8882.[94]

---

red flag for the case agent because there were very limited individuals who knew of the ongoing investigation.  The phone call demonstrated that sensitive information about the investigation was being leaked to non-law enforcement personnel.

[93] The Defendants' ability to leave the country on a whim is evidenced by the fact the Phua left Las Vegas on July 1, 2014 and flew to London, England.  He returned approximately 48 hours later.  This information was confirmed though Department of Homeland Security records.

[94] Their entry into villa 8882 was prompted by a request from that villa's occupants (which included Wei Seng Phua) which came very early in the morning of July 4, 2014, at 5:58 a.m. Government's Exhibit 12 at para 14.  This request, which is detailed in the search warrant affidavit at para. 12, was *not prompted* by law enforcement or any individuals assisting law enforcement with the instant investigation.  *Id.*  Further, it was completely unconnected to the ruse.  DSL contractor responded to

In the morning of July 4, 2014, DSL contractor and Special Agent Lopez, acting in an undercover capacity, delivered the laptop to villa 8882.  As detailed in the search warrant affidavit, and verified by DSL contractor's affidavit (Government's Exhibit 12), it was during this delivery attempt that an Asian male butler employed by Caesars restricted DLS contractor and Special Agent Lopez's access to the butler's pantry.  *See* Government's Exhibit 12 at para. 14.  The butler was adamant that the contractor and Special Agent Lopez not leave the pantry, and further clearly indicated that he wanted them to drop off the laptop and immediately leave.  *Id*.  According to the DSL contractor, the butler's behavior was unusual because it appeared aggressive and demanding, and he and his company had enjoyed a long-term, positive relationship with Caesars employees.  *Id.* The DSL contractor's affidavit also provides that he has never previously had a similar reception from a butler.[95]

Despite the attempts to disconnect DSL service for what agents believed were villas 8882 and 8888, a call for service only came from villa 8881.  That call for service came *after* the DSL contractor delivered the laptop to villa 8882.  Government's Exhibit 12 at para. 17.  It was at that time that the DSL contractor realized that the documentation about which DSL line ran to which unit was incorrect, and that instead of disconnecting 8882 and 8888, Wood TMS had accidentally disconnected the DSL for villas 8881 and 8888. The DSL contractor then reconnected the service for villas 8881 and 8888.  *Id.* at para. 18.  A call for service for villa 8888 was never received by DSL contractor or Wood TMS.[96]  *Id.* at para. 17.

---

the request, and advised that he had an extra laptop and that he would deliver it to villa 8882 as soon as possible.  *Id.*  He then informed law enforcement of the request for the laptop.

[95] Given the unusual nature of the encounter with the butler, and the other activity going-on within villa 8882, M.L.W. informed the agents that from that point forward, neither M.L.W. nor any of his employees would go into villa 8882.  *See generally* Government's Exhibit 12 at para. 15.

[96] A call for internet service to villa 8888 was likely not placed because the occupants had access to numerous internet-capable cellphones, including cellphones that could be used as mobile hotspots, as

"Suppression should be ordered only if the warrant application, ... clarified by disclosure of previously withheld material, no longer demonstrates probable cause," but not because the previously withheld material is limited to the information the defendant recommends. *See, e.g. United States v. Stewart*, 337 F.3d 103, 105 (1st Cir. 2003). The Ninth Circuit has established that facts omitted from an affidavit (and, that are necessary to prevent it from being misleading) should be corrected and supplemented. *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (emphasis added) (referencing *Liston v. County of Riverside*, 120 F.3d 965, 973-74 (9th Cir. 1997). After reviewing the corrected, supplemented affidavit, the court then determines if it establishes probable case. *Id.* ("If [an] officer omitted facts required to prevent technically true statements in the affidavit from being misleading, the court determines whether the affidavit, *once corrected and supplemented*, establishes probable cause."); *see also United States v. Whitworth*, 856 F.2d 1268 (9th Cir. 1988) (supplement with search warrant omissions and then determine if probable cause exists). "It is well-settled that the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001) (*citing Gates*, 462 U.S. at 238).

While the omitted information regarding the ruse does supply additional information regarding the scope of the investigation, the omissions were not intentional, reckless, or–critically– *material* to the probable cause determination. If anything, the information reveals–yet again–that the Defendants took no efforts to conceal their illegal activities from Caesars employees. Time and time again, private individuals entered the subject premises to perform various tasks. During those times, just like during the entry of undercover agents, the Defendants alone consented to the employees'

---

well as four mobile Wi-Fi hotspots. *See* Government's Exhibit 24 (list of items recovered during search warrant). Alternatively, it is possible that no one was in the villa at the time the DSL connection was disrupted, given that the main occupant of villa 8888, Hui Tang, also had a suite reserved at the Bellagio during the same time period. Tang was arrested at that Bellagio on July 13, 2014.

entrances and chose *not* to exclude them or conceal their illegal activities.  In determining whether

an omission was material, "the pivotal question is whether an affidavit containing the omitted

material would have provided a basis for a finding of probable cause."  *United States v. Chavez-*

*Miranda*, 306 F.3d 973, 979 (9th Cir. 2002). *Id*. (quoting *United States v. Garcia-Cruz*, 978 F.2d

537, 541 (9th Cir. 1992)).  The Defendants have failed to meet this burden that therefore suppression

in this instant case is not warranted.  *Accord United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir. 1994);

*United States v. Burnes*, 816 F.2d 1354, 1358 (9th Cir. 1987) (mere negligence is not sufficient to

warrant a *Franks* hearing); *United States v. Kiser*, 716 F.2d 1268, 1274 (9th Cir. 1983) (defendant

must demonstrate false or misleading information included to deliberately or recklessly mislead the

magistrate); *Franks*, 438 U.S at 171 ("Omissions or misstatements resulting from negligence or good

faith mistakes will not invalidate an affidavit which on its face establishes probable cause.").

> **i.**    **Undercover Agents were Provided Detailed Training in Order to Appear Like Legitimate DSL Service Technicians.**

The Defendants also argue that the search warrant should be invalidated because it contained

false information regarding the fact that the DSL contractor provided NGCB Special Agent Lopez

and FBI Special Agent Mike Kung instructions on how to fix the DSL so as to appear like "real"

technicians.  *See* Doc. No. 232 at 9-10.  The Defendants contend that this information was false and

misleading because the only way for the DSL to be fixed was from outside of the villas.  *Id.* at 10.

But while the DSL had been disconnected from outside the villas, Special Agents Lopez and Kung

were given instructions on how to "fix" the DSL in order for the Defendants to believe they were

legitimate technicians.  *See* Government's Exhibit 12 at para. 26.  Thus, this information is not false.

At worst, the information is misleading because the affidavit omitted the additional information

about the ruse.  By supplementing the warrant with the information about the ruse, the information

regarding the agents' instructions on how to fix the DSL only further explains the scope of the

42

investigation and the ruse.  Supplementing and correcting the affidavit with the "ruse information" does not render paragraph 14 of the search warrant affidavit false, and it certainly has no bearing on the probable cause determination.  Thus, the Defendants cannot demonstrate the required materiality (*see Chavez-Miranda*, 306 F.3d at 979) and this, too, provides no basis for suppression of the evidence.  *See Kyllo*, 37 F.3d at 529; *Burnes*, 816 F.2d at 1358; *Kiser*, 716 F.2d at 1274; *Franks*, 438 U.S at 171.

### G. Even if this Court Determines the Inclusion of Information About the Ruse Would Impact the Magistrate Judge's Probable Cause Determination, the Evidence Should Not Be Suppressed Because the Evidence Would Have Been Inevitably Discovered.

Based on the foregoing points, authorities, and arguments, the Government does not concede that omissions about the ruse from the search warrant affidavit render it invalid.  However, in the event this Court disagrees, the Government asserts that evidence seized from the three subject premises should not be suppressed pursuant to the inevitable discovery doctrine.   Under "the 'inevitable discovery' exception to the fruit-of-the-poisonous-tree doctrine . . . evidence that is illegally obtained is nonetheless admissible if it 'would inevitably have been discovered through lawful means.'"  *United States v. Pulliam*, 405 F.3d 782, 790-91 (9th Cir. 2005) (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989)).  The Government bears the burden of proving "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."  *Nix v. Williams*, 467 U.S. 431, 444 (1984); *see also United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000).

Here, as shown in the statement of facts and the additional information provided to the Court, the agents could have obtained a search warrant for the three subject premises without ever initiating the ruse.  Through the assistance of the Defendants and their willingness to share their criminal activities with Caesars personnel, sufficient evidence of possible criminal activity existed prior to law enforcement disrupting the DSL service to the three villas. That evidence included Phua's arrest

in Macau, the computer/electronic setup in villa 8888 (clearly demonstrated by photographs), the requests for similar equipment in villas 8881 and 8882, the known association between the occupants of all three villas, and the suspicious financial transactions between the occupants of all three villas.  That evidence was strengthened when the occupants of villa 8882 requested a courtesy laptop be delivered by the DSL contractor.  When he and Special Agent Lopez entered villa 8882 to drop it off, they heard sounds consistent with the World Cup Game being watched there.

The Government assumes that the Defendants will assert that watching a soccer game is not illegal.  That argument, however, is not credible because it fails to account for and consider the information already known to law enforcement prior to delivering the laptop, or the fact that the agents had sufficient probable cause to obtain search warrants for crimes related to unlawfully operating a sports betting operation and illegal transmission of wagers.  Those warrants could (and would) have been obtained without ever disrupting the DSL service.

Thus, the agents could have secured search warrants for the three locations without ever putting the ruse into action.  The result of obtaining those warrants would be the recovery of the same evidence recovered from villas 8881, 8882, and 8888 pursuant to the instant search warrant; consequently, they would have been inevitably discovered and should not be suppressed.

**CONCLUSION**

WHEREFORE, after consideration of the included facts, points, authorities, and arguments, the United States respectfully requests that this court DENY Defendants' Motion (doc. no. Doc. No. 232).  The facts of this case are unique.  First and foremost, search warrants are presumptively valid.  Under *Franks*, a defendant overcomes the presumption of validity that attaches to a search warrant affidavit by making a substantial preliminary showing that both the affidavit contains intentionally or recklessly false statements or misleading omissions, *and* that the allegedly false information was material to the magistrate's issuance of the warrant.  Under very narrow circumstances, a defendant

1  may be entitled to a hearing to challenge, in the first instance, the truthfulness of facts set forth in a

2  presumptively valid affidavit supporting a search warrant.  A defendant's attack on an affidavit,

3  however, must be more than conclusory and supported by more than a mere desire to cross-examine

4  the officer.  Further, mere allegations of negligence or innocent mistake are insufficient.

5       Based on the argument above, Defendants have not made either showing.  Accordingly, the

6  Court should find that Defendants' Motion fails.

7       DATED this 10th day of November, 2014.

8                                                    Respectfully submitted,

9                                                    DANIEL G. BOGDEN
                                                     United States Attorney
10
                                                           //s//
11                                                   _____
                                                     KIMBERLY M. FRAYN
12                                                   PHILLIP N. SMITH, JR.
                                                     Assistant United States Attorneys

13

14

15

16

17

18

19

20

21

22

23

24

1

## CERTIFICATE OF SERVICE

2

This is to certify that the undersigned has served counsel for Defendants with the foregoing

3

by means of electronic filing.

4

DATED:  November 10, 2014.

5

_____/s/_____

6

KIMBERLY M. FRAYN
Assistant United States Attorney

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24