UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                   Plaintiff,<br><br>        v.<br><br>WEI SENG PHUA, et al.,<br><br>                                   Defendants. | Case No. 2:14-cr-00249-APG-PAL<br><br>REPORT OF FINDINGS AND<br>RECOMMENDATION<br><br>(Jt. Mtn to Suppress - Dkt. #232) |

Before the court is Defendants' Joint Motion to Suppress Fruits of Search Warrant Pursuant to *Franks v. Delaware* (Dkt. #232) which was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  The court has considered the Motion, the government's Response (Dkt. #230), Defendants' Joint Reply (Dkt. #300), the voluminous exhibits attached to the moving and responsive papers, as well as evidence adduced at an evidentiary hearing conducted December 15-18, 2014.  For the reasons explained below, the court will recommend that the motion to suppress be granted.

## BACKGROUND

### I.      Procedural History.

Defendants Wei Seng ("Paul") Phua and Darren Wai Kit Phua were initially charged in a criminal Complaint (Dkt. #1) on July 14, 2014.  They were released on cash bonds with Pretrial Services supervision and other conditions following a detention hearing at their initial appearance.  *See* Minutes of Proceedings (Dkt. #20).

On July 29, 2014, the grand jury returned an Indictment (Dkt. #86) charging Defendants with one count of transmission of wagering information in violation of 18 U.S.C. § 1955, and

one count of operating an illegal gambling business in violation of the laws of the State of Nevada, and aiding and abetting in violation of 18 U.S.C. § 2.  The indictment alleges that not later than June 6, 2014, and continuing through July 9, 2014, the Defendants aided and abetted each other and others known and unknown in the business of betting and wagering by knowingly using a wire communication facility for the transmission in interstate and foreign commerce of bets and wagers, information assisting in placing bets and wagers on the World Cup soccer tournament in violation of 18 U.S.C. § 1084(a) and 18 U.S.C. § 2.  Count Two alleges that beginning no later than June 6, 2014, and continuing through July 13, 2014, the Defendants aided and abetted each other and others known and unknown in conducting and financing, managing, supervising, directing and owning all or part of an illegal gaming business involving sports betting in violation of the laws of the State of Nevada.  The sports betting business involved five or more persons, remained in continuous operation for a period in excess of thirty days, and had a gross revenue of $2,000 in any single day in violation of 18 U.S.C. §§ 2, 1955. The indictment contains forfeiture allegations.

Briefing of this motion was delayed while the parties attempted to resolve the case against all of the Defendants by plea negotiation.  After the joint motion to suppress was filed, five of the eight Defendants charged in the initial criminal Complaint (Dkt. #1) reached plea agreements with the government, waived indictment, and pled guilty to a misdemeanor Superseding Information (Dkt. #325).  The government did not seek an indictment against a sixth Defendant initially charged in the criminal complaint.

## II.   Defendants' Joint Motion to Suppress.

The motion to suppress was jointly filed on behalf of all of the Defendants initially charged in the complaint.  As indicated, five of the Defendants pled guilty and have now been sentenced.  The Phuas, father and son, are the only remaining two Defendants.  During a status and scheduling conference conducted December 12, 2014, before the December 15, 2014, evidentiary hearing, the court addressed how the motion to suppress had been narrowed as a result of the pleas.  The initial motion challenged warrantless entries into three villas at Caesars Palace occupied by the Defendants charged in the original complaint—villas 8881, 8882, and

8888.  It is undisputed that the Phuas occupied villa 8882.  At the status conference, counsel for the Phuas conceded that they had no standing to challenge warrantless intrusions into the two other villas, and the companion Motion to Suppress (Dkt. #229) addressed only two warrantless intrusions into villa 8882 on July 4 and 5, 2014.

This motion to suppress argues that the fruits of the search of villa 8882 must be suppressed because the warrant application contains significant misstatements that were either intentionally or recklessly made to the issuing magistrate judge.  Specifically, the affidavit contains false or misleading statements that the residents of the three villas were associated with each other, requested and used a large amount of computer equipment and support, and transferred millions of dollars among each other.  The Defendants maintain that the government acquired all evidence suggesting any illegal sports betting was occurring in villa 8882 by warrantless searches.  The warrant application misled the magistrate judge into believing the warrantless searches were constitutional and did not disclose that the probable cause recited in the affidavit was not lawfully-acquired.  The warrantless intrusions led directly to other evidence cited in the application.  For example, the initial intrusion into villa 8882 to determine if the residents were using DSL to connect to the internet occurred in the media room where the wireless router was located.  Serious misrepresentations in the warrant application hid the likely unconstitutionality of the government's warrantless intrusions into the villas and deprived the magistrate judge from determining whether the application was based on legally-acquired evidence.

Defendants also argue that the warrant application created the false impression that the villas' residents voluntarily consented to searches, experienced genuine internet outages, and called for technical assistance.  The application falsely represented that government agents entered the villas for the ostensibly legitimate purpose of repairing the internet connection when, in fact, agents knew that the DSL connection could only be restored outside the villa itself.

Defendants also contend the application falsely represented that agents saw evidence of sports betting in plain view during the course of their legitimate activities in the villa and that agents acquired relevant evidence in the course of legitimately dropping off a laptop requested

by the residence of villa 8882.  The application failed to disclose to the issuing magistrate judge that Wood and SA Lopez defied the butler's instruction to remain in the butler's pantry and entered the villa in violation of the Fourth Amendment.  The application also falsely stated that Wood was fearful for his safety and was too afraid to accompany SA Lopez on a subsequent entry into villa 8882.  A video of Wood's interaction with the butler taken on July 4, 2014, and produced by the government in discovery reveals this claim is false.

The motion maintains that government agents went to great lengths to conceal their scheme to interrupt the internet access to the villa to gain entry and that the timing and contents video recordings of the intrusions create the impression that the outages were genuine.  Had the magistrate judge known the actual facts, the application for a warrant to search all three villas would have been denied because the warrantless intrusions in the villas raised Fourth Amendment problems.  First, the government's scheme impermissibly targeted the villas' residents without a reasonable basis to believe they were engaged in illegality.  Second, the residents did not consent to giving up their privacy and were induced to admit the agents into the villas.  Third, the agents exceeded the scope of any consent by entering the villas unnecessarily and remaining there after the internet connection had been restored.

Based on these serious misrepresentations and omissions about the warrantless intrusions, which were the only source of evidence suggesting any illegal activity was occurring in villa 8882, the fruits of the search warrant must be suppressed.  The motion claims that the search warrant application made intentionally or recklessly false statements in an effort to link the residents of 8882 to a supposed illegal sports betting operation.  The affidavit contained multiple references to the occupants of all three villas as "associates" of Defendant Paul Phua, and tried to create the impression that the group existed and was operating a gambling ring.  However, Defendants claim that these representations were grossly misleading as there was no such group of "Phua associates," and the government had no basis to represent to the issuing magistrate judge that illegal activities were linked or that Phua was orchestrating them.

To the contrary, Defendants maintain the agents knew these representations were misleading because they had documents in their possession showing that: (1) Paul Phua's arrest

in Macau had nothing to do with allegations in this case; (2) Yong made reservations for villas 8881 and 8882, but not 8888, and he transferred money to his own Caesars account, which Caesars required him to do to receive a line of credit; (3) the residents of villa 8888 requested the installation of computer equipment for their villa alone; (4) the residents of villa 8882 requested a laptop and reported an outage in their DSL service because the government had disconnected it; and (5) numerous other individuals, most of whom had nothing to do with this case, shared their casino credit lines and did not transfer funds between themselves.

The affidavit falsely stated that an unidentified "associates" of Paul Phua reserved all three villas and that the residents of the villas arrived close in time to each other.  In fact, the principal resident of villa 8888, Hui Tang, made his own arrangements with Caesars and arrived several days later than the warrant application claims.  The warrant omitted evidence that would have contradicted the contention that the residents of all three villas were operating a sports book together, for example, that no one reported anything suspicious about villa 8881 or villa 8882. The Defendants maintain that Caesars' records provided strong evidence that the residents of the three villas were not operating a sports book together.  Specifically, these records show the residents watched the World Cup in their own separate villas, and the residents of 8881 and 8882 socialized relatively rarely with residents of villa 8888.

The warrant falsely represented that a large amount of computer equipment was requested in all three villas by "Phua and his associates."  The application is grossly misleading in claiming that eight separate internet lines were installed, and by omitting the fact that the only unusual amount of computer equipment was in villa 8888 and was installed at the request of that villa's occupants.  Caesars installed a single line in each of the six villas in the building, including three villas whose occupants were unrelated to this case.

The agents were working with Caesars' DSL contractor, Wood TMS, and knew by July 4, 2014, that Caesars had decided to install DSL internet service in each villa as an alternative means of internet access because of pervasive problems with the internet service provided by Cox Communications.  The installation of a single DSL line in 8882 did not signify any unusually large amount of internet traffic, and there was no evidence that the residents of 8882

made any unusual requests for equipment or technical support.   Nevertheless, the warrant application states that Wood told the agents that he "had never previously received any request for such a large amount of equipment and technical support as that which had been requested by Subject Premises 1-3's occupants."   This was a false statement.   The agent's notes reflect that during the government's interview of Wood, he referred to a request to connect five computers in villa 8888 to the DSL.   The affidavit was misleading in failing to mention that Caesars provided law enforcement with the results of its own view of the villas, which showed only a single isolated computer in villa 8882 and none in villa 8881.

The motion also argues that the affidavit falsely described the financial transactions among the residents of all three villas in an attempt to draw an association among them.   The affidavit described deposits to Caesars and transactions between Phua and his associates through Caesars which grossly distorted the nature of those transactions.   For example, the application stated that an unknown Phua associate wire-transferred approximately $4 million in U.S. dollars from an originating bank account in the Bank of China into Yong's Caesars account, creating the impression that the deposit was a transfer between two different people.   The affidavit stated that Phua recently deposited four certified checks totaling $4 million from an originating account at the Bank of China.   Both were false representations.   Both transfers were from Yong to himself, and Phua had nothing to do with either one.   Additionally, there is nothing suspicious about gamblers transferring money to their casino accounts.   "Front money" deposits are common, and the casino frequently requires a deposit to extend credit.   The application omitted references to these facts and attempted to characterize the deposits as suspicious.

The application also grossly distorted the alleged "transactions" between Phua's associates to suggest that the residents were sharing funds related to wagers "rather than merely betting against the casino."   The actual records the government had showed there were no "transfers," and no money changed hands.   In this case, the only person with money on account at Caesars was Defendant Yong.   Caesars' records reflect that when Yong transferred funds from his front money deposit to pay for the "buy ins" of two poker players in a World Series of Poker event, Caesars documented its extensive approval process.   In reality, each of the transactions

cited by the government involved nothing more than one person vouching for the credit of another by sharing part of the Caesars credit line by transferring a casino marker.  Sharing credit lines is evidence that the residents were engaged in gambling, but is not evidence of illegality.

The application represents that Phua transferred $3 million to Gyouye Huang.  Huang was a guest in villa 8882.  Caesars' record actually indicates "signed marker MKR for $3Mil trans to 4266598 [Huang Caesars player number] Chen Husan per MG/Bing."  The search warrant application omitted reference to the fact that that it is common for gamblers to share credit lines and that specific individuals involved in this investigation had done so in prior years on prior gambling trips.  Even assuming the agents were "confused," confusion is not probable cause, and the credit line was not fairly characterized to the issuing magistrate judge.  For all of these reasons, the fruits of the search of villa 8882 must be suppressed.

### III.    The Government's Response.

The government opposes the motion, acknowledging that a number of mistakes were made in the warrant application.  The government argues that the affidavit in this case, once corrected and supplemented, would be sufficient to support a finding of probable cause, and suppression is therefore not required.

The government contends that the investigation and Caesars' records reviewed during the course of the investigation established the relationship between the occupants of all three villas.  All three reservations for 8881, 8882, and 8888 were made through the same casino host.  Paul Phua reserved Salon 7 for exclusive use by him and his associates.   Hotel registration information provided by Caesars indicated Phua and his associates checked in and out of Caesars during the relevant period.  Some of the butler logs showed interaction among the occupants of the villas.  The government disputes that the occupants would need to regularly visit each other to run a book-making operation because the Defendants were aware that there was a main room where they were running their illegal sports betting business in villa 8888.  The government also argues that the Defendants could operate the business remotely from wherever they had access to the internet, and it has evidence of instant messaging applications and skype chats recovered from Paul Phua's computer and phone, as well as Darren Phua's phone in villa 8882, presumably

1    recovered pursuant to the search warrant.  The government also support this argument with other

2    evidence recovered as a result of the search warrant challenged in this motion.

3         The opposition concedes that the affidavit could have been more accurate by reflecting

4    that there was a request made for five, rather than eight, DSL lines for villa 8888.  However, the

5    government argues that this error is immaterial.  The government claims that with the exception

6    of two "inadvertent and immaterial factual errors," the affidavit accurately characterized

7    significant financial transactions among the residents of the three villas.  After the search warrant

8    was executed, SA Pham learned of two misstatements in the affidavit.  First, paragraph fifteen of

9    the affidavit stated Phua recently deposited four checks totaling $4 million from an originating

10    account at the Bank of China in Macau with the Caesars to secure a marker.  This was incorrect

11    because it was Seng Chen Yong who deposited the four checks.  A portion of paragraph sixteen

12    stated that Boonchai Kasamvillas transferred $3 million to Herman Chun Sang Yeung.  This was

13    incorrect; Kasamvillas actually transferred $3 million to Chuchai Waraporn.  The government

14    argues that these later-discovered errors were not intentional, reckless, misleading, or material to

15    issuance of the warrant.  The remaining transactions referenced in the affidavit were accurate and

16    reflected financial transactions that occurred between May 9, 2014, and June 27, 2014.

17         Defendants are not entitled to bolster their arguments that there is nothing suspicious

18    about the transfers with expert reports that were not part of the historical facts known to the

19    agents at the time they applied for the search warrant.  The government also challenges the

20    expertise of the expert preparing the report concerning the financial transactions, asserting the

21    expert is not an expert on financial transactions or junkets.  The opposition points out that the

22    experts have been paid for their services, presumably to assert they are biased.

23         The government argues that law enforcement officers are entitled to use their training and

24    experience to draw limited inferences of criminal activity from behavior that is not facially

25    criminal.  The government disputes that it failed to inform the issuing magistrate judge of

26    unlawful entries into the villas.  The government's position is that the occupants of the villas

27    consented to the entries although law enforcement used trickery or deception to gain entry.  The

28    government relies on a line of cases that have upheld searches in which law enforcement officers

or individuals working with them gain consent to enter through use of trickery or deception.  The government cites an Eight Circuit case which held that one who consents to an undercover agent's entry into his house has no legally-enforceable expectation that the agent is not an undercover police officer, and therefore, the warrants obtained with information gained from the warrantless deceptive entries were not tainted by any illegality.  *See United States v. Wagner*, 884 F.2d 1090 (8th Cir. 1989).  In short, the government maintains that information learned from the warrantless intrusions into villa 8882 that were prompted by law enforcement's disruption of the DSL service was lawfully-obtained.

The government concedes that the information regarding the ruse was not, and should have been, included in the warrant application.  However, the government maintains that the failure to include information about the ruse does not "equate to an attempt to recklessly or deliberately mislead the magistrate judge."  The opposition argues that the application omitted reference to the ruse was because: (1) at the time the agents applied for the search warrant, they believed the technique was protected; (2) the search warrant was obtained during a live, time-sensitive operation; and (3) the agents needed to protect the ongoing assistance of a civilian.  The agents were aware that "one of the Defendants had just fled Macau after being arrested for similar offenses and had access to a personal Learjet" and learned after the arrest "that Phua and his associates had bribed their way out of Macau."  The Defendants' access to "remarkable sums of money was a grave concern to law enforcement."

The government argues that even if the magistrate judge should have been told about the ruse used to gain entry into 8882, suppression is not required.  Citing *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009), the government maintains that the party challenging the warrant must show that the affidavit deliberately or recklessly made false statements or omissions that were material to a finding of probable cause.  Once established, the false statements are purged from the affidavit, and the court determines whether the remainder of the affidavit sets forth probable cause.  Similarly, if an officer omitted facts required to prevent the affidavit from being misleading, the court determines whether the affidavit, corrected and supplemented, establishes probable cause.  If probable cause remains after amendment, no

1    constitutional error was made.  In this case, the affidavit purged of paragraphs thirteen and

2    fourteen, and corrected with respect to the five DSL lines requested for villa 8888 and the

3    monetary transfers, still established probable cause to justify the search warrants for all three

4    villas.  The government also argues that omission of reference to the ruses used to gain

5    warrantless entries was not intentional, reckless, or material to the probable cause determination.

6        The government disputes that the representation in the affidavit that the DSL contractor

7    provided SAs Lopez and Kung instruction on how to fix the DSL lines was false.  The

8    government acknowledges that the DSL was connected outside the villas and could only be fixed

9    there.  However, the DSL contractor did give the agents instruction on how to appear as

10   legitimate technicians.  At worst, the government argues, the affidavit was misleading by

11   omitting the additional information about the ruse.  As supplemented by information about the

12   ruse, the search warrant affidavit "does not render paragraph 14 of the search warrant affidavit

13   false, and it certainly has no bearing on the probable cause determination."  Thus, this omission

14   was not material.

15       The government also argues that even if the court determines that the application should

16   have informed Magistrate Judge Koppe about the ruse, and if that information had an impact on

17   her probable cause determination, the evidence should still not be suppressed because it would

18   have been inevitably discovered.  The inevitable discovery doctrine is an exception to the fruit of

19   the poisonous tree doctrine for which, as the government acknowledges, it bears the burden of

20   establishing by a preponderance of the evidence.  Here, the agents could have obtained a search

21   warrant for all three villas without ever initiating the ruse based upon the information they had.

22   The government had sufficient evidence of possible criminal activity prior to disrupting the DSL

23   service to the three villas based on "the assistance of the Defendants and their willingness to

24   share their criminal activities with Caesars personnel."  Evidence of possible criminal activity

25   was only strengthened when the occupants of villa 8882 requested a courtesy laptop to be

26   delivered by the DSL contractor, which gave SA Lopez and the DSL contractor an opportunity to

27   hear sounds "consistent with the World Cup game being watched there."  The fact that watching

28   a soccer game is not illegal "fails to account for and consider the information already known to

1    law enforcement prior to delivering the laptop, or the fact that the agents had sufficient probable

2    cause to obtain search warrants for crimes related to unlawfully operating the sports betting

3    operation and illegal transmission of wagers."   The warrants could have and would have been

4    obtained without disrupting the DSL service.   The agents could have secured search warrants for

5    all three villas without using a ruse.   Thus, the same evidence would have inevitably discovered,

6    and evidence recovered from the villas should not be suppressed.

7    **IV.    The Defendants' Reply**.

8    The reply argues that the government misrepresented and omitted critical facts in the

9    warrant application, either recklessly or to intentionally mislead the court.   Specifically, the

10   government characterized its "unprecedented covert operation that involved disrupting the DSL"

11   as consensual searches; falsely claimed that the various Defendants were known members of the

12   14K Triad, an organized crime group, and were associates of each other; made suspicious

13   requests for electronic equipment; and engaged in suspicious financial transactions.   The

14   Defendants maintain that all of these statements are provably false, and the government's

15   opposition compounded its error by confessing to a few of them.   The government's post-hoc

16   attempts to rehabilitate the warrant application only highlights how flawed it is.   Defendants

17   maintain that "the government cobbled together wafer-thin evidence, much of which was

18   unlawfully obtained—and then aggressively mischaracterized that evidence."

19   The warrant application provides no support for the conclusion that Paul Phua was

20   known by law enforcement to be high-ranking member of the 14K Triad.   This unsupported

21   statement is recklessly false.   The fact that the agents were aware that Phua was recently

22   involved in a raid and arrest for his involvement in running a large-scale book-making operation

23   elsewhere did not support a finding of probable cause and was not evidence that Phua was

24   engaging in a violation of U.S. law in the villas at Caesars.   The application made similar

25   outrageously unsupported statements that law enforcement was aware that Defendant Yong was

26   a member of the 14K Triad.   In light of the lack of proof offered by government in its response,

27   "one can only conclude that [the statements] were made recklessly or with intent to mislead."

28   / / /

1  Falsely characterizing Defendants as known members of organized crime is a material
2  misrepresentation.

3      The reply argues that the government not only concealed law enforcement's covert
4  operation to disrupt the villas' internet, but also engaged in an extensive cover up by creating
5  deceptive videos and false Form 302 reports so that its scheme would not be discovered.  Caught
6  red-handed, Defendants argue the government now concedes information about the ruse was not
7  and need not have been included in the application.

8      Defendants assert there are at least five examples of the government misleading the
9  issuing magistrate judge.  First, Wood did not tell Lopez how to repair the internet connection,
10  and it was impossible to repair the connection from inside the villa.  Second, when Wood and
11  Lopez arrived in villa 8882, the butler did not tell them the residents did not want anyone to see
12  their "business."  Third, the videotape of Wood and Lopez's entry made clear that Wood was not
13  afraid for his safety.  Fourth, the government's opposition falsely states that during the laptop
14  drop off, Wood suggested entering the media room with a laptop.  The videotape demonstrates
15  that Lopez whispered, "Let's go, before he [the butler] gets back."  Fifth, Wood did not see
16  illegal sports betting odds in villa 8881.  Defendants maintain Wood was too far away to see the
17  a computer screen, and he had no basis to conclude the site was "illegal" because online sports
18  betting on licensed websites is legal in Nevada, and reading odds from a computer screen is not a
19  crime.

20      The reply disputes that law enforcement agents had legitimate good faith reasons for
21  failing to disclose the ruse.  The warrant application was under seal, so it is absurd to believe the
22  ruse was not disclosed to protect a law enforcement technique.  The government does not explain
23  how a time-sensitive operation excuses a failure to disclose.  The government could have
24  protected Wood's identity without failing to disclose in the application that the DSL was
25  disconnected, and the warrantless searches occurred after the service was already restored.
26  Defendants maintain that all of these misstatements and omissions are material and were
27  intended to convince the judge that the searches were consensual without disclosing "that the
28  scheme here was entirely unprecedented in the entire history of American law enforcement."

The government does not dispute the materiality of the evidence that agents saw in the course of the warrantless searches, which establishes the only alleged ties between villas 8881 and 8882 and an online sports betting operation.

The reply reiterates arguments that the warrant application purposely misled the issuing judge into believing that the residents of villas 8881 and 8882 were acting in concert with the residents of 8888 by describing diverse actions between unrelated individuals as if they were committed by a single, coherent group of Paul Phua's "associates."

The government cannot rely upon evidence of association that was not included in the warrant application. Additionally, the Defendants dispute that law enforcement began investigating them after Caesars personnel made observations in the Defendants' villas that caused them to be concerned with the possibility of criminal activity, that the personnel alerted Caesars' management which, in turn, alerted law enforcement. The Caesars investigator who transmitted a document to the Nevada Gaming Control Board ("NVGCB") raised concerns only regarding villa 8888. Caesars employees raised concerns only about villa 8888 with one exception: the investigator sent an email with a photograph of the computer equipment in 8888, noting that there was only one computer in 8882, an exculpatory fact the government omitted from the warrant application.

The government also improperly attempts to rely on evidence it seized in executing the search warrant to bolster representations made in the application. The Defendants dispute that the phone logs and other information the government relies upon supports the government's claim and, in fact, argues that the phone logs disprove the government's claim.

The reply reiterates arguments that application contained false statements that the occupants of villas 8881 and 8882 requested the installation of substantial electronic equipment. The agents also failed to disclose their personal knowledge that there was no suspicious computer equipment consistent with a sports book in villa 8881 or 8882. In fact, the residents of villas 8881 and 8882 did not request an unusual amount of equipment or DSL lines. Emails produced in discovery between Wood and Caesars explained that Wood's company installed the DSL lines after guests complained that the Wi-Fi in the villas had "stability" issues. Caesars

1    proposed installing additional Wi-Fi access points, but Wood, not the residents of the villas,

2    proposed installing DSL internet service because "the DSL connection was more consistent and

3    faster than the in-house Wi-Fi."  Wood also cited other advantages to installing DSL lines.

4    Caesars instructed Wood to install the lines without any input from the occupants of the villas.

5    Guests in the villas requested assistance from Caesars and Wood because the Wi-Fi was

6    unreliable, and both Wood and Caesars knew that.  This information was not disclosed in the

7    warrant application and was a material omission.

8        Similarly, it is false that the residents of villa 8881 and 8882 requested additional fax

9    machines.  The warrant application's statements regarding financial transactions between

10   occupants of the villas are false.  Even if the statements were made in good faith, which the

11   Defendants doubt, "good faith without more, does not necessarily preclude a finding of

12   recklessness."  *SEC v. Infinity Grp. Co.,* 212 F.3d 180, 192 (3d Cir. 2000); *see also United States*

13   *v. Brown*, 631 F.3d 638, 647 (3d Cir. 2011).

14       The government has admitted that the warrant application included two false statements

15   which Defendants maintain are undeniably material: that Phua (1) deposited $4 million, and (2)

16   transferred $3 million to Huang, a female occupant of villa 8882.  It is untrue that any of the

17   other financial transactions cited in the affidavit were huge transfers among the residents of the

18   three villas.  In fact, they were not transfers at all.  The agents relied upon records that establish

19   that in each instance, one person was merely guaranteeing the credit of another, who remained

20   responsible for the debt.  These are commonplace transactions.  No money changed hands, and

21   these transactions could not be used to draw inferences of illegality.

22       The reply argues that if the affidavit were stripped of its misrepresentations and

23   supplemented to correct omissions, the magistrate judge would not have issued.  A supplemented

24   and corrected warrant would not have established probable cause to believe that evidence of a

25   crime would be found in any of the villas, and especially not in villas 8881 and 8882.  At most, it

26   would have established that the residents of villa 8888 were using a lot of computers for

27   something, possibly sports related, in a city where betting on sports is lawful and encouraged.

28   ///

1    Finally, the Defendants do not understand the government's inevitable discovery
2 argument that based on statements, the government could have obtained a search warrant for the
3 three premises without initiating the ruse.  The fact that Wood and Lopez heard sounds
4 consistent with a soccer game being watched when they dropped off the laptop is not evidence of
5 illegality and adds nothing to the probable cause inquiry.

6    **DISCUSSION**

7    The Fourth Amendment provides:

8    The right of the people to be secure in their persons, houses, papers, and effects
     against unreasonable searches and seizures, shall not be violated, and no Warrants
9    shall issue, but upon probable cause, supported by Oath or affirmation, and
     particularly describing the place to be searched, and the persons or things to be
10   seized.

11 U.S. Constitution, amend IV.

12   **I.    Probable Cause to Support a Search Warrant.**

13   In *Illinois v. Gates,* the Supreme Court established the standard of review for the issuance
14 of a search warrant.  The issuing judge must make a "practical, common-sense decision whether,
15 given totality of the circumstances set forth in the affidavit, including the veracity and basis of
16 knowledge of people supplying hearsay information, there is a fair probability that contraband or
17 evidence of a crime will be found in a particular place."  462 U.S. 213, 238-39 (1983).  The duty
18 of a reviewing court is to ensure that the issuing judge had a "substantial basis" for concluding
19 that probable cause existed.  *See Ewing v. City of Stockton,* 588 F.3d 1218, 1223 (9th Cir. 2009)
20 (citing *Gates,* 462 U.S. at 238-39).  Probable cause requires only a fair probability or substantial
21 chance of criminal activity.  *See United States v. Alaimalo,* 313 F.3d 1188, 1193 (9th Cir. 2002).
22 Neither certainty nor a preponderance of the evidence is required.  *See United States v. Kelley,*
23 482 F.3d 1047, 1050, 1051 (9th Cir. 2007).  In doubtful cases, the court should give preference
24 to the validity of the warrant.  *Id.* (citing *Gates,* 462 U.S. at 237 n.10).  The reviewing court
25 should not "flyspeck" the affidavit supporting a search warrant through de novo review; instead,
26 the issuing judge's determination "should be paid great deference."  *Id.* (citing *United States v.*
27 *Gourde,* 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)).  Therefore, a judge's determination that
28 / / /

an affidavit stated probable cause to issue a search warrant "will be upheld unless clearly erroneous." *United States v. Alvarez,* 358 F.3d 1194, 1203 (9th Cir. 2004).

Probable cause is "a fluid concept--turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The existence of probable cause is determined by analyzing the totality of the circumstances surrounding the intrusion. *Id.* Probable cause does not deal with hard certainties, but with probabilities. *Id.* at 241. The Supreme Court held in *Ornelas v. United States*, 517 U.S. 690 (1996), that a probable cause determination is two-fold. First, judges must determine the "historical facts," that is, the events that occurred leading up to the stop or the search. *Id.* at 695. Second, judges are to decide "whether the historical facts, viewed from the standpoint of a reasonable police officer," amount to probable cause. *Id.* at 696-97. The *Ornelas* court held that appellate courts must review findings of historical facts only for clear error and must "give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at 699.

It is well-recognized that law enforcement officers can rely on their own experience and the experience and information of other law enforcement officers in establishing probable cause. *See United States v. Butler*, 74 F.3d 916 (9th Cir. 1996). Similarly, "a magistrate may rely on the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found." *United States v. Fannin*, 817 F.2d 1379, 1381 (9th Cir. 1987); *see also United States v. Ayers*, 924 F.2d 1468, 1479 (9th Cir. 1991) ("In weighing the evidence supporting a request for a search warrant, a magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found"). An officer need not include *all* of the information in his possession to obtain a search warrant. An affidavit need only show facts adequate to support the finding of probable cause. *See United States v. Johns*, 948 F.2d 599, 605 (9th Cir. 1991).

## II.   *Franks v. Delaware*.

A defendant is entitled to a hearing pursuant to the United States Supreme Court's opinion in *Franks v. Delaware* where he makes a substantial preliminary showing that: (a) the

affidavit in support of a search warrant contains intentionally or recklessly false statements or misleading omissions; and (b) the affidavit in support of a search warrant cannot support a finding of probable cause without the allegedly false information.  *See Franks,* 438 U.S. 154, 170 (1978)); *United States v. Reeves,* 210 F.3d 1041, 1044 (9th Cir. 2000).  To justify a hearing, a defendant must make "specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such claim with a detailed offer of proof."  *United States v. Craighead,* 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted).  Intentional or reckless omissions may also provide grounds for a *Franks* hearing.  *See United States v. Jawara,* 474 F.3d 565, 582 (9th Cir. 2007).  If a defendant makes the requisite preliminary showing, the court conducts a hearing to determine the validity of the warrant.  Suppression results if, after excising the false or misleading statements from the affidavit, there is not probable cause to support the warrant.  *See Franks,* 438 U.S. at 171-72.  The court granted an evidentiary hearing on this motion and the companion motion to suppress, finding the Defendants had met their threshold burden and that development of the factual record was necessary to resolve both motions.

**III.     Good Faith and the Exclusionary Rule.**

In *United States v. Leon*, 468 U.S. 897, 925 (1984), the United States Supreme Court established an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant.  The Supreme Court held that the exclusionary rule should not bar evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, but which is ultimately found to be unsupported by probable cause.  Adopting a good faith reliance test, the Supreme Court reasoned that the rationale for the Fourth Amendment exclusionary rule was to deter unlawful *police* conduct.  If, after reviewing an affidavit and application for a search warrant, an issuing judge incorrectly concludes the affidavit states probable cause, the mistake is made by the judge not the police officer.  The exclusionary rule's "primary purpose is to deter future unlawful police conduct, and therefore effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."  *United States v. Calandra*, 414 U.S. 338, 347 (1974).  In *Leon*, the Supreme Court recognized that if an officer is acting as a reasonable officer would and should

act in similar circumstances, excluding evidence "can in no way affect his conduct unless it is to make him less willing to do his duty."  468 U.S. at 920.

*Leon* recognized four circumstances where the good faith exception does not apply because reliance is per se unreasonable.  They include: (1) where the issuing magistrate was misled by information in the affidavit that was knowingly or recklessly false; (2) where the issuing judge abandoned the detached and neutral judicial role; (3) where the affidavit was so lacking in probable cause as to render official belief in its existence entirely unreasonable; or (4) where the warrant is so facially-deficient in failing to particularize the place to be searched or things to be seized that the executing officers could not reasonably presume it to be valid.

The Supreme Court has emphasized that lower courts should apply the exclusionary rule pragmatically, balancing the costs of excluding evidence with the benefits of deterring overreaching by law enforcement officers.  *See Illinois v. Krull*, 480 U.S. 340, 347 (1987).  The Supreme Court has also held that courts have the discretion to determine whether the good faith reliance exception applies before determining whether a search warrant application and affidavit are supported by probable cause.  *See Leon*, 468 U.S. at 923-25.

Suppression is not an automatic consequence of a Fourth Amendment violation.  *See Herring v. United States*, 555 U.S. 135, 137 (2009).  The exclusionary rule applies to intentional or reckless conduct, not good faith mistakes.  *Id.*  A long line of Supreme Court cases establish that exclusion has always been the court's last resort, not its first impulse.  *Id.* at 140 (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)); s*ee also Heien v. North Carolina,* -- U.S. --, 135 S. Ct. 530, 536. (Dec. 15, 2014) (holding Fourth Amendment not violated by an officer's objectively reasonable mistake of law that reasonable suspicion to conduct a traffic stop existed and suppression not required.)

**IV.   Analysis.**

The Phuas seek suppression of evidence seized during execution of the search warrant in villa 8882, asserting the warrant contained intentional or reckless misrepresentations or omissions material to a finding of probable cause.  Counsel acknowledge that the Phuas have no standing to seek suppression of evidence recovered from villas 8881 and 8888.  The Phuas argue

that corrected of the false or misleading statements, and supplemented to correct the material omissions, the warrant application lacked probable cause, and suppression is therefore required.

The government concedes it should have disclosed the DSL disruption ruse to the magistrate judge issuing the warrant, and it acknowledges that the warrant contained mistakes. However, the government argues that properly corrected and supplemented, the warrant nevertheless stated probable cause and that suppression is not required.

The court did not take oral argument following the evidentiary hearing. However, government counsel volunteered, at the close of four days of evidentiary hearings, that even if the court found the agents exceeded the scope of the consent they received to enter villa 8882 as part of the DSL disruption ruse, the good faith exception applies. Counsel for the Phuas objected to this argument as it was not asserted in any of the briefs. Defense counsel is correct. The government did not argue the good faith exception in its responsive papers. The parties' briefs and supporting exhibits were voluminous, and neither side requested supplemental briefing because counsel were surprised by the testimony. More importantly, the good faith exception to the exclusionary rule does not save a warrant based on recklessly or intentionally false or misleading statements or omissions.

### A. Testimony of SA Pham.

SA Minh Pham testified at the evidentiary hearing. He was the affiant of the search warrant application in dispute in this case. He has been an FBI agent for approximately fifteen years and assigned to the organized crime squad in Las Vegas for approximately four years. SA Creighton Felt of the NVGCB contacted Pham in June 2014. Felt reported he had information from Caesars employees that there may be an illegal gaming operation at their facility. Pham believed this initial conversation with SA Felt happened around June 25 or 26, 2014, after Felt had been contacted by Paul Urban, the Director of Security for Caesars. Pham did not initially open a case to investigate because he did not have enough information. Felt told Pham that some Caesars employees had gone into villas and observed what they believed to be illegal gaming equipment, and they believed a wire room was operating there. Felt told Pham that some of the individuals in the villas had recently been arrested in Macau, and Felt believed the operation at

1    Caesars was part of that same operation.  The following week, Pham met with Felt accompanied

2    by SA Justin Nwadiashi and learned that a Malaysian with the last name of Phua was one of the

3    people arrested in Macau.

4            At the meeting, Felt showed the other the agents emails and photos taken in one of the

5    villas which showed what Felt believed was a wire room involving many computers, monitors,

6    and electronic equipment.   The occupants' request for equipment included extra-large

7    televisions, computers, laptops, and additional network services for cable, including Cox,

8    DirecTV, and Dish Network.  SA Pham testified that Felt stated the occupants of villas 8881,

9    8882, and 8888 requested this equipment.  Pham traced the development of the investigation in

10   his testimony and was ultimately shown the search warrant affidavit he presented to Judge

11   Koppe.

12           Pham testified that in his initial discussions with Assistant U.S. Attorney Kimberly Frayn

13   about the investigation, he reported he did not have the same amount of probable cause that the

14   occupants of villas 8881 and 8882 were engaged in illegal activity as he did for villa 8888.  He

15   requested legal advice from AUSA Frayn about approaching Caesars employees to get consent

16   to disrupt the villas' occupants' cable, Dish Network, or DirecTV service, and if Caesars'

17   consent would be sufficient to permit agents to enter the villas with Caesars employees to see

18   what was going on inside the villas.  AUSA Frayn advised Pham that as long as agents got

19   consent from Caesars, that would suffice, but she was going to look into it and let him know if

20   there was a problem.

21           Pham started drafting the affidavit supporting the search warrant when he left Caesars on

22   July 5, 2014.  He did not include information about disrupting the DSL because he did not

23   believe it needed to be included because: (1) it was law enforcement sensitive; and (2) it would

24   expose Wood as a cooperator.  The affidavit disclosed that an individual was cooperating, but it

25   only used Wood's initials.  Pham discussed the first plan to disrupt cable service with AUSA

26   Frayn, but he had not discussed the plan Wood suggested to disrupt the DSL.  He did not tell

27   AUSA Frayn about the plan to disrupt the DSL up through the time that he swore out the search

28   / / /

1  warrant affidavit.  He did not include all information that he learned from the investigation in the

2  search warrant affidavit.

3  After Pham submitted and obtained the search warrant, he learned the affidavit contained

4  errors.  Specifically, it stated that Paul Phua wired $4 million into a Caesars account to secure a

5  credit line.  Pham later discovered it was actually Seng Chen "Richard" Yong that requested the

6  wire to secure both their lines of credit.  However, at the time Pham submitted the search warrant

7  affidavit, he believed it was correct that Paul Phua had initiated this transfer.

8  The affidavit also stated Paul Phua had transferred approximately $900,000 from a casino

9  in Fort Lauderdale, Florida, to the Caesars account.  However, Pham later learned that Paul Phua

10  had been only one of the individuals who signed the consent to have that money wire-transferred

11  into Yong's account.  At the time Pham submitted the affidavit, he believed the statement was

12  true based on documents from Caesars concerning monetary transfers that he had received.

13  Pham referred to the spreadsheet contained in government's Exhibit 2F as a document he relied

14  upon to support his statement in the affidavit.  The font size was very small and difficult to read.

15  He also discovered another error in the affidavit days later.  There were transfers for $3

16  million between individuals in the villas.  He looked at the spreadsheet, and it was off by one or

17  two lines," which caused him to associate the wrong name with the transfer.

18  The search warrant affidavit also stated there was a request for eight DSL lines.  He later

19  learned that he was "off by maybe one or two lines."

20  Pham believed using the DSL ruse was legal because agents had consent from Caesars

21  employees to disrupt the DSL but not to disconnect the cable.  The occupants of the villas used

22  the DSL in furtherance of their illegal activities and requested additional broadcasting services

23  from Dish, DirecTV, and Cox to monitor the games.  There was a request for additional DSL

24  lines although Wi-Fi was already available to the occupants.  Caesars did not want their own

25  employees going into the villas because of guest privacy concerns.  However, Caesars had no

26  problem with their outside contractor, Wood, assisting the agents by disrupting the DSL service

27  he was responsible for installing and servicing.

28  / / /

1    SA Pham's affidavit stated there was probable cause to believe that evidence of the target

2    offenses would be discovered in all three villas, for the reasons averred to in Paragraph Nos. 6

3    through 16.  This report and recommendation addresses only the probable cause to search villa

4    8882, the villa occupied by the Phuas and others.  The court will address the Defendants'

5    arguments concerning false or misleading statements or omissions by category.

6                          **B.  The Search Warrant Affidavit.**

7                              **1.  Phua and Associates.**

8         The Defendants argue extensively that the affidavit uses a materially false and

9    misleading, conclusory "rhetorical device" by repeatedly referring to "Phua and his associates"

10   to link the Phuas with illegal gambling activity at Caesars Palace.  The court finds that the

11   affidavit's repeated use of the phrase "Phuas and associates" is materially misleading.  The

12   affidavit took every opportunity to suggest that Paul Phua himself made requests and engaged in

13   conduct which he had not.

14        Pham and other investigators certainly had evidence that Phua was "associated" with

15   occupants in villas 8881 and 8888 in the sense that he was gambling with some of them in Salon

16   7 and sharing credit lines.  Pham had evidence he did not include in the affidavit which was

17   discussed at the evidentiary hearing by multiple witnesses.  With the help of Paul Urban, Pham

18   and other investigators identified individuals gambling with Phua in Salon 7 and linked them as

19   guests in villas 8881, 8882, 8888 as well as villas 8883 and 8887.  The occupants of villas 8883

20   and 8887 were not targets of the investigation. From reviewing Caesars' records, Urban

21   concluded that $65 million was associated with the group in villas 8881, 8882, and 8888.  He

22   concluded that the Caesars Loyalty Program cardholders occupying these villas were moving

23   money between cards and customers and throughout the casino.  The $65 million was traced to

24   Salon 7, which Paul Phua reserved for his exclusive use and the use of his guests.  This

25   information was not included in the search warrant affidavit.

26        However, neither Paul Phua personally, nor any of the occupants of villa 8882, made

27   requests that linked them to illegal gambling activities. A request for a laptop was made on July

28   4, 2014, and a request to restore DSL in villa 8882 was requested on July 5, 2014.  These were

not unusual requests or requests that would indicate the occupants of 8882 were engaged in illegal bookmaking.  The affidavit provided very little information to support Pham's conclusion that Phua was associated with the occupants of villa 8881 and 8888 in an illegal sports betting operation.  It provided some information that Phua was associating with occupants of villas 8881 and 8888 as well as others.

Paragraph 6 of the affidavit states that "Phua and his associates transacted hundreds of millions of dollars in illegal bets on the World Cup Soccer Tournament while in Macau."  It also stated that Pham believed that "Phua and his associates" were continuing their illegal gambling business at Caesars Palace.

Paragraph 7 states that an employee of Caesars Entertainment reserved the three villas for which a warrant was requested "at the behest of Phua or one of his associates."  It states that on June 7, 2014, Phua's associate Hui Tang checked in and was registered as occupying villa 8888.  It states that Phua checked into villa 8882 on June 11, 2014.  Pham also attests in Paragraph 7 that after occupying premises 1 through 3, "Phua and his associates requested that Caesars Palace provide them with an unusually large amount of electronic equipment and technical support, which they requested to be installed in the subject premises" i.e., all three villas to support eight DSL connections and Wi-Fi access.

Paragraph 8 of the affidavit states that on June 22, 2014, Caesars' electrical engineer employees entered villa 8888 "in response to Phuas and his associates' request" to assist with setting up equipment.

Paragraph 10 of the affidavit relates that Caesars security personnel provided NVGCB with photographs of the equipment set up in 8888, which SA Lopez believed was a setup similar to a "wire room" for illegal wagers.  Paragraph 10 goes on to state that Pham believed that "Phua, Yong, Tang and others acting under their direction and control, are monitoring the World Cup and betting odds associated with the World Cup Soccer Games in furtherance of their illegal gambling business."

Paragraph 11 states that on July 3, 2014, MLW, an information technology technician who was a subcontractor to Caesars and who provided technical support and assistance to all

three villas was interviewed.  MLW told agents "that he/she had been providing technical support for four or five years and had never previously received any request for such a large amount of equipment and technical support as that which has been requested by subject premises 1 - 3's occupants."

Paragraph 12 states that on July 4, 2014, one of Phua's associates requested delivery of a laptop to villa 8882.

Paragraph 14 states that on July 5, 2014, "Phua's associates made an urgent request to MLW for technical assistance with the DSL in villa 8882."  It also states that while SAs Lopez and Kung were inside villa 8882, Lopez "observed one of Phua's associates using another laptop computer which was depicting a login screen for an illegal sports wagering site on the screen."

Paragraph 15 states that Phua reserved Salon 7 at Caesars "for his and his associates' exclusive use."  It also averred that on June 4, 2014, Yong, "Phua's associate" in villa 8882 wire transferred $4 million in U.S. dollars from an account in the Bank of China into Yong's Caesars account.  It states that on June 16, 2014, "Phua or one of his associates" wired an additional $985,561 from the Seminole Casino in Ft. Lauderdale into Yong's Caesars account and that Phua recently deposited four certified checks totaling $4 million from an account at the Bank of China in Macau with the casino to secure a marker.

Paragraph 16 attests that a review of casino records revealed recent financial transactions "between Phua and his associates from May 9, 2014, to June 27, 2014."  Multiple financial transactions are detailed in the subparagraphs below:

      i.     Phua was alleged to have transferred $3 million to Huang, a female occupant of villa 8882.

      ii.     Relates transfers made by Boonchaie Kasamvillas "Phua's roommate and associate" who was also occupying villa 8882.

      iii.     Indicates Tang, "Phua's associate" in villa 8888 transferred $3 million to Fan.

      iv.     Relates transfers by Yong, "Phua's associate" in villa 8881.

/ / /

- 24 -

The affidavit repeatedly refers to "Phua and his associates" without providing information, other than the financial transactions which linked the occupants of all three villas. The affidavit is extremely conclusory and provides little factual support for Pham's conclusion that Phua was associated in illegal activity with the occupants of the other villas.

The affidavit is misleading by claiming that the occupants of all three villas requested an unusual amount of DSLs and computer equipment. The information investigators had was that only villa 8888 had an unusual amount of computer equipment set up, which Lopez and Felt believed was consistent with a wire room for illegal sports betting activity. The government and Pham acknowledge that the affidavit is simply wrong that eight DSLs were requested. In fact, Caesars had its outside contractor, Wood TMS, install DSL in all six of the luxury villas on that floor because the Wi-Fi was unstable, and guests were complaining. Wood did not tell Pham or other agents that an unusual amount of computer equipment was requested in villa 8882. A single DSL was installed in villa 8882, at the request of Caesars Palace Luxury Services, because the guests were not satisfied with the stability of the Caesars Palace internet connection. The single DSL installed in villa 8882 was installed on June 13, 2014, before Phua's arrest in Macau. Additionally, Wood did not tell agents that he had had several calls for DSL service from the occupants of villa 8882.

Occupants of Villa 8888 requested and received three DSLs. Villa 8888 was the villa in which an inordinate amount of computer equipment, monitors and televisions was observed. One DSL was initially installed in villa 8881 at the request of Luxury Services at the same time the DSLs were installed in all six of the luxury villas on that floor. The occupants of 8881 requested a second DSL, which was installed.

The occupants of villa 8882 requested a laptop on July 4, 2014. On June 4, 2014, a marketing representative for Caesars Palace requested that Caesars Luxury Services set up villa 8882 with an office desk and equipment like a fax, printer and scanner, by June 11, 2014, again well before Phua was arrested in Macau for illegal sports betting. *See* Defendants' Exhibit 102, Bates stamp CP00000939. The same email requested a setup of one additional television in the media room for all six villas on the floor.

1    Wood did not tell agents that he had been providing technical support for four or five

2    years and had never previously received any requests for such a large amount of equipment and

3    technical support as that which had been requested by the occupants of villas 8881, 8882, and

4    8888..  What he told agents was that the occupants of villa 8888 had requested a DSL connection

5    that would allow for five commuters to make hard connections to one line, and he was unable to

6    do that.  He stated that the DSL accommodated connection ports for four computers, and he had

7    never received a request to connect five computers to a single line.

8                        **2.   The Ruse/Warrantless Entries.**

9    The affidavit did not disclose to Judge Koppe that the agents employed a DSL disruption

10   ruse to gain warrantless entries into villa 8882.  Pham's testimony at the evidentiary hearing

11   suggested that Judge Koppe could have made this deduction from information that was provided

12   in the affidavit, specifically, because of the timing of the World Cup game.   The court

13   categorically rejects that suggestion.  The affidavit disclosed that on July 4, 2014, MLW, who

14   was assisting investigators, agreed to accompany SA Lopez, who was posing as a support

15   technician employed by MLW, to enter villa 8882 to deliver a laptop the occupants requested.  It

16   also disclosed that the butler restricted their access to the butler's pantry area, blocked their path

17   to other parts of the villa, and was adamant that they not be allowed into other parts of the villa.

18   The affidavit did not disclose that on July 5, 2014, the urgent request by the occupants of

19   8882 for technical assistance to restore the DSL was a direct result of a disruption caused by

20   MLW working with the agents to assist in the investigation.   It did not disclose that MLW

21   suggested the disruption of DSL service to provide an opportunity to enter villa 8882.  It did not

22   disclose that the disruption was accomplished remotely from an office outside the villa and could

23   be restored remotely from the same location.

24   The affidavit was misleading in stating that MLW gave SA Lopez and Kung instruction

25   on how to resolve the problems with the DSL.  Wood did provide instructions to Lopez and

26   Kung on how to look like a legitimate DSL technicians.  However, the affidavit was misleading

27   because Lopez and Kung were not in the villa to resolve the problem with the DSL and did not

28   / / /

need to be inside the villa to resolve the problem with the DSL.  The affidavit did disclose that the disruption occurred shortly before a World Cup game.

It borders on the ridiculous to claim that Judge Koppe could have figured out from the information provided in the affidavit that the agents caused the disruption of the DSL service to villa 8882.  The four corners of the warrant application make it appear that the agents took advantage of a fortuitous DSL outage to further their investigation just as they took advantage of a fortuitous request for delivery of a laptop to villa 8882 the day before.  The affidavit accurately reported to Judge Koppe what Kung and Lopez observed when they entered villa 8882 posing as technicians there to repair a DSL disruption they created.

An issuing judge is required to assess probable cause for a warrant from a practical, common-sense, totality-of-the-circumstances standpoint which includes the basis of the knowledge of people supplying hearsay information.  *See Gates*, 462 U.S. at 238-39.  The government concedes it should have disclosed the DSL disruption ruse to Judge Koppe.  Had the ruse been disclosed, Judge Koppe would have had the opportunity to assess, for herself, whether the information learned from the warrantless entry could be used to support issuance of the warrant for villa 8882.  The agents used the ruse to gain entry into villa 8882 because they recognized that they needed additional probable cause that the occupants of villa 8882 were engaged in the illegal activity they reasonably concluded was occurring in villa 8888.

For the reasons explained at length in the report and recommendation on the companion motion to suppress, the court has found that the warrantless entry on July 4, 2014, exceeded the scope of the consent Lopez and Wood were granted when they entered the butler's pantry to deliver the laptop.  They were unequivocally told to remain in the butler's pantry, but they failed to comply and entered the interior of the villa.  However, the search warrant affidavit did not make reference to observations or information Wood and Lopez learned after leaving the pantry.  The court has also found that that the warrantless entry on July 5, 2014, did not violate the Fourth Amendment.  These findings do not excuse the failure to disclose the ruse.  As the use of a DSL disruption ruse to gain warrantless entry is a case of first impression, Judge Koppe should

/ / /

1    have been told so that she could assess whether this information was properly included in the

2    warrant or not.

### 3.  Wood Fearful for His Safety.

4           The Phuas contend that the affidavit contained a false statement that after entering the

5    villa on July 4, 2014, with SA Lopez, Wood stated he feared for his safety and was too afraid to

6    go back with Lopez the following day.  Wood does not appear fearful for his safety on the video

7    recording of the July 4, 2014, entry.  However, he testified at the evidentiary hearing and

8    explained that he was fearful for himself and for his employees, and therefore would not agree to

9    reenter any of the villas although he would continue to in assist in the investigation.  He testified

10   that up until the July 4, 2014, entry, he did not really appreciate what he was getting himself into

11   by assisting the investigation.  He testified that after entering the villa on July 4, 2015, "the

12   reality set in, and he was afraid."  Additionally, all of Wood's interactions with the butler staff in

13   the past had been extremely cordial, and the butler's insistence that he and Lopez remain in the

14   pantry area was inconsistent with his prior interaction with villa staff.  Wood also testified that

15   the butler seemed tense, somewhat aggressive, and not as cordial as his relaxed prior interactions

16   had been.

17          Paul Urban also testified that Wood told him after Wood had entered the villa on July 4,

18   2014, that Wood was fearful for his own safety and that of his employees and would not agree to

19   return.  Urban testified that he spoke with Wood after Wood entered the room on July 4, 2014,

20   and "heard concern in Wood's voice."

21          The court appreciates why counsel for the Phuas argue that the videotape of the July 4,

22   2014, entry belies a suggestion that Wood was fearful for his safety based on his contact with the

23   butler.  However, after the evidentiary hearing, the court found both Wood and Urban credible

24   that Wood was genuinely concerned for his safety for cooperating with this investigation and

25   being identified with it.  The court also found Wood credible that he told the agents that he and

26   his employees would not return to the villa to assist in their investigation because of his fear.

27   / / /

28   / / /

### 4.  Macau Arrest.

The motion to suppress argues the affidavit was materially misleading in suggesting that Phua's arrest in Macau had anything to do with illegal activity occurring at Caesars Palace. Paragraph 6 of the affidavit relates that Phua, who is known by law enforcement to be a high ranking member of the 14K Triad, was arrested in Macau on June 19, 2014, with more than twenty other individuals for operating an illegal sport book gambling business.  The affidavit does not disclose how "law enforcement" knows Phua is allegedly a high ranking member of the 14K Triad.  However, it is accurate in stating that Phua was arrested in Macau with more than twenty other individuals for operating an illegal sports book gambling business.

Paragraph 6 also states that prior to "their arrest, Phua and his associates transacted hundreds of millions of dollars in illegal bets on the World Cup Soccer Tournament" and that most of these bets were made through use of the wires, i.e., online or over the phone.  These allegations are conclusory and do not provide any supporting facts for these conclusions. Paragraph 6 goes on to relate that Phua posted bail, was released, and arrived at McCarran Airport in his private jet on June 23, 2014.  Pham then stated that based on his training and experience, he believed Phua and his associates were continuing their illegal gambling business at Caesars Palace.

The court finds these statements misleading.  The testimony was clear that only one of the more than twenty individuals arrested with Phua in Macau checked into Caesars Palace in one of the villas at issue after Phua's Macau arrest.  Paragraph 6 is worded to suggest that "Phua and his associates" are the same associates who were arrested in Macau.  It suggests that after "Phua and his associates" were arrested in Macau for illegal sports betting, they got on Phua's private plane, and traveled to Caesars Palace to continue "their illegal gambling business."  The court does not doubt that this is what SA Pham believed.  However, with the exception of one individual, Pham and other investigators had no reason to attest under oath that anyone other than Phua and the one individual arrested with him came to Las Vegas to continue an illegal gambling business.  In fact, investigators knew that the one individual arrested with Phua in

/ / /

1    Macau was seen gambling in Salon 7, which Phua reserved.  However, they did not know that

2    this individual was staying in villa 8881, 8882, or 8888.

3                          **5.  Financial Transactions.**

4           The government concedes that the warrant contains mistakes about certain financial

5    information.  The government claims the mistakes were not deliberately or recklessly made and

6    not material.  The Phuas argue that the information from Caesars' records that agents were

7    provided disclosed that the deposits and credit lines reported were typical of legal gaming and

8    ordinary, legal transactions that Phua had engaged on prior trips to Las Vegas.

9           Four days of evidentiary hearings exposed what the gaming industry, gaming regulators,

10   long-term residents, and frequent gambling visitors to Las Vegas know, but others may not.  Las

11   Vegas is a tale of two sin cities.  On one side, there are those who profit from high-stakes

12   gamblers, including the casino host and junketeers who invite high rollers to Las Vegas, the

13   marketing people who entice them to stay with $50 million luxury villas provided compliments

14   of the house, and those in the service industry who rely on tips.  The compensation for all of

15   these people is directly related to keeping the guests happy and gambling.

16          On the other side are state and the federal regulators and casino employees responsible

17   for complying with gaming, banking, and money laundering laws and regulations.

18          Testimony and exhibits in the record clearly show the tension between the two sides of

19   Las Vegas.  The people whose livelihoods depend on high rollers are there to facilitate whatever

20   the guests want from, as Mr. Brosius testified, a live tiger in the room or an exotic sports car, to a

21   bowl of only red M&Ms.  The marketing and service side of Las Vegas is the basis of the now-

22   iconic advertising slogan "What happens in Vegas stays in Vegas."  But behind the neon,

23   compliance officers understand that a gaming license is a privilege in Nevada and that those who

24   have one must comply with myriad complex rules, regulations and laws, and they must cooperate

25   with gambling regulators on pain of losing their license and privilege to do business.

26          Defense counsel are correct that investigators could have dug deeper to understand the

27   financial transactions in the records Caesars provided to determine whether they contained

28   evidence of illegal gambling activity.   However, Paul Urban testified that he advised

investigators not to interview the butlers and marketing people precisely because their livelihood depends on keeping the guests happy, and those employees would likely disclose the investigation.  In fact, this is exactly what occurred.  The initial plan was to serve the search warrant on July 12, 2014, during one of the World Cup Soccer Games to hopefully catch the occupants of one or more of the villas "in the act."  That plan was foiled when Paul Urban received a call from a Caesars' executive asking why he had not been told of an ongoing FBI investigation.  As a result, the warrant was executed on July 9, 2014, ahead of plan.

The government has acknowledged the mistakes made in the affidavit that state that Paul Phua deposited $4 million and transferred $3 million to a female occupant at villa 8882.  Pham also testified that he learned after the warrant was submitted that the statement that Paul Phua transferred in excess of $900,000 from a casino in Ft. Lauderdale to a Caesars account was not accurate.  In fact, Phua was only one of the individuals involved in the transfer which went to Yong's accounts.

The court finds that Pham's mistakes about the financial transactions were neither intentionally or recklessly false.  They were mistakes based on a lack of understanding of the records that were provided and based on an unwillingness to talk with the people who could properly interpret them out of fear the investigation would be compromised.  Caesars' own compliance employee, Paul Urban, testified at the evidentiary hearing that his own review of the financial transaction documents showed that "all the money traced back to Phua."  Urban testified that based on his own review of the financial information contained on two pages of the spreadsheet marked as Government's Exhibit 2F, it showed "who was giving who money, and who was giving it back."  While these conclusions may not ultimately be correct, the court finds the affidavit was not intentionally or recklessly false or misleading regarding the financial transactions.

## CONCLUSION

Pham testified he intentionally decided not disclose law enforcement's use of the DSL disruption ruse in the search warrant application because it was law enforcement sensitive, and he wanted to protect Wood's identity as the cooperator.  Having reviewed and considered the

voluminous moving and responsive papers and the testimony from over four days of evidentiary hearing, the court finds that this is the only material omission in the search warrant application. The court finds that the remaining errors and misleading statements identified in this Report and Recommendation were not intentional, but reckless. The investigators' suspicions that Phua was engaged in illegal sports betting at Caesars Palace may be borne out by the evidence recovered in the execution of the warrant. However, a search warrant is never validated by what its execution recovers. *See, e.g., Maryland v. Garrison,* 480 U.S. 79, 85 (1987).

The court finds that the search warrant application, excised of false and misleading statements, does not support a finding of probable cause. The affidavit was written in a way to suggest investigators had much more information linking Phua to an illegal sports betting operation or wire room connected with the occupants of villa 8888. The affidavit's repeated use of the phrase "Phua's and his associates" or "Phua's associates" or "at the behest of Phua or one of his associates" suggests that Phua was making requests and engaging in conduct which he was not. Excised of errors and false or misleading statements, and supplemented with material omissions, the search warrant is fatally flawed and lacks probable cause to support the search of villa 8882.

Based on the foregoing, it is recommended that Defendants' Joint Motion to Suppress (Dkt. #232) be GRANTED.

Dated this 30th day of January, 2015.

Peggy A. Leen
United States Magistrate Judge