UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WEI SENG PHUA, et al.,<br><br>Defendants. | Case No. 2:14-cr-00249-APG-PAL<br><br>REPORT OF FINDINGS AND RECOMMENDATION<br><br>(Jt. Mtn to Suppress - Dkt. #229) |

Before the court is Defendants' Joint Motion to Suppress Fruits of Warrantless Searches (Dkt. #229), which was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  The court has considered the Motion, the government's Response (Dkt. #259), Defendants' Joint Reply (Dkt. #302), the voluminous exhibits attached to the moving and responsive papers, as well as evidence adduced at an evidentiary hearing conducted December 15-18, 2014.  For the reasons explained below, the court recommends that the Motion be granted in part and denied in part.

<u>**BACKGROUND**</u>

**I.      Procedural History.**

Defendants Wei Seng ("Paul") Phua and Darren Wai Kit Phua were initially charged in a criminal Complaint (Dkt. #1) on July 14, 2014.  They were released on cash bonds with Pretrial Services supervision and other conditions following a detention hearing at their initial appearance.  *See* Minutes of Proceedings (Dkt. #20).

On July 29, 2014, the grand jury returned an Indictment (Dkt. #86) charging Defendants with one count of transmission of wagering information in violation of 18 U.S.C. § 1955, and

one count of operating an illegal gambling business in violation of the laws of the State of Nevada, and aiding and abetting in violation of 18 U.S.C. § 2.  The indictment alleges that not later than June 6, 2014, and continuing through July 9, 2014, the Defendants aided and abetted each other and others known and unknown in the business of betting and wagering by knowingly using a wire communication facility for the transmission in interstate and foreign commerce of bets and wagers, information assisting in placing bets and wagers on the World Cup Soccer Tournament in violation of 18 U.S.C. §§ 1084(a) and 2.  Count Two alleges that beginning not later than June 6, 2014, and continuing through July 13, 2014, the Defendants aided and abetted each other and others known and unknown in conducting and financing, managing, supervising, directing, and owning all or part of an illegal gaming business involving sports betting in violation of the laws of the State of Nevada.  The sports betting business involved five or more persons, remained in continuous operation for a period in excess of thirty days, and had a gross revenue of $2,000 in any single day in violation of 18 U.S.C. §§ 1955 and 2.  The indictment contains forfeiture allegations.

Briefing of this motion was delayed while the parties attempted to resolve the case against all of the Defendants by plea negotiation.  After the joint motion to suppress was filed, five of the eight Defendants charged in the initial criminal complaint reached plea agreements with the government, waived indictment, and pled guilty to a misdemeanor information.  The government did not seek an indictment against a sixth Defendant initially charged in the criminal complaint.

## II.    Defendants' Joint Motion to Suppress.

The motion to suppress was jointly filed on behalf of all of the Defendants initially charged in the complaint.  As indicated, five of the Defendants pled guilty and have now been sentenced.  The Phuas, father and son, are the only remaining two Defendants.  During a status and scheduling conference conducted December 12, 2014, before the December 15, 2014, evidentiary hearing, the court addressed how the motion to suppress had been narrowed as a result of the pleas.  The initial motion challenged warrantless entries into three villas at Caesars Palace occupied by all eight original Defendants charged in the initial complaint—villas 8881,

8882, and 8888.  It is undisputed that the Phuas occupied villa 8882.  At the status conference, counsel for the Phuas conceded that they had no standing to challenge warrantless intrusions into the two other villas and that the motion to suppress now addressed only two warrantless intrusions into villa 8882 on July 4 and 5, 2014.

The investigation concerning the Defendants' alleged illegal operation of a sports betting operation in one or more of the three villas as Caesars Palace Hotel & Casino ("Caesars") was initiated in June 2014.  Caesars informed the Nevada Gaming Control Board ("NVGCB") that the occupants of villa 8888 might be operating an unlicensed sports book taking bets on the 2014 World Cup soccer tournament.  An internal investigation was initially conducted by Paul Urban, Manager of Special Investigations for Caesars.  Urban interviewed hotel employees who had been inside of villa 8888 and had seen a number of computers, monitors, and chairs set up in a configuration which resembled a "boiler room bookie operation."  A hotel worker took a photo of the computers and the configuration in villa 8888, and Urban forwarded information about his investigation to the NVGCB on June 23, 2014.  NVGCB contacted the FBI, resulting in a joint NVGCB/FBI investigation.

Caesars cooperated with the NVGCB/FBI investigation and provided extensive records about the villas' residents.  Mike Wood, a principal of Wood Telemanagement & Solutions ("Wood TMS"), a private contractor hired by Caesars to maintain the villas' high-speed internet connections also cooperated in the investigation.  The investigation ultimately resulted in a search warrant for all three villas issued by the Honorable Nancy J. Koppe on July 9, 2014.

The Defendants' motion to suppress focuses on the initial investigation into villa 8888 and makes extensive factual arguments about the lack of any evidence of illegality occurring in villas 8881 or 8882.  Based on documents produced in discovery in this case, the motion argues that the Caesars records provided the government compelling evidence that the residents of the three villas were not operating a sports book together because they were not together prior to or during the World Cup matches, and they rarely interacted.  The motion asserts that investigators did not have probable cause for a search warrant when they began investigating the residents of villas 8881 and 8882.  The joint motion to suppress seeks to suppress evidence obtained during

1    execution of the warrant.   A separately-filed joint motion to suppress argues that *Franks*

2    violations mandate suppression.

3          Defendants concede that government agents were aware that, the father, Wei Seng "Paul"

4    Phua, was staying in villa 8882 and had been arrested in Macau and released on charges of

5    engaging in sports betting in violation of Macau law.  However, Defendants argue that the agents

6    had no evidence that the Macau activities violated U.S. law or that the residents of villa 8882

7    were engaged in any illegal activity in the villas at Caesars.   Nevertheless, agents developed

8    what Defendants characterize as an "extraordinary plan" to conduct warrantless searches of all

9    three villas.  After speaking with Caesars' DSL contractor, Mike Wood, who cooperated with the

10   investigation, agents decided to disrupt the villas' high-speed internet service to cause the guests

11   to report the outage and request it be repaired.  Investigators could then enter the villas on a ruse

12   of fixing the internet connection.  The initial plan was that NVGCB SA Lopez would enter the

13   villas with Wood, posing as one of Wood's employees, to restore the service.

14         The motion alleges that on the morning of July 4, 2014, Wood disconnected the DSL

15   internet service for villa 8888 during the World Cup matches.  The plan was unsuccessful

16   because either the residents did not report an outage to Caesars, or Caesars did not tell Wood

17   about a reported outage.  After the initial plan was unsuccessful, investigating agents contacted

18   AUSA Kimberly Frayn, who is responsible for the case.  The government did not produce any

19   discovery memorializing the subject matter of this discussion, but Caesars produced an internal

20   email which did.  According to the defense, Frayn directed the agents not to cut off the service

21   because "it was a consent issue," so "they could not continue with the engineer plan."  This

22   factual argument was supported by an email attached to the packet of exhibits attached as Exhibit

23   B to the motion and Bates stamped Phua000044.   The subject line of the email refers to a

24   conversation with Mike Wood regarding support to NVGCB.

25         On July 4, 2014, the residents of villa 8882 requested that Caesars provide them with a

26   laptop computer.  Wood and Lopez delivered the laptop with Lopez dressed as a technician to

27   "look the part."  This fortuitously gave agents another excuse to enter the villa.  The butler for

28   villa 8882 met Wood and Lopez at the entry pantry.  Wood falsely told the butler that he was

setting up the laptop, but he was secretly using the villa's Wi-Fi service to confirm the residents of 8882 were using the DSL connection.  Wood and Lopez then falsely told the butler that they needed to go past the pantry to check the internet connection.  The butler explained that the residents had instructed him to keep the villa private and denied them entry.  The butler left the pantry area, and Wood and Lopez entered the interior of the villa.  Lopez heard a soccer game playing in the media room.  The butler intercepted Wood and Lopez.  Wood and Lopez told the butler that they needed to check the internet connection inside the villa.  The butler explained the residents were in the media room, which they wanted to keep private, denied them access to the interior of the villa, and ushered them back to the pantry.  Wood and Lopez recorded the entry into the villa with hidden cameras.  According to the motion, they "scripted their conversation so that anyone who later saw the recordings would believe that they were genuinely acting as technicians would be."

After entering villa 8882, Lopez told Wood he was convinced the residents were operating a sports book out of villa 8882.  According to the defense, Lopez created an FBI form 302 to record the results of the search, but he misrepresented what occurred.  The 302 reflects that when the butler let in Wood and Lopez, he "immediately" said that the residents did not want anyone inside because they did not want anyone seeing their "business."  Defendants argue that this was false because the butler's statement about the occupants not wanting anyone to see their "business" occurred after the butler left the pantry, and Wood and Lopez entered the villa contrary to the butler's instruction.

The following morning, on July 5, 2014, Wood disconnected the DSL service to villa 8882.  The residents reported the outage to Caesars which sent its own engineer to the villa. When the engineer saw that the router had no internet connection, he called Wood.  The government knew that the DSL connection could not be restored inside the villa, and it could only be fixed from the outside.  Wood nevertheless escorted Lopez and FBI SA Michael Kung, dressed as TMS technicians, to villa 8882 on the ruse of fixing the problem.  The only purpose for the ruse was to gain entry into villa 8882 to gather evidence without a warrant.  When Lopez and Kung arrived at villa 8882, they were admitted by the female Caesars butler on duty, who

asked if they were there to fix the DSL.  The butler admitted them and took them to the media room where the router was located.  The motion argues that in the media room, the agents observed five individuals focused on the soccer game on television, and nothing that the agents saw inside the villa was consistent with the operation of a sports book.  Only the Phuas had laptop computers, and neither was attached to a phone.  No one in the room was working or communicating by phone or with anyone outside the room.

Lopez and Kung saw the red light on the router which showed it was not receiving an internet connection and placed a speaker phone call to Wood.  Wood falsely claimed to be examining the external equipment to diagnose the problem, but he was actually stalling to give the agents more time to examine the media room.  Lopez assured Paul Phua that they would get the DSL working, and when the agents had seen everything possible from their location in the room, Lopez used a "secret code word" to tell Wood to restore the DSL.  The agents remained in the room after the connection had been restored and used their own laptop that showed the Wi-Fi connection was working.  They maneuvered behind the residents on their laptops and asked the residents whether the connection was working.  This allowed the agents to see what appeared to be betting odds and a message on Paul Phua's laptop to the effect "good luck with the hedge bet."  Darren Phua tried to keep the contents of his screen private, but the agents caught a glimpse of the login page of a sports betting site.

Based on a transcript of the video-recorded entry, the Defendants argue that Lopez recognized that the sports-betting site the residents of 8882 were viewing was used to "wager," i.e., to place, not take, bets.  Both SAs Lopez and Kung later prepared 302s that created the false impression that the agents were invited into the villa to respond to a genuine outage and acted as actual technicians would have.  As late as October 1, 2014, the agents prepared additional 302s "to supplement and to clarify," which continued to claim that SAs Lopez and Kung responded as technicians for the DSL in villa 8882.  In fact, the residents of 8882 merely reported the outages to Caesars.  The residents were unaware that the government caused the outage and that neither agent could fix the problem they manufactured as a ruse to enter the villas.

/ / /

1      Lopez recorded video with a hidden camera of the second entry into villa 8882, but he

2  started recording only after Wood had disabled the DSL.  The defense argues that the recording

3  is tailored to create the false impression that the agents genuinely fixed a real outage.

4      The agents subsequently applied for a warrant to search all three villas.  The application

5  cites facts garnered during the course of the warrantless intrusions in attempts to link the

6  residents of all three villas together.  However, Defendants argue the application falsely

7  characterizes the warrantless searches and concealed from the issuing magistrate judge that the

8  agents caused the outages, that the residents did not contact Wood, that the agents could not

9  repair the outages from inside the villa, and that the agents only obtained the evidence used to

10  support the search warrant application by remaining in the villas after the DSL was restored.

11      Based on this factual background, the motion seeks to suppress all the fruits of the

12  warrantless intrusions including evidence secured in the execution of the search warrant that was

13  ultimately issued.  Defendants argue that Wood was unquestionably a government agent actively

14  participating in this investigation.  Defendants contend that Wood and the agents intruded on the

15  Defendants' constitutionally-protected zone of privacy by entering and searching the villas.

16  Absent an applicable exception to the warrant requirement, the fruits of their entries should

17  therefore be suppressed.  Defendants acknowledge that the government is not required to secure

18  a warrant if a resident freely and voluntarily consents to an entry, i.e., makes a conscious,

19  uncoerced choice to give up privacy.  Defendants also acknowledge that courts have held that an

20  agent may deceive residents about his identity if invited in to commit a crime.  Defendants

21  concede that the courts have held that law enforcement agents may go into a home without

22  creating a false identity if it is open to the public, for example, if a house is offered for sale.

23  However, Defendants contend that these decisions do not justify the warrantless intrusions that

24  occurred here.

25      The Defendants maintain that a search warrant was required to enter the villa and that the

26  consent exception to the warrant requirement does not apply to the facts of this case.  The

27  government has the heavy burden of proving consent, and the government's burden is heaviest

28  when it claims that it received consent to search a home or hotel.  Without evidence learned from

the warrantless intrusions into villa 8882, the Defendants argue that the magistrate judge would not have issued the search warrant.  The Ninth Circuit has held that suppression is appropriate where, as here, unlawfully obtained evidence was used to obtain a warrant.  Because the initial warrantless intrusions violated the Fourth Amendment, everything uncovered as a result of the intrusions must be suppressed.

Additionally, the Defendants argue there are three reasons the government cannot satisfy its heavy burden of proving that they consented to the warrantless entries.  First, government agents used a false identity and created a fictitious service outage to deceive the Defendants into giving up their privacy when the government had no reasonable basis to suspect the villas contained evidence of illegality.  Second, the Defendants did not consent to the search within the meaning of the Fourth Amendment because the government used the outages and their own appearance as Caesars' technicians "to thwart the residents' desire to maintain their privacy."  Third, the residents only granted a limited license to repair the internet connection, which the agents violated by unnecessarily entering the villas and engaging in searches after they had restored the DSL.

Citing *United States v. Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993), the Defendants argue that under general Fourth Amendment principles, the use of a ruse becomes a search if it intrudes on the person's reasonable subjective expectation of privacy.  An individual has a legitimate expectation of privacy if he has a subjective expectation that his activities would be private, and it is an expectation society is prepared to recognize as reasonable.  Here, the Defendants had a reasonable expectation of privacy in their villa.  They did not invite strangers in and sought to exclude them.  When Wood and Lopez arrived at villa 8882 on July 4, 2014, to deliver the laptop, they were refused entry into the private areas and were told to remain in the butler's pantry.

Defendants argue that the residents' expectation of privacy "is not diminished by [the] wildly hypothetical possibility that someone was purposely disconnecting their internet access in order to create an excuse to come in."  Defendants reason that no one expects a hotel will permit someone to interfere with basic services, and when the power goes off, the water stops running,

or internet connection stops working, the guests will, of course, call the front desk and admit a hotel engineer who comes to the door.

Relying on a press release describing a Federal Communications Commission fine of Marriott hotel chain for interfering with its guests' Wi-Fi access, Defendants argue that "the expectation of privacy is greatest with respect to internet services." Defendants also argue that interfering with individuals' use of their computers is a federal crime under the Computer Fraud and Abuse Act and a state crime under NRS 205.447(1).

Defendants contend that the government violated the Fourth Amendment by deceiving them into giving up their privacy without any reason or basis to believe they would find evidence of illegality in the villas. Defendants argue that when agents engage in affirmative deception about their identities to trick a person into giving up privacy, the resulting intrusion is per se unconstitutional absent reasonable suspicion of illegality. Defendants cite *State v. Ahart*, 324 NW 2d 317, 319 (Iowa 1992), *United States v. Benezario*, 339 F. Supp. 2d 361, 364, 368 (D. P.R. 2004), *United States v. Maldonado Garcia,* 655 F. Supp. 1363, 1367 (D. P.R. 1987), and *People v. Reeves*, 391 P.2d 393, 396 (Cal. 1964), to support their arguments that it is well-settled in both state and federal courts that an entry obtained by trickery, stealth, or subterfuge renders a search and seizure invalid.

Defendants maintain that the dispositive question is whether the agents had any reasonable basis to believe that there would be evidence of illegality in villa 8882. Defendants argue that there was no evidence tying the occupants of 8882 to any crime. To the contrary, substantial evidence contradicted the agents' theory that the residents of all three villas were operating an illegal sports book together. Defendants also argue that the government's systematic and sustained efforts to evade the warrant requirement "easily distinguish[] this case from any other ever approved by any court." The cases which have held that the Fourth Amendment permits an undercover agent to enter a residence on the basis of "mistaken consent" involve "one-off isolated intrusions." This case, however, involved an extensive, multi-day scheme, employed sophisticated equipment and multiple layers of participants, and included the participation of government agents, Wood and his employees, and employees of Caesars.

Even if the agents had reasonable suspicion to believe the residents of 8882 were engaged in illegal conduct, the warrantless intrusions would have violated the Fourth Amendment because this is not a case of mistaken consent, but a case of no consent at all.  The occupants did not make an independent choice to surrender their privacy uninfluenced by government coercion.  Citing *Hoffa v. United States,* 385 U.S. 293, 301 (1996), Defendants argue the Supreme Court has recognized that the Fourth Amendment can "be violated by guileful as well as forcible intrusions into a constitutionally protected area."  For this reason, the government's deception is an important factor in finding the Defendants did not consent to an intrusion.  Defendants maintain that the legal question here is whether this particular ruse frustrated the purpose of the constitutional requirement that consent to a warrantless entry to search a home be voluntary and free of implied or express coercion.

Defendants argue the government's scheme violated the Fourth Amendment because it overcame the residents' "reticence or resistance to the search."  The government violated the Fourth Amendment by inducing the residents to give up their privacy by disconnecting the DSL and forcing the residents to report the outage and request repair.  The government also violated the Fourth Amendment by inducing the residents to give up their privacy when Wood and the agents appeared as technicians "with the apparent authority to enter the villas."  Defendants reason that an individual cannot voluntarily consent to a search by a person who represents he is employed by the property owner.  Here, the residents did not consent to any person entering the villa.  Rather, they told Caesars that the internet was not functioning and indicated that it should be fixed.  This did not constitute authorization for a third party to enter the villa.  Defendants maintain that a reasonable hotel guest would not believe, or would at least doubt, that he had the authority to refuse to permit technicians acting at Caesars' directions to enter to repair Caesars' telecommunications equipment.  By terminating the villas' internet access and entering the villas while posing as technicians with the authority to be on the premises, the government deprived the residents of the opportunity to make a genuine choice whether to consent to the agents' entries and searches.  Thus, the searches violated the Fourth Amendment.

/ / /

Finally, Defendants argue that even if an individual mistakenly consents to an intrusion by a government agent, he retains the expectation of privacy that the agent-invitee will act as a private person would in the same circumstances.  The scope of the residents' consent is "limited to conduct which would be normal for one adopting the disguise used in seeking entry."  In this case, the agents exceeded the scope of Defendants' consent by unnecessarily entering the villa.  The only purpose for allowing entry was to repair the internet connection, which could have been repaired outside of the villa.  Additionally, the agents' false claim that they were there to repair the internet connection was a trespass because of the misrepresentation of material facts to gain admission.  The Defendants rely on the *Restatement (Second) of Torts*, §§ 173 and 892B to support this argument.  Defendants acknowledge it is not trespass to withhold an ulterior motive that would lead a homeowner to exclude a person he is otherwise willing to admit.  However, it is trespass to gain entry to an otherwise private space by misrepresenting that the invitee will provide an "authorized service function."  The agents also exceeded the scope of the Defendants' consent by unnecessarily remaining in the villa to conduct a search after Wood had restored the DSL from outside the villa.  For all of these reasons, the court should grant the motion to suppress.

### III.    The Government's Response.

The government opposes the motion, acknowledging that this case involves the use of a ruse by law enforcement officers to obtain Defendants' consent to enter villa 8882 after Caesars reported substantial evidence that Defendants were using DSL lines to conduct an illegal internet sports betting operation to law enforcement.  The government claims that under Caesars' internet access terms of use, Caesars retained the right to terminate internet service if used for illegal activity.

The government maintains that the Defendants may only seek suppression on an alleged illegal entry into villa 8882 where they were staying.  The government contends that the question whether the use of the ruse to enter villa 8882 violated the Fourth Amendment turns on the unique facts of this case in which the government briefly disconnected a DSL line that Caesars installed for Defendants to supplement the Wi-Fi already provided by Caesars.  The government

did not disrupt the Wi-Fi or any other essential or non-essential service to the villa.  The ruse was therefore not coercive, and Defendants' consent was valid.

The government disputes that the use of a ruse must be supported by reasonable suspicion.  However, even if reasonable suspicion was required to proceed with a ruse, the agents had ample suspicion in this case.  The government also disputes that it exceeded the scope of the Defendants' consent when agents entered the villas.  The government's opposition outlines what it contends was reasonable suspicion to believe the occupants of all three villas were engaged in an illegal sports betting operation.

A Caesars VIP Services employee reserved several villas, including 8881, 8882 and 8888 "at the behest of Paul Phua, Richard Yong or one of their associates in anticipation of their arrival in Las Vegas in June 2014."  Richard Yong checked into 8881 June 6, 2014.  Hui Tang checked into villa 8888 June 7, 2014, and Paul Phua checked into villa 8882 June 11, 2014.

The government maintains that in June 2014, law enforcement knew Paul Phua was a high-ranking member of the 14k Triad.  The government also contends that prior to their arrivals in these villas, "Paul Phua and his associates requested that Caesars provide them with an unusual amount of electronics equipment and technical support, which they requested be installed in the villas."  On June 22, 2014, Caesars sent several electrical engineers to villa 8888 to assist with setting up the equipment.  A Caesars engineer, J.A., later told a Caesars investigator that the equipment in villa 8888 appeared to be setup for an illegal gaming operation.  J.A. also told law enforcement that he saw a computer screen with words in the Chinese language and several columns of numbers that looked like betting odds, similar to what J.A. was familiar with in sports betting in casinos.

Another Caesars engineer, J.S., made similar observations on June 22, 2014, and reported there were five stations set up in the room, with three monitors attached to each station, and that each station's computer tower was hooked up to a Century Link DSL line with voice-over internet protocol phones.  Near the computer stations, J.S. saw three large-screen televisions with service from Cox, Dish and DirecTV—each of which was tuned to the World Cup.  J.S. reported that one of the chief complaints of the villas' occupants was the time delay between the video

signals of each service.  J.S. reported he believed that an illegal sports book betting was being conducted in villa 8888.

On June 30, 2014, Caesars' investigator provided the FBI and Nevada Gaming agents with photographs of the equipment set-up in villa 8888.  NVGCB SA Lopez reviewed the photos and concluded they were part of a "wire room" where illegal wagers were made and monitored.

Additionally, law enforcement was aware that on June 18, 2014, Paul Phua traveled from Las Vegas to Macau, where he was arrested on June 19, 2014, with twenty others for engaging in organized crime and operating an illegal sports book gambling business.  The opposition maintains that prior to their arrest, "Paul Phua and his associates" transacted hundreds of millions of dollars in illegal bets on the World Cup soccer tournament.[1]  Phua was released from custody in Macau and traveled to Las Vegas on June 23, 2014.

In early June 2014, Wood TMS was contacted by Caesars VIP Services Group to install additional fax machines into villas 8881, 8882 and 8883, and to install DSL lines in those villas and in 8888.  Wood TMS installed a DSL line into villa 8888 on June 8, 2014, which allowed for a hard connection for four computers.  Caesars received a request from villa occupants which was forwarded to Wood TMS to install a DSL connection that would allow a hard connection for five computers.  However, Wood TMS did not have the ability to meet the request.  Wood had also installed DSL lines in villas 8881 and 8882 on June 10, 2014.

During the month of June 2014, Wood TMS employees responded to requests for service in villas 8881, 8882 and 8888, and entered the villas on at least two occasions to respond to calls for service.

On June 30, 2014, SA Lopez contacted FBI SA Minh Pham about the investigation and forwarded the photographs taken of the computer equipment in villa 8888.  SA Lopez and FBI SAs Justin Nwadiashi and Pham interviewed Wood about the work he had done inside villas

---

[1] The government supports this allegation by information retrieved from Phua's laptop, tablet, cell phone, and information recovered from a computer in villa 8888, presumably as a result of the search warrant executed in this case.  It is axiomatic that a warrantless search and seizure is never justified by what it uncovers.  *See, e.g., Maryland v. Garrison,* 480 U.S. 79, 85 (1987).

8881, 8882, 8883, and 8888 on July 3, 2014.  The Caesars investigator and Wood TMS agreed to assist law enforcement in their investigation and asked Wood how they could surreptitiously gain entry to the villas.  Various ideas were discussed, including the intentional disruption of services such a cable or DSL.  A plan was developed to disrupt DSL service in villas 8882 and 8888 on July 4, 2014, to generate a call for service, with the help of the DSL contractor, Wood TMS.

On July 4, 2014, "one of Phua's associates" requested that Caesars' VIP Services deliver a laptop computer to villa 8882.  This request was emailed to Wood TMS who conveyed the information to the Caesars investigator, who in turn conveyed it to SA Lopez.  The laptop request was used as a means to get an undercover agent inside villa 8882.  On July 4, 2014, SA Lopez accompanied the DSL contractor into villa 8882 under the guise of delivering the laptop.  According to the government, the DSL contractor, acting on his own, later entered and videotaped the inside of villa 8881.  Lopez and the DSL contractor were admitted into the butler's pantry area in villa 8882.  While inside, they could hear noises consistent with the soccer game on television.  Lopez and Wood left the pantry and walked into villa 8882 toward the media room where the butler reappeared and "assertively informed them to go back to the pantry."  Wood later reported to SA Lopez that the butler's aggressive actions were so intimidating that he was fearful for his safety and would not go back into villa 8882.

The DSL disruption did not generate a call for service on July 4, 2014, and the agents left Caesars.  Later in the afternoon, however, Wood received a call that the DSL in villa 8881 was not working.  Wood investigated and learned that Wood TMS had accidentally disconnected DSL service to villa 8881, rather than to villa 8882 and 8888 as planned.  Wood reconnected the DSL lines and, according to the government, responded to a service call from villa 8881 on his own volition and without any direction or contact with law enforcement.  During this call for service, Wood entered villa 8881 and took a short video inside.  The video captured a phone list with names and villa numbers of the villas' occupants.  In the media room, the video captured an individual on a computer which displayed a sports betting odds-related website.

After leaving villa 8881, Wood contacted SA Lopez, explained the mistake, and informed Lopez that he had reconnected the DSL and that he had shot a short video inside of villa 8881.

Law enforcement met with Wood at his office at Caesars where Wood turned over a copy of the video. SA Pham believed that one of the people in the video seated at the computer in villa 8881 was Richard Yong. The agents and Wood agreed to come back the next day and disconnect the DSL for 8882 as originally planned.

On the morning of July 5, 2014, the government represents that SA Lopez and Kung entered villa 8882 after Wood TMS disconnected the DSL service there. The agents were acting undercover, disguised as DSL technicians. Wood instructed them so they would appear to be legitimate technicians. Approximately thirty minutes after the DSL was disconnected, Paul Phua reportedly directed the butler to make an urgent request for technical assistance to fix the DSL in villa 8882. A Caesars engineer was called to respond to the call for service. However, once he discovered that the issue was DSL-related, the engineer contacted the DSL contractor. Lopez and Kung, posing as technical support assistants, entered villa 8882 equipped with concealed audio and video recording devices which they kept on while working in villa 8882. Lopez and Kung saw Paul Phua, Richard Yong, Darren Phua, and two of their associates in the media room. Kung saw Paul Phua sitting at a laptop computer which was displaying both the website "SBOBET" and an active instant messaging window. The agent saw Paul Phua clicking on numbers, which Lopez believed were sports wagering odds on the SBOBET website, and SA Kung observed an incoming message to Phua stating "good luck on the hedge bet" or something similar. Kung later accessed SBOBET and confirmed that it was an illegal Asian online wagering website.

SA Lopez observed Darren Phua using another laptop computer, which showed a login screen for an illegal sports wagering site. Phua switched to a Google search page when he saw SA Lopez approaching his computer. SA Lopez connected the DSL modem to a laptop Wood had given him to use as part of the ruse to make it look like he was legitimately trying to fix the problem. Lopez talked to the occupants of the room and asked if they were able to connect to it. After learning that the DSL was disconnected and not working, SA Kung went into another room, possibly villa 8881, which is connected to villa 8882 by an internal hallway, to look at a modem. Lopez called Wood, appearing to converse about correcting the service outage. The

call was a prearranged signal for Wood to reconnect villa 8882's DSL.  The DSL connection was re-established, agents confirmed it was working, and they left villa 8882.

A search warrant was obtained from United States Magistrate Judge Nancy J. Koppe on July 9, 2014, to search villas 8881, 8882, and 8888 based on information learned during this investigation.

The government's opposition emphasizes what claims the Defendants have not made. Specifically, the Defendants do not claim any Fourth Amendment violation related to: (1) entries into the villas by Caesars employees and contractors prior to July 4, 2014; (2) information Caesars provided about the Defendants and their use of the villas to the government; or (3) that the DSL disruption itself was a Fourth Amendment violation "as that action involved no entry, trespass, or seizure."  Thus, the government frames the issues to be resolved as: (1) whether the agents violated the Fourth Amendment when they responded to Defendants' call for service and entered villa 8882 on July 4 and 5, 2014, without a warrant; and (2) whether Defendants' consent was vitiated because the government provoked Defendants by disrupting the DSL service "which was only essential for the illegal gaming operation, but nothing else."

The government's opposition was filed before this case was resolved against all Defendants except Paul and Darren Phua.  The opposition therefore argued which Defendants had standing to challenge the entries into which villas.  As indicated, during the December 12, 2014, status conference, counsel for the Phuas acknowledged that the Phuas only have standing to challenge entries into villa 8882.

The government maintains that the July 4 and 5, 2014, intrusions into villa 8882 were an appropriate law enforcement technique used every day in undercover operations, and that consent obtained by law enforcement ruses is valid unless the deceit leaves the occupant with no choice but to consent to an entry.  In this case, the ruse involved a brief disruption of DSL service for which no Fourth Amendment intrusion was necessary.  The ruse did not interfere with the occupants' other means of internet access, was not coercive, and therefore the motion to suppress should be denied.

/ / /

Consent is a recognized exception to the warrant requirement which balances societal interests against the individual's interest to be left alone.  The government acknowledges that it has the burden of proving consent, by a preponderance of the evidence, citing *United States v. Snype*, 441 F.3d 119 (2nd Cir. 2006).  The government relies on a line of cases which have upheld warrantless entries based on law enforcement ruses in which a law enforcement agent misrepresents his identity or purpose.

The government acknowledges that in "certain extreme circumstances," a ruse or trick can undermine an otherwise consensual encounter.  Citing *United States v. Hardin*, 539 F.3d 404, 424-25 (6th Cir. 2008), the government argues it is only when the effect of the ruse is to convince the resident that he or she had no choice but to invite the undercover officer in that the consent is considered involuntary, resulting in a Fourth Amendment violation.  For example, law enforcement may not use a ruse which purportedly creates a life-threatening emergency or deprives an occupant of an essential service such as water.  Quoting *Hardin*, the government argues the question under the Fourth Amendment is whether the police misrepresentation of purpose is so extreme that it deprived the individual of the ability to make a fair assessment of the need to surrender his privacy.  In this case, the occupants of the villas had regular Wi-Fi internet service, and disconnection of the DSL was not so extreme as to deprive the Defendants of making a fair assessment of the need to surrender their privacy.

The government points out that the Defendants rely on decades-old, non-binding cases to support their argument that reasonable suspicion is required before a ruse may be initiated.  However, the court need not reach this issue because, here, law enforcement had a reasonable basis for suspecting criminal activity in all three villas before employing the ruse.

The government also argues that there was no Fourth Amendment violation when SA Lopez accompanied Wood into villa 8882 to deliver the laptop the occupants had requested.  The government maintains that Wood was acting on "a private frolic outside of any agency relation with the [government]" when he entered 8881 and videoed the interior on his own initiative.  The government was not involved either directly as a participant, or indirectly to encourage Wood, to enter villa 8881 and video what he saw.

1    Similarly, the government contends that agents did not violate the occupants' Fourth

2 Amendment rights when they entered villa 8882 after the DSL was disrupted on the ruse of

3 repairing the internet because DSL was a non-essential service.  The Defendants have no basis to

4 argue that they had no choice but to allow Caesars technicians to enter their villa to repair the

5 DSL as no emergency was presented.  The government reiterates that the hotel's Wi-Fi provided

6 continuous, uninterrupted access to the internet.  Disconnecting the DSL disrupted only the

7 occupants' ability to operate their illegal bookmaking operation.  Thus, the ruse did not strip

8 Defendants of their ability to make a fair assessment of whether or not to surrender their privacy,

9 as Defendants argue.  The government argues that consent is not vitiated merely because the

10 consenting occupant is later surprised that the person to whom he voluntarily revealed his

11 unlawful conduct turned out to be a police officer.  The Defendants had the choice of whether

12 and when to admit SA Lopez and Kung to enter villa 8882 and were "not faced with the *Hobson*

13 choice of no internet access or calling for service."

14    The Supreme Court has held that an officer may legitimately obtain an invitation into a

15 house by misrepresenting his identity, which is what SAs Lopez and Kung did by posing as

16 Caesars technicians.  Once inside, the agents may constitutionally observe anything in plain view

17 as long as they do not exceed the scope of their invitation.  The government disputes that their

18 entry exceeded the scope of the consent provided on either July 4, 2014, when they delivered the

19 laptop, or on July 5, 2014, when they pretended to fix the DSL connection.

20    Finally, the government argues that Caesars' "Internet Access Terms of Use" with its

21 customers gave it the right to terminate the DSL connections at its discretion.  The Terms of Use

22 permitted Caesars to immediately terminate internet access if, in its sole discretion, its customer:

23 (1) used internet service for "financial gain, commercial activity, or illegal activity"; and (2)

24 infringed "on the rights of Caesars Entertainment, Hospitality or a third party, or that has

25 otherwise violated any intellectual property laws or regulations."  The Terms of Use warn

26 patrons that Caesars intends to monitor and collect internet traffic.  The patron agrees that

27 Caesars has the right to protect itself or its subscribers, and to disclose any information as

28 necessary to satisfy any law enforcement regulation or other governmental request.  These Terms

of Use diminish any expectation of privacy in the complimentary internet service the Phuas received.

The government argues that it is not seeking to create a broad change in legal precedent. The government asserts that the disruption of the DSL in this case is more analogous to drug cases where law enforcement is invited onto the premises to help the trafficker run his business than to the cases that have held that disruption of essential services is constitutionally unreasonable.

**IV.     Defendants' Reply.**

Defendants' reply reiterates arguments that reasonable suspicion is required to use a ruse which deceives an occupant about an agent's identity to gain access to private property.  The reply also argues that the intrusion into the interior of villa 8882 on July 4, 2014, violated the Fourth Amendment because agents exceeded the scope of the Defendants' consent.   The warrantless searches of 8882 after the DSL was terminated violated the Fourth Amendment because the Defendants did not give voluntary consent but were induced to believe they had to admit a technician from outside the premises to repair the DSL service.  Wood and the agent falsely misrepresented themselves as having the authority to enter the villas.  Finally, the search of villa 8882 after the DSL was disconnected violated the Fourth Amendment because it "exceeded the scope of any supposed consent."

The reply points out that the government does not dispute that it intentionally disconnected the DSL service as a ruse to gain entry into the villa.  The government's position that the intrusions were constitutional presents a grave threat to privacy.  The government downplays the significance of its conduct.  The agents not only lied about their identity, but also they "disrupted life inside the villas in order to force the occupants to open the doors."  This was a scheme that no one, crooked or not, would refuse.  If the facts are unique in this case, it is because the government's actions are unusually egregious, and the government does not articulate a limiting principle that would protect ordinary citizens from flagrant violations of privacy in the sanctity of their homes.

/ / /

The reply suggests that the government does not believe its own rationalizations because of the "extraordinary cover-up" it undertook to prevent this court and the Defendants from discovering what actually happened. The agents did not create any documents that acknowledged the scheme until after Defendants provided the U.S. Attorney's Office with a draft of the motion to suppress. Defendants maintain they would never have known about the ruse but for an inadvertent slip-up between Wood and Lopez on one videotape.

Defendants acknowledge no binding precedent exists that applies to the facts of this case, and the lower courts have made conflicting statements. Defendants argue that this is probably because law enforcement rarely engages in such a brazen, suspicionless, covert operation. The better view is that reasonable suspicion is required before a law enforcement ruse may be employed to gain access to a home. The government's contrary view would advance a rule of law that is not reasonable under the Fourth Amendment.

**V.    The Evidentiary Hearing**.

Four days of evidentiary hearing were conducted between December 15 and 18, 2014. The government called Christian Brosius, Special Agent Minh Pham, Ka Meng "Cheri" Leong, Special Agent Creighton Felt, Paul Urban, Michael Wood, Special Agent Mike Kung, and Special Agent Rick Lopez, and submitted the stipulation of counsel concerning the testimony of Gerald "Willy" Reichel. Defense counsel called Orlie Co. The parties stipulated to the admission of the vast majority of exhibits which were voluminous.

**DISCUSSION**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people, not places." *Id*. To contest a search, a defendant must establish a legitimate expectation of privacy in the place searched. *See United States v. Bautista,* 362 F.3d 584, 589 (9th Cir. 2004). The Fourth Amendment protection against unreasonable searches and seizures extends to hotel or motel rooms. *Id*. Unless the rental has expired when the search is conducted, an occupant of a hotel or

1   motel room has a reasonable expectation of privacy in the room.  *Id.*  Evidence obtained in

2   violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit

3   of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

4   **I.     The Warrant Requirement.**

5          The Supreme Court has repeatedly held that the touchstone of the Fourth Amendment is

6   reasonableness.  *Brigham City v. Stuart*, 547 U.S. 397, 403 (2006).  When law enforcement seeks

7   to discover evidence of criminal wrongdoing, reasonableness generally requires a search warrant.

8   *See Vernonia School District 47J v. Acton*, 515 U.S. 646, 653 (1995).  In the absence of a search

9   warrant, a search is reasonable only if it falls within a specific exception to the warrant

10  requirement.  *See Riley v. California*, 134 S. Ct. 2473, 2482 (2014).  Or, as the Ninth Circuit has

11  stated, a warrantless search is unconstitutional unless the government demonstrates that it falls

12  within certain well-established exceptions to the warrant requirement.  *See United States v.*

13  *Brown*, 563 F.3d 410, 414 (9th Cir. 2009) (internal citation omitted)).

14  **II.    The Consent Exception.**

15         Consent is one such exception, and the Supreme Court has held that a warrantless search

16  conducted pursuant to a valid consent is "constitutionally permissible."  *Schneckloth v.*

17  *Bustamante*, 412 U.S. 218, 222 (1973).  A search conducted without a warrant does not offend

18  the constitution "if conducted pursuant to the valid consent of a person in control of the

19  premises."  *United States v. Kaplan*, 895 F.2d 618, 622 (1990).  It is the government's burden to

20  demonstrate that consent was voluntary.  *See United States v. Papaya Soriano*, 361 F.3d. 494,

21  501 (9th Cir. 2002).  Where the validity of a search rests on consent, the government has the

22  burden of proving that consent was freely and voluntarily given.  *See Florida v. Royer,* 460 U.S.

23  491, (1983).  The government's burden of establishing consent was freely and voluntarily given

24  "is not satisfied by showing a mere submission to a claim of lawful authority."  *Id.*  The

25  government's burden is to prove consent by a preponderance of the evidence.  *See, e.g., United*

26  *State v. Whitten,* 706 F.2d 1000 (9th Cir. 1983).  The court applies a totality of the circumstances

27  test to determine whether consent was "freely and intelligently given."  *United States v. Basher*,

28  629 F.3d. 1161, 1168 (9th Cir. 2011).

1       Consent may be inferred from non-verbal actions, but it must be "unequivocal and

2  specific" and "freely and intelligently given." *Id.* at 1167 (quotations and citations omitted)

3  (finding a defendant who affirmatively nodded his head when asked by an officer if his son

4  would retrieve a shotgun from a tent consented).   The Ninth Circuit found consent in a case

5  where the defendant opened the door after the police stated they would like to talk to him, and

6  the Defendant responded, "Ok," nodded, and stepped back.  *See United States v. Garcia*, 997

7  F.2d 1273, 1281 (9th Cir. 1993).  The question of whether a consent to search was voluntary or

8  the product of duress or coercion, express or implied, is a question of fact to be determined from

9  the totality of all the circumstances.  *Id.* (citing *Schneckloth,* 412 U.S. at 227).  "On appeal,

10  evidence regarding the question of consent must be viewed in the light most favorable to the

11  fact-finder's decision." *Kaplan,* 895 F.2d at 622.

12       Law enforcement does not need probable cause to ask questions or request consent to

13  search, so long as the consent is not coerced.  *See Schneckloth*, 412 U.S. at 225.  In fact, law

14  enforcement officers may initiate consensual encounters without a showing of reasonable

15  suspicion. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) (holding no suspicion was needed to

16  justify a "knock and talk" or "walk and talk").

17       In general, the Ninth Circuit considers five factors in determining whether consent was

18  voluntarily given: (1) whether the defendant was in custody; (2) whether the arresting officer had

19  his gun drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was

20  notified that he had a right not to consent; and (5) whether the defendant had been told that a

21  search warrant could be obtained.  *See United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir.

22  2002).  All five factors need not be present to determine a search was consensual.  *See United*

23  *States v. Cormier*, 220 F.3d, 1103, 1113 (9th Cir. 2000).   No single factor is dispositive.

24  *Schneckloth*, 412 U.S. at 226-27; *Kaplan*, 85 F.2d at 622 (stating "there is no single controlling

25  criteria").  This five-factor test provides little guidance to the court in resolving consent obtained

26  by ruse or deception.

27  / / /

28  / / /

**III.     Consent by Deception.**

There are at least three separate consent by deception lines of cases which provide guidance about whether consent by deception comports with the requirements of the Fourth Amendment.   One line of cases involves law enforcement agents who pose as criminals or friends or acquaintances of criminals and use artifice, stratagem, stealth, and strategy to "catch those engaged in criminal enterprises."   *See Sorrells v. United States,* 287 U.S. 435 (1932) (collecting cases).   These cases hold that law enforcement officers may, consistent with the Fourth Amendment, conceal their identity to obtain an invitation to enter a suspect's home. These cases reason that the Fourth Amendment does not protect wrongdoers from misplaced confidence in their associates and visitors.   The Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa,* 365 U.S. at 302.

In *United States v. Glassel*, the Ninth Circuit held that a law enforcement officer may legitimately obtain an invitation to a house by misrepresenting his or her identity.  488 F.2d 143, 145 (citing *Lewis v. United States*, 385 U.S. 206, 210 (1966)).   If invited inside, the law enforcement officer "does not need probable cause to enter, he does not need a warrant, and quite obviously, he does not need to announce his authority and purpose." *Id.*   However, once inside, the officer may not exceed the scope of his invitation by ransacking the house generally, but may seize anything in plain view.   *Id.* (citing *Lewis*, 385 U.S. at 210-11, and *Coolidge v. New Hampshire*, 403 U.S. 499 (1970)).

Similarly, in *United States v. Bramble*, 103 F.3d 1475, 1477 (9th Cir. 1996), the defendant invited undercover police officers into his home to negotiate the sale of illegal sea otter pelts.  103 F.3d at 1477.  While there, the defendant also showed the police officers parts of a bald eagle, a golden eagle, a red tail hawk, and a grey horned owl, all of which were unlawful to possess.  *Id.*   One officer also observed what appeared to be a vial of cocaine on the dining room table. *Id.*   The court found that the defendant's consent in allowing the undercover agents into his home was not vitiated because the officers did not conduct a search beyond the scope of the defendant's consent.  *Id.*   They remained in the area where the defendant had invited them,

1   and they only acted in furtherance of the purpose for which they had been invited, *i.e.*, to conduct

2   an illegal transaction.

3        A second line of consent by deception cases involves law enforcement officers who

4   conceal their identity and purpose to gain entry for a legitimate or lawful purpose, such as to buy

5   a home, rent an apartment, or to provide a good or service. *See*, *e.g., United State v. Miller*, 688

6   F.2d 652 (9th Cir. 1982); *United States v. Scherer*, 673 F.2d 176 (7th Cir. 1982) (cert denied 457

7   U.S. 1120) (agent posing as cousin of an informant invited on property to build duck blinds);

8   *United States v. Wagner*, 884 F.2d 1090 (8th Cir. 1989) (officer dressed as a UPS employee

9   accompanying a genuine UPS employee to deliver a package); *United States v. Wright*, 641 F.2d

10   602 (8th Cir. 1981) (officers pretending to have car trouble and asking for tools and a flashlight

11   who see drugs inside when door opened). The rationale for this line of cases is that the Fourth

12   Amendment does not protect what people voluntarily expose to view on the mistaken belief that

13   incriminating evidence they allow others to see will not be used against them.

14        The third line of consent by deception cases involves law enforcement officers who

15   identify themselves as law enforcement officers, but deceive the occupants about their purpose

16   for requesting permission to enter. For example, in *United States v. Giraldo*, a police officer

17   pretended to work for the gas company and told the defendant she was checking for a gas leak.

18   745 F. Supp. 152, 153-55 (E.D.N.Y. 1990). The court granted the defendant's motion to

19   suppress, finding the consent was obtained by falsely inducing fear of an imminent life-

20   threatening danger, and was therefore invalid. *Id*. The court found that the defendant's only

21   "free choice" was to have refused entry and "risked blowing up himself and his neighbors." *Id.*

22   The court was particularly concerned that condoning this sort of deception could potentially

23   harm public safety because it is vital that emergency warnings be trusted. *Id*. at 153-55.

24        The court found these facts distinguishable from the *Lewis* line of cases because of the

25   nature of the police deception. Acknowledging that courts permit some forms of deception to

26   gain entry into a private dwelling, the court found "there are sound public policy reasons for

27   distinguishing the type of deception engaged in here." *Id*. at 154. The court took judicial notice

28   of the suspicion with which the police, fire departments, and public utilities are regarded in poor

urban communities. Likening the ruse to a false cry of "wolf," the court found that condoning a ruse involving a life-threatening emergency would send the message that emergency warnings could not be trusted and "would risk serious dangers of life if people refused to open their doors or vacate the premises in case of fire, toxic fumes, gas leaks, flooding or the like." *Id.* The court concluded that the entry was illegal because consent was obtained "by falsely inducing fear of an imminent life-threatening danger." *Id.*

Similarly, in *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 191-93 (S.D.N.Y. 2008), law enforcement officers who were members of a DEA task force knocked on the defendant's motel door, identified themselves as police officers, and told the defendant they were searching for a missing girl. One of the officers displayed a New York City Police Department Detective badge and showed the defendant a flier from the National Center for Missing and Exploited Children. The agent asked if he could enter the room to check for the missing girl, and the defendant consented. However, the agent was actually a DEA agent, not a New York City Police Department Detective, and he was there because he wanted to search the room for evidence of drug dealing. The court found the defendant's consent was invalid because the defendant "would have had every reason to believe that his failure to consent to the search would hinder or delay the efforts to resolve safely (what appeared to be) a grave emergency." *Id.* at 291. The court found that the "missing girl" ruse "created a false sense of exigent circumstances similar to that raised in a 'gas leak' scenario." *Id.* at 291. The court emphasized that the problem of missing children is a profoundly serious one, and that there was a strong need to rely on private persons to assist law enforcement in locating missing children. The court found that these public policy concerns and the police conduct in creating a false grave emergency to obtain consent could not be considered "the product of an essentially free and unconstrained choice." *Id.* (citing *Schneckloth,* 412 U.S. at 225). The court therefore concluded that the defendant did not voluntarily consent to a search of his room.

**IV.    Analysis**

This case raises the difficult question of how far law enforcement and their agents may go in engaging in deceptive conduct to gather evidence of criminal activity in places where

citizens have a reasonable expectation of privacy.  It involves the ongoing lively debate of "the judicial power to require fair play in federal law enforcement."  *Lee v. United States*, 343 U.S. 747, 751 (1952).  The legal issue in this case concerns the admissibility and use of evidence obtained by deception.  The government maintains that the Phuas gave valid consent to the July 4 and 5, 2014, entries into villa 8882, and that their consent was not vitiated because the agents misrepresented their identity and purpose.  The Phuas contend that the government's deception is so egregious that they could not make a free and voluntary, uncoerced choice, and the government can therefore not meet its heavy burden of establishing valid consent.  Both sides agree that the facts of this case are unique, and there are no known decisions discussing the ruse used in this case.

In a case of first impression, the court must decide whether the government deception used in this case violated the Phuas' Fourth Amendment right to a reasonable expectation of privacy in villa 8882.  "The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusion into a constitutionally protected area."  *Hoffa*, 385 U.S. at 301.  However, a long line of Supreme Court and appellate cases has held that the Fourth Amendment is not violated when government agents gain entry into a private residence concealing or misrepresenting their identity or purpose as long as their entry is for the purpose contemplated by the occupant.  *See, e.g., Lewis v. United States*, 385 U.S. 206, 210 (1966).

In this case, law enforcement agents and Wood deceived the occupants of villa 8882 about their identity and purpose for seeking entry into the villa.  They did not pose as criminals or friends or acquaintances of criminals there to engage in criminal activity, and the first line of cases have no application here.  The court also finds that the third line of cases does not apply because the ruse used did not involve falsely claiming an imminent life-threatening emergency.  Disrupting DSL service to the occupants of a hotel room who have access to the hotel's Wi-Fi and cable connections to three different carriers is not a disruption of an essential service that leads an occupant which no choice but to consent to an entry to restore the service.  The occupants of the villa had continuous access to Caesars' Wi-Fi and cable connections to three different carriers.  This case does not involve cutting off air conditioning to a hotel room in July

during 100+ degree temperatures or depriving the occupants of water or other essential services which render the hotel room uninhabitable.   Although the DSL service was disrupted, the Phuas still had internet access via Caesars' Wi-Fi.   In fact, when SAs Kung and Lopez entered villa 8882 on July 5, 2014, both Paul and Darren Phua were working on their laptops, accessing the internet.

As an initial matter, the court finds, that Wood was acting as a government agent when he entered villa 8882 on July 4 and 5, 2014.  Wood was interviewed by investigating special agents on July 3, 2014, agreed to cooperate, and actively participated in developing the plan to disrupt DSL service to the villa to enable agents to get inside the villa.  The purpose of getting inside the villa was clearly to try to gather evidence of illegality, and more specifically, that the occupants of villa 8882 were engaging in an illegal sports book wagering operation.

Since at least 1974, the United States Supreme Court has held that a warrantless entry and search of premises with the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-tenant is constitutionally valid under the Fourth Amendment over the objections of an absent co-occupant.  *See United States v. Matlock*, 415 U.S. 164, 170 (1974).  In this case, the evidence is clear that Caesars provided the high roller occupants of its luxury villas with butlers to attend to their every need and request, and a butler was assigned to villa 8882 twenty-four hours a day, seven days a week.  The butlers were the individuals Caesars employees were required to contact if entry to the villas for any purpose was required while the occupants were present, and the butlers were unquestionably given authority to admit persons into the villa to deliver goods and services requested by the occupants.

Defendants do not dispute this.  In fact, in their briefs, and in questioning during the evidentiary hearing, defense counsel emphasized, that the butler who admitted Wood and Lopez on July 4, 2014, initially gave them permission to enter and restricted their access to the pantry area.  Questioning by defense counsel also emphasized that the high roller occupants of the luxury villas have a "heightened expectation" of privacy and security.  Defense counsel elicited testimony that one of the butler's responsibilities is to ensure the privacy of the occupants is

respected and that the occupants are not disturbed unless they wish.  The villas are not accessible to the general public, have additional security features ordinary guest rooms do not, and permission to enter is required from a butler before an occupied villa may be entered.  The Defendants do not claim that the butlers lacked authority to allow the agents to enter on either July 4 or 5, 2014.   Rather, the Defendants claim that the agents exceeded the scope of the consent they obtained while delivering the laptop on July 4, 2014, and that the DSL disruption deception rendered the consensual entry invalid because it was not the result of a free and uncoerced choice.

The court finds the ruse to disrupt the DSL connection in villa 8882 on July 4, 2014, was unsuccessful because Wood and/or his employees assisting him had an incorrect wiring diagram and disconnected the DSL to the wrong villa.  Fortuitously, however, Paul Phua requested a laptop computer to be delivered to his room on July 4, 2014.  Phua told the butler who contacted Caesars VIP Luxury Services who contacted Wood to provide the laptop.  Wood, in turn, contacted investigating agents.  A plan was developed for Wood to deliver the laptop with SA Lopez posing as a TMS technician.  Wood and Lopez contacted the butler for villa 8882 to make arrangements to gain entry to the villa to deliver the laptop.  Wood testified that when a villa is occupied, Caesars requires an employee or contractor to contact the butler to obtain permission to enter a villa to provide a service.  Wood received permission from the butler to deliver the laptop.  Wood and Lopez went to the butler's pantry entry because Wood was aware Caesars Palace limited access to the villas to this area.  The butler admitted Wood and Lopez to deliver the laptop.

It is clear, and the court finds, that the butler unequivocally restricted Wood and Lopez to the pantry area.  Both Wood and Lopez attempted to gain access to the interior of the villa by stating access was needed to ensure the laptop was properly connected.  However, the butler clearly told Wood and Lopez that the residents did not want to be disturbed, wished to maintain their privacy, and that neither could enter the interior of the villa.  The butler left the pantry area while Wood worked on the laptop to set it up.  Against the butler's unequivocal instructions that they not enter the villa, Wood and Lopez entered the interior.  After a brief interval, the butler

1    intercepted them, denied them access to the media room or other areas inside the interior of the

2    villa, and directed them back to the pantry.

3        The court finds Wood was clearly invited to the villa to deliver a laptop at Phua's request.

4    However, it is equally clear that Wood and Lopez were restricted to the pantry area and told not

5    to invade the occupants' privacy by leaving the pantry, even after Wood claimed it was needed

6    in order to ensure the laptop was running and connected to the internet.  Wood did not disclose

7    that he was acting as a government agent.  SA Lopez deceived the butler about his identity by

8    posing as a TMS employee there to assist Wood.  Lopez also deceived the butler concerning his

9    purpose in accompanying Wood to deliver the laptop.  SA Lopez's purpose in entering the villa

10   was unquestionably to try to obtain evidence of any illegality occurring inside the villa.  The

11   court concludes that Wood and Lopez exceeded the scope of the consent they were given to enter

12   villa 8882 on July 4, 2014, when they left the butler's pantry area.  When they entered the

13   interior of the villa, they violated the occupants' Fourth Amendment rights.

14       On July 5, 2014, Paul Phua requested that the butler make arrangements to have the DSL

15   connection inside the villa immediately repaired or restored.  The female butler on duty that day

16   admitted SAs Lopez and Kung posing as TMS technicians present to correct the problem.  Lopez

17   and Kung had been instructed by Wood how to appear to be legitimate technicians and how to

18   act like they were fixing the problem they created.  Lopez and Kung entered the interior of the

19   villa, misrepresenting that their presence was required to diagnose and restore the DSL

20   connection.  They misrepresented their identities, and they misrepresented the purpose for which

21   they were there.

22       The agents' sole purpose in entering villa 8882 was to obtain evidence of illegality.  They

23   were not legitimate technicians there to fix a DSL disruption.  The DSL had been disrupted

24   precisely so that the agents could enter on the ruse of being legitimate technicians there to fix a

25   problem the agents had themselves created.  The court also finds it was not necessary to enter

26   villa 8882 to restore the DSL connection the agents had caused to be disrupted with the

27   assistance of Wood TMS.  The DSL connection was disconnected in a room near Wood's office

28   at Caesars and could have been, and eventually was, restored from the same location.  The agents

1   deceived the occupants both as to their identity and purpose posing as Wood TMS technicians

2   there to restore the DSL connection so they could learn what they could learn to further their

3   investigation.

4          The court finds that the plan to disrupt the DSL services was created when investigators

5   interviewed Caesars' outside DSL contractor Mike Wood at his initial interview on July 3, 2014.

6   The agents asked Wood for advice about how best to generate a call for service that would allow

7   law enforcement officers to enter one or more of the villas to gather evidence. Disruption of

8   cable and DSL service was discussed.  Before the DSL disruption ruse was employed, agents

9   considered disrupting cable connections to the villas.  AUSA Frayn advised investigators they

10  could not disrupt the cable to the villas without Caesars' consent.  The rationale for this legal

11  advice was that Caesars provided the service to guests free of charge and could terminate the

12  service if Caesars decided to do so.  If Caesars' decision to cut off the cable to the villas resulted

13  in one or more calls for service, government counsel took the position, and so advised

14  investigators, that they could employ the ruse of acting as repairmen to enter the villas requesting

15  service to gather information to further their investigation.   The advice government counsel

16  provided investigators was that, if Caesars consented to the cable disruption, and if the occupants

17  requested someone to restore the cable, the occupants would be consenting to the entries.

18         The plan to disrupt cable service to generate a call for service was abandoned because

19  Caesars engineers and Wood concluded it was not feasible.  Disruption of the cable was not

20  feasible primarily because it could not be done surreptitiously and it was not possible to disrupt

21  cable to the villas under investigation without disrupting cable service to the other guests.

22  Additionally, the court finds that Caesars was unwilling to disrupt cable service to villa guests

23  without assurances on behalf of the government that Caesars would not be found responsible or

24  liable.  The assigned AUSA refused to provide any assurances, and in fact, even declined to talk

25  with Caesars' lawyer about the proposal to disconnect cable service.  The inference the court

26  draws from these findings is that government counsel did not want Caesars to be able to claim

27  that it relied, in any way, on advice from counsel for the government in deciding whether or not

28  to disrupt cable service.

The Defendants' motion argued that the DSL disruption ruse was conducted against the express legal advice of government counsel. However, the court found the testimony of SA Pham credible that agents were advised they could not disrupt the cable connection without Caesars' consent and were not told that their DSL disruption ruse was unlawful. The U.S. Attorney's Office advised SA Pham that the agents could not proceed with their plan to disrupt cable service without Caesars' consent. Caesars refused to give consent to disrupt the cable service which Caesars provided. Equally important, the agents abandoned the cable disruption plan because it was not feasible.

Wood suggested disrupting the DSL connection and agreed to assist law enforcement officers in the ruse and furthering their investigation. Caesars' counsel had no objection to the agents' plan to disrupt the DSL service because Caesars had not directly provided the DSL service. Caesars did not object to its outside contractor, Wood TMS, disrupting the DSL service that Wood had installed and serviced. The USAO was not contacted for legal advice about the plan to disrupt the DSL. The agents believed, based on advice they received about disrupting the cable, as long as Wood TMS, the outside contractor consented, the plan was lawful. FBI general counsel was contacted about the plan to disrupt service and told SA Pham if the USAO agreed, FBI general counsel had no objection to the plan.

The court finds that the occupants of villa 8882 requested restoration of the DSL service and consented to the entry of Lopez and Kung posing as technicians there to restore the DSL service. The occupants were deceived about a number of things. The occupants were not informed that the government disrupted the DSL service. The occupants were not informed that the DSL service was disconnected from a room outside the villa and could be restored from the same location. The occupants were not told that Lopez and Kung were special agents posing as DSL technicians. However, under the totality of the circumstances present here, the court finds the deception did not deprive the occupants of a free and uncoerced choice. To be sure, the occupants would not have consented to allowing Kung and Lopez into the villa if they had known they were law enforcement officers. However, the same can be said about every undercover operation. The Fourth Amendment does not protect the occupants' misplaced

1 confidence that the agents, posing as technicians, would not reveal what they saw in the areas

2 they were granted access to carry out their ruse.

3 The ruse that was used here was not based on a health or safety issue in which the

4 occupants would feel they had no choice but to allow entry or risk an imminent life-threatening

5 emergency. The occupants' consent was not vitiated merely because they would not have given

6 consent to enter the villa, but for the non-disclosures and affirmative misrepresentations which

7 were made.

8 In this case, the Phuas surrendered their privacy to what they exposed to the view of

9 Lopez and Kung when they admitted them to fix the fake DSL disruption. The Phuas wanted the

10 DSL to work. They were willing to admit technicians to fix the problem. They allowed the

11 agents to go where they thought the agents needed to go to fix the problem. They were tricked.

12 But, they assumed the risk that Kung and Lopez would see what the Phuas exposed to view when

13 they admitted Kung and Lopez, dressed as technicians, into the villa.

14 The Fourth Amendment may be violated if government agents engage in conduct not

15 contemplated by the residents when they consented to entry. *Gouled v. United States*, 355 U.S.

16 138 (1921) is a classic example. In *Gouled*, the defendant's business acquaintance, working with

17 federal officers, obtained entry into the defendant's office pretending he was there to pay a social

18 call. While there, the acquaintance secretly ransacked the office and seized incriminating papers.

19 The Supreme Court found the defendant's Fourth Amendment rights were violated because,

20 although the defendant had invited the entry, he did not consent to a secret and general

21 ransacking of his office. In this case, Lopez and Kung were allowed into the villa and allowed to

22 enter the areas they claimed they needed to be to restore the DSL connection. Their deception

23 did not vitiate the occupants' consent. The agents gained entry into the villa concealing or

24 misrepresenting their identity and their purpose.

25 In this case, the Phuas surrendered their privacy to what they exposed to the view of

26 Lopez and Kung when they admitted them to fix the fake DSL disruption. The court finds that

27 Lopez and Kung did not exceed the scope of the consent they were given on July 5, 2014, when

28 / / /

1    they gained entry to villa 8882 after disrupting the DSL service and posing as technicians present

2    to restore the service.

3    **V.    Conclusion.**

4         For the reasons explained in this report and recommendation, the court finds law

5    enforcement investigators did not violate the Phuas' Fourth Amendment rights when they

6    entered villa 8882 on July 4, 2014 with Wood to drop off a laptop the occupants requested.

7    However, they exceeded the scope of the consent to enter when they left the butler's pantry area

8    and entered the interior of the villa against the butler's clear instructions.  As a result, evidence

9    derived from entering the interior of the villa on July 4, 2014, should be suppressed.  The court

10   also finds the Phuas consented to the warrantless entry on July 5, 2014, although their consent

11   was obtained by ruse.  The agents did not exceed the scope of the consent they were given when

12   they were admitted posing as technicians to repair a DSL disruption they created as a ruse to

13   obtain entry.

14        Accordingly,

15        IT IS RECOMMENDED that the Joint Motion to Suppress (Dkt #229) be granted to the

16   limited extent described above and be denied in all other respects.

17        Dated this 2nd day of February, 2015.

18

19                                              _____
                                                 Peggy A. Leen
20                                               United States Magistrate Judge

21

22

23

24

25

26

27

28