UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

UNITED STATES OF AMERICA,

Plaintiff,

v.

WEI SENG PHUA, *et al.*,

Defendants.

Case No. 2:14-cr-00249-APG-PAL

**ORDER ON OBJECTIONS TO REPORTS OF FINDINGS AND RECOMMENDATIONS**

(Dkt. Nos. 229, 232, 406, 407, 418, 419, 420)

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. This case tests the boundaries of how far the government can go when creating a subterfuge to access a suspect's premises. Here, the government disrupted the internet service to the defendant's hotel room in order to generate a repair call. Government agents then posed as repairmen to gain access to the defendant's room and conduct a surreptitious search for evidence of an illegal sports betting operation. By creating the need for a third party to enter defendant's premises and then posing as repairmen to gain entry, the government violated the defendant's Fourth Amendment rights.

**I. BACKGROUND**

The sole remaining defendant in this case, Wei Seng Phua, objects to two Reports of Findings and Recommendation (Dkt. #406 & #407) Magistrate Judge Leen issued on Phua's two motions to suppress. The first (Dkt. #407) addresses Phua's motion to suppress evidence obtained during two allegedly unconstitutional searches of his hotel room at Caesars Palace Hotel & Casino ("Caesars"). The second (Dkt. #406) addresses Phua's motion to suppress based on alleged omissions and misrepresentations in the search warrant affidavit. The United States objects only to the second Report of Findings and Recommendation.

The indictment (Dkt. #86) charges Phua and the other defendants with transmitting wagering information in violation of 18 U.S.C. § 1084(a), operating an illegal gambling business

in violation of 18 U.S.C. § 1955, and aiding and abetting in violation of 18 U.S.C. § 2.[1]  The indictment alleges that in June and July of 2014, Phua and the other defendants were engaged in an illegal gambling business that accepted wagers on the World Cup Soccer Tournament.  The investigating agents suspected this alleged business operated out of three luxury villas at Caesars: villas 8881, 8882, and 8888.  Phua occupied villa 8882.

The investigation began with Caesars' Manager of Special Investigations, Paul Urban.  Urban conducted an internal investigation into whether the occupants of villa 8888 might be illegally taking bets on the tournament.  He interviewed hotel employees who had been inside villa 8888 and had seen a number of computers, monitors, and chairs set up in a configuration that resembled a boiler room bookie operation.  One worker indicated that he saw a computer screen displaying words in Chinese as well as several columns of numbers that looked like betting odds.  Urban forwarded information about his investigation to the Nevada Gaming Control Board ("NVGCB").  The NVGCB contacted the FBI, which triggered a joint NVGCB/FBI investigation.  The lead NVGCB agent was Ricardo Lopez.

Caesars cooperated with the NVGCB/FBI investigation and provided records about the villas' residents.  Mike Wood, a principal of Wood Telemanagement & Solutions ("TMS"), also cooperated with the investigation.  TMS maintains the villas' high-speed internet connections ("DSL") for Caesars.  Lopez, FBI special agent Minh Pham, and another agent interviewed Wood about the work he had done inside the villas and asked him how they could get inside surreptitiously.  With Wood's help, they developed a plan to disrupt DSL service in villas 8882 and 8888 to generate a call for service.[2]  The plan was to have agents pose as repairmen and then conduct a search once inside the villas.

////

---

[1] The factual recitation is derived from Judge Leen's Report of Findings and Recommendation.

[2] The agents had discussed disrupting cable service but decided against that when Assistant United States Attorney Kimberly Frayn advised that they would need Caesars' consent.  Caesars declined to consent without assurances from the government that it would not be held liable.  Additionally, the agents determined that plan was not feasible because it could not be done surreptitiously and would have disrupted cable service to other guests.

Wood disconnected the DSL for villa 8888 and 8882 on the morning of July 4, 2014.  But the plan was unsuccessful because either the residents did not report an outage to Caesars or Caesars did not tell Wood.[3]

That same day, the residents of villa 8882 requested that the hotel provide them with a laptop computer.  Caesars contacted Wood, and Wood contacted the investigating agents.  Wood and Lopez delivered the laptop with Lopez dressed as a technician to "look the part."  Wood and Lopez were met by the butler[4] for villa 8882 at the entry pantry.  Wood and Lopez told the butler they needed to go past the pantry to check the internet connection.  The butler denied them entry into the villa's interior, explaining that the residents had instructed him to keep the villa private.  The butler then left the pantry area.  Despite the butler's instructions, Wood and Lopez entered the interior.  The butler intercepted Wood and Lopez, denied them further access, and ushered them back to the pantry.  Wood and Lopez recorded their entry into the villa with hidden cameras.

The following morning, Wood cut the DSL connection to villa 8882 from his office at TMS.  Phua told the butler on duty the internet was not working, and she contacted her manager at Caesars to fix it.  Lopez and FBI agent Michael Kung, who were dressed as TMS technicians and had hidden recording devices, went to villa 8882.  Wood had told Lopez and Kung how to appear like legitimate technicians and how to act like they were fixing the DSL.  The agents knew that the DSL connection could not be restored inside the villa and instead had to be reconnected from the outside (within a few feet from where Wood was sitting in his office).  The ruse's only purpose was to gain entry into villa 8882 and gather evidence without a warrant.

When Lopez and Kung arrived at villa 8882, they were admitted by the butler, who asked if they were there to fix the DSL.  The butler took them to the media room where the router was

_____

[3] Apparently, Wood inadvertently cut off the DSL to villa 8881 instead.  Later that day, the occupant of that villa reported the outage and (because the government agents had left for the day) Wood entered villa 8881 and looked around under the guise of repairing the problem.  He secretly recorded his investigation and provided that to the agents.

[4] Caesars provides butlers to the high-roller occupants of its luxury villas to attend to the occupants' needs.  Judge Leen found, and the parties do not dispute, that "the butlers were unquestionably given authority to admit persons into the villa to deliver goods and services requested by the occupants." (Dkt. #407 at 27.)

located.  Lopez and Kung saw Phua and others in the room.  Phua was sitting at a laptop computer that displayed an illegal online sports wagering website.  The laptop screen also displayed an active instant messaging window that contained an incoming message stating "good luck on the hedge bet" or something similar.  Lopez saw one of the other individuals using another laptop computer that displayed the login screen for an illegal sports wagering site.  This person switched the web page to a Google search page when he noticed Lopez was approaching him.  After spending some time in the villa pretending to attempt to fix the DSL, Lopez called Wood, who restored the connection.  The agents remained in the room to continue their search, pretending to confirm that the connection had been restored for all of the computers in the villa.

The agents subsequently applied for warrants to search all three villas.  The application cites facts garnered during the course of the warrantless intrusions to link together the residents of the three villas.  Magistrate Judge Nancy Koppe signed search warrants for the three villas on July 9, 2014.  Pursuant to the warrants, law enforcement searched all three villas and seized evidence.

Phua filed two motions to suppress.  One is based on the two warrantless entries into villa 8882.  The other is based on alleged omissions and misrepresentations in the warrant affidavit.  Judge Leen held a four-day evidentiary hearing on Phua's motions in December 2014.  She issued two Reports of Findings and Recommendation.  With respect to Phua's motion to suppress based on the warrantless searches, she recommends I find that Wood and Lopez violated Phua's Fourth Amendment rights when they visited the villa on July 4 to deliver the laptop.  In her view, it was unconstitutional for them to exceed the scope of consent by disregarding the butler's instructions not to enter the villa's interior.

Judge Leen also recommends I find the agents did not violate Phua's Fourth Amendment rights when they disrupted the DSL and then posed as service technicians.  She found that Phua consented to the agents entering the villa and he therefore "surrendered [his] privacy to what [he] exposed to the view of Lopez and Kung when [he] admitted them to fix the fake DSL disruption." (Dkt. #407 at 32.)  Judge Leen found Phua's consent was voluntary because the ruse did not raise a safety issue or disrupt an essential service so that the occupants would feel they

1    had no choice but to allow entry. (*Id.*)  Judge Leen further found that Kung and Lopez were

2    allowed into the areas they claimed they needed to be in order to restore the DSL connection, and

3    thus they engaged in conduct within the scope of Phua's consent. (*Id.*)  Although Phua was

4    "tricked," Judge Leen concluded that he "assumed the risk of what the two men [he] admitted

5    would see [and] what [he] exposed to view in allowing their entry." *Id.*

6         With respect to Phua's *Franks* motion to suppress based on defects in the warrant

7    application, Judge Leen recommends I suppress evidence seized as a result of the search of villa

8    8882 conducted pursuant to the warrant.  She found that after supplementing the warrant

9    application with material information that was omitted and correcting misrepresentations in the

10   affidavit, the warrant affidavit lacks probable cause.

11   **II.  STANDARD OF REVIEW**

12        The Federal Magistrates Act does not allow a magistrate judge to decide a motion to

13   suppress evidence in a criminal prosecution. 28 U.S.C. § 636(b)(1)(A); *United States v. Raddatz*,

14   447 U.S. 667, 673 (1980) (stating that with respect to a motion to suppress in a criminal case, a

15   magistrate judge "has no authority to make a final and binding disposition").  Under 28 U.S.C.

16   § 636(b)(1)(B), a district judge may authorize a magistrate judge to "conduct hearings, including

17   evidentiary hearings, and to submit to a judge of the court proposed findings of fact and

18   recommendations for the disposition" of motions that the magistrate cannot dispose of under

19   § 636(b)(1)(A).  After the magistrate judge has submitted proposed findings of fact and

20   recommendations, the district judge is required to "make a de novo determination of those

21   portions of the report or specified proposed findings or recommendations to which objection is

22   made." 28 U.S.C. § 636(b)(1); *see also Reynaga v. Cammisa*, 971 F.2d 414, 416 (9th Cir. 1992)

23   ("The primary difference between subsections 1(A) and 1(B) is that the former allows the

24   magistrate [judge] to determine the matter (subject to the review of the district court for clear or

25   legal error) while the latter allows the magistrate [judge] only to submit proposed findings and

26   recommendations for the district court's de novo review." (quotation omitted)).

27        I therefore review de novo the findings and recommendations regarding Phua's motions

28   to suppress.  I "may accept, reject, or modify, in whole or in part, the findings or

1    recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  I "may also receive

2    further evidence." *Id.*

3    **III.  MOTION TO SUPPRESS WARRANTLESS SEARCHES (Dkt. Nos. 229, 407, 418)**

4         Judge Leen recommends I grant in part and deny in part the defendants' joint motion to

5    suppress the fruits of warrantless searches.  First, she recommends I find that law enforcement

6    violated Phua's Fourth Amendment rights by exceeding the scope of the consent given to enter

7    Phua's villa when they delivered the laptop.  Neither Phua nor the Government objects to this

8    recommendation.  I nevertheless conducted a de novo review.  I accept this portion of Judge

9    Leen's Report of Findings and Recommendation because it sets forth the proper legal analysis

10   and factual basis for the decision.

11        Second, Judge Leen recommends I find the investigating agents did not violate Phua's

12   Fourth Amendment rights when they disrupted high-speed internet service to the villa and then

13   posed as service technicians to enter the villa on the pretense of repairing the outage.  Phua

14   objects, contending law enforcement should not be permitted to use a ruse to gain entry into a

15   home or hotel room without reasonable suspicion that they would find evidence of illegality.

16   Phua also argues that because the agents disrupted the DSL service and then posed as repairmen

17   with apparent authority from the hotel to enter the room to fix it, he did not voluntarily consent

18   to their presence.  Finally, Phua asserts that even if he consented, the agents exceeded the scope

19   of that consent both by entering the villa when the agents knew the DSL could be fixed only

20   from the outside and by staying longer than necessary after the DSL was restored.

21        The Government responds that law enforcement does not need reasonable suspicion to

22   support a consensual encounter.  According to the Government, the ruse did not render Phua's

23   consent involuntary because DSL is not an essential service and the situation was not an

24   emergency.  Therefore, the Government contends, Phua could have declined to request the repair

25   or delayed calling for assistance until after he had concealed from plain view any items he did

26   not want a third party to see.  Finally, the Government argues the technicians did not exceed the

27   scope of the consent because they did not stay in the villa for an unreasonable period of time and

28   they may record whatever was in plain view.

1    Under the totality of the circumstances in this case, I conclude that the officers violated

2    Phua's Fourth Amendment rights by creating the need for a third party to enter Phua's hotel

3    room to repair the DSL and then posing as repairmen to gain entry.  Under these circumstances,

4    Phua's consent was not voluntary within the Fourth Amendment's meaning.  Allowing law

5    enforcement to engage in this conduct would eviscerate the warrant requirement.  Authorities

6    would need only to disrupt phone, internet, cable, or other "non-essential" service and then pose

7    as technicians to gain warrantless entry to the vast majority of homes, hotel rooms, and similarly

8    protected premises across America.  Permitting the government to engage in this conduct is

9    inconsistent with the narrow consent exception to the Fourth Amendment's warrant requirement.

10    It is also contrary to "the very core of the Fourth Amendment . . .[,] the right of a man to retreat

11    into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United*

12    *States*, 533 U.S. 27, 31 (2001).

13    **A.  The Fourth Amendment**

14    The Fourth Amendment protects "the right of the people to be secure in their persons,

15    houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.

16    "To invoke the protections of the Fourth Amendment, a person must . . . demonstrate a

17    subjective expectation that his activities would be private, and he must show that his expectation

18    was one that society is prepared to recognize as reasonable." *United States v. Bautista,* 362 F.3d

19    584, 589 (9th Cir. 2004) (quotation omitted).  Absent a reasonable expectation of privacy, the

20    defendant lacks standing to challenge a search under the Fourth Amendment. *United States v.*

21    *Dorais*, 241 F.3d 1124, 1128 (9th Cir. 2001).  An occupant of a hotel or motel room has a

22    reasonable expectation of privacy in the room. *Id.*; *see also Stoner v. State of Cal.*, 376 U.S. 483,

23    489-90 (1964).[5]

24    The Fourth Amendment prohibits unreasonable searches. *Morgan v. United States*, 323

25    F.3d 776, 780 (9th Cir. 2003).  A search "inside a home without a warrant [is] presumptively

26    unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  However, because the

27

28    [5] Phua's expectation of privacy was confirmed when the butler told the agents not to leave the pantry because the villa occupants wanted privacy.

1    Fourth Amendment's "touchstone" is reasonableness, *id.*, a warrantless search may nevertheless

2    be reasonable if it falls within "one of the narrow and specifically delineated exceptions to the

3    warrant requirement." *Thompson v. Louisiana*, 469 U.S. 17, 21 (1984); *see also Riley v.*

4    *California*, 134 S. Ct. 2473, 2482 (2014).

5            Consent is one such exception. *Morgan*, 323 F.3d at 781.  A warrantless search

6    conducted pursuant to a valid consent is "constitutionally permissible." *Schneckloth v.*

7    *Bustamonte*, 412 U.S. 218, 222 (1973).  The consent must be given by "a person in control of the

8    premises." *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990).  "Consent can be inferred

9    from non-verbal actions, but it must be unequivocal and specific and freely and intelligently

10   given." *United States v. Basher*, 629 F.3d. 1161, 1167 (9th Cir. 2011) (quotation omitted).  Law

11   enforcement does not need reasonable suspicion or probable cause to ask questions or request

12   consent to search, so long as the consent is not coerced. *See Florida v. Bostick*, 501 U.S. 429,

13   434 (1991); *Schneckloth*, 412 U.S. at 225.  Whether a consent to a search was voluntary or was

14   "the product of duress or coercion, express or implied, is a question of fact to be determined

15   from the totality of all the circumstances."[6] *Schneckloth*, 412 U.S. at 227; *see also Basher*, 629

16   F.3d. at 1168.  The government bears the burden of proving by a preponderance of the evidence

17   that consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548

18   (1968); *Kaplan*, 895 F.3d at 622.  This burden is not satisfied by showing "no more than

19   acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49.

20           "The Fourth Amendment can certainly be violated by guileful as well as by forcible

21   intrusion into a constitutionally protected area." *Hoffa v. United States*, 385 U.S. 293, 301

22   (1966).  Thus, deception or trickery by a government agent "is appropriately considered as part

23   ////

24   _____

25       [6] As Judge Leen noted, the five-factor test usually used to determine whether consent was
     voluntarily given provides little guidance where law enforcement obtains consent through a ruse.
26   *See United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (listing as factors (1) whether the
     defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether
27   *Miranda* warnings were given; (4) whether the defendant was notified that he had a right not to
     consent; and (5) whether the defendant had been told that a search warrant could be obtained).

28

of the totality of circumstances in determining whether consent was gained by coercion or

duress." *United States v. Harrison*, 639 F.3d 1273, 1278-79 (10th Cir. 2011).

### B. Consent by Deception

There are at least three separate lines of cases that provide guidance about whether

consent by deception comports with the Fourth Amendment's requirements.  One line of cases

involves law enforcement agents who pose as criminals, or friends or acquaintances of criminals,

and use deception to "catch those engaged in criminal enterprises." *See Sorrells v. United States,*

287 U.S. 435, 441 (1932) (collecting cases).  These cases hold that law enforcement officers may

misrepresent that they are involved in criminal activity to obtain valid consent to enter a

suspect's home because the Fourth Amendment does not protect wrongdoers from misplaced

confidence in their acquaintances. *See Hoffa*, 365 U.S. at 302.  If a law enforcement officer

obtains consent in this manner, he "does not need probable cause to enter, he does not need a

warrant, and quite obviously, he does not need to announce his authority and purpose." *United*

*States v. Glassel*, 488 F.2d 143, 145 (9th Cir. 1973) (citing *Lewis v. United States*, 385 U.S. 206,

210 (1966)).  Once inside, the officer may seize anything in plain view, but he may not exceed

the scope of his invitation by searching the house generally. *Id*. (citing *Lewis*, 385 U.S. at 210-11

and *Coolidge v. New Hampshire*, 403 U.S. 443 (1970)).

For example, in *United States v. Bramble*, the defendant invited undercover police

officers into his home to negotiate the sale of illegal sea otter pelts. 103 F.3d 1475, 1477 (9th Cir.

1996).  While there, the defendant showed the officers other animal parts that were unlawful to

possess. *Id*.  One officer also observed what appeared to be a vial of cocaine on the dining room

table. *Id*.  The Ninth Circuit held that the defendant consented to allowing the undercover agents

into his home and that his consent was not invalidated because the officers did not conduct a

search beyond the scope of the defendant's consent. *Id*. at 1478.  Instead, the officers remained in

the area where the defendant had invited them, and they acted only in furtherance of the purpose

for which they had been invited*, i.e.*, to conduct an illegal transaction. *Id.*

////

////

A second line of consent by deception cases involves government agents who deceive the occupants into believing that an emergency or life-threatening situation exists.[7]  For example, in *United States v. Giraldo*, a police officer pretended to work for the gas company and told the defendant she was checking for a gas leak. 743 F. Supp. 152, 153 (E.D.N.Y. 1990).  The court found the defendant's consent was obtained by falsely inducing fear of an imminent life-threatening danger and was therefore invalid because the defendant's only "free choice" was to have refused entry and "risk[] blowing up himself and his neighbors." *Id.* at 154.  The court also noted that condoning this sort of deception could potentially harm public safety because it is vital that emergency warnings be trusted. *Id.* at 153, 155.

Similarly, in *United States v. Montes-Reyes*, law enforcement officers knocked on the defendant's motel door, identified themselves as New York City police officers, and told the defendant they were searching for a missing girl. 547 F. Supp. 2d 281, 283 (S.D.N.Y. 2008).  One of the officers displayed a police badge and showed the defendant a flier from the National Center for Missing and Exploited Children. *Id.*  The officer asked if he could enter the room to check for the missing girl, and the defendant consented. *Id.*  The officer was actually a DEA agent who wanted to search the room for evidence of drug dealing. *Id.*  The court held the defendant's consent was invalid because he "would have had every reason to believe that his failure to consent to the search would hinder or delay the efforts to resolve safely (what appeared to be) a grave emergency." *Id.* at 291.  The court found that the "missing girl" ruse "created a false sense of exigent circumstances similar to that raised in a 'gas leak' scenario." *Id.*  This court also expressed the policy concern that allowing ruses of this type may inhibit private individuals from assisting law enforcement in locating missing children. *Id.*  Accordingly, the court found that these public policy concerns, together with the police conduct in creating a false grave emergency to obtain consent, could not be considered "the product of an essentially free and unconstrained choice." *Id.* (quoting *Schneckloth,* 412 U.S. at 225).

////

---

[7] Judge Leen discussed this line of cases as the third line of cases. (Dkt. #407 at 24:14-25:25.)

A third line of consent by deception cases involves law enforcement officers who conceal their identity and purpose to gain entry for a legitimate or lawful purpose, such as to buy a home, rent an apartment, or to provide a good or service.[8] *See, e.g., United State v. Miller*, 688 F.2d 652, 658 (9th Cir. 1982) (even if private citizen were a government agent, no violation where citizen was invited onto property after expressing an interest in buying a trailer); *United States v. Scherer*, 673 F.2d 176, 181-82 (7th Cir. 1982) (agent posing as cousin of an informant invited on property to build duck blinds); *United States v. Wagner*, 884 F.2d 1090, 1094-95 (8th Cir. 1989) (officer dressed as a UPS employee accompanying a genuine UPS employee to deliver a package); *United States v. Wright*, 641 F.2d 602, 603-04 (8th Cir. 1981) (officers who see drugs inside a motel room when defendant opened door after officers pretended to have car trouble and asked for tools and a flashlight).  The rationale for this line of cases is that the Fourth Amendment does not protect what people voluntarily expose to view on the mistaken belief that incriminating evidence they allow others to see will not be used against them. *See, e.g.*, *Wright*, 641 F.2d at 604 ("The fact is that the undercover officers, by standing at the opened door of appellant's motel unit, like any member of the public, could see inside and observe various items in 'plain view.'").

However, some courts have held that this role-playing violates the Fourth Amendment if the officer poses as someone with at least some authority to enter the residence, such as a landlord.  For example, in *United States v. Hardin*, police officers enlisted the apartment manager to go to an apartment to see if the defendant was inside. 539 F.3d 404, 407 (8th Cir. 2008).  The manager used his own key to enter the apartment and called out "Maintenance" as he entered. *Id.*  The defendant asked what the manager wanted. *Id.*  The manager responded that there was a water leak in the upstairs apartment and he wanted to check the bathroom. *Id.*  The defendant let the manager look into the bathroom, and the manager later told the officers that the person they were looking for was inside the apartment. *Id.* at 407-08.

////

---

[8] Judge Leen discussed this line of cases as the second line of cases. (Dkt. #407 at 24:3-13.)

The Eighth Circuit held that the manager was acting as an agent of the police and conducted a non-consensual search when he entered the apartment before obtaining consent. *Id.* at 420, 424.  The court further held that "even assuming that the apartment manager merely called out through the closed door and did obtain consent prior to physically entering the apartment, then the manager's use of the ruse that he was investigating a water leak invalidated any possible consent." *Id.*  The court reasoned that "the ruse regarding the water leak presented a situation in which an individual would feel no choice but to invite the undercover officer in," and the defendant's consent therefore was "invalid." *Id.* at 425; *see also United States v. Boyd*, 910 F. Supp. 2d 995, 998 (W.D. Mich. 2011) (holding consent invalid where, among other factors, police in plainclothes lied about being "Tim from maintenance" to gain access to an apartment and then said they would not leave when an occupant asked them to come back later).

### C. Application

As Judge Leen and the parties have noted, there are no known cases of the government employing the kind of ruse it used in this case.  The first line of consent by deception cases is not directly on point because Phua did not invite the agents in for the purpose of engaging in illegal activity.  The second line of cases likewise is not directly on point because Kung and Pham did not lie about an emergency or life-threatening situation, nor did they cut an essential service.

The third line of cases is the most similar to the facts presented here.  Arguably, Phua invited the agents in to perform the lawful and legitimate service of repairing the DSL, like the defendant in *Scherer* invited someone onto his property to build duck blinds.  What separates this case from any that have come before is the additional fact that here the Government was not just taking advantage of a fortuitous opportunity.  Rather, the Government created the need for the occupant to call for assistance from a third party by cutting off a service enjoyed by the occupant.

The Government does not dispute that if the agents terminated essential services, such as water, heat, or electricity, any consent to fix those services would be involuntary.  Instead, the Government contends that DSL is not an essential service, particularly where the villa occupants still had access to the internet through Caesars' Wi-Fi.  As discussed above, several cases have

held the government cannot obtain consent through deception by creating a false emergency or life-threatening circumstance.  But no case has held that consent is invalidated only when the government creates such a situation or terminates an "essential" service.  I conclude that disruption of even "non-essential" services may support a finding that consent was coerced if the totality of the circumstances otherwise supports that finding.

Under the totality of the circumstances here, the Government has not met its burden of proving by a preponderance of the evidence that Phua's consent was voluntary.  Phua had a reasonable expectation of privacy in his hotel room.  He expressed his desire to protect his privacy the day before the Government disrupted the DSL when the butler advised the agents, who were posing as TMS technicians delivering a laptop, that the occupants did not want anyone entering the villa's interior.  When the Government could not take advantage of the fortuitous request for a laptop, it disrupted the high-speed internet connection to Phua's villa.  The Government thus created the need for Phua to request a repair to a service previously available to him as part of his room rental.  As a guest at a hotel, Phua could not call anyone of his choosing to repair the DSL.  He had to accept whoever presented themselves as authorized by the hotel to perform the repair.  Like in *Hardin* and *Boyd*, the agents presented themselves as individuals authorized by Caesars to enter the villa to repair the problem the Government created, knowing that the problem could not be fixed inside the villa.  The Government misled Phua into believing that to fix the problem (that unbeknownst to Phua the Government created), he had to surrender his privacy right that he was otherwise inclined to protect.  Under the totality of these circumstances, Phua's consent was invalid.

As in *Giraldo* and *Montes-Reyes*, policy concerns also weigh against allowing the government to use a ruse of this type.  Cable, telephone, and internet services are widely used in America.  Most reasonable people would invite a third party repair person into their home if they were led to believe it was necessary to fix a problem with those services. *See People v. Reyes*, 98 Cal. Rptr. 2d 898, 899-900 (Cal. Ct. App. 2000) (finding consent involuntary where the officer lied to the defendant about causing damage to the defendant's truck to lure him outside his home because "the police lure was one that almost no one, crooked or not, would refuse").  Permitting

the government to create the need for the occupant to invite a third party into his or her home would effectively allow the government to conduct warrantless searches of the vast majority of residences and hotel rooms in America.  The government need only disrupt the phone, cable, internet, or some other "non-essential" service, and reasonable people will opt to invite a third party onto their property to repair it, unwittingly allowing government agents into the most private spaces to view and record whatever and whomever they see.[9]

I therefore sustain Phua's objections to the portion of Judge Leen's Report of Findings

The Fourth Amendment's narrow consent exception to the warrant requirement cannot be broadened in this fashion.  In reaching this conclusion, I am mindful of the admonition in *Boyd v. United States*:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.  This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.  A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance.  It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

116 U.S. 616, 635 (1886).

I therefore sustain Phua's objections to the portion of Judge Leen's Report of Findings and Recommendation that recommends I find the government agents did not violate Phua's Fourth Amendment rights by disrupting the DSL and then entering the villa while posing as repairmen.  Under the totality of the circumstances, Phua's consent was invalid, and the warrantless entry into the villa was an unreasonable search in violation of Phua's Fourth Amendment rights.  Accordingly, I grant Phua's motion to suppress the fruits of the July 5, 2014 warrantless entry of villa 8882.[10]

////

////

---

[9]  In this age of rapidly-advancing technology and widespread use of computers and smart phones, this scenario becomes more likely.

[10]  Because resolution of this matter does not involve a credibility determination, and because the parties generally do not dispute the relevant facts concerning the ruse, I conclude no additional evidentiary hearing is necessary to resolve the question of whether Phua validly consented to the agents entering villa 8882 on July 5, 2014. *See Raddatz*, 447 U.S. at 681 n.7.

**IV.  MOTION TO SUPPRESS BASED ON WARRANT AFFIDAVIT (Dkt. Nos. 232, 406, 419, 420)**

Phua's second motion to suppress is based on alleged omissions and misrepresentations in the warrant affidavit.  The motion initially was filed jointly on behalf of all of the defendants.  The motion challenged the searches of all three villas, each of which was occupied by at least one defendant.  By the time Judge Leen issued her Report of Findings and Recommendation, five of the defendants had pleaded guilty and Phua and his son were the only remaining defendants.  Phua and his son occupied only villa 8882.  During a status and scheduling conference conducted before the December 2014 evidentiary hearing, counsel for the Phuas conceded that they had no standing to challenge the searches of villas 8881 and 8888.

However, Phua has standing to challenge the search of his villa, villa 8882.  Phua argues the warrant application contains significant misstatements that were either intentionally or recklessly made to the issuing magistrate judge.  According to Phua, when corrected of the false or misleading statements and supplemented with the material omissions, the warrant application lacks probable cause and suppression is therefore required.  The Government concedes both that it should have disclosed the DSL disruption ruse to the magistrate judge issuing the warrant and that the warrant affidavit contains mistakes.  The Government argues, however, that when properly corrected and supplemented, the affidavit nevertheless states probable cause.

Judge Leen recommends I suppress all evidence obtained from the search of villa 8882 conducted pursuant to the search warrant.  She found the warrant affidavit's repeated use of the phrase "Phua and his associates" was materially misleading because the affidavit provides little information linking Phua to illegal activity with the occupants of the other villas. (Dkt. #406 at 22, 25.)  She found that the affidavit misleadingly claimed the occupants of all three villas requested an unusual amount of computer equipment and DSL service and that it misrepresented what Wood said about which villa had requested this equipment and service. (*Id.* at 25-26.)  Judge Leen further found significant that the affidavit did not disclose to Judge Koppe (who issued the warrants) the ruse used to gain entry into villa 8882. (*Id.* at 26.)  According to Judge Leen, it "borders on the ridiculous to claim that Judge Koppe could have figured out from the

1    information provided in the affidavit that the agents caused the disruption of the DSL service to

2    villa 8882." (*Id.* at 27.)

3         Judge Leen ruled the ruse was constitutional, but she nevertheless concluded that the

4    agents should have disclosed the ruse to Judge Koppe because this "is a case of first impression,

5    [and] Judge Koppe should have been told so that she could assess whether this information was

6    properly included in the warrant or not." (*Id.* at 27-28.)  She concluded the failure to disclose the

7    ruse was the only intentional material omission. (*Id*. at 29-32.)  However, Judge Leen found

8    other statements in the affidavit were misleading, and she found the misrepresentations were

9    reckless. (*Id.* at 32.)  Judge Leen ultimately concluded that once the misleading statements are

10   excised from the warrant application and information about the ruse is included, probable cause

11   is lacking. (*Id.*)  She therefore recommends I suppress all evidence obtained from the search of

12   villa 8882 conducted pursuant to the search warrant. (*Id.*)

13        The Government objects to Judge Leen's ruling, arguing that omission of the ruse was

14   not material because Judge Leen concluded the ruse was constitutional.  The Government further

15   contends the identified misstatements were neither reckless nor material.  Phua requests I adopt

16   Judge Leen's ruling, but he argues I should find additional intentionally false statements in the

17   warrant affidavit beyond those Judge Leen identified.

18        A judge issuing a search warrant must make a "practical, common-sense decision"

19   whether, given the totality of the circumstances set forth in the affidavit, "including the veracity

20   and basis of knowledge of persons supplying hearsay information, there is a fair probability that

21   contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S.

22   213, 238-39 (1983) (quotation omitted).  The duty of a court reviewing that decision is to ensure

23   that the issuing judge "had a substantial basis for . . . conclud[ing] that probable cause existed."

24   *See Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009) (quoting *Gates*, 462 U.S. at

25   238-39).  "Probable cause requires only a fair probability or substantial chance of criminal

26   activity." *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002).

27        Pursuant to *Franks v. Delaware*, a defendant may challenge the truthfulness of the factual

28   statements made in an affidavit supporting a warrant. 438 U.S. 154, 164-65 (1978).  A defendant

1    is entitled to a hearing under *Franks* if he "makes a substantial preliminary showing that (1) the

2    affidavit contains intentionally or recklessly false statements or misleading omissions, and (2)

3    the affidavit cannot support a finding of probable cause without the allegedly false information."

4    *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000); *see also Franks*, 438 U.S. at 170;

5    *United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007).  To justify a hearing, a defendant

6    must make "specific allegations, allege a deliberate falsehood or reckless disregard for the truth,

7    and accompany such claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d

8    1073, 1080 (9th Cir. 2008).  If a defendant makes the requisite preliminary showing, a hearing is

9    conducted to determine the warrant's validity. *Franks*, 438 U.S. at 171-72.  The court should

10   suppress if, after excising the false or misleading statements from the affidavit and

11   supplementing material omissions, the warrant does not state probable cause. *See id.* at 156.

12          After conducting a de novo review, I accept Judge Leen's recommendation.  I modify her

13   recommendation only to reflect my ruling that the ruse was unconstitutional.  Accordingly, I

14   reject the Government's argument that the unconstitutional ruse was not material.  I also reject

15   the Government's argument that the remaining identified misrepresentations were not reckless or

16   material and accept Judge Leen's findings on these points.  I also overrule Phua's objection

17   asking me to go beyond Judge Leen's findings.  Both Judge Leen and I have found a material

18   omission and misrepresentations in the affidavit which, when corrected and supplemented,

19   render the warrant invalid for lack of probable cause.  Judge Leen made credibility

20   determinations that I am not inclined to countermand absent another evidentiary hearing before

21   me.  And because I find the warrant invalid, an evidentiary hearing and further findings are

22   unnecessary.  Evidence seized from villa 8882 pursuant to the search warrant is suppressed.

23   **V.  SUPPRESSION OF EVIDENCE RECOVERED IN VILLAS 8881 AND 8888**

24          Phua occupied only villa 8882.  He nevertheless raises two arguments to suppress

25   evidence seized in villas 8881 and 8888: (A) evidence seized in these rooms should be

26   suppressed under the "fruits of the poisonous tree" exclusionary doctrine, and (B) I should use

27   my supervisory authority to suppress this evidence given an alleged pattern of government

28   misconduct.

**A.  Suppression under the poisonous tree exclusionary doctrine**

Phua's poisonous tree argument appears to raise two theories for suppression: evidence seized from the two other villas is (1) fruit of the *Franks* violations and (2) fruit of the warrantless search of villa 8882 carried out under the ruse.

*1.  Suppression of fruits of <u>Franks</u> violations*

Phua argues I should suppress evidence seized in villas 8888 and 8881 because the warrants used to search those villas are fruits of the defective affidavit used to secure all three warrants.  Phua argues that the warrant to search villa 8882 is defective under *Franks* and that if the Government had not obtained the warrant for Phua's villa, it would not have sought warrants to search villas 8888 and 8881.  He argues that the evidence seized in villas 8888 and 8881 is therefore tainted by the defects in the warrant affidavit and should be suppressed as fruit of the poisonous tree.  Phua's argument is an amalgamation of the poisonous tree exclusionary doctrine and the law governing invalidation of a warrant under *Franks*.

Generally, a defendant must have a reasonable expectation of privacy to challenge a search under the Fourth Amendment; otherwise he lacks "standing" to challenge the search. *United States v. Salvucci*, 448 U.S. 83, 85 (1980); *United States v. Reyes-Bosque*, 596 F.3d 1017, 1026-27 (9th Cir. 2010).  "A person who is aggrieved by an illegal search and seizure . . . of a third person's premises or property has not had any of his Fourth Amendment rights infringed," and he therefore lacks standing to challenge that search. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

But under the poisonous tree doctrine, evidence found in a third party's premises is inadmissible if it was obtained as a direct result of an illegal search the defendant has standing to challenge. *See United States v. Santa Maria*, 15 F.3d 879, 883 (9th Cir. 1994).  Thus, if the government searches a third party's residence because of information it gained from an unconstitutional search of the defendant's residence, the defendant may challenge the derivative search even though he otherwise would lack standing to challenge it. *Salvucci*, 448 U.S. at 85; *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).  In other words, the defendant must have standing to challenge the underlying search, but he need not have standing to challenge the

derivative search. *Wong Sun*, 371 U.S. at 485.  Therefore, to use this doctrine, Phua must first identify a constitutional violation that he has standing to challenge, which constitutes the "poisonous tree," and then he must explain how evidence seized from villas 8888 and 8881 is the fruit of that constitutional violation.

Phua argues the *Franks* violations, consisting of defects in the warrant affidavit, constitute a poisonous tree requiring suppression of all evidence seized under the resulting warrants.  *Franks* provides a means for invalidating a warrant.  But it does not change the requirement that the defendant must have standing to challenge the search to move for suppression. *See Franks,* 438 U.S. at 155-56; *United States v. Mastromatteo*, 538 F.3d 535, 538, 544 (6th Cir. 2008) (affirming district court's decision to deny a *Franks* hearing because the defendant lacked standing to challenge warrant for property); *United States v. Guthrie*, 931 F.2d 564, 569 (9th Cir. 1991) (same).

The Government searched villas 8888 and 8881 without valid warrants, but Phua has no standing to challenge those searches.  Only the tenants of those units could directly challenge the searches based on invalid warrants.

The cases Phua relies on do not address using a *Franks* violation to suppress the fruits of a search the defendant otherwise has no standing to challenge. *See United States v. Siciliano*, 578 F.3d 61, 64 (1st Cir. 2009); *Murray v. United States*, 487 U.S. 533, 542 (1988).  Unlike Phua, the defendant in *Siciliano* had standing to challenge the derivative search because it was carried out in the defendant's home. 578 F.3d at 64.  *Siciliano* presents a common example of a proper application of the poisonous tree doctrine.  Police officers found drug paraphernalia in a defendant's home during an illegal search and then used that illegally seized evidence to obtain a warrant to search the defendant's home again. *Id.* at 64-68.  The First Circuit held that evidence found in the second search should be suppressed as poisonous fruit of the initial warrantless search. *Id.*  In *Murray*, the defendant likewise had standing to challenge the derivative search because he owned the premises. *See United States v. Moscatiello*, 771 F.2d 589, 601 (1st Cir. 1985) (finding defendants Murray and Carter had standing because they owned the warehouse through a close corporation).

1     Phua has failed to provide any authority or analysis explaining how defects in the warrant

2  affidavit to search villa 8882 provide him standing to challenge the searches of villas 8881 and

3  8888, given that he had no reasonable expectation of privacy in those other villas.  That all three

4  warrants were obtained through a single warrant affidavit does not give Phua standing to

5  challenge searches of villas in which he has no privacy interest.  Therefore, even though the

6  omissions and misrepresentations in the warrant affidavit invalidate the warrants under *Franks*,

7  Phua has no grounds to move for suppression of the evidence seized in villas 8888 and 8881 on

8  the basis of *Franks* violations.

9                    *2.  Suppression of evidence as fruits of an unconstitutional search*

10     Phua appears to also suggest in some of his briefing, filed after Judge Leen's

11  recommendations, that evidence seized from villas 8888 and 8881 should be suppressed as fruits

12  of the warrantless search of villa 8882, a search I have now found to be unconstitutional because

13  of the Government's ruse.  If the Government sought warrants and searched villas 8888 and 8881

14  as a direct result of what they found during their unconstitutional search of villa 8882, and they

15  did not have sufficient untainted sources of information to prompt these searches, Phua may have

16  grounds to move to suppress that evidence. *See Chandler v. U.S. Army*, 125 F.3d 1296, 1304 (9th

17  Cir. 1997); *see also United States v. Salas*, 879 F.2d 530, 538 (9th Cir. 1989).  The questions

18  would be whether the government's decision to seek the warrants and search villas 8888 and

19  8881 was prompted by what agents saw during the unconstitutional search of villa 8882, and

20  whether information obtained from that search was presented to the magistrate judge and

21  affected her decision to issue the warrants. *See Murray*, 487 U.S. at 542.

22     The parties have not fully addressed whether the searches and seizures in villas 8888 and

23  8881 resulted from what was found in the warrantless search of villa 8882.  The parties likely did

24  not do so because the defendants with standing to directly challenge the searches of those villas

25  were still in this case when the original motions were filed and because Judge Leen recommends

26  I find that the search of villa 8882 conducted during the ruse was constitutional.  Now that I have

27  found that search to be unconstitutional, if Phua believes the evidence seized in villas 8888 and

28  8881 are fruits of that unconstitutional search, he should file a new motion.

- 20 -

**B.  Suppression of evidence under the court's supervisory authority**

Also not properly before me at this time is whether I should suppress evidence seized in villas 8888 and 8881 under my supervisory authority.  Phua raised this argument for the first time in his response to the government's objection to Judge Leen's recommendation. (*See* Dkt. #430 at 18-24.)  I need not address arguments and evidence not raised before the magistrate judge, and I decline to do so at this time. *United States v. Howell*, 231 F.3d 615, 621 (9th Cir.2000); *see also Heilman v. Lyons*, No. 2:09-CV-2721 JAM KJN, 2012 WL 1455083, at *2 (E.D. Cal. Apr. 26, 2012).  As with his poisonous fruits argument based on the unconstitutional search, if Phua believes suppression is warranted under my supervisory authority, he should file a new motion.

## VI.  CONCLUSION

IT IS THEREFORE ORDERED that defendant Phua's motion to suppress (Dkt. #229) is granted, Phua's objections (Dkt. #418) are sustained in part, and I accept in part and modify in part Judge Leen's Report of Findings and Recommendation (Dkt. #407) as more fully set forth in this order.  All evidence seized from villa 8882 during the unconstitutional warrantless searches on July 4 and July 5, 2014 is suppressed.

IT IS FURTHER ORDERED that defendant Phua's motion to suppress (Dkt. #232) is granted, Phua's objections (Dkt. #419) and the Government's objections (Dkt. #420) are overruled, and I accept in part and modify in part Judge Leen's Report of Findings and Recommendation (Dkt. #406) as more fully set forth in this order.  All evidence seized from villa 8882 as a result of the search conducted pursuant to the search warrant is suppressed.

IT IS FURTHER ORDERED that any related motions to suppress based on arguments regarding the fruit of the poisonous tree doctrine or the court's supervisory authority must be filed within 14 days of entry of this order.

////

////

////

////

1         IT IS FURTHER ORDERED that defendant Phua's motion for leave to file sur-reply

2  (Dkt. #465) is denied and the sur-reply (Dkt. #466) is stricken.

3         DATED this 17th day of April, 2015.

4

5                                      ANDREW P. GORDON

6                                      UNITED STATES DISTRICT JUDGE

- 22 -